# 23-705

---

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

STEPHEN T. MITCHELL,

Plaintiff-Appellant,

-against-

THE STATE OF NEW YORK

Defendants-Appellees.

---

On Appeal from the United States District Court
For the Eastern District of New York

---

APPELLANT'S APPENDIX
VOLUME
1 of 2
by

Stephen T. Mitchell, Pro Se
461 Central Park West Apt. 6B
New York, N.Y. 10025
stm7615@aol.com

# TABLE OF CONTENTS

|  | Page(s) |
|---|---|
| Table of contents | i-ii |
| Civil Docket Sheet for case 1:22-cv-1747 | AP-1-5 |
| Notice of Appeal | AP-6 |
| -Memorandum and Order dated 3/31/23 | AP-7-14 |
| -Clerk's Judgment | AP-15 |
| Summons In a Civil Court Action for case 1:22-cv-1747 | AP-16-17 |
| Plaintiff's Affirmation of Service dated 4/29/22 | AP-18 |
| Plaintiff's Amended Petition and Complaint dated 4/6/22 with Exhibits: | AP-19-90 |

## Amended Complaint Exhibits

| | |
|---|---|
| -Kings County Supreme Court Indictment 4743-2010 | AP-91-94 |
| -In Re Charles Brown Guardianship Docket Sheet | AP-95-96 |
| -In Re Charles Brown Guardianship Bond | AP-97-102 |
| -In Re Charles Brown Guardianship Decision and Order dated 2/24/10 | AP-103-107 |
| -Estate of Charles Brown Decree Granting Probate | AP-108-109 |
| -Estate of Charles Brown Affidavit of Heirship | AP-110-112 |
| -Estate of Charles Brown Order Granting Probate dated 10/20/03 | AP-113-114 |
| -In Re Charles Brown Order Discharging Guardian dated 6/26/08 | AP-115-117 |
| -In Re Charles Brown Order Revoking Discharge of Guardian dated 2/24/10 | AP-118-120 |
| -People's Response to Defendant Singer and 14th Amendment Motion | AP-121-126 |
| -In Re Charles Brown Report of Guardian Ad Litem dated 3/9/09 | AP-127-132 |
| -Kings County DA Investigator Vincent Verlezza notes | AP-133-136 |
| -Minnie Simmons New York CPL §190.30(3) Affidavit | AP-137-138 |
| -Excerpts from Linda Simmons Grand Jury Testimony dated 7/8/2010 | AP-139-142 |
| -Excerpts from Linda Simmons Grand Jury Testimony dated 8/4/2010 | AP-143-146 |
| -Kings County Supreme Court Indictment 4743-2010 | AP-147-150 |
| -People's Motion for Conditional Exam of Minnie Simmons dated 10/7/10 | AP-151-157 |
| -Order Permitting Conditional Exam of Minnie Simmons dated 5/10/11 | AP-158-159 |
| -Transcript of Conditional Examination of Minnie Simmons dated 5/18/11 | AP-160-204 |
| -Excerpts of Defense Omnibus Motion dated 12/20/10 | AP-205-210 |
| -People's Response to Defendant's Omnibus Motion dated 2/1/11 | AP-211-226 |
| -Decision and Order for Indictment 4743-2010 dated 3/28/11 | AP-227-230 |
| -People's Voluntary Disclosure Form dated 10/5/10 | AP-231-235 |
| -People's Letter to Court to Memorialize Disclosures dated 11/22/11 | AP-236-238 |
| -Letter from Justice Pesce to Charles Emma dated 8/28/08 | AP-239-240 |
| Appellate Decision: Second Department Decision and Order dated 11/18/20 | AP-241-243 |
| New York Court of Appeals Denial of Leave to Appeal dated 3/31/21 | AP-244-245 |

| | |
|---|---|
| Defense Motion for Minnie Simmons Medical and Psychiatric Records | AP-246-263 |
| People's Opposition to Disclosure of Minnie Simmons Records | AP-264-270 |
| -Defense Reply to People's Opposition to Disclose M. Simmons Records | AP-271-288 |
| -Decision and Order for Indictment 4743-2010 dated 2/10/12 | AP-289-295 |
| -Defense Re-argument Motion for 2/10/12 Decision and Order dated 3/9/12 | AP-296-322 |
| -Decision and Order for Indictment 4743-2010 dated 4/9/12 | AP-323-324 |
| -Decision and Order for Indictment 4743-2010 dated 5/1/12 | AP-325-329 |
| -Letter to Justice Barry Kamins regarding limits of pre-trial disclosures | AP-331-336 |
| -Defense In Limine motion to preclude Minnie Simmons testimony | AP-337-351 |
| -Defense Singer motion | AP-352-373 |
| -People's Response to Defense Motion to Preclude Minnie Simmons | AP-374-406 |
| -People's Response to Defense Singer Motion | AP-407-442 |
| -Decision and Order for Indictment 4743-2010 dated 3/5/13 (Preclusion) | AP-443-444 |
| -Decision and Order for Indictment 4743-2010 dated 3/5/13 (Singer) | AP-445-446 |
| -Excerpts from 6/10/13 Pre-trial Hearing for Indictment 4743-2010 | AP-447-488 |
| -Excerpts from 6/11/13 Pre-trial Hearing for Indictment 4743-2010 | AP-489-508 |
| -Defense disclosure request letter to court dated 2/19/13 | AP-509-511 |
| -Defense disclosure request letter to court dated 4/12/13 | AP-512-513 |
| -Defense disclosure request letter to court dated 6/3/13 | AP-514-516 |
| -Handwritten objections to trial court rulings dated 6/18/13 | AP-517-520 |
| -Second set of handwritten objections to trial court rulings dated 6/18/13 | AP-521-522 |
| -People's Trial Witness List for Indictment 4743-2010 | AP-523-524 |
| -People's Response to Appellant Disclosure Request dated 9/4/14 | AP-525-529 |
| -People's Response to Appellant Disclosure Request dated 7/9/18 | AP-530-537 |
| -Excerpts of Peoples Affirmation dated 2/8/13 | AP-538-542 |
| -In re Charles Brown Guardianship Docket | AP-543-544 |
| -Decision and Order for Indictment 4743-2010 dated 5/23/14 | AP-545-546 |
| -Decision and Order for Indictment 4743-2010 dated 12/20/10 | AP-547-548 |
| -Decision and Order for Indictment 4743-2010 dated 9/3/14 | AP-549-550 |
| -Decision and Order for Indictment 4743-2010 dated 2/19/13 | AP-551-553 |
| -Ian Nelson Curricula Vitae | AP-554-555 |
| -Charles Emma, Esq. Notes | AP-556-557 |
| Letter request for signed subpoenas to Justice DiMango dated 4/21/12 | AP-558-564 |
| Letter regarding "Writ of Prohibition to Justice DiMango dated 10/22/12 | AP-565-569 |
| Letter to ADA Neubauer regarding disclosure requests dated 4/14/12 | AP-570-573 |
| Excerpts from the June 2013 trial of Indictment 4743-2010 | AP-574-701 |

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:22-cv-01747-LDH-LB

Mitchell v. The State of New York et al
Assigned to: Judge LaShann DeArcy Hall
Referred to: Magistrate Judge Lois Bloom
other Cases: 1:19-cv-03980-DC-LB
           1:22-cv-03791-DC-LB
related Cases: 1:23-cv-04465-DC-LB
           1:23-cv-04466-LDH-LB
Cause: 42:1983 Civil Rights Act

Date Filed: 03/30/2022
Date Terminated: 03/31/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Stephen T. Mitchell**

represented by **Stephen T. Mitchell**
461 Central Park West
# 6B
New York, NY 10025
Email: STM7615@AOL.COM
PRO SE

V.

**Defendant**

**The State of New York**

represented by **Ian Ramage**
NYS Office of The Attorney General
Litigation Bureau
28 Liberty Street
18th Floor
New York, NY 10005
212-416-8659
Email: ian.ramage@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Letitia James**
*the Attorney General for the State of New York*

represented by **Ian Ramage**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2022 | 1 | COMPLAINT against All Defendants, filed by Stephen T. Mitchell. (Attachments: # 1 Civil Cover Sheet) (Bowens, Priscilla) (Additional attachment(s) added on |

| | | 4/1/2022: # 2 Envelope) (Bowens, Priscilla). (Entered: 03/31/2022) |
|---|---|---|
| 03/31/2022 | 2 | Summons Issued as to All Defendants. (Bowens, Priscilla) (Entered: 03/31/2022) |
| 03/31/2022 | 3 | FILING FEE: $ 402.00, receipt number 4653164145 (Bowens, Priscilla) (Entered: 03/31/2022) |
| 03/31/2022 | 4 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.** (Bowens, Priscilla) (Entered: 03/31/2022) |
| 04/06/2022 | 6 | Letter dtd. 1/14/2022 filed by Pltff. Stephen T. Mitchell to Clerk, advising to apt. number info. to his address (already updated) and that he delivered a motion to amend along with exhibits. Further requesting a copy of the docket, summons and stamped copy of his amended complaint once all documents are filed on the court's docket. (Layne, Monique) (Entered: 04/07/2022) |
| 04/06/2022 | 7 | AMENDED COMPLAINT against Letitia James, The State of New York, filed by Stephen T. Mitchell. (Attachments: # 1 Exh 1-15, # 2 Exh 16-20, # 3 Exh 21-27, # 4 Exh 28-35, # 5 Exh 36-41, # 6 Exh 49-50, # 7 Exh 51-62, # 8 Exh 63-71, # 9 Final Exh) (Layne, Monique) (Entered: 04/07/2022) |
| 04/07/2022 | 5 | ORDER: The Honorable LaShann DeArcy Hall assigned this case to me for all pretrial purposes. Enclosed is a copy of the "Individual Practices of Magistrate Judge Lois Bloom." Plaintiff and defendants, alike, are required to follow these rules. Plaintiff is to provide a copy of this Order and the enclosed rules to defendants along with the summons and complaint.<br><br>Plaintiff shall have 90 days from the filing of the Complaint to serve defendant and file proof of service with the Court. Fed. R. Civ. P. 4(m). Accordingly, if proper service is not made upon defendants by June 28, 2022, or if plaintiff fails to show good cause why such service has not been effected by that date, it will be recommended that the Court should dismiss this action without prejudice. See attached Order. Ordered by Magistrate Judge Lois Bloom on 4/7/2022. (Yindra, Hannah) (Entered: 04/07/2022) |
| 04/29/2022 | 8 | SUMMONS Returned Executed by Stephen T. Mitchell. Letitia James served on 4/22/2022, answer due 5/13/2022; The State of New York served on 4/22/2022, answer due 5/13/2022. (Layne, Monique) (Entered: 04/29/2022) |
| 05/09/2022 | 9 | NOTICE of Appearance by Ian Ramage on behalf of Letitia James, The State of New York (aty to be noticed) (Ramage, Ian) (Entered: 05/09/2022) |
| 05/09/2022 | 10 | Letter MOTION for Extension of Time to File Answer *or otherwise respond to Plaintiff's Amended Complaint* by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 05/09/2022) |

| 05/10/2022 | 11 | ORDER: Defendants request an extension of time to respond to the Complaint. ECF No. 10 . Defendants did not seek plaintiff's consent. In the future, they must do so. However, as this is a first request for an extension which is generally granted as a courtesy, the request is granted. Defendants shall respond to plaintiff's complaint by July 8, 2022. See attached Order. Ordered by Magistrate Judge Lois Bloom on 5/10/2022. (Yindra, Hannah) (Entered: 05/10/2022) |
|---|---|---|
| 07/08/2022 | 12 | Letter MOTION for pre motion conference *to discuss Defendants' proposed Motion to Dismiss* by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 07/08/2022) |
| 07/13/2022 | 13 | RESPONSE to 12 Letter MOTION for pre motion conference *to discuss Defendants' proposed Motion to Dismiss* filed by pltff. Stephen T. Mitchell. (Layne, Monique) (Entered: 07/13/2022) |
| 07/22/2022 | | ORDER: Defendants letter-motion 12 for a pre-motion conference on its anticipated motion to dismiss Plaintiff's complaint is GRANTED. The Court will hold a pre-motion conference via telephone conference on August 3, 2022, at 9:00 a.m. The parties are directed to call chambers on August 3, 2022, at 9:00 a.m. using the following conference line and dial-in information: toll free number 1-888-684-8852; access code 1537693. Ordered by Judge LaShann DeArcy Hall on 7/22/2022. (Williams, Erica) (Entered: 07/22/2022) |
| 08/02/2022 | | SCHEDULING ORDER: The pre-motion conference scheduled for August 3, 2022 is ADJOURNED sine die. Defendant shall serve Plaintiff with their motion and supporting papers by August 15, 2022. Plaintiff shall serve Defendant with his opposition and supporting papers by September 5, 2022. Defendant shall serve Plaintiff with their reply, if any, and file the fully briefed motion by September 12, 2022. As a courtesy, unless objected to by the parties, the Court asks that the parties file the motion only once it is fully briefed. Defendant shall provide the Court with a courtesy copy of the filed, stamped, fully briefed motion, within two business days of filing. Memoranda of law and courtesy copies shall comply with this Court's Individual Practices. Defendant is directed to serve Plaintiff with full texts of the Court's Individual Practices and Rules. The Clerk of Court is respectfully requested to serve a copy of this Order on the pro se litigant. Ordered by Judge LaShann DeArcy Hall on 8/2/2022. (Williams, Erica) (Entered: 08/02/2022) |
| 08/02/2022 | 14 | *Pro Se* Consent to Electronic Notification; filed by Stephen T. Mitchell, dated 8/2/2022. *(Plaintiff's E-mail Address: STM7615@AOL.COM)* (Latka-Mucha, Wieslawa) (Entered: 08/03/2022) |
| 08/03/2022 | | Email Notification Test - DO NOT REPLY. (Latka-Mucha, Wieslawa) (Entered: 08/03/2022) |
| 08/08/2022 | 15 | Letter MOTION for Extension of Time to File *Defendants' Motion to Dismiss* by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 08/08/2022) |
| 08/15/2022 | | ORDER: Defendants motion 15 for an extension of time to file their motion to dismiss, made with Plaintiffs consent, is GRANTED. Defendants shall serve Plaintiff with their motion and supporting papers by August 29, 2022. Plaintiff shall serve Defendants with his opposition and supporting papers by September 19, 2022. Defendants shall serve Plaintiff with their reply, if any, and file the fully briefed motion by September 26, 2022. As a courtesy, unless objected to by the parties, the |

Case 23-705, Document 31, 07/21/2023, 3547452, Page7 of 333

| | | Court asks that the parties file the motion only once it is fully briefed. Defendants shall provide the Court with a courtesy copy of the filed, stamped, fully briefed motion, within two business days of filing. Memoranda of law and courtesy copies shall comply with this Court's Individual Practices. Defendants are directed to serve Plaintiff with full texts of the Court's Individual Practices and Rules. The Clerk of Court is respectfully requested to serve a copy of this Order on the pro se litigant. Ordered by Judge LaShann DeArcy Hall on 8/15/2022. (Williams, Erica) (Entered: 08/15/2022) |
|---|---|---|
| 09/26/2022 | 16 | Notice of MOTION to Dismiss for Failure to State a Claim by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 09/26/2022) |
| 09/26/2022 | 17 | MEMORANDUM in Support re 16 Notice of MOTION to Dismiss for Failure to State a Claim filed by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 09/26/2022) |
| 09/26/2022 | 18 | RESPONSE in Opposition re 16 Notice of MOTION to Dismiss for Failure to State a Claim filed by Letitia James, The State of New York. (Ramage, Ian) (Entered: 09/26/2022) |
| 09/26/2022 | 19 | REPLY in Support re 16 Notice of MOTION to Dismiss for Failure to State a Claim filed by Letitia James, The State of New York. (Attachments: # 1 Affidavit Affirmation of Service) (Ramage, Ian) (Entered: 09/26/2022) |
| 10/05/2022 | 20 | Letter MOTION to Amend/Correct/Supplement 1 Complaint *(Asking this court for permission to move to amend the complaint to include Eric Gonzalez, Esq., the Kings County District Attorney, and the Kings County District Attorney Office as defendants)* by Stephen T. Mitchell. (ML) (Entered: 10/07/2022) |
| 03/31/2023 | 21 | MEMORANDUM AND ORDER: For the reasons stated in the attached memorandum and order, Defendants' motion to dismiss 16 for lack of subject matter jurisdiction is GRANTED. Plaintiff's motion 20 to amend the complaint is DENIED. The Clerk of Court is respectfully directed to enter judgment and close the case. Ordered by Judge LaShann DeArcy Hall on 3/31/2023. (CG) (Entered: 03/31/2023) |
| 03/31/2023 | 22 | CLERK'S JUDGMENT: That the Defendants' motion to dismiss is granted; and Plaintiff's motion to amend the complaint is denied. Signed by Brenna B. Mahoney, Clerk of Court by J. Poveda, Deputy Clerk on 3/31/2023. (ML) (Entered: 03/31/2023) |
| 04/21/2023 | 23 | NOTICE OF APPEAL as to 21 Order on Motion to Dismiss for Failure to State a Claim,, Order on Motion to Amend/Correct/Supplement, 22 Clerk's Judgment by Stephen T. Mitchell. (VJ) (Entered: 04/24/2023) |
| 04/21/2023 | | APPEAL FILING FEE DUE re 23 Notice of Appeal Payment in the amount of $505.00, can be made in person to the clerks office, or mailed in or paid online with the event *Civil Case Appeal Filing Fee*. (VJ) (Entered: 04/24/2023) |
| 04/24/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 23 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 04/24/2023) |

Case 23-705, Document 31, 07/24/2023, 3547452, Page8 of 333

| 04/24/2023 | 24 | USCA Appeal Fees received $ 505 receipt number 100006403 re 23 Notice of Appeal filed by Stephen T. Mitchell (VJ) (Entered: 04/24/2023) |
| 04/24/2023 | | Supplemental Electronic Index to Record on Appeal sent to US Court of Appeals. 23 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 04/24/2023) |

RECEIVED IN PRO SE
APR 21 2023 @ 12:54 PM
VIA BOX.COM

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---

Stephen T. Mitchell,

Plaintiff,

·AGAINST·

The State of New York and

Letitia James,

Attorney General of the State of New York

Defendants.

NOTICE

OF

APPEAL

22-cv-1747

(LDH)(LB)

---

NOTICE OF APPEAL
TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Notice is hereby given that Stephen T. Mitchell, the Plaintiff, hereby appeals to the United States Court of Appeals for the Second Circuit from a final judgment the District Court entered in this action granting the Defendants' motion to dismiss and denying the Plaintiff's motion to amend on the 31st day of March 2023.

April 21, 2023

Respectfully submitted,

Stephen T. Mitchell
*Pro Se*
461 Central Park West, Apt. 6B
New York, NY 10025
slm7615@aol.com

CERTIFICATE OF SERVICE

I hereby certify that it is my knowledge and understanding that counsel for the Respondent, Assistant Attorney General, Ian Ramage, Esq., is a participant in the Court's CM/ECF program and that separate service of the foregoing document is not required beyond the Notification of Electronic Filing to be forwarded on April 21, 2023 upon The filing of the foregoing document.

Stephen T. Mitchell,
*Pro Se*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN T. MITCHELL,

Plaintiff,

v.

NEW YORK STATE, and LETITIA JAMES,
Attorney General of the State Of New York,

Defendants.

**MEMORANDUM AND ORDER**

22-CV-1747 (LDH) (LB)

LASHANN DEARCY HALL, United States District Judge:

Stephen T. Mitchell ("Plaintiff"), proceeding pro se, brings the instant action against Defendants the State of New York and Letitia James ("Defendants") pursuant to 42 U.S.C. § 1983, alleging violations of his Fifth, Sixth, and Fourteenth Amendment rights. Defendants move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint in its entirety.

## BACKGROUND[1]

On October 5, 2010, Plaintiff was arrested and charged with Grand Larceny in the Second Degree in the Supreme Court of the State of New York, Kings County. (Am. Compl. ¶ 5, ECF No. 7; Am. Compl. Ex. 23, ECF No. 7-3.) Plaintiff pleaded not guilty. (Am. Compl. ¶ 5.) Plaintiff alleges that at different points during the pre-trial, trial, and post-trial proceedings, state judicial officers and prosecutors knowingly violated Plaintiff's constitutional rights. (*Id.* ¶¶ 20, 25.) Specifically, Plaintiff claims that the indictment "was procured by fraud because [prosecutors] knowingly allowed false testimony regarding the mental capabilities of [a witness] to be presented to the grand jurors." (*Id.* ¶¶ 12–13.) Plaintiff further alleges that the trial court

---

[1] The following facts are taken from the amended complaint (ECF No. 7) and are assumed to be true for the purpose of this motion.

denied him the opportunity to testify and to be heard in his own defense; allowed a witness to provide false testimony against him regarding material issues during the trial; and denied him the right to cross-examine a witness. (*Id.* ¶¶ 28–32.) After the trial, Plaintiff was convicted of Grand Larceny in the Second Degree. (*Id.* ¶ 16.) Plaintiff has exhausted his state court appeals. (*Id.* ¶ 18.)

## STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of establishing beyond a preponderance of the evidence that subject matter jurisdiction exists. *Id.* "In reviewing a Rule 12(b)(1) motion to dismiss, the court '"must accept as true all material factual allegations in the complaint, but [the court is] not to draw inferences from the complaint favorable to plaintiff[ ].'" *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184, 190 (E.D.N.Y. 2013) (citing *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir.2004)). Further "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

Moreover, where, as here, a plaintiff is proceeding pro se, his pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). A pro se complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)). This rule is "particularly so when the pro se plaintiff alleges that [his] civil rights have

been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Still, "even pro se plaintiffs asserting civil right[s] claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I.    Article III Standing

Defendants argue that Plaintiff does not have standing to assert his claims. (Defs.' Mem. Supp. of Mot. to Dismiss ("Defs.' Mem.") at 4–5, ECF No. 17.) Specifically, Defendants contend that Plaintiff failed to establish that Defendants caused his alleged injuries or that Defendants can provide the requested relief. (*Id.*) The Court agrees.

To establish standing, a plaintiff must show: (i) a concrete and particularized, and actual or imminent, invasion of a legally protected interest; (ii) a causal connection between the invasion and the alleged injury; and (iii) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Critically, any alleged injury must be fairly traceable to the challenged action of the defendant and not the result of an independent action of some third party not before the court. *See N.Y. Coastal P'ship, Inc. v. U.S. Dep't. of Interior*, 341 F.3d 112, 116 (2d Cir. 2003). Further, it must be "likely," and not "speculative," that the alleged injury will be redressed by a favorable decision of the court. *Lujan*, 504 U.S. at 560–61. In addition, when a plaintiff seeks injunctive or declaratory relief, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [he] will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir.

3

1998) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)). Plaintiff's amended complaint fails to satisfy any of these requirements.

*First*, Plaintiff claims that the New York State courts and certain unnamed New York state prosecutors violated his constitutional rights. (Am. Compl. ¶¶ 11, 19–21, 30–36, 360–61, 378.) However, Plaintiff names only the State of New York and Letitia James, New York's Attorney General, as Defendants. Unsurprisingly, there are no allegations of conduct attributable to the State of New York, and Attorney General James is mentioned only twice in the amended complaint—once in the caption and once in Paragraph Two identifying her as a defendant. (Am. Compl. ¶ 2.) There are simply no allegations that might allow the Court to find that Plaintiff's alleged injury is traceable to either Defendant. (*See generally* Am. Compl.)

*Second*, the amended complaint is devoid of any allegation that might establish the requisite redressability of Plaintiff's claims. Redressability focuses "on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). To satisfy the redressability requirement, a plaintiff must demonstrate that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Id.* at 273–74 (internal quotation marks and citation omitted). Here, Plaintiff asks the Court "to grant relief pursuant to 42 U.S.C. § 1983 in the same manner as if the Plaintiff-Petitioner was successful with a 28 U.S.C. § 2254 application." (Am. Compl. at p.71.) Among other things, Plaintiff seeks an order directing the state court to order a new trial and directing Defendants to vacate and expunge his conviction.[2] (*Id.* ¶ 24.) However, Sections 2254 and 1983 are not interchangeable. "In order for a federal court to have jurisdiction over a [Section 2254] habeas petition, the petitioner must be 'in

---

[2] Plaintiff also requests that the Court expunge his criminal conviction. (Am. Compl. ¶¶ 24, 37.) However, the Court is unaware of a mechanism under New York law that would allow for a criminal record to be expunged.

custody pursuant to the judgment of a State court" at the time the petition is filed." *Vega v. Schneiderman*, 861 F.3d 72, 74 (2d Cir. 2017) (quoting 28 U.S.C. § 2254(a)). Because Plaintiff asserts that he is "no longer [] within the custody and control of the State of New York," habeas relief is not available to him and such relief cannot be granted pursuant to Section 1983. (Am. Compl. ¶ 4.) *See Teichmann v. New York*, 769 F.3d 821 (2d Cir. 2014) (finding that "while broad in its equitable and legal remedies—[Section 1983] does not recognize a declaration of innocence, standing alone, as a cognizable form of relief.")

*Third*, Plaintiff seeks declaratory and injunctive relief based only upon past injures. Specifically, Plaintiff alleges constitutional violations that occurred during his state court criminal trial. (Am. Compl. ¶¶ 20, 25.) But, again, when a plaintiff seeks injunctive or declaratory relief, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [he] will be injured in the future." *Deshawn E. by Charlotte E.*, 156 F.3d at 344.

Simply put, Plaintiff lacks standing.

## II.   Immunity

Even if Plaintiff had established standing to bring his claim, his amended complaint would nonetheless be dismissed under sovereign immunity. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity[.]" *See Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted). Eleventh Amendment immunity also extends to "state officials acting in their official capacities." *Huang v. Johnson*, 251 F.3d 65, 70 (2d Cir. 2001). Because Plaintiff has offered no evidence that New York State consented to be subject to suit in this context, or

5

that its immunity has been otherwise abrogated, the State of New York and Attorney General

James are plainly entitled to sovereign immunity.

Conceivably, under the *Ex Parte Young* exception, a plaintiff may bring "'a suit [for

injunctive relief] challenging the constitutionality of a state official's actions in enforcing state

law' under the theory that such a suit is not 'one against the State,' and therefore [is] not barred

by the Eleventh Amendment." *CSX Transp., Inc. v. N.Y. Off. Real Prop. Servs.*, 306 F.3d 87, 98

(2d Cir. 2002) (quoting *Ex Parte Young*, 209 U.S. 123, 154 (1908)). But to do so, the complaint

must both allege an ongoing violation of federal law and seek relief properly characterized as

prospective. *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007). Further, a

plaintiff must show that the "state officer against whom a suit is brought '[has] some connection

with the enforcement of the act' that is in continued violation of federal law." *In re Dairy Mart

Convenience Stores, Inc.*, 411 F.3d 367, 372–73 (2d Cir. 2005) (quoting *Ex Parte Young*, 209

U.S. at 154). Plaintiff's complaint fails to meet any of these elements.[3] Clearly there is no

ongoing violation of federal law because Plaintiff alleges constitutional violations that occurred

during his state court criminal trial. And, the relief he seeks is purely retrospective because he

seeks to overturn his past criminal conviction. (Am. Compl. at p. 71.) Courts have dismissed

claims seeking this exact type of relief against state officers. *See, e.g., Molina v. James*, No. 21-

CV-3144, 2022 WL 813815, at *5 (E.D.N.Y. Mar. 17, 2022) (dismissing plaintiff's claim for

injunctive relief against Attorney General James seeking an order directing defendants to vacate

---

[3] Plaintiff filed a letter on October 5, 2022 requesting that the Court allow him to file his second amended complaint to include Eric Gonzalez, Esq., the Kings County District Attorney, and the Kings County District Attorney's Office as defendants. (*See* ECF No. 20.) Plaintiff's request is denied. Even if the Court granted Plaintiff leave to amend and add these Defendants, suit against these Defendants are similarly barred under the Eleventh Amendment. *See, e.g., Burris v. Nassau Cnty. Dist. Att'y*, No. 14-CV-5540, 2017 WL 9485714, at *4 (E.D.N.Y. Jan. 12, 2017) (collecting cases establishing that it is well settled in the Second Circuit that § 1983 suits against a district attorney in his official capacity and a district attorney's office are barred by the Eleventh Amendment because prosecutorial decisions made by both entities are made in a quasi-judicial capacity, and thus they represent the state, not the county). In other words, such an amendment would be futile.

6

his state criminal judgment, in part, because this relief was retrospective, which plaintiff could not rely on to use the *Ex Parte Young* exception). In addition, Plaintiff fails to allege how Attorney General James participated in or was connected to the violative conduct. Therefore, the *Ex Parte Young* exception does not apply to Attorney General James.

### III.   *Rooker-Feldman* Doctrine

Plaintiff's claims are also barred by the *Rooker-Feldman* doctrine. Under the *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." *Sung Cho v. City of New York*, 910 F.3d 639, 644 (2d Cir. 2018) (citation omitted). That is, because "federal district courts are granted original—and not appellate—jurisdiction, cases that function as *de facto* appeals of state-court judgments are therefore jurisdictionally barred." *Id.* The *Rooker-Feldman* doctrine is properly invoked where: "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced." *Id.* at 645. Here, all four factors are met. Plaintiff complains that he was "unconstitutionally convicted and incarcerated," after a state court trial in 2014—almost nine years prior to the commencement of this action. (Am. Compl. ¶¶ 16, 21.) Because Plaintiff challenges the validity of his state court criminal conviction, he necessarily invites the Court to review the judgment of conviction. (*Id.* ¶¶ 16, 20, 24 and ECF p. 71.) Dismissal is warranted. *See Molina*, 2022 WL 813815, at *5 (dismissing plaintiff's request for an injunction to dismiss his criminal conviction as barred by the *Rooker-Feldman* doctrine).[4]

---

[4] Although Defendants raise arguments for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, in light of the findings set forth above, the Court need not reach those arguments.

7

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

SO ORDERED.

Dated:  Brooklyn, New York
        March 31, 2023

/s/ LDH
LaSHANN DeARCY HALL
United States District Judge

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
STEPHEN T. MITCHELL,

                      Plaintiff                        JUDGMENT

       v.                                      22-CV-1747 (LDH) (LB)

NEW YORK STATE, and LETITIA JAMES,
Attorney General of the State Of New York,

                        Defendants.
----------------------------------------------------------------X
      A Memorandum and Order of the Honorable LaShann DeArcy Hall, United States

District Judge, having been filed on March 31, 2023, granting Defendants' motion to dismiss;

and denying Plaintiff's motion to amend the complaint; it is

      ORDERED and ADJUDGED that the Defendants' motion to dismiss is granted; and

Plaintiff's motion to amend the complaint is denied.

Dated: Brooklyn, New York                  Brenna B. Mahoney
       March 31, 2023                    Clerk of Court

                                  By:     */s/Jalitza Poveda*
                                       Deputy Clerk

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York

| | |
|---|---|
| Stephen T. Mitchell | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No.  22-cv-1747(LDH)(LB) |
| The State of New York, Leticia James, Attorney General New York, Kings County; NY State Attorney General | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  New York State Attorney General Office
55 Hansen Place, #1080
Brooklyn,. NY 11217

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Pro Se Plaintiff
Stephen T. Mitchell
461 Central Park West
New York, NY 10025

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

BRENNA B. MAHONEY

_CLERK OF COURT_

Date: _____03/31/2022_____          _s/ Giselle Almonte_
                                        _Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  22-cv-1747(LDH)(LB)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                          *Server's signature*

                                 _____
                                          *Printed name and title*

                                 _____
                                          *Server's address*

Additional information regarding attempted service, etc:

FILED
in the Clerk's Office
U.S. District Court, EDNY
April 29, 2022
10:04AM
Brooklyn Pro Se Office via
Box.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Stephen T. Mitchell,

                                          Plaintiff,                    Affirmation of Service

                    ·AGAINST·

The State of New York and

Letitia James,                                                        22·CV·1747 (LDH)

Attorney General of the State of New York

                                          Defendants.

I, Stephen T. Mitchell, under the penalties of perjury pursuant to 28 U.S.C. §1746 do hereby affirm that I served a copy of an original habeas corpus/42 U.S.C. §1983 complaint filed with the Eastern District of New York on March 30, 2022 with exhibits, a copy of an amended habeas corpus/42 U.S.C. §1983 complaint filed with the Eastern District of New York on April 6, 2022, and a Summons issued by the Eastern District of New York on March 31, 2022 by mailing copies of the aforesaid materials via the United States Postal Service by return receipt mail to the following individuals and entities on April 22, 2022:

Letitia James, Esq.
Attorney General for the
State of New York

And

The State of New York
at

55 Hanson Place #1080
Brooklyn, NY 11217

April 29, 2022

Stephen T. Mitchell





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Stephen T. Mitchell,

                                        Plaintiff,

·AGAINST·

The State of New York and

Letitia James,

Attorney General of the State of New York

                                        Defendants.

AMENDED
PETITION AND
COMPLAINT

Docket: 22·CV·1747

## THE PLAINTIFF·PETITIONER

1. The plaintiff·petitioner is Stephen T. Mitchell, an African·American former attorney who was licensed practice law in the State of New York.

## THE DEFENDANTS

2. The defendant·respondents are the State of New York and Letitia James, the Attorney General for the State of New York.

## PROCEDURAL HISTORY FOR THE
## HABEAS CORPUS APPLICATION

3. These papers represent a complaint and petition for habeas corpus relief pursuant to 42 U.S.C. §1983 in lieu of 28 U.S.C. §2254(d)(1) and 28 U.S.C. §2254(d)(2).

A TRUE COPY
ATTEST
DATE July 19th 20 23
BRENNA B. MAHONEY
                                CLERK
BY
        DEPUTY CLERK

1

4. This petition is brought pursuant to 42 U.S.C. §1983 in lieu of a federal habeas corpus petition pursuant 28 U.S.C. §2254(d)(1) and 28 U.S.C. §2254(d)(2) because the plaintiff-petitioner no longer is within the custody and control of the State of New York.  The plaintiff-petitioner was discharged from state parole supervision on June 17, 2020.

5. The petitioner was indicted in August 2010.[1] He was arrested and arraigned in September 2010.[2] He pled not guilty at his arraignment and has maintained that he is not guilty throughout all judicial proceedings.

6. Pre-trial proceedings lasted nearly three years.  Among the most prominent motions were the defendant's omnibus motion in December 2010. The omnibus motion contained a general request and a specific request for Brady material.[3]

7. The pre-trial proceedings also included the successful effort by the People to move pursuant to New York Criminal Procedure Article 660 for the Conditional Examination of one of the People's principal grand jury witnesses, Minnie Simmons.[4]

8. The pre-trial proceedings also included unsuccessful efforts by the defense to re-open the conditional examination of Minnie Simmons and obtain her medical and psychiatric records prior to the re-opened conditional examination.[5]

9. The pre-trial proceedings include a motion In Limine to preclude Minnie Simmons as a witness at trial.[6]

---

[1] See Exhibit 1.
[2] See Exhibit 23.
[3] See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Exhibit 20 at Affirmation pages 1, 4 and Demand to Produce at pages 8, 9.
[4] See Exhibits 17, 18.
[5] See Exhibits 28, 29, 30, 31, 32, 33, 34, 35.
[6] See Exhibits 36, 38, 40.

2

10. The defense also propounded a motion, pursuant to <u>People v. Singer</u>, that sought to dismiss the case because of pre-indictment delay.[7]

11. The habeas petitioner contended the state prosecutors violated his Fourteenth Amendment rights, in bad faith, by allowing Minnie Simmons memories of her decisions regarding her stewardship of the Guardianship and Estate of Charles Brown to fade in order to enhance the People's prospects of obtaining a conviction.[8]

12. In October 2012 the habeas petitioner sought to challenge the unlawful and unconstitutional nature of the grand jury proceedings for this case by means of a Writ of Prohibition.

13. The petitioner alleged the indictment was procured by fraud because the People knowingly allowed false testimony regarding the mental capabilities of Minnie Simmons to be presented to the grand jurors.

14. The Supreme Court of the State of New York Appellate Division: Second Department denied the writ application on November 28, 2012 after a review of both parties' briefs.[9]

15. The Court of Appeals of the State of New York denied leave for the habeas petitioner's October 2012 writ application on February 19, 2013.[10]

16. The pre-trial hearings and the trial began by early June 2013. The habeas petitioner was convicted after trial on June 24, 2013 and sentenced May 23, 2014. A Notice of Appeal timely was filed on June 9, 2014.

---

[7] See <u>People v. Singer</u>, 44 N.Y.2d 241, 253-255 (1978); see also <u>United States v. Marion</u>, 404 U.S. 307, 320, 324 (1971); <u>United States v. Lovasco</u>, 431 U.S. 783, 788-795 (1977); <u>Arizona v. Youngblood</u>, 488 U.S. 51, 56-58 (1988); Exhibits 37, 39, 41.
[8] See Exhibits 37, 39, 41.
[9] See Exhibits 42, 43, 44, 45.
[10] See Exhibit 46.

3

17. On November 18, 2020 the Supreme Court of the State of New York Appellate Division: Second Department denied the habeas petitioner all relief he sought on appeal.[11]

18. On March 31, 2021 the Court of Appeals of the State of New York exhausted all of the plaintiff-petitioner's state court appeals for this case by refusing to grant leave to appeal.[12]

## CAUSES OF ACTION

19. This action has been brought for declaratory and injunctive relief to redress the deprivation of rights secured to the plaintiff-petitioner, Stephen T. Mitchell, pursuant to the federal constitution and 42 U.S.C. §1983.  This matter has been brought pursuant to 42 U.S.C. §1983 in lieu of an action pursuant to 28 U.S.C. §2254 because federal habeas corpus, likely, is not a remedy available to the plaintiff because he is no longer "in custody or control" in accord with the provisions of 28 U.S.C. §2254.

20. The plaintiff-petitioner alleges that the State of New York, through state actors, unreasonably violated his Fifth, Sixth, and Fourteenth Amendment rights afforded him pursuant to the United States Constitution during pre-trial, trial, and post-trial determinations made by the New York State courts, agents of the New York State courts, and New York State prosecutors.  The aforesaid determinations resulted in the denial of the plaintiff-petitioner's federal constitutional right to Due Process of Law, a fair trial, and his federal constitutional right to confront witnesses against him.

21. Plaintiff-petitioner was unconstitutionally convicted and incarcerated, after trial, for one count of Larceny in the Second Degree.  The imposition by the

---

[11] See Exhibit 26
[12] See Exhibit 27

4

state courts of radical rulings that were unreasonable and contrary to well settled United States Supreme Court law egregiously violated the most fundamental of the plaintiff-petitioner's federal constitutional rights.

## JURISDICTION

22. Jurisdiction over this action is conferred upon this court pursuant to 28 U.S.C. §§1343(3) and 1343(4) conferring original jurisdiction upon this court of any civil action to secure equitable relief under any Act of Congress providing for the protection of civil rights, under the Declaratory Judgement Statute, 22 U.S.C. § 2201, and pursuant to 42 U.S.C. §1983.

## VENUE

23. Venue is appropriate in the Eastern District of New York pursuant to 28 U.S.C. §1391(b) and (c) because the defendants are located in this judicial district, a substantial part of the plaintiff's claims have emerged from the district, and all of the defendants have sufficient contacts to be subject to personal jurisdiction in the district.

## RELIEF SOUGHT

24. The plaintiff-petitioner seeks injunctive and declaratory relief pursuant to 42 U.S.C. §1983 to expunge the conviction because of the State of New York's egregious and unreasonable violations of his fundamental federal constitutional rights. In the alternative, the plaintiff-petitioner seeks an order from this court directing the state court to order a new trial, forthwith.

## PRELIMINARY STATEMENT

25. The petitioner-complainant in this case has maintained throughout all judicial proceedings that he is not guilty of the charge. He is entitled to the relief sought because state judicial officers and state prosecutors knowingly engaged

in some of the worst federal constitutional violations possible against the accused.

26. The federal constitution entitles every person accused of a crime a meaningful opportunity to present a complete defense.[13] The United States Supreme Court has determined that the right to a meaningful opportunity to present a complete defense includes, at a minimum, an opportunity for the accused to be heard in his own defense, including the right to examine witnesses against him and to offer testimony in his favor.[14]

27. This case concerns allegations of theft by the accused from an estate. The People's chief witness against the accused was Michael Pesce, a former Justice of the Kings County Supreme Court.

28. At trial the court deliberately sought to deny the accused every semblance of an opportunity to be heard in his own defense. The trial court deliberately denied the accused his federal constitutional right to a meaningful defense in order to spare the reputation of a judicial colleague.

29. Michael Pesce, a former Justice of the Kings County Supreme Court, knowingly testified falsely regarding material issues during the trial in order to aid the prosecution.[15]

30. The state prosecutors knowingly used Justice Pesce's materially false testimony to advance and win a conviction in clear violation of the Sixth and Fourteenth Amendment rights of the accused. Further, the state prosecutors

---

[13] Crane v. Kentucky, 476 U.S. 683, 690 (1986).
[14] In re Oliver, 333 U.S. 257, 273 (1948); Pointer v. Texas, 380 U.S. 400, 403-408 (1965); Chambers v. Mississippi, 410 U.S. 284, 294, 302-303 (1973); Davis v. Alaska, 415 U.S. 308, 315-318 (1974).
[15] Compare In the Matter of Brown, No. 107103-99 at 2 (Supreme Court, Kings County, February 24, 2010) with Trial Record at 611, 658, 900, 1115-1116.

refused to correct known false material testimony proffered by Justice Pesce during the trial in violation of the Fourteenth Amendment.[16]

31. The trial court's allegiance to Justice Pesce was far greater than his to the proper enforcement of the federal constitution. The court deliberately allowed his judicial colleague to testify falsely during the trial and denied the cross-examination of Justice Pesce regarding material issues pertinent to the outcome of the case.[17]

32. The trial court denied the petitioner the most fundamental of his Sixth and Fourteenth Amendment rights to confront the materially false testimony proffered by Justice Pesce through cross-examination or the admission of a state court order that would have impeached Justice Pesce's materially false testimony.[18]

33. Further, the trial court refused properly to charge essential components of New York Estate, Powers, and Trust Law notwithstanding the fact that the case concerned an alleged theft from an estate.[19]  Instead, the trial court allowed Justice Pesce to testify falsely that he had the jurisdictional authority to determine the use of the proceeds of the Estate of Charles Brown knowing he had no such authority.[20]

34. The trial court repeatedly allowed his colleague falsely to testify that the underlying matter concerned a guardianship and that there were unwritten

---

[16] See Napue v. Illinois, 360 U.S. 264, 269-272 (1959).
[17] Compare In the Matter of Brown, No. 107103-99 at 2 (Supreme Court, Kings County, February 24, 2010) with Trial Record at 611, 658, 900, 1115-1116, 1148; see also Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Pointer v. Texas, 380 U.S. 400, 403-408 (1965); Washington v. Texas, 388 U.S. 14, 19 (1967); Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948).
[18] Id.; see also Trial Record at 184-185, 340-341, 1007-1010, 1148.
[19] See Trial Record at 184-185, 340-341, 1007-1010, 1148; see also New York Criminal Procedure Law §300.10(2); People v. Watts, 57 N.Y.2d 299-300 (1982); People v. Moscato, 251 A.D. 2d 352, 353 (2 Dept. 1998); Cupp v. Naughten, 414 U.S. 141, 147 (1973); see EPTL 11-1.1(b)(13) and (22).
[20] Trial Record at 184-185, 340-341, 561, 563, 606-611, 621-624, 900, 1007-1010, 1115-1116, 1148; see also In the Matter of Brown, No. 107103-99 at 2 (Supreme Court, Kings County, February 24, 2010).

7

and unreviewable rules and laws that were applicable to the circumstances of this case.[21]

35. The trial court allowed this materially false testimony and refused to permit the accused effectively to cross-examine Justice Pesce concerning whether or not he had jurisdictional authority over the estate and other material issues notwithstanding the fact that the trial court knew the Justice's testimony was not true.[22]

36. The New York State courts, in violation of the federal constitution, imposed needless limitations upon the petitioner's ability to exercise his right to a meaningful opportunity to present a complete defense to the charges. The trial court's rulings and the upholding of the rulings by the New York State Appellate courts were outrageous, unreasonable, and clear violations of the holdings of well settled United States Supreme Court law.[23]

37. For all of the following reasons this court must expunge the conviction of the accused for this case, or, order a new trial forthwith.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY
### a. The Charles Brown Guardianship.

38. Although the indictment primarily concerns the Estate of Charles Brown the case also involves a guardianship set up for Mr. Brown while he was alive. When he was alive Charles Brown was the owner of real property located at

---

[21] Id.
[22] Id.
[23] Napue v. Illinois, 360 U.S. 264 (1959); Davis v. Alaska, 415 U.S. 308 (1974); Pointer v. Texas, 380 U.S. 400 (1965); Washington v. Texas, 388 U.S. 14 (1967); Crane v. Kentucky, 476 U.S. 683 (1986); In re Oliver, 333 U.S. 257 (1948); Cupp v. Naughten, 414 U.S. 141 (1973).

AP-26

302 St. James Place in Brooklyn, New York.[24]  The aforesaid property became a part of the estate upon Mr. Brown's death.[25]

39. Charles Brown was declared mentally incapacitated by the year 1999.[26] His sister-in-law, Minnie Simmons, was appointed as the lawful guardian for Mr. Brown pursuant to New York Mental Hygiene Law Article 81 by August 2000.[27]

40. Minnie Simmons' appointment as lawful guardian meant that she was responsible for decisions concerning Mr. Brown's personal and financial affairs.[28]

41. Charles Brown passed away in June 2003.[29] The Article 81 guardianship established for Mr. Brown was extinguished with his passing and Minnie Simmons no longer could administer assets once owned by Charles Brown through the guardianship, as guardian, after he died.[30]

b. The Charles Brown Estate.

42. Mr. Brown left a Last Will and Testament with his passing that named Minnie Simmons as the executor of his estate.[31] Minnie Simmons initiated the probate process to assume becoming the executor with the help of an attorney named Marshall Kaplan.[32]

---

[24] Trial Record at 40.
[25] See Matter of Frank, 283 N.Y. 106, 110 (1940); Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Vellozzi v. Brady, 267 A.D. 2d 695 (3rd Dept. 1999); see also In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see also Exhibit 4.
[26] Trial Record at 37
[27] Trial Record 37, 41- 42; see also Exhibits 2, 3.
[28] See New York State Mental Hygiene Law Article 81 (hereinafter MHL).

[29] Trial Record 39, 692
[30] See Matter of Frank, 283 N.Y. 106, 110 (1940); Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Vellozzi v. Brady, 267 A.D. 2d 695 (3rd Dept. 1999); see also In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see also Exhibit 4.
[31] Exhibit 5; see also Trial Record 692, 846.
[32] Exhibit 6; Trial Record 304-305.

Case 1:22-cv-01747-LDH-LB   Document 7   Filed 04/06/22   Page 10 of 72 PageID #: 92

43. Mr. Kaplan filed a probate petition with the Kings County Surrogate's Court
in order to seek the appointment of Minnie Simmons as executor within a few
months after Mr. Brown's passing.[33] Minnie Simmons was familiar with Mr.
Kaplan because he assisted her with her responsibilities as guardian from 2001
until Mr. Brown's passing in June 2003.[34]

44. On November 6, 2003 the Kings County Surrogate's Court issued a decree
granting probate that named Minnie Simmons the executrix of the Estate of
Charles Brown.[35]

c. Retention of the Petitioner by the Brown Estate.

45. The habeas petitioner was hired as an attorney to represent the Estate of
Charles Brown by Minnie Simmons within a year of the December 2005 sale
of Charles Brown Estate's real property.[36]

46. Minnie Simmons' daughter, Linda Simmons, discussed with her mother
whether or not the habeas petitioner should be hired and was present when
Minnie Simmons signed the retainer.[37]The retainer designated that the habeas
petitioner would be compensated for his work on a percentage basis with no
money paid up front.[38]

47. The habeas petitioner was hired to sell real property of the estate and pay
estate creditors.[39]Minnie Simmons, as the executor for the Estate of Charles
Brown, entered a contract to sell and sold 302 St. James Place on December

---

[33] Exhibit 6; see also Trial Record 45, 133, 304-305, 367-368, 560.
[34] Id.
[35] Exhibits 5, 7.
[36] Trial Record 707-708.
[37] Id.
[38] Trial Record 707-708.
[39] Trial Record 847-848.

10

23, 2005.[40] The habeas petitioner represented the estate as an attorney during the contract and sale transactions.[41]

48. The appellant subsequently was accused of stealing proceeds of the sale of this property.[42]

d. Justice Michael Pesce and the Charles Brown Guardianship.

49. Justice Michael Pesce was the primary witness for the People's case during the trial.[43]

50. He was a Kings County Supreme Court Justice in June 2003 at the time of Mr. Brown's passing.  Justice Pesce was the judge assigned to preside over the *Brown* guardianship.  He was assigned the *Brown* guardianship in 2003, just prior to Mr. Brown's death.[44]

51. In November 2004 Justice Pesce issued an order directing Minnie Simmons, the guardian for Charles Brown, to file a final accounting for the *Brown* MHL Article 81 guardianship.[45]

52. MHL §81.44(a)(4) governs the content of a final accounting.  The guardian was required to file a statement under oath that reported the approximate value of guardianship property at the time of the incapacitated persons death with an approximate amount of the claims, debts, or liens against the guardianship property.[46]

---

[40] Trial Record 245, 255.
[41] Trial Record 257.
[42] Exhibit 1.
[43] Trial Record 611, 658, 900, 1115-1116; see also Exhibit 4; In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010 (Pesce, J.).
[44] Trial Record 556.
[45] Trial Record at 367, 564.
[46] MHL §81.44(a)(4).

11

53. Marshal Kaplan represented the *Brown* guardianship for several years prior to Mr. Brown's death and was the attorney for the guardianship in June 2003 when Mr. Brown passed away.[47]

54. Judge Pesce testified that Mr. Kaplan was a co-guardian acting on behalf of the guardianship because Minnie Simmons could not obtain a bond.[48]

55. Justice Pesce's testimony was not true and he and the state prosecutors knew it was not true when it was said. Mr. Kaplan never was a co-guardian for the *Brown* guardianship.[49]

56. Mr. Kaplan was the attorney for the guardian while Mr. Brown was alive and his role as the attorney for the guardianship meant he should have prepared a final accounting for the *Brown* guardianship. Although Mr. Kaplan prepared a preliminary accounting for the guardianship he never completed a final accounting.[50]

57. The petitioner began to appear before Justice Pesce for the *Brown* guardianship as the attorney for Minnie Simmons after he was retained as the attorney for the estate.[51] The petitioner had no involvement with the *Brown* guardianship before the June 2003 death of Mr. Brown.[52]

58. In June 2013 Justice Pesce testified that he expected the petitioner to prepare a final accounting for the *Brown* guardianship that including information pertaining to the sale of real property owned by *Brown* Estate.[53]

---

[47] Trial Record at 45, 304-306, 367-368, 560; see also Exhibit 6.
[48] Compare Trial Record 560 with Exhibit 3.
[49] Trial Record at 38; see also Exhibit 2.
[50] Trial Record at 305.
[51] Trial Record at 708.
[52] Trial Record at 692, 708.
[53] Trial Record at 563.

59. However, in correspondence signed by Justice Pesce in August 2008, Justice Pesce informed Charles Emma that issues pertaining to the sale of the 302 St. James Street property were in the jurisdiction of the Kings County Surrogate's court and that he would defer to that court's purview.[54]

60. Justice Pesce insisted during the trial that he was authorized to include the closing for the real property owned by the *Brown* Estate as a part his order for the guardianship accounting because the real property was sold through the guardianship.[55]

61. However, Justice Pesce knew, and the trial court and state prosecutors knew, in accord with Justice Pesce's own order and his August 2008 letter to Charles Emma, that the property was sold by means of the Estate of Charles Brown upon an order issued by the Kings County Surrogate's Court when Justice Pesce falsely testified during the trial.[56]

62. The habeas petitioner's efforts to file the accounting the judge sought had several handicaps. First, the habeas petitioner never was the attorney for the guardianship while Mr. Brown was alive.

63. The habeas petitioner did not have personal knowledge of the value of the guardianship property at the time of Mr. Brown's passing and thus could not affirm what the value of the guardianship was when Mr. Brown died.[57]

64. Second, Mr. Kaplan was responsible for filing the final guardianship accounting because he was the attorney assisting Minnie Simmons at the time of Mr. Brown's death.[58]

---

[54] See Exhibit 25; see also Exhibit 4 at 2.
[55] Id.
[56] Exhibit 4; In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010 (Pesce, J.); see also Exhibit 25; Trial Record at 611, 658, 900, 1115-1116.
[57] New York Mental Health Law (MHL) §81.44(a)(4).
[58] Trial Record at 305.

65. Justice Pesce dismissively ignored the habeas petitioner's efforts to point out that Mr. Kaplan was not fulfilling his responsibilities to account to the guardianship court on behalf of the *Brown* guardianship.[59]

66. On June 26, 2008 Justice Pesce concluded the petitioner took too long to provide an accounting and appointed Charles Emma, as guardian ad litem, to complete the final accounting for the *Brown* guardianship.[60] Justice Pesce testified that he appointed Mr. Emma because the habeas petitioner was unresponsive to the court's repeated demands for the final accounting.[61]

67. Justice Pesce never required Mr. Kaplan to assist the petitioner with preparing an accounting for the guardianship.

68. The order appointing Mr. Emma guardian ad litem for the *Brown* guardianship was deeply flawed. The June 26, 2008 order issued by Justice Pesce falsely claimed the habeas petitioner was the MHL Article 81 guardian for Mr. Brown notwithstanding Justice Pesce knew he was not.[62]

69. Both Justice Pesce and Mr. Emma knew the petitioner was not the guardian for Charles Brown at the time the June 26, 2008 order was issued.[63]

70. The June 26, 2008 order indicated that Mr. Emma was "directed to prepare and file a final accounting for Mr. Mitchell covering that period of time from the date of his appointment to the date of this Order..."[64]

---

[59] Trial Record at 637.
[60] Trial Record at 575; see also Exhibit 8.
[61] Trial Record at 563-574.
[62] Exhibits 8, 9. 62.
[63] Trial Record at 335; Exhibits 7, 9.
[64] Exhibit 8.

14

71. The appellant never was appointed guardian for Mr. Brown so there was no date of appointment as a starting point.[65]

72. The June 26, 2008 order also directed a final accounting for the guardianship to include several years beyond the date of death for Mr. Brown.[66]

73. New York law did not extend Justice Pesce the jurisdictional authority to order a guardianship accounting that included transactions beyond Mr. Brown's June 2003 passing.[67]

e. Charles Emma's involvement as guardian ad litem.

74. Charles Emma testified that when he was appointed guardian ad litem Justice Pesce charged him with locating the assets of the guardianship.[68] The court granted Mr. Emma subpoena power and he began his investigation of the guardianship by July 2008.[69]

75. Mr. Emma became aware early in his investigation that Minnie Simmons was appointed the MHL Article 81 Guardian for Mr. Brown.[70] He also learned that Minnie Simmons was the executor of the Estate of Charles Brown.[71]

76. Although Justice Pesce testified that he expected that the assigned guardian ad litem, Charles Emma, would speak to Minnie Simmons because she was Mr. Brown's guardian, Mr. Emma never spoke with her during the course of his investigation.[72]

---

[65] Exhibits 2, 9; Trial Record 335.
[66] See Exhibits 8, 9.
[67] See Matter of Frank, 283 N.Y. 106, 110 (1940); Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Vellozzi v. Brady, 267 A.D. 2d 695 (3rd Dept. 1999); see also In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see also Exhibits 4, 25.
[68] Trial Record 34, 37.
[69] Trial Record 34, 37.
[70] Trial Record 38, 41-42
[71] Trial Record 38-39, 41-42
[72] Trial Record 279-280, 617-620.

77. Charles Emma testified that he never spoke to Minnie Simmons in his entire life as of the June 2013 dates he testified at trial.[73]

78. Mr. Emma testified that he did not speak to Minnie Simmons during his investigation of her actions as a guardian because he knew counsel represented her.[74]

79. Mr. Emma claimed he deliberately chose not to seek a waiver of attorney-client privilege from Minnie Simmons in order to interview her as a part of his investigation.[75]

80. Mr. Emma falsely claimed that he conducted a forensic audit of the moneys expended by the accused.[76]

81. His testimony was not true. He never approached Minnie Simmons to discuss the whether or not the monies spent from the estate proceeds were unauthorized or inappropriate.[77]

82. In June or July 2008 Mr. Emma was told by one of Minnie Simmons' daughters that Minnie Simmons was exhibiting signs of dementia.[78]

83. Mr. Emma did not retain the name of the daughter who told him of Minnie Simmons' dementia and never provided the source of this information to the defense.[79]

---

[73] Trial Record at 280.
[74] Trial Record 293-295.
[75] Trial Record at 293-295.
[76] Trial Record at 295-296.
[77] Trial Record at 279-280, 299.
[78] Trial Record at 144, 166-167, 279-280, 285, 312.
[79] Compare Trial Record at 144, 166-167, 279-280, 312 with Exhibit 10.

16

84. While Mr. Emma was the guardian ad litem for Mr. Brown's guardianship he spoke to an attorney named Marshal Kaplan. Marshal Kaplan represented the *Brown* guardianship throughout most of the term of the guardianship.[80]

85. Mr. Emma testified that Marshal Kaplan fully cooperated with him and gave him his files.[81]

### f. Justice Pesce and Charles Emma's investigation.

86. Justice Pesce and Mr. Emma used a fraudulent June 26, 2009 guardianship order as a basis to issue a subpoena to seize copies of the appellant's banking and financial records from third parties purportedly to conduct an examination of the guardianship's financial transactions.[82]

87. Justice Pesce issued a subpoena based upon his authority from a fraudulent June 26, 2009 guardianship order to obtain the petitioner's bank records in February 2009.[83]

88. The petitioner challenged the jurisdictional basis of Justice's Pesce's authority to issue the subpoena Mr. Emma sought to use to obtain the petitioner's banking records.[84]

89. Justice Pesce overruled the petitioner's jurisdictional challenge and his chambers received the records on or about February 23, 2009.[85]

90. Mr. Emma examined the petitioner's fraudulently subpoenaed bank records obtained by the use of the fraudulent court order.[86]

---

[80] Trial Record at 45, 304, 306, 367-368, 560-561; see also Exhibit 6.
[81] Trial Record at 45.
[82] Trial Record at 136-137, 589-590; see Exhibits 8, 9.
[83] Trial Record at 136-137, 589-590, 646-647; see Exhibits 8, 9.
[84] Trial Record 136-137, 589-590, 646-647.
[85] Compare Trial Record 136-137, 589-590, 646-647, Exhibits 8, 9 with Exhibit 4.
[86] Trial Record 137.

Case 1:22-cv-01747-LDH-LB   Document 7   Filed 04/06/22   Page 18 of 72 PageID #: 100

91. Neither Justice Pesce nor the guardian ad litem, Mr. Emma, spoke with Minnie Simmons regarding the contents of the records seized or discussed with her whether or not expenditures that were made from the proceeds of the sale of the property were unauthorized or inappropriate.[87]

92. On or about March 9, 2009 Mr. Emma issued a report to Justice Pesce in his capacity as guardian ad litem. The report concluded the appellant might have converted the sale proceeds of the estate's real property.[88]

93. Mr. Emma made the conclusions of his March 9, 2009 report without meeting with and discussing the report with Minnie Simmons.[89]

94. Minnie Simmons had served as the guardian for Mr. Brown and was serving as the executor for the Estate of Charles Brown as of the time Mr. Emma prepared his report.

95. Mr. Emma recommended that the Kings County District Attorney's Office investigate the matter in his March 2009 report.

96. In March 2009 Justice Pesce sought and acquired the involvement of the Kings County District Attorney.[90]

97. The state prosecutors began to investigate whether or not the petitioner stole the proceeds from the sale of 302 St. James Place, Brooklyn, New York with the assistance of Charles Emma by April 2009.[91]

---

[87] Trial Record at 279-280, 299, 640-641.
[88] Exhibit 11.
[89] Trial Record at 280.
[90] Trial Record at 640-641.
[91] Trial record at 513; see also Exhibit 10.

18

98. Mr. Emma's work with state prosecutors for the preparation of the case for presentation to the grand jury and for trial was extensive.[92]

### g. The state prosecutor's fraudulent grand jury presentation.

99. Linda Simmons was a witness during the grand jury presentation and at trial. She is Minnie Simmons' daughter. Linda Simmons was a New York City Police Detective during the investigation and prosecution of this case.[93]

100. On or about May 6, 2010 one of the Kings County prosecutor's investigators, Vincent Verlezza, interviewed Linda Simmons on behalf of the Kings County District Attorney's Office. The interview took place approximately two months before Linda Simmons testified in the grand jury.[94]

101. Vincent Verlezza wrote in May 2010 that Linda Simmons told him Minnie Simmons was in the early stages of Alzheimer's disease.[95]

102. Minnie Simmons did not testify in the grand jury. The state prosecutors offered a CPL §190.30(3) affidavit in lieu of her appearance before the grand jury that purportedly was signed by Minnie Simmons on June 10, 2010.[96]

103. Minnie Simmons later testified during a CPL Article 660 hearing on May 18, 2011 that the signature on the aforesaid CPL §190.30(3) affidavit was not hers.[97]

104. On July 8, 2011 and August 4, 2011 Linda Simmons testified before the grand jury about Minnie Simmons' mental capabilities.

---

[92] Trial Record at 277-279; Exhibit 10.
[93] Trial Record at 687-688.
[94] Exhibit 12.
[95] Exhibit 12.
[96] Exhibit 13; see Exhibit 19; May 18, 2011 Conditional Examination of Minnie Simmons at page 33.
[97] See Exhibit 19; the Conditional Examination of Minnie Simmons at page 33.

105. On July 8, 2011 Linda Simmons testified that her mother was "mentally alright."[98]

106. On August 4, 2011 Linda Simmons testified her mother was "mentally okay."[99]

107. Linda Simmons' grand jury testimony differed markedly from what she told Vincent Verlezza a few months before her grand jury testimony.[100]

108. The petitioner was indicted by the use of an investigative grand jury on or about August 13, 2010 for the charge of Grand Larceny in the Second Degree.[101]

109. The petitioner was arrested at his home in New Jersey on September 8, 2010.

### h. Pre-trial proceedings prior to the May 2011 Conditional Examination of Minnie Simmons.

110. The habeas petitioner was arraigned by mid-September 2010. He was charged with one count of Grand Larceny in the Second Degree.

111. The state prosecutors promised the habeas petitioner that the People would furnish impeachment material in their possession consistent with their obligations pursuant to Brady v. Maryland in writing as a part of an October 5, 2010 Voluntary Disclosure Form furnished to defense counsel at or near the arraignment.[102]

112. The state prosecutors did not provide the habeas petitioner at or near his arraignment with notice of the existence of facts or information that could be

---

[98] Exhibit 14.
[99] Exhibit 15.
[100] Compare Exhibits 12, 14, 15.
[101] Exhibit 16.
[102] Exhibit 23.

20

considered exculpatory consistent with the holdings of <u>Brady v. Maryland</u> or its progeny.[103]

113.   For example, although the People were in possession of Vincent Verlezza's notes indicating reports that Minnie Simmons was suffering from Alzheimer's disease at the time they furnished Voluntary Disclosure Form by October 2010, the state prosecutors did not furnish the aforesaid Verlezza notes to the defense until on or about November 22, 2011; approximately six months after the May 2011 conditional examination of Minnie Simmons and more than one year after they provided the Voluntary Disclosure Form.[104]

114.   Further, the People did not reveal Charles Emma's April 2009 knowledge of the family reports of Minnie Simmons' dementia until Mr. Emma's testimony during the June 2013 trial; notwithstanding their promise made as a part of the October 2010 Voluntary Disclosure Form.[105]

115.   In October 2010 the state prosecutors put forth a motion pursuant to Article 660 of the New York State Criminal Procedure Law for the conditional examination of Minnie Simmons.[106]

116.   Minnie Simmons was the executor of the Estate of Charles Brown at the time of the indictment. She was of an advanced age at the time of the indictment and the state prosecutors expressly claimed that they sought to preserve her testimony via a video recorded conditional examination because of her age and poor physical condition.[107]

---

[103] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); see also <u>Fuentes v. T. Griffin</u>, 829 F.3d 233 (2d Cir. 2016).
[104] Compare Exhibit 12 with Exhibits 23 and 24.
[105] Trial Record at 144, 166-167, 279-280, 285, 312; see Exhibit 23.
[106] Exhibit 17.
[107] Exhibit 17 at ¶¶7-11.

117. No mention was made of Charles Emma's knowledge of reports from Minnie Simmons' daughter that she was suffering from dementia in the People's application for a conditional examination.[108]

118. The defense did not oppose the People's Article 660 application and the motion was granted in May 2011.[109]The conditional examination took place May 18, 2011.[110]

119. The defense put forth motions for discovery and other forms of pre-trial applications by December 2010 and the People responded to those applications soon after they were received.[111]

120. One of the pre-trial applications made by the defense in a December 2010 omnibus motion was for exculpatory facts or information consistent with the People's obligation pursuant to <u>Brady v. Maryland</u>.

121. The Kings County Supreme Court first ordered the People to furnish the defense with impeachment facts or information consistent with the People's obligation pursuant to <u>Brady v. Maryland</u> on March 28, 2011; this order was made approximately two months before the conditional examination of Minnie Simmons.[112]

    i.  <u>The May 18, 2011 Conditional Examination of Minnie Simmons.</u>

122. The conditional examination of Minnie Simmons took place on May 18, 2011.

---

[108] Trial Record at 144, 166-167, 279-280.
[109] Exhibit 18.
[110] See Exhibit 19.
[111] See Exhibits 20, 21.
[112] See Exhibit 22.

123. Minnie Simmons had considerable difficulty recalling facts and circumstances regarding the Estate of Charles Brown during her conditional examination.[113] She testified that she was going senile.[114]

124. The state prosecutors, through their investigative agent Charles Emma, were aware by April 2009 that there were reports from her family members that Minnie Simmons was suffering from dementia.[115]

125. The People sought to preserve the testimony of Minnie Simmons by means of a video-taped conditional examination because the state prosecutors considered her a potentially important witness whose testimony might not be available for trial because of her advanced age and physical condition.[116]

126. The state prosecutors because of their obligations pursuant to Brady v. Maryland, the promise made by the state's Voluntary Disclosure Form served in October 2010, and a March 2011 order issued by the Kings County Supreme Court insisting the People comply with their Brady obligations were required to provide the petitioner with Charles Emma's knowledge of reports of Minnie Simmons dementia from her family members and Mr. Verlezza's notes so the defense had access to this material prior to the May 2011 conditional examination.[117]

127. The People violated their obligations pursuant to Brady v. Maryland because the state did not provide the exculpatory or impeachment information prior to the conditional examination and Brady required the state prosecutors in this

---

[113] See Exhibit 19; the Conditional Examination of Minnie Simmons (May 18, 2011 at page 8, 17, 21-24, 28-32, 33, 34-36).
[114] Id. at 24.
[115] Trial Record at 144, 166, 279-280.
[116] Exhibit 17.
[117] Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); see Exhibits 22, 23,

23

case to disclose material exculpatory evidence early enough so that the defense could make use of exculpatory or impeachment information.[118]

128. Notably, Minnie Simmons testified during the conditional examination that she did not sign a CPL §190.30(3) affidavit regarding the permission and authority component of the larceny charge.[119]

129. The state prosecutor did not correct Minnie Simmons' testimony stating she did not sign the CPL §190.30(3) affidavit the People used as a material component of their presentation to the grand jury.[120]

j. Post-conditional examination efforts by the defense to obtain the medical and psychiatric records of Minnie Simmons.

130. The People did not want the habeas petitioner and his counsel to know there were reports from her daughter that Minnie Simmons was suffering from Alzheimer's disease or dementia prior to the May 2011 conditional examination or the June 2013 trial.

131. The People repeatedly withheld information known by the state prosecutors and their agents that informed them that Minnie Simmons was suffering from Alzheimer's disease or dementia prior to, during, and after her May 2011 conditional examination.

132. The habeas petitioner was unable to move for relief based upon information received during the May 2011 conditional examination until September 2011. One reason was the habeas petitioner was not able to afford a copy of the conditional examination transcripts until August 2011.

---

[118] Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); Leka v. Portuondo, 257 F.2d 89, 99-103 (2d Cir. 2001); St. Germain v. United States, U.S. Dist. LEXIS 9784 (S.D.N.Y. 2004); United States v. Cobb, 271 F.Supp. 159, 163 (S.D.N.Y. 1967).
[119] See Exhibit 19; the Conditional Examination of Minnie Simmons (May 18, 2011 at page 33).
[120] Id. at page 33; see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

24

133. On September 18, 2011 the habeas petitioner, independent of counsel, moved to dismiss the indictment pursuant to CPL §210.20 and CPL §210.35(5). The habeas petitioner's motion of September 18, 2011 sought to renew his application for relief pursuant to the aforesaid statutes because of new information unavailable to the defense prior to the May 2011 conditional examination.

134. The September 2011 motion sought the dismissal of the indictment because Minnie Simmons testified during the conditional examination that material evidence presented to the grand jury was a fraud and stood uncorrected by the state prosecutors before the grand jurors voted for an indictment.[121]

135. The petitioner sought dismissal of the indictment because Minnie Simmons testified during the conditional examination that she did not sign a CPL §190.30(3) affidavit the People presented to the grand jury to obtain the indictment.[122]

136. The CPL §190.30(3) affidavit purportedly signed by Minnie Simmons was material to the grand jury presentation. Minnie Simmons did not testify in the grand jury. The aforesaid CPL §190.30(3) affidavit was presented to the grand jurors in lieu of Minnie Simmons' testimony in order to support the permission and authority component of the charge.

137. The habeas petitioner sought to dismiss the indictment in the September 18, 2011 motion because Minnie Simmons testified that she did not sign the CPL §190.30(3) affidavit and, thus, a forged material document was presented by the People during the grand jury proceedings without correction.[123]

---

[121] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).
[122] See Exhibit 19: The May 18, 2011 Conditional Examination at 33; see also Exhibit 13.
[123] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

138.   Pursuant to the September 18, 2011 motion the habeas petitioner also sought to preclude Minnie Simmons testimony before the grand jury or any hearing or trial pertaining to the indictment.

139.   The habeas petitioner contended in the September 2011 motion that the People falsely and knowingly presented evidence to the grand jury that Minnie Simmons was mentally competent to provide evidence to the grand jurors when they knew she was not.

140.   Linda Simmons, Minnie Simmons' daughter, testified that her mother was "mentally alright" on two separate occasions before the grand jury notwithstanding the fact that she told the prosecutors' investigator, Vincent Verlezza, six months before her grand jury testimony that her mother was in the beginning stages of Alzheimer's disease.[124]

141.   The People also knew as of April 2009 through Charles Emma that Minnie Simmons' daughter told him of her suffering from dementia.[125]

142.   The defendant moved in the September 2011 motion to preclude Minnie Simmons testimony before the grand jury or to grant disclosure of her pertinent medical and psychiatric records.

143.   The court refused to consider the September 2011 well written and well-reasoned defense motion prepared by the defendant because it was not adopted by his counsel. The defendant relieved counsel upon her refusal to present the September 2011 motion and new counsel was assigned.

---

[124] Compare Exhibit 12 at page 2 (bottom) with Exhibits 14, 15.
[125] Trial Record at 144, 166-167, 279-280, 312.

26

144. The defendant's new counsel put forth a December 2011 motion, in part pursuant to <u>Brady v. Maryland</u>, that sought medical and psychiatric records for Minnie Simmons.[126]

145. The December 2011 motion argued that the defendant was entitled to the medical and psychiatric records as a means of effective cross-examination because the aforesaid materials may have bearing upon the credibility of Minnie Simmons and her capability to perceive, remember, and accurately recall events.[127]

146. The aforesaid motion argued that Minnie Simmons conceded that she was going senile and provided numerous instances where she could not remember material facts and circumstances pertinent to the case.[128]

147. The People responded by providing a false affirmation in support of their opposition to the December 2011 motion.

148. On or about January 12, 2012 the state prosecutors responded to the petitioner's December 2011 motion's request for information pursuant to <u>Brady</u>: "[t]he People are aware of their continuing obligations pursuant to <u>Brady v. Maryland</u>, 363 US 83 (1963), and are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons' testimony."[129]

149. The aforesaid material affirmation put forth by the People to oppose the December 2011 defense motion was false. The state prosecutors knew their

---

[126] See Exhibit 28; see also <u>Brady v. Maryland</u>, 363 U.S. 83, 87 (1963); see also <u>People v. Baranek</u>, 287 A.D.2d 74, 78-81 (2 Dept. 2001).
[127] Id.; see also <u>People v. Rensing</u>, 14 N.Y.2d 210, 212-214 (1964).
[128] See Exhibit 28; see also Exhibit 19 at page 23-24; see also <u>People v. Gissendanner</u>, 48 N.Y.2d 543, 550 (1979); see also <u>People v. Knowell</u>, 127 A.D.2d 794, 795 (2 Dept. 1987).
[129] See Exhibit 29 at ¶7.

affirmation concerned a material issue of the case and was false when it was made. The People never made an effort to correct this false material affirmation prior to or during the trial and appeal of this matter.[130]

150. On or about January 2012 the state prosecutors were in possession of their employee, Vincent Verlezza's, May 2010 notes of Linda Simmons' reports of her mother's Alzheimer's disease. These notes were not furnished to the defense until several months after the May 2011 conditional examination.[131]

151. The People knew, pursuant to Vincent Verlezza's May 2010 notes, about reports from Linda Simmons of her mother's Alzheimer's disease before their January 2012 affirmation.[132]

152. The People also knew by 2009 from Charles Emma, their investigative agent, that one of Minnie Simmons' daughters reported that their mother was suffering from dementia.[133]

153. When the People affirmed in January 2012 that they, "are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons' testimony," they were lying and trying to conceal material facts that would have resulted in the likely disclosure of the records sought.[134]

154. The defense filed a reply to the People's January 2012 response on or about February 6, 2012. The reply affirmation highlighted Vincent Verlezza's May 2010 notes regarding Linda Simmons' discussion of her mother's Alzheimer's disease.[135]

---

[130] Napue v. Illinois, 360 U.S. 264, 269-272 (1959); United States v. Agurs, 427 U.S. 97, 103-106 (1976).
[131] See Exhibits 12, 24.
[132] See Exhibit 12.
[133] Trial Record at 144, 166-167, 279-280.
[134] See California v. Trombetta, 467 U.S. 479, 485 (1984); Kyles v. Whitley, 514 U.S. 419, 435 (1995); compare Exhibit 12 and Trial Record at 144, 166-167, 279-280 with Exhibit 29 at ¶7.
[135] See Exhibit 30.

28

155. On or about February 10, 2012 the Kings County Supreme Court issued an order determining the motion practice initiated by the defense concerning the production of Minnie Simmons medical and psychiatric records.[136]

156. Notwithstanding their obligations pursuant to <u>Brady v. Maryland</u> and <u>Napue v. Illinois</u> the state prosecutors did not furnish to the court or the defense information within the People's pre-trial possession pertaining to Charles Emma's knowledge of the reports by Minnie Simmons' daughter of her mother's dementia until during the June 2013 trial.[137]

157. Notwithstanding the fact that the People had access to Mr. Emma's information regarding Minnie Simmons' dementia by April 2009 the People made no effort to provide Mr. Emma's information regarding the reports of Minnie Simmons' dementia to the court while the February 10, 2012 and May 1, 2012 decisions were being considered or try to correct the record prior to Charles Emma's June 2013 testimony.[138]

158. The Kings County Supreme Court opens its February 10, 2012 decision and order expressing the court's concern as to why the defense waited seven months after the conditional examination to seek relief pursuant to <u>Brady</u>.

159. The court ignored its decision to refuse to consider the defendant's September 18, 2011 effort to address the People's <u>Brady</u> failures after the May 2011 conditional examination. The defendant's proposed motion sought <u>Brady</u> relief soon after the transcript for the conditional examination became available to him.[139]

---

[136] See Exhibit 31.

[137] See <u>Brady v. Maryland</u>, 363 U.S. 83, 87 (1963); <u>Napue v. Illinois</u>, 360 U.S. 264, 269-272 (1959); <u>United States v. Agurs</u>, 427 U.S. 97, 103-106 (1976); <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984).

[138] Id.; see also Exhibits 31, 32, 33, 34, 35.

[139] The September 18, 2011 motion proposed by the defendant raised the People's <u>Brady</u> failures prior to the conditional examination. The court did not accept the motion because it was not adopted by his counsel.

160.  The court's order of February 10, 2012 essentially questioned the utility of the defense request for Minnie Simmons' medical records seven months after the conditional examination.

161.  The defense was entitled to the medical and psychiatric records and a renewed conditional examination because the People withheld from the accused a full and fair opportunity to cross-examine the witness bearing upon her ability to accurately and reliably recall facts and circumstances pertinent to the case.[140]

162.  A medical or psychiatric report or an expert who had the opportunity to review her records may have determined that there was no circumstance that a jury could rely upon her testimony.

163.  The People used written testimony pursuant to CPL §190.30(3), relied upon by the grand jurors, to indict the petitioner.  A full and fair review of her medical records and/or an expert opinion may have allowed the defense to challenge the grand jury presentation of the fraudulent CPL §190.30(3) affidavit before the Kings County Supreme Court.[141]

164.  The defense raised both the prospect that the People impeded the habeas petitioner's opportunity to engage in a complete cross-examination of the witness during the conditional examination and was denied a state and federally constitutional fair grand jury presentation by the introduction of a CPL §190.30(3) affidavit by an incompetent or a person who testified under oath they did not sign a material document.[142]

---

[140] Fuentes v. T. Griffin, 829 F.3d 233, 245-253 (2d Cir. 2016).
[141] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); Crane v. Kentucky, 476 U.S. 683, 690 (1986); Napue v. Illinois, 360 U.S. 364, 269-272 (1959).
[142] Crane v. Kentucky, 476 U.S. 683, 690 (1986).

165.   The court's decision and order of February 10, 2012 ignored that these issues were raised as a part of the initial <u>Brady</u> motions post-December 2011 and the petitioner's motion to reargue filed in March 2012.[143]

166.   The court's order of February 10, 2012 wrongly determined that the defendant's omnibus motion did not make a specific or general request for <u>Brady</u> material.[144]

167.   The order of February 10, 2012 directed the state prosecutors to furnish the court with the medical and psychiatric records of Minnie Simmons for an *in camera* inspection.[145]

168.   The People furnished the court with the medical and psychiatric records of Minnie Simmons for an *in camera* inspection some time before the court's May 1, 2012 decision refusing to provide the defense access to the aforesaid records.[146]

169.   The defendant filed a motion, with a supporting affidavit, asking the court to reconsider it's February 10, 2012 decision on or about March 9, 2012.[147]

170.   The re-argument request noted that the court overlooked and failed to address the consequences of the People's failure to meet their obligations pursuant to <u>Brady v. Maryland.</u>[148]

171.   The court's May 1, 2012 order failed to address that the People did not furnish the Verlezza notes prior to the May 2011 conditional examination notwithstanding the fact that it is apparent from the notes the state prosecutor

---

[143] See Exhibits 28, 30, 32; see also Exhibits 36, 37. 40, 41.
[144] See Exhibit 31; see also Exhibit 20 at <u>Affirmation</u> pages 1, 4 and <u>Demand to Produce</u> at pages 8, 9.
[145] See Exhibit 31.
[146] See Exhibit 34.
[147] See Exhibit 32.
[148] Id.

managing the case was aware of Mr. Verlezza's reference to Alzheimer's disease prior to the conditional examination.[149]

172.   The motion to reargue posited that the defendant was entitled to a <u>Brady</u> hearing to determine the reasons for the People's failure to provide the defense with exculpatory information consistent with the state prosecutors' obligation pursuant to the Fourteenth Amendment to the United States Constitution.[150]

173.   Whether or not Minnie Simmons was suffering from mental defects that could have impacted her ability to perceive and recall material events pertinent to the case was something the defense would have wanted to know and was entitled to know prior to the May 2011 conditional examination.[151]

174.   The habeas petitioner sought a <u>Brady</u> hearing because the state court should have made an assessment as to whether or not the People's failure to produce the Verlezza notes were deliberate and materially prejudiced the defense.[152]

175.   The People did not want the defense to challenge the authenticity of the CPL §190.30(3) affidavit purportedly subscribed by Minnie Simmons in June 2010 just prior to the August 2010 indictment.

176.   The June 10, 2010 CPL §190.30 affidavit purportedly signed by Minnie Simmons was a material document presented to the grand jury.[153]

177.   If the habeas petitioner was aware and in possession of the pre-indictment Verlezza notes he would have had a basis to challenge the People's use in the

---

[149] Compare Exhibit 12 with Exhibits 24, 25, 29, and 34.
[150] See <u>Leka v. Portuondo</u>, 257 F.3d 89, 98-103 (2001); see also Exhibit 32 at ¶3.
[151] See <u>Napue</u> at 269-272; see also <u>United States v. Agurs</u>, 427 U.S. 97, 103-106 (1976); <u>Leka v. Portuondo</u>, 257 F.3d 89, 98-103 (2001).
[152] See <u>Leka</u> at 98-103; see also <u>Lewis v. Connecticut Commander of Corrections</u>, 790 F.3d 109, 123-124 (2d Cir. 2015).
[153] See Exhibit 13.

grand jury of the CPL §190.30(3) statement Minnie Simmons purportedly signed.

178. The defense could have challenged the integrity of the grand jury proceedings before the state court prior to trial.[154]

179. This option was denied the defense because the People continuously lied about their possession of material impeachment information related to a principal witness.[155]

180. This form of misconduct violated the federal constitution by denying the petitioner an opportunity to be heard and engage a meaningful opportunity to present the complete defense that he was entitled to pursuant to New York State law.[156]

181. On May 1, 2012 the court determined: "first, nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness; second, as conveyed to the defendant by the court, the records reviewed *in camera* do not substantiate any claims of Alzheimer's disease."

182. The court's assertion that "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness" resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented during the May 18, 2011 conditional examination.[157]

183. As to the court's claim that "the records reviewed *in camera* do not substantiate any claims of Alzheimer's disease" no proof remains for appellate review. The People, an interested party, lost all of the records reviewed by the court to

---

[154] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); CPL §210.35(5).
[155] Compare Exhibit 29 at ¶7 and Trial Record at 144, 166-167, 279-280.
[156] See Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948).
[157] See Exhibit 19 at 6-8, 10, 17, 19-25, 27-30, 33, 35, 38, 40-41.

assess whether or not the habeas petitioner was entitled to use them as a part of his defense.[158]

184. The aforesaid People's misconduct violated the federal constitution by denying the habeas petitioner a full and fair appellate review for a material <u>Brady</u> violation.[159]

185. The state prosecutors repeatedly, and over the course of several years, withheld material <u>Brady</u> information in order to prevent the timely revelation of material impeachment disclosures.

186. It should be noted that throughout the <u>Brady</u> disclosure motion practice that took place between the May 2011 conditional examination and the May 2012 order denying the defendant access to Minnie Simmons' psychiatric and medical records not once did the People inform the court of Mr. Emma's knowledge of the reports from Minnie Simmons family of her dementia.[160]Mr. Emma's knowledge of the reports of Minnie Simmons' dementia was not imparted to the defense until more than one year after the May 1, 2012 order.[161]

187. The state prosecutors were reminded of their obligations pursuant to <u>Brady</u> just prior to the May 18, 2011 conditional examination through to the May 1, 2012 order of the court. Notwithstanding, the People deliberately ignored the court's orders during this period so that they could prevail at the end of motion practice engaged to determine whether or not the defense would receive access to Minnie Simmons' medical and psychiatric records.[162]

---

[158] See Exhibit 59 at ¶¶10, 11; see also Exhibit 60 at ¶¶7, 8, 9.
[159] See <u>Brady</u> at 87; see also <u>Fuentes v. T. Griffin</u>, 829 F.3d 233 at 247-253 (2d Cir. 2016).
[160] Trial Record at 144, 166-167, 279-280.
[161] Id.
[162] See Exhibits 22 and 31.

188.  If the court was aware of Mr. Emma's information regarding Minnie Simmons' dementia the outcome of the motion practice initiated by the defense to obtain Minnie Simmons' medical and psychiatric records would have been different.

### k. The State Court Refused to Allow the Defendant Access to Compulsory Process in Violation of the Federal Constitution.

189.  The state courts, beginning more than one year prior to trial, denied the habeas petitioner's every request for a subpoena or letter request for disclosure prior to and during the June 2013 trial.

190.  The habeas petitioner prepared several letter requests for disclosures in 2013 before the trial. Justice William Garnett instructed the defendant to make all disclosure requests to him by letter as opposed to seeking to obtain signed subpoenas.[163]

191.  The habeas petitioner sought numerous subpoenas from the state court, in earnest, beginning in April 2012 because it appeared that a trial of the matter was imminent. The trial did not take place until June 2013, fourteen months later.

192.  Every subpoena request made by the defendant was denied through the trial. The state court denied every subpoena request made by the defense for at least fourteen consecutive months.[164]

193.  The defendant sought to subpoena parties to transactions by the estate.

194.  The defendant also sought to subpoena Kings County Court records pertinent to the guardianship and the estate. The state prosecutors furnished incomplete copies of court records as a part of an open file discovery practice.

---

[163] See Exhibits 51, 52, 53; see also Exhibits 56, 57.
[164] See Exhibit 34; see also Exhibits 51, 52, 53, 56, 57.

35

The files were incomplete and the defense sought to obtain materials he knew were missing.

195. For example, the habeas petitioner had to provide a letter with an itemized list of estate expenditures and prospective expenditures to the Surrogate's Court in order to renew Letters Testamentary.  The files of the Kings County Surrogate at the time of the sale of the real property never were made available to the petitioner.

196. The reason court files were important to the defendant was because of the "Best Evidence Rule" and also because the petitioner lost many of the files pertinent to the guardianship and estate cases due to a flood of his office.

197. The petitioner also sought to subpoena policy information from the New York City Human Resources Administration (HRA).  HRA attorneys withdrew a petition for a compulsory accounting during the administration of the estate in Kings County Supreme Court.

198. At trial there was a material conflict between an affirmation made by Charles Emma and the testimony of the HRA attorney, Richard Balsam, regarding why the compulsory accounting was withdrawn.[165]

199. The HRA attorney falsely denied during the trial that he advised Mr. Emma that: "they (HRA) withdrew the proceeding only because they believed the estate assets were already distributed because of the sale of the house in December 2005."[166]

200. The petitioner sought HRA policies and procedures in anticipation of an effective cross-examination of Richard Balsam, the HRA attorney.[167]

---

[165] Compare Trial Record at 769, 772-775 with Exhibit 11.
[166] Trial Record at 772-775.
[167] Trial Record at 772-775.

36

201.   HRA's policies were inconsistent with the claims made by Mr. Balsam and consistent with the claims made in Mr. Emma's report.[168]

202.   Justice Pesce, notwithstanding the fact he was not a Kings County Surrogate's Court judge and had no jurisdictional authority over the matter, engaged in conversations with HRA officials regarding this matter and asked HRA to investigate it.[169]

203.   The defense was denied the opportunity to impeach Mr. Balsam with evidence of the agency's policies.[170]

204.   The trial court also refused the defendant's requests to obtain and review a full set of Justice Pesce's records, in part, for the purpose of identifying the HRA officials he claimed to speak to.[171]

205.   The trial court also denied the defense access to persons who personally observed Minnie Simmons capacity to perceive and recall during pertinent times of the case.[172]

1. The habeas petitioner sought a Writ of Prohibition to dismiss the indictment.

206.   On or about October 22, 2012 the habeas petitioner sought a Writ of Prohibition seeking the dismissal of Kings County Supreme Court Indictment 4743-2010 because the indictment was obtained fraudulently and therefore was jurisdictionally defective.[173]

207.   The petitioner alleged in his writ application that the state prosecutors knowingly presented testimony regarding the mental health of Minnie

---

[168] Compare Exhibit 11 with Trial Record at 315-318, 772-775.

[169] Trial Record at 632; see also Exhibit 4.

[170] See Exhibit 34.

[171] Trial Record at 558-559, 632-633; see also Exhibits 51, 52, 53, 56, 57.

[172] See Exhibit 34.

[173] Matter of Mitchell v. DiMango, 100 A.D.3d 1001 (2 Dept. 2012); see also People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

Simmons, a material witness to the grand jury, that they knew was false in order to mislead the grand jurors and fraudulently obtain an indictment against the petitioner.

208. The writ petitioner alleged that the state prosecutors deliberately withheld information regarding the mental health of Minnie Simmons, a material witness to the grand jury, in order to convey a false portrayal to the grand jurors of the capacity of the witness to recall facts and circumstances of the case.[174]

209. The writ petitioner also alleged that the prosecution of the indictment should be discontinued because the district attorney knowingly presented the grand jurors with a fraudulent CPL §190.30(3) affidavit that recited facts purportedly material to the case that was a known fraud: to wit, the affidavit was not signed by Minnie Simmons, the alleged declarant.[175]

210. The prosecutors relied upon this affidavit to secure the indictment for this case in spite of the fact that the purported declarant, Minnie Simmons, stated the signature on the affidavit was not hers.[176]

211. The prosecutions knowing use of false material information during a presentation to the grand jury violated the state and federal constitutional rights of the accused.[177]

212. The state prosecutors responded to the aforesaid allegations of grand jury fraud perpetrated by the People by concealing pertinent information from the Appellate Division: Second Department.

---

[174] Compare Exhibits 14, 15 with Exhibit 12; see also Trial Record at 144, 166-167, 279-280.
[175] Exhibit 19; Conditional Examination at 33.
[176] Id.
[177] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

213.  The People refer to the Napue violations alleged by the petitioner in their response to his writ as passing references that were insignificant to the grand jury presentation.

214.  This claim is false.  The People were under an obligation to inform the Appellate Division: Second Department and the New York State Court of Appeals of Charles Emma's April 2008 knowledge of Minnie Simmons' daughter's report to him of her mother's dementia.[178]

215.  The People had a duty to correct the record during the writ process and reveal to the state courts information in their possession that they knew was unfavorable to their cause.  The state prosecutors violated the federal constitution by concealing the material information about reports of Minnie Simmons' dementia known by them through Charles Emma.[179]

216.  Instead, the People concealed crucial and material information from the state courts that would have made a significant difference with respect to the outcome of the writ and the case as a whole.

217.  The writ petitioner sought the disclosure of the medical and psychiatric records of Minnie Simmons and a deposition of Charles Emma as a part of his writ application.  Had the court known of Mr. Emma's knowledge of the reports of Minnie Simmons' dementia the disclosure application, and likely the writ, would have been granted.

---

[178] Compare Exhibits 14, 15 with Exhibit 12; see also Trial Record at 144, 166-167, 279-280.
[179] Napue v. Illinois, 360 U.S. 264, 269-272 (1959); Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); Leka v. Portuondo, 257 F.2d 89, 99-103 (2d Cir. 2001); St. Germain v. United States, U.S. Dist. LEXIS 9784 (S.D.N.Y. 2004); United States v. Cobb, 271 F.Supp. 159, 163 (S.D.N.Y. 1967).

218.  The Appellate Division: Second Department denied the petitioner's disclosure
      requests and the writ without knowledge of the information Charles Emma
      could have provided because the People deliberately concealed the material.

219.  But for the People's deliberate federal constitutional violation of the writ
      application process the petitioner's writ would have been granted and the
      indictment dismissed.

  m.  The petitioner's Singer and Fourteenth Amendment applications would have
  been granted but for the People's deliberately false response to defense application
                               for relief.

220.  The habeas petitioner moved to dismiss the indictment pursuant to the Sixth
      and Fourteenth Amendments to the United States Constitution and New York
      Criminal Procedure Law §30.20 because of pre-indictment delay on or about
      January 2013.

221.  The habeas petitioner alleged in state court that the state prosecutors
      deliberately withheld information regarding the onset of Minnie Simmons'
      dementia from the defense from 2009 to the May 2011 conditional examination
      in order to gain an advantage in the litigation.

222.  The defense claimed the People engaged in the deliberate spoilage of Minnie
      Simmons' recollections regarding her instructions and transactions made on
      behalf of the estate.

223.  The petitioner alleged that the People deliberately sought to allow Minnie
      Simmons' memories of facts and circumstances pertinent to the case to
      diminish so that she could not remember facts and circumstances favorable to
      the defense.[180]

---

[180] United States v. Lovasco, 431 U.S. 783, 788-795 (1977); see also United States v. Marion, 404 U.S. 307, 320, 324 (1971); People v. Singer, 44 N.Y.2d 241, 253-255 (1978).

40

224.   The defense argued the People deliberately failed to inform the accused that they knew of reports of Minnie Simmons' dementia so that the defense could not make immediate efforts to try to preserve her recollections or effectively challenge the integrity of the grand jury's findings before a state court judge or tribunal.[181]

225.   The People's repeated false affirmations to the courts with respect to revealing the reports of Minnie Simmons' dementia were evidence of bad faith efforts by the state prosecutors to impede the defense from finding out the truth regarding Minnie Simmons' pre-indictment mental capability in order to conceal information unfavorable to their cause.[182]

226.   The People knowingly and deliberately replied falsely to the defense motion to gain an advantage in the litigation.

227.   In Paragraph 16 of their response to the defendant's Singer and Fourteenth Amendment application the state prosecutor falsely affirmed that: "Charles Emma confirmed that he has never been aware of any mental condition afflicted Minnie Simmons, diagnosed or otherwise."[183]

228.   Charles Emma testified, under oath, at trial that Minnie Simmons' daughter told him in 2008 that her mother was suffering from dementia.[184]

229.   The People put forth the aforesaid false affirmation in their response to the defendant's motion a few months before the trial in order to defeat the defense motion to dismiss pursuant to Singer and the Fourteenth Amendment.

230.   The state prosecutors deliberately sought to mislead the trial court with respect to the validity of defendant's Brady applications for Minnie Simmons'

---

[181] See Napue at 269-272; see also Pelchat at 103-108; see CPL §210.35(5).
[182] Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); see also Exhibits 29, 38, 39.
[183] See Exhibit 10.
[184] Trial Record at 144, 166-167, 279-280; compare Exhibits 14, 15 with Exhibit 12.

medical and psychiatric records in order to defeat the defense motion to dismiss because of a violation of the Fourteenth Amendment to the United States Constitution.

## n. Pre-trial Applications.

231.  The accused pre-trial applications included the defendant's repeated invocations of the Sixth Amendment to the United States Constitution in a futile effort to convince the trial court that he was entitled to the notes and correspondence prepared by the People's most important witnesses as of the time those witnesses testified at trial.[185]

232.  The case was in a trial mode by early March 2013 because two significant pre-trial motions to dismiss were resolved by March 5, 2013.[186]

233.  The defendant placed on the record the severity of his concerns for obtaining access to disclosures that would help him defend against the indictment as early as April 24, 2012, more than a year before the trial.

234.  Justice Kamins was the chief judge of the criminal division at that time. In the April 2012 letter the defense told Judge Kamins that the courts presiding over his case were refusing to sign subpoenas for the defense to obtain non-privileged materials relevant to the defense.[187]

235.  The materials sought included a request for court records and communications by and to the court by third parties with information relevant to the case.[188]

---

[185] See Exhibit 49 the Pre-trial conference 6/10/13 at 10-14, 16-17, 23-24, 47, 58-59, 70-73; see also Exhibit 50 at Pre-trial conference 6/11/13 at 19-22, 26-31.
[186] See Exhibits 40, 41.
[187] See Exhibit 35.
[188] Id.

42

236. Justice Kamins never responded to the letter and Justice Walsh denied all of the relief sought by the letter.[189]

237. The defense wrote three letters to the trial court between January and June 2013 (at the trial court's suggestion) seeking court orders directing the disclosures from the People's witnesses (especially the lawyers) of the notes, memoranda, and correspondence from witnesses the state prosecutors intended to call during the trial.[190]

238. On June 3, 2013, more than one week before trial, the defense followed up two earlier 2013 requests and asked the trial court to order the production of the files of the persons listed on the People's witness list.[191]

239. The defense made specific requests for the files of the People's most important witness on their witness list, Justice Michael Pesce, more than a week before the trial and two weeks before Justice Pesce testified.[192]

240. Justice Pesce testified that he prepared notes and maintained a separate file regarding matters relevant to the trial.[193]

241. For example, Justice Pesce's notes included the names of HRA witnesses he said he spoke to about facts and circumstances relevant to the case.[194]

242. Justice Pesce refused to surrender his files as a matter of course and the trial court did not overrule his refusal.[195]

---

[189] See Exhibit 34.
[190] See Exhibits 51, 52, 53.
[191] See Exhibit 53; see also Exhibits 51, 52, 58.
[192] See Exhibit 58; see also Exhibit 49 June 10, 2013 Pre-trial conference at 12-14; see also Exhibits 51, 52, 53.
[193] See Trial Record at 558-559, 632-633.
[194] Trial Record at 632-633.
[195] Trial Record at 558-559, 632-633.

243. The habeas petitioner invoked the Sixth Amendment to the United States Constitution several times during pre-trial discussion in order to try to convince the court that he should have access to the files and notes of witnesses for the prosecution.[196]

244. The court explicitly indicated that the trial court for this case was far more concerned with expedience than the enforcement of commands of the Sixth Amendment to the United States Constitution on behalf of the defense.[197]

245. The trial court ignored all of the defendant's diligent efforts to acquire relevant disclosure materials prior to and during the trial. The court denied the requests for disclosures that were made in the several 2013 pre-trial and trial letters to the court and during the pre-trial conferences. The court then closed discovery during the pre-trial conferences and during the trial.[198]

246. The court also refused to re-consider the decision to compel the disclosure of relevant court records, memoranda, and notes prepared by the People's most important witness, Justice Pesce, notwithstanding the fact that the defense made specific requests for these materials and Justice Pesce conceded their relevance and existence.[199]

247. One of the most important components of the defense for this case was to establish for the jury that Justice Pesce had no lawful jurisdictional authority over the Estate of Charles Brown.[200]

248. The defendant's claim that Justice Pesce lacked jurisdiction was conceded in an opinion written by Justice Pesce as a part of the Brown Guardianship

---

[196] Compare Exhibits 51, 52, 53 with Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31.
[197] See Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31.
[198] Id.; see also Exhibits 56, 57.
[199] See Exhibit 49 Pre-trial conference 6/10/13 at 58-59, 70-73; see Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31; see also Exhibits 56, 57; Trial Record at 558-559, 632-633.
[200] Trial Record at 184-185, 340-341, 899-900, 1007-1011, 1148; See Exhibit 49 Pre-trial conference 6/10/13 at 50-55.

Matter in February 2010.[201]Both the trial court and the People were aware of the aforesaid decision and order by Justice Pesce prior to trial.[202]

249. The defense raised this issue during the pre-trial conferences in order to place the trial court and the People on notice that the state prosecutors' assertions of consciousness of guilt were disingenuous and would be rebutted by the defendant's factual assertion that Justice Pesce lacked lawful jurisdiction over the estate.[203]

250. The trial court reserved decision regarding this issue at the end of the pre-trial conferences but, at trial, the court precluded the defense from challenging Justice Pesce's patently false claim of jurisdiction over the estate during the trial.[204]

251. Justice Pesce and the state prosecutors knowingly offered false material testimony regarding his jurisdictional authority over the estate and the trial court refused to allow the accused to cross-examine him with his own February 24, 2010 order or other materials to impeach him.[205]

252. Further, in spite of prior notice of the importance of this issue for the defense, the trial court refused to charge the jury regarding the law that denied Justice Pesce's jurisdictional authority over the Estate of Charles Brown.[206]

253. Justice Pesce's false representations to the jury were not corrected by the trial court or the People. Worse the court refused to instruct the jurors that Justice

---

[201] See Exhibit 4; Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see Exhibit 49 Pre-trial conference 6/10/13 at 50-55; see also Exhibit 50 Pre-trial conference 6/11/13 at 37-39.
[202] Trial Record at 899-900.
[203] Id.
[204] Trial Record at 184-185, 340-341, 899-900, 1007-1011, 1148; see also Trial Record at 611, 658.
[205] Trial Record at 611, 658, 900, 1115-1116; see also Trial Record at 184-185, 340-341, 1007-1011, 1148.
[206] See Exhibit 49 Pre-trial conference 6/10/13 at 50-55; see also Exhibit 50 Pre-trial conference 6/11/13 at 37-39; see also Trial Record at 1007-1011; see also Exhibits 56-57.

45

Case 1:22-cv-01747-LDH-LB   Document 7   Filed 04/06/22   Page 46 of 72 PageID #: 128

Pesce's testimony was to be treated as any other witness testimony and that the trial judge would give the instructions on the law.[207]

o. The Trial.

254.   The habeas petitioner was denied a fair trial in violation of the federal constitution. The trial court allowed the state prosecutors to elicit known false testimony from Justice Pesce in order to win a conviction.[208]

255.   Both the state prosecutors and the trial judge knew Justice Pesce was falsely testifying with respect to a material issue of the case when he claimed that he was in charge of the Brown Estate.[209]

256.   The People, with Justice Pesce, concocted the claim that Justice Pesce was in charge of the Brown Estate because they believed Minnie Simmons would be an unreliable witness for them. The state prosecutors allowed Justice Pesce's known false testimony to stand without correction because without the testimony of the executor of the estate the People would not have an appropriate permission and authority witness necessary to support the larceny charge.[210]

257.   Larceny is not a strict liability crime and without evidence of criminal intent, in this case established by a lack of permission or authority from the executor, the People's case is insufficient as a matter of law.[211]

258.   The state prosecutors, with the aid of the trial court and Justice Pesce, substituted Justice Pesce's mendacious claim of authority over the estate in

---

[207] See Exhibit 49 Pre-trial conference 6/10/13 at 96.
[208] Trial Record at 611, 658, 900, 1115-1116.
[209] Compare Trial Record at 611, 900, 1115-1116 with Trial Record 899-900 and Exhibit 4 at page2.
[210] People v. Zona, 14 N.Y.3d 488, 493-495 (2010); People v. Chesler, 50 N.Y.2d 203, 209-210 (1980); People v. Ricchiuti, 93 A.D.2d 842, 844-845 (2 Dept. 1983).
[211] See Chesler at 209-210; Ricchiuti at 844-845.

46

order to support a material component of the larceny charge in violation of the federal constitution.[212]

259. The trial court decapitated the defense by refusing to allow the accused to cross-examine Justice Pesce and his agent, Charles Emma, regarding whether or not they had lawful jurisdictional authority to demand an accounting of the estate's assets and argue they had no lawful authority to determine the use of the estate's assets.[213]

260. The court's refusal to allow cross-examination regarding a material issue for the case denied the accused his Sixth Amendment right to confront witnesses against him and his Fourteenth Amendment right to a fair trial.[214]

261. The accused would have been able to refer Justice Pesce to his own writings to demonstrate that he did not have lawful authority to be in charge of the Brown Estate.[215]

262. Later, the court catastrophically destroyed any semblance of a fair trial by refusing to charge the jurors with New York law that would have demonstrated that neither Justice Pesce nor his agent, Charles Emma, had any lawful authority with respect to the determination of the assets of the Estate of Charles Brown.[216]

263. The trial court also precluded the defendant's use of a material expert witness, Ian Nelson.[217]

---

[212] Napue at 269-272.
[213] Trial Record at 184-185, 340-341, 1007-1011, 1148.
[214] Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Crane v. Kentucky, 476 U.S. 683, 690 (1986).
[215] Id. see also Exhibit 4 at page 2; see also Exhibit 25.
[216] Id.; see also Cupp v. Naughten, 414 U.S. 141, 147 (1973); Jackson v. Edwards, 404 F.3d 612, 624-628 (2d Cir. 2005); see also Trial Record at 1007-1011.
[217] Trial Record at 924-927.

264.   The People called a financial witness, Charles Emma, that exaggerated the legitimacy of his financial examination.  Mr. Emma testified that he engaged in a "forensic" examination of the accused financial records in order to assess whether or not the accused stole monies from the estate.[218]

265.   The People also summoned other so called "financial investigators" who described transactions from the defendant's attorney trust accounts without any context. Although the People's "financial investigators" created charts and had records of the transactions from the attorney trust accounts they examined they never spoke with Minnie Simmons to determine if any of the expenditures were unauthorized.[219]

266.   The defendant never disputed that he spent the money at issue.  The People were obligated to prove beyond a reasonable doubt that the defendant spent moneys owned by the estate that he was not authorized to spend or spent moneys that were not for the benefit of the estate.[220]

267.   The defense sought to counter the testimony offered by the People's purported "financial experts" to demonstrate the substandard nature of their proof.

268.   The defense sought to call a Certified Public Accountant, Ian Nelson.  Mr. Nelson was familiar with forensic audits from his experience and practice.  He offered to testify that any forensic accounting would involve speaking to the person responsible for the expenditures to ensure those expenditures were authorized or consistent with the goals of the entity.[221]

269.   Neither Mr. Gillon nor Mr. Emma ever met or spoke with Minnie Simmons.[222]

---

[218] Trial Record at 21, 22, 33, 295, 297.
[219] Trial Record at 280, 461; see also Chesler at 209-210; Ricchiuti at 844-845.
[220] People v. Ricchiuti, 93 A.D.2d 842, 844-845 (2 Dept. 1983); People v. Chesler, 50 N.Y.2d 203, 209-210 (1980).
[221] Trial Record at 913-914; see People v. Zona, 14 N.Y.3d 488, 493-495 (2010); Ricchiuti at 844-845; Chesler at 209-210.
[222] Trial Record at 280, 461.

270. Mr. Gillon's charts never were reviewed by Minnie Simmons.[223]

271. The United States Supreme Court has recognized that a common defense tactic is to discredit the caliber of the prosecutions' investigation. This tactic is a part of a complete defense.[224]

272. The defense was entitled to an expert witness to counter the substandard nature and presentation of the People's financial witnesses.[225]

273. The People's witnesses established that monies were spent but could not establish that the monies spent were not authorized to be spent by the executor of the estate; the executor was the only person lawfully authorized by the State of New York to determine and approve Brown Estate expenditures.[226]

p. The Appeal

274. The judgment of conviction took place May 23, 2014. The petitioner, timely, filed his Notice of Appeal with the state court June 9, 2014.

275. The appellant's brief emphasized the federal constitutional violations that occurred during the pre-indictment, post-indictment, pre-trial, and trial phases of the litigation.

276. The state appellate courts ignored nearly every federal constitutional claim made by the habeas petitioner and failed to address the federal constitutional claims with any specificity or detail.[227]

---

[223] Id.
[224] Kyles v. Whitley, 514 U.S. 419, 446-447 (1995); see also Crane at 690.
[225] Id; see also Washington v. Texas, 388 U.S. 14, 19 (1967); Pointer v. Texas, 380 U.S. 400 (1965); Davis at 315-318; Crane at 690; In re Oliver, 333 U.S. 257, 273 (1948).
[226] See New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980).
[227] See Exhibit 26.

277. The appellant argued that the state prosecutors did not establish beyond a reasonable doubt each and every element of the larceny charge in violation of the Fourteenth Amendment to the United States Constitution.[228]

278. The appellant argued that his Fourteenth Amendment rights were violated because the People could not establish the permission and authority prong of the larceny charge without the use of testimony the state prosecutors knew was false that was provided by Justice Pesce.

279. The state appeals courts ignored the fact that the prosecutors never corrected Justice Pesce's false testimony.

280. The People never sought to confront New York State law with respect to whether Justice Pesce had lawful authority to determine the use of the funds.[229]

281. He did not and his own words confirmed the appellant's claim that Justice Pesce lacked the authority to determine the use of the Brown estate's funds.[230]

282. The intermediate appeals court and the Court of Appeals of the State of New York disregarded well settled New York law and Justice Pesce's own words in order to excuse the fact that a judicial colleague testified falsely in order to assist the state prosecutors to obtain a conviction in violation of the Fourteenth Amendment to the United States Constitution.[231]

---

[228] See Jackson v. Virginia, 443 U.S. 307, 317-319 (1979); see also In re Winship, 397 U.S. 358, 362-364 (1970).
[229] See New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980).
[230] See Exhibit 4 at page 2; see also Exhibit 25.
[231] See Exhibit 26; the November 18, 2020 Decision and Order of the Supreme Court of the State of New York Appellate Division: Second Department; see also Napue at 269-272; see also Jackson at 317-319.

283.   As noted above Justice Pesce deliberately testified falsely about his jurisdictional powers over the estate during the trial. The state intermediate appellate court and the New York Court of Appeals excused Justice Pesce's offer of false testimony by their colleague by concluding his testimony was "marginally relevant and collateral."

284.   The truth is Justice Pesce's testimony was the most important proffer of testimony for the People's case. Justice Pesce was the only People's witness to testify that he had the authority to determine the use of the monies owned by the Brown Estate.[232]

285.   Justice Pesce's known false testimony offered in support of a known false claim regarding a material issue of the case violated the habeas petitioner's Fourteenth Amendment right to a fair trial.[233]

286.   The state intermediate appellate court and the New York Court of Appeals failed to review the federal constitutional import of Justice Pesce's offer of known false testimony and the People's failure to correct it once it was offered.[234]

287.   The state intermediate appellate court and the New York Court of Appeals also failed to address the trial court's efforts to protect his colleague. The trial court denied the defendant his right to cross-examine Justice Pesce on a material issue of the case, jurisdictional authority, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[235]

---

[232] Trial Record at 611.
[233] Napue at 269-272.
[234] See Exhibit 26; see also Napue at 269-272.
[235] Trial Record at 184-185, 340-341, 1007-1011, 1148; see also Washington v. Texas, 388 U.S. 14, 19 (1967); Pointer v. Texas, 380 U.S. 400 (1965); Davis at 315-318; In re Oliver, 333 U.S. 257, 273 (1948); Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Crane v. Kentucky, 476 U.S. 683, 690 (1986).

288. Further, the trial court sought to protect Justice Pesce by refusing to construct a charge on the law regarding the extent of his judicial colleague's lawful authority with respect to the Brown Estate.[236]

289. The trial court's refusal to charge the jury with the law regarding the extent of Justice's Pesce's jurisdictional authority concerning the Brown Estate was catastrophic to the defense and violated the Fourteenth Amendment to the United States Constitution. The decision denied the accused a fair trial.[237]

290. The intermediate appellate court and the New York Court of Appeals elected not to address the habeas petitioner's federal constitutional claim of undue delay. The trial court summarily denied the claim a few months before the trial.[238]

291. The habeas petitioner contended that the state prosecutors deliberately engaged in untoward pre-indictment delay from at least 2009 in order to ensure that Minnie Simmons was useless as a witness for the defense in violation of the Fourteenth Amendment to the United States Constitution.[239]

292. The People were on notice of reports of Minnie Simmons dementia since 2009. Instead of alerting the courts and the defense of her condition prior to the August 2010 indictment the People concealed this information throughout the entire pre-trial period of the case.

293. The People deliberately impeded every effort by the defense to discover material information pertaining to the mental capabilities of Minnie Simmons by the proffer of numerous false affirmations, in violation of specific Brady

---

[236] Trial Record at 1007-1011; see also Exhibits 56, 57; see also Exhibits 4 and 25.
[237] Cupp v. Naughten, 414 U.S. 141, 147 (1973); Trial Record at 1007-1011.
[238] See Exhibits 26 and 41.
[239] See United States v. Marion, 404 U.S. 307, 320, 324 (1971); United States v. Lovasco, 431 U.S. 783, 788-795 (1977); Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); see also Exhibits 37, 41.

52

requests, in order to prevent the defense from using information regarding her mental incapacity to defend against the charges.

294. The People went so far as to lose medical and psychiatric records reviewed by the trial court in order to avoid appellate review.[240]

295. The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[241]

296. The intermediate appellate court and the New York Court of Appeals failed to address the petitioner's contention that the People knowingly made use of a false material document, a fraudulent CPL §190.30 affidavit, in the grand jury to obtain the indictment and later win a conviction after trial.

297. The habeas petitioner contended that the People's knowing use of a false material document before the grand jurors violated his Fourteenth Amendment rights pursuant to the United States Supreme court ruling in Napue.[242]

298. The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[243]

299. The habeas petitioner also asserted that the state court violated his Sixth and Fourteenth Amendment rights by denying him, Ian Nelson, as an expert witness to refute the People's financial witnesses.

300. The habeas petitioner sought to call Ian Nelson to establish a material flaw in the People's case; that although the state prosecutors established that monies

---

[240] See Exhibits 59 and 60.
[241] Exhibit 26.
[242] See Napue at 269-272.
[243] See Exhibit 26.

were spent by the petitioner from the Brown Estate proceeds the People failed to prove that there was no authorization by the executor to spend these monies.

301.  Ian Nelson's expertise was crucial to the defense and it was a denial of the petitioner's Sixth and Fourteenth Amendment rights to deny his testimony.[244]

302.  The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[245]

303.  The intermediate appellate court and the New York Court of Appeals erred with respect to the habeas petitioner's Sixth and Fourteenth Amendment claims because of the trial court's refusals to grant the disclosures of the files of witnesses the People intended to call.

304.  The issue was well preserved because it was raised several times during pre-trial proceedings in writing and on the record.[246]

305.  The trial court refused to follow its own orders and direct the delivery of witness files (particularly of Justice Pesce) so that the habeas petitioner could fully and fairly cross-examine material witnesses for the People's case.

306.  The trial court's refusal to direct the delivery of trial witness files during the examination of the witness violated the Sixth and Fourteenth Amendment rights of the accused.[247]

307.  The intermediate appellate court and the New York Court of Appeals failed to address this federal constitutional claim with any specificity in the opinion.

---

[244] Kyles at 446-447; Washington at 19; Crane at 690; Davis at 315-318; Pointer at 403-408; Van Arsdall at 679-680, 684; see also Howard v. Walker, 406 F.3d 114, 131-135 (2d Cir. 2005).
[245] Exhibit 26.
[246] See Exhibits 51, 52, 53; see also Exhibit 49 June 10, 2013 Pre-trial conference at 12-14.
[247] Exhibit 50 Pre-trial conference 6/11/13 at 19-22, 26-31; see Washington at 19; Crane at 690; Davis at 315-318; Van Arsdall at 679-680, 684; In re Oliver at 273; Brady at 87; see also Pennsylvania v. Ritchie, 480 U.S. 39 (1987).

308.   The Supreme Court Appellate Division: Second Department denied relief on November 18, 2020 and the Court of Appeals of the State of New York denied leave to appeal March 31, 2021.[248]

## HABEAS CHARGES

309.   All state court appeals for the May 23, 2014 judgment of conviction pertaining to Kings County Indictment 4743·2010 have been exhausted.

## GROUND 1

310.   The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 1 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

311.   The gravamen of the state prosecutors charge against the plaintiff petitioner is that the accused took and kept money from the Estate of Charles Brown without the permission or authority of the estate.

312.   The People sought to prove their case and earn a conviction by knowingly using the false testimony of Justice Michael Pesce.  Prior to the death of Charles Brown in June 2003 Justice Pesce served as Mr. Brown's guardianship judge.

313.   Once Charles Brown passed away his estate was probated and Minnie Simmons was named his executor.  The property at issue was sold by Minnie Simmons as executor pursuant to an order of the Surrogate's Court.  Justice Pesce had no authority to determine the use of the estate assets beyond the June 2003 death of Charles Brown.

---

[248] See Exhibits 26 and 27.

*55*

314. The People determined at some point that Minnie Simmons would not be a reliable witness for them. Without the executor of the Estate of Charles Brown the People would not be able to establish the permission and authority component of the larceny charge.

315. The People knowingly and fraudulently introduced Justice Pesce as their permission and authority witness at trial. The state prosecutors elicited known false material testimony from Justice Pesce, to wit: Justice Pesce falsely claimed that he was in charge of the Brown Estate long after Charles Brown died.[249]

316. The People knowingly used materially false testimony in order to satisfy the permission and authority component of the larceny charge at trial. The state prosecutors deliberately failed to correct Justice Pesce's false testimony.

317. The trial court unreasonably applied Napue v. Illinois in the court's determination to allow Justice Pesce's false testimony to stand without correction. The trial court's determination denied the habeas petitioner his Fourteenth Amendment right to a fair trial.[250]

318. The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 1 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of Napue v. Illinois, 360 U.S. 264, 269-272 (1959); California v. Trombetta, 467 U.S. 479, 484-485 (1984); Kyles v. Whitley, 514 U.S. 419, 435 (1995); Banks v. Dretke, 540 U.S. 668, 675-676 (2004); United States v. Agurs, 427 U.S. 97, 103-106 (1976).

---

[249] Compare Exhibit 4: In the Matter of Brown, No. 107103-99 at 2 (Supreme Court, Kings County, February 24, 2010) with Trial Record at 611, 658, 900, 1115-1116.
[250] See Napue at 269-272.

319. The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

320. Justice Pesce's false testimony was revealed by his own words which were introduced by the defense during motion practice and for applications for relief during the pre-trial and trial proceedings.[251]

321. The trial court should not have given credence to testimony the court understood would be false during the pre-trial stages of the litigation and at trial.[252]

322. The court's decision to ignore the petitioner's referrals to the February 2010 order and the 2008 letter were based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

323. State court remedies and appeals with respect to Ground 1 are exhausted.

324. The state court errors were not harmless.

325. The issue for Ground 1 was raised on direct appeal.

## GROUND 2

326. The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 2 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

---

[251] See Trial Record at 899-900; see also Exhibits 4 and 25.
[252] See Exhibit 49 Pre-trial conference 6/10/13 at 50-55; see also Exhibit 50 Pre-trial conference 6/11/13 at 37-39; see also Trial Record at 1007-1011; see also Exhibits 56-57.

327.  The gravamen of the state prosecutors charge against the plaintiff petitioner is that the accused took and kept money from the Estate of Charles Brown without the permission or authority of the estate.

328.  The People sought to prove their case and earn a conviction by knowingly using the false testimony of Justice Michael Pesce.  Prior to the death of Charles Brown in June 2003 Justice Pesce served as Mr. Brown's guardianship judge.

329.  Once Charles Brown passed away his estate was probated and Minnie Simmons was named his executor.  The property at issue was sold by Minnie Simmons as executor pursuant to an order of the Surrogate's Court.  Justice Pesce had no authority to determine the use of the estate assets beyond the June 2003 death of Charles Brown.

330.  The People determined at some point that Minnie Simmons would not be a reliable witness for them.  Without the executor of the Estate of Charles Brown the People would not be able to establish the permission and authority component of the larceny charge.

331.  The People knowingly and fraudulently introduced Justice Pesce as their permission and authority witness at trial.  The state prosecutors elicited known false material testimony from Justice Pesce, to wit: Justice Pesce falsely claimed that he was in charge of the Brown Estate long after Charles Brown died.

332.  The People knowingly used materially false testimony in order to satisfy the permission and authority component of the larceny charge at trial.  The state prosecutors deliberately failed to correct Justice Pesce's false testimony.

333.  The trial court unreasonably applied Davis v. Alaska, Crane v. Kentucky, and other seminal United States Supreme Court cases in the court's determination

to allow Justice Pesce's false testimony to stand without allowing the defendant to exercise his Sixth and Fourteenth Amendment rights to cross-examine him regarding his jurisdictional authority over the estate.[253]

334.    The trial court's determination denied the habeas petitioner his Sixth and Fourteenth Amendments right to cross-examination, a complete defense, and for a fair trial.

335.    The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 2 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of Kentucky v. Stincer, 482 U.S. 730, 736 (1987); Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948); Chambers v. Mississippi, 410 U.S. 284, 294, 302-303 (1973); Pointer v. Texas, 380 U.S. 400, 403-408 (1965); Washington v. Texas, 388 U.S. 14, 19 (1967); Crawford v. Washington, 541 U.S. 36, 42-52 (2004).

336.    The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

337.    Justice Pesce's false testimony was revealed by his own words which were introduced by the defense during motion practice and for applications for relief during the pre-trial and trial proceedings.

338.    The trial court ignored facts that were a part of the court record.  The defense should have been given the opportunity to use the written words of Justice

---

[253] Trial Record at 184-185, 340-341, 561, 563, 606-611, 621-624, 900, 1007-1010, 1115-1116, 1148.

Pesce to cross-examine him.[254]The court's failure to consider Justice Pesce's February 2010 order and his 2008 letter were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

339.   State court remedies and appeals with respect to Ground 2 are exhausted.

340.   The state court errors were not harmless.

341.   The issue for Ground 2 was raised on direct appeal.

## GROUND 3

342.   The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 3 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

343.   State prosecutors deliberately withheld information they were required to furnish to the defense pursuant to <u>Brady v. Maryland</u> in order to gain an advantage during the litigation.

344.   The People were aware as early as 2009, more than one year before the August 2010 indictment, of reports that some measure of dementia inflicted their principal witness, Minnie Simmons.

345.   Rather than inform the court and the defense of the potential for the partial or complete loss of Minnie Simmons' capability to perceive or recall facts and circumstances material to the case the People repeatedly filed false

---

[254] Compare Trial Record at 611 with Exhibits 4 and 25.

affirmations over the course of three years to impede the defendant's ability to obtain disclosures regarding her mental capabilities as a witness at trial.

346.   The People repeatedly flouted state court orders pursuant to <u>Brady</u> and falsely affirmed to the court on multiple occasions that they had no knowledge of reports of Alzheimer's disease or dementia attributable to Minnie Simmons.

347.   The People were aware of report's that Minnie Simmons was suffering from dementia or Alzheimer's disease as early as 2009 several months before the August 2010 indictment.  The state prosecutors did not inform the defense of Minnie Simmons' daughter's reports of her dementia until the June 2013 trial.[255]

348.   The People engaged in this misconduct to ensure the defense would be unable to use Minnie Simmons as a witness because her memories of her involvement with the estate and the guardianship would fade.

349.   The repeated <u>Brady</u> violations over the course of several years were evidence of bad faith efforts by the People to impede the disclosure of and conceal material evidence in violation of the petitioner's Fourteenth Amendment rights.

350.   The court denied the defendant's application for the dismissal of the indictment for untoward prosecutorial delay in violation of the Fourteenth Amendment on March 5, 2013.[256]

351.   The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 3 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of:

---

[255] See Exhibit 12; compare Trial Record at 144, 166-167, 279-280, 312 with Exhibit 10.
[256] Exhibit 41.

United States v. Lovasco, 431 U.S. 783, 788-795 (1977); United States v. Marion, 404 U.S. 307, 320, 324 (1971); Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); Brady v. Maryland, 373 U.S. 83, 87 (1963); Crane v. Kentucky, 476 U.S. 683, 690 (1986).

352. The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

353. The People lost the medical and psychiatric records reviewed by the state court in order to prevent an accurate assessment of the petitioner's Brady claims and the magnitude of their bad faith efforts of delay.

354. The court's determination that there was no evidence of Minnie Simmons' diminished mental capacity to an extent that could impact the case and that the petitioner had no basis to believe he was entitled to examine her medical and psychiatric records for cross-examination and as a part of a complete defense were unreasonable determinations of the facts in light of the evidence presented in the state court proceeding.

355. The state appellate court should have insisted upon reviewing the medical and psychiatric records reviewed by the trial court or dismissed the indictment because of spoilage by an interested party.[257]

356. State court remedies and appeals with respect to Ground 3 are exhausted.

357. The state court errors were not harmless.

358. The issue for Ground 3 was raised on direct appeal.

---

[257] Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988).

## GROUND 4

359.  The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 4 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

360.  The trial court should have charged the petit jurors with state laws that governed Justice Pesce's jurisdictional authority with respect to the Brown Estate.[258]

361.  The trial court's failure to charge the jurors properly had a catastrophic impact upon the federal Due Process rights of the defendant because it allowed a material falsehood regarding Justice Pesce's jurisdictional authority to stand without correction.[259]

362.  The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 4 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of: Cupp v. Naughten, 414 U.S. 141, 147 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986); Napue v. Illinois, 360 U.S. 264, 269-272 (1959); United States v. Agurs, 427 U.S. 97, 103-106 (1976).

363.  State court remedies and appeals with respect to Ground 4 are exhausted.

---

[258] New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980); MHL Article 81; See Exhibit 4; see also In the Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Matter of Frank's Estate, 283 N.Y. 106, 110 (1940); see also Trial Record at 1007-1011; see also People v. Watts, 57 N.Y.2d 299, 300 (1982); see also People v. Moscato, 251 A.D.2d 352, 353 (2 Dept. 1998).
[259] Cupp at 147.

364. The state court errors were not harmless.

365. The issue for Ground 4 was raised on direct appeal.

## GROUND 5

366. The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 5 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

367. The People should not have presented a known false CPL §190.30 affidavit to the grand jurors prior to the August 2010 indictment.  Further, the People should have corrected their use of the false affidavit before the grand jury once they realized Minnie Simmons asserted that she did not sign the document.[260]

368. The People knowingly charged the grand jurors with a fraudulent material document and they did not correct the false material information before the grand jurors when they realized their presentation to the grand jurors was false.[261]

369. The trial court's failure to charge the grand jurors properly had a catastrophic impact upon the federal Due Process rights of the defendant.

370. The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 5 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of: Cupp

---

[260] See Exhibit 19 the 5/18/11 Conditional Examination at 33.
[261] Pelchat at 103-108; see Napue at 269-272; Agurs at 103-106.

AP-82

v. Naughten, 414 U.S. 141, 147 (1973); Napue v. Illinois, 360 U.S. 264, 269-272 (1959); California v. Trombetta, 467 U.S. 479, 484-485 (1984); Kyles v. Whitley, 514 U.S. 419, 435 (1995); Banks v. Dretke, 540 U.S. 668, 675-676 (2004); United States v. Agurs, 427 U.S. 97, 103-106 (1976).

371.  The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

372.  It was unreasonable for the state courts to deem the CPL §190.30 affidavit a truthful and legitimate document of integrity after Minnie Simmons' testimony under oath on questioning by the People that she did not sign the document.[262]

373.  State court remedies and appeals with respect to Ground 5 are exhausted.

374.  The state court errors were not harmless.

375.  The issue for Ground 5 was raised on direct appeal.

## GROUND 6

376.  The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 6 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

---

[262] See Exhibit 19 at 33; see also Exhibit 49 at 36, 37.

377.  The trial court denied the defendant a complete defense by refusing to impose its order to require the People to furnish the defense with notes, memoranda, and files of material witnesses for the prosecution.[263]

378.  The defense repeatedly asked the trial court to compel the production of the notes, memoranda, and files of material witnesses by the time those witnesses testified at trial. The trial court's refusal to order the People's witnesses to furnish these materials violated the petitioner's Sixth and Fourteenth Amendment rights for compulsory process, to confront witnesses against him, and for a fair trial.

379.  The habeas petitioner's Sixth and Fourteenth Amendment rights were particularly denied with respect to the trial court's refusal to order Justice Pesce to provide his notes, memoranda, and files.

380.  Justice Pesce conceded he was in possession of files material and relevant to the case; he just refused to turn them over to the defense and the trial court refused to impose the requirements of the Sixth And Fourteenth Amendments upon his colleague.[264]

381.  The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 6 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of: Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948); Washington v. Texas, 388 U.S. 14, 19 (1967); Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Kentucky v. Stincer, 482 U.S. 730, 736 (1987); Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986).

---

[263] See Exhibits 51, 52, 53; see also Exhibit 49 at 13, 14, 23-24
[264] Trial Record 558-559, 632-633.

382. The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

383. The state court representations that the petitioner did not make specific requests for material disclosures from the trial witness files in a timely manner is baseless and an unreasonable determination of the facts in light of the evidence presented in the state court proceedings upon a full and fair review of the court record.

384. State court remedies and appeals with respect to Ground 6 are exhausted.

385. The state court errors were not harmless.

386. The issue for Ground 6 was raised on direct appeal.

## GROUND 7

387. The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 7 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

388. The trial court denied the accused his Sixth and Fourteenth Amendment rights by refusing to allow Ian Nelson, a CPA, to testify for the defense.

389. The People put forth several financial witnesses in order to prosecute their case.  One witness claimed to prepare a "forensic" examination of the petitioner's financial reports. Another recited his findings via a chart. Neither

witness spoke with the executor of the estate, Minnie Simmons, regarding their findings.[265]

390.   Ian Nelson would have testified that a proper forensic examination would require an interview with the person lawfully responsible for expenditures made by a third party to determine whether or not the expenditures were authorized.[266]

391.   The defense intended to use Mr. Nelson's testimony to establish that material evidence presented by the People was disingenuous and substandard.

392.   The court's denial of Ian Nelson as a witness violated the accused Sixth and Fourteenth Amendment rights to confront witnesses and for a fair trial.

393.   The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 7 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of: Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948); Washington v. Texas, 388 U.S. 14, 19 (1967); Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Kentucky v. Stincer, 482 U.S. 730, 736 (1987); Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Kyles v. Whitley, 514 U.S. 419, 435, 446-447 (1995); Napue v. Illinois, 360 U.S. 264, 269-272 (1959); California v. Trombetta, 467 U.S. 479, 484-485 (1984).

394.   The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[265] Trial Record at 280, 461.
[266] Trial Record at 913, 914.

395. The court questioned whether or not Ian Nelson could testify as an expert notwithstanding the fact that he was a CPA licensed in New York and New Jersey and had more than twenty years of accounting experience, including with forensic examinations.

396. It was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding to exclude Ian Nelson as an expert witness based upon his alleged lack of relevant professional credentials.

397. State court remedies and appeals with respect to Ground 7 are exhausted.

398. The state court errors were not harmless.

399. The issue for Ground 7 was raised on direct appeal.

## GROUND 8

400. The federal courts should grant the plaintiff petitioner's application for a writ of habeas corpus pursuant to 42 U.S.C. §1983, in lieu of 28 U.S.C. §2254, for Ground 8 because it can be shown that the adjudication of this claim on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

401. The trial court denied the accused his Fourteenth Amendment rights by excusing the state prosecutor from having to prove each and every element of the larceny charge beyond a reasonable doubt.

402. The People failed to prove the permission and authority component of the larceny charge because their permission and authority witness, Justice Michael Pesce, had no lawful jurisdictional authority over the estate to grant

69

permission or authority with respect to the determination of the use of estate assets.[267]

403. The trial court erroneously allowed Justice Pesce to testify falsely regarding his jurisdictional authority without cross-examination by the defense or a correction of the false testimony by the state prosecutor.[268]

404. The false proffer by Justice Pesce should not stand for establishing proof of a material component of the charge. The court, by allowing Justice Pesce's false claim of jurisdiction to stand without correction, lowered the requirement for a lawful and constitutionally sufficient conviction pursuant to the Fourteenth Amendment.

405. The People, effectively, were excused from proving the permission and authority component of the larceny charge by the state court allowing Justice Pesce's false testimony to stand without correction.

406. The plaintiff-petitioner claims the aforesaid state court ruling pertaining to Ground 8 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court with respect to the holdings of the United States Supreme Court cases of: Crane v. Kentucky, 476 U.S. 683, 690 (1986); Jackson v. Virginia, 443 U.S. 307, 317-319 (1979); In re Winship, 397 U.S. 358, 362-364 (1970); Napue v. Illinois, 360 U.S. 264, 269-272 (1959); California v. Trombetta, 467 U.S. 479, 484-485 (1984).

---

[267] People v. Ricchiuti, 93 A.D.2d 842, 844-845 (2 Dept. 1983); see also People v. Zona, 14 N.Y.3d 488, 493-495 (2010); New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980); MHL Article 81; See Exhibit 4; see also In the Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Matter of Frank's Estate, 283 N.Y. 106, 110 (1940); see also Trial Record at 184-185, 340-341, 561, 563, 606-611, 621-624, 900, 1007-1010, 1115-1116, 1148.
[268] Trial Record at 184-185, 340-341, 561, 563, 606-611, 621-624, 900, 1007-1010, 1115-1116, 1148.

407. The plaintiff-petitioner also claims the aforesaid state court ruling resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

408. The state courts' decision to allow Justice Pesce's false claim of jurisdictional authority to stand was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

409. State court remedies and appeals with respect to Ground 8 are exhausted.

410. The state court errors were not harmless.

411. The issue for Ground 8 was raised on direct appeal.

## RELIEF REQUESTED

1. The plaintiff-petitioner asks this court to grant relief pursuant to 42 U.S.C. §1983 in the same manner as if the plaintiff-petitioner was successful with a 28 U.S.C. §2254 application;

2. The plaintiff-petitioner asks this court for all equitable and injunctive he is entitled including and not limited to an order directing the defendant-respondents to vacate and expunge the aforesaid conviction

WHEREFORE, STEPHEN T. MITCHELL, the plaintiff-petitioner, herein, asks this Court to grant the following relief: to issue an order pursuant to 42 U.S.C. §1983, in lieu of the issuance of a Writ of Habeas Corpus, vacating said conviction and directing the State of New York to expunge the conviction forthwith or retry the plaintiff-petitioner within ninety days and any and all just relief to which the plaintiff-petitioner is entitled.

71

VERIFICATION

I affirm under the penalties of perjury pursuant to 28 U.S.C. §1746 that the aforesaid statements are true and correct to the best of my ability.

I further affirm under the penalties of perjury pursuant to 28 U.S.C. §1746 that I sent a copy of this petition to the Kings County District Attorney's Office via electronic mail and also via a mailing or postal service addressed to Appeals Division, Kings County District Attorney's Office, 350 Jay Street, New York, New York 11201 on March 30, 2021.

Dated: April 4, 2021

Stephen T. Mitchell

By:_____

Stephen T. Mitchell, Esq.

New York, NY 10025

STM7615@aol.com

# EXHIBIT 1

**Kings County**
**Indictment 4743-2010**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                    -AGAINST-

X - STEPHEN MITCHELL

                    DEFENDANTS.
------------------------------------------------X

8A

INDICTMENT NO.
4743/2010

NON-ALIGNED
RACKETS DIVISION

GRAND LARCENY IN THE SECOND DEGREE (ONE
COUNT)

CRIMINAL TERM AP-4/40?
SUPREME COURT KINGS
2010 AUG 13  PM 5: 04

**AP-4**

## COUNT ONE

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT STEPHEN MITCHELL OF THE CRIME OF GRAND LARCENY IN THE SECOND DEGREE [P.L. § 155.40(1)], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN DECEMBER 23, 2005 AND MARCH 31, 2006, IN THE COUNTY OF KINGS AND ELSEWHERE, STATE OF NEW YORK, STOLE PROPERTY HAVING AN AGGREGATE VALUE EXCEEDING FIFTY THOUSAND DOLLARS, NAMELY, A QUANTITY OF UNITED STATES CURRENCY FROM THE ESTATE OF CHARLES BROWN.

CHARLES J. HYNES
DISTRICT ATTORNEY
KINGS COUNTY

**AP-5**

COURT OF KINGS
THE PEOPLE OF THE STATE OF NEW YORK,

              Plaintiff,

              v.

    STEPHEN MITCHELL

              Defendant

      PEOPLE'S STATEMENT OF READINESS
      FOR TRIAL PER CPL 30.30

      Indictment. 4743/2010

      Please be advised that the people are ready for trial in the above
captioned case pursuant to CPL 30.30

                            CHARLES J. HYNES
                            District Attorney
                            Kings County

          By: *Eileen K. Cupassian*   Date  AUG 1 3 2010
           Assistant District Attorney

Filed with the court by attaching to the
indictment at the time of filing       Date  AUG 1 3 2010

Served on defense by personal service       Date_____

Served on defense by mailing          Date_____

**AP-6**

# EXHIBIT 2

**In re Charles Brown**
**Kings County Supreme Court**
**107103/1999**
**Guardianship Docket Sheet**

Case 1:22-cv-01747-LDH-LB   Document 7-1   Filed 04/06/22   Page 6 of 56 PageID #: 160

## 107103 / 1999

Opened: 4/16/1999 Type: * CONF Incomp

SIMMONS, M. & E.B. DAVIS, SR. AS CO-GUARDIANS INRE vs. BROWN, CHARLES AN INCAPACITATED PERSON

Atty: PLAZA      Atty:

| Filed | | Actions | RecRoom |
|---|---|---|---|
| 10/7/2010 | 🖹 | Order DISCHARGING GUARDIAN | |
| 9/30/2010 | 🖹 | Decision and order to Pay, Rpt Ad Litem, Rpt of Counsel, Statemt Approval Compensation, Affts, Affrms, etc | |
| 4/2/2010 | 🖹 | Affirm. in Opposition | |
| 3/16/2010 | 🖹 | Affirm. of Serv / G.A.L | |
| 3/5/2010 | 🖹 | Decision and order Accepting F/A, Granting Motion to Settle F/A, Submit Affrms, etc, Motion, Opp to Motion, Rpt of Counsel, Certification & Rpt Guardian Ad Litem | |
| 3/5/2010 | 🖹 | Order Vacating Discharge of Guardian | |
| 3/4/2010 | 🖹 | Affirm. of Serv w/ Statement Approval Compensation | |
| 8/25/2009 | 🖹 | MOTION COVERPAGE fee pd .guard. | |
| 6/10/2009 | 🖹 | Letter / ATTORNEY | |
| 3/11/2009 | 🖹 | MEMO conference w/ undated misc | |
| 10/2/2008 | 🖹 | Notice of appearance , affirmation of service | |
| 7/24/2008 | 🖹 | Affirm. AFFT, CONSENT, | |
| 7/3/2008 | 🖹 | Order Discharging Guardian & Appointing Charles Emma Guardian Ad Litem, No Bond | |
| 12/5/2007 | 🖹 | Order , Conference copy | |
| 6/6/2007 | 🖹 | Conference Order | |
| 2/26/2007 | 🖹 | Affts, Affrms, Letters, Invoice, Statement Approval Compensation, unsigned & copy Order, Appraisals, Minutes, etc | |
| 9/29/2006 | 🖹 | ORIG. ORDER TO CONSOLIDATE #'S 48049/01 INTO 5261/99 PROPERTY OWNED BY THE AIP, OSC AFRM, ETC | |
| 11/16/2004 | 🖹 | Order Permitting FINAL ACCOUNT | |
| 6/26/2003 | 🖹 | Notice OF SETTLEMENT, unsigned & Letter | |
| 6/18/2003 | 🖹 | Order APPOINTING APPRAISER ETC | |
| 4/30/2003 | 🖹 | Unsigned Order Show Cause, Withdrawn | |
| 3/14/2002 | 🖹 | Annual Report 2000, copy | |
| 1/15/2002 | 🖹 | LETTERS | |
| 3/12/2001 | 🖹 | Designation & Commision and Bond in the amount of BOND $65,000,00 to Guardian Property, Co-Guardian Person, M. Simmons & Co-Guardian Person E. Davis, Sr. TRAVELERS | |
| 8/22/2000 | 🖹 | Copy ord. notice entry, afft.svc. | |
| 8/9/2000 | 🖹 | Order, Judgment, Commission to auth pymt and appt EUGENE BERNARD DAVIS SR. & MINNIE SIMMONS CO-GUARDIANS PERSON & MINNIE SIMMONS GUARDIAN PROPERTY (RESETTLED) W/ BOND FOR $65,000,00 & DESIGNATION/PERSON | |
| 8/4/2000 | 🖹 | Certif of compliance w/ Notices of Appt | |
| 8/4/2000 | 🖹 | DESIGNATION & CONSENT TO ACT | |
| 8/2/2000 | | Affidavit of serv. PROOF OF CLAIM | |
| 5/16/2000 | 🖹 | Designations & Consents to Act | |
| 5/16/2000 | 🖹 | Certif of compliance w/ Notices of Appt | |
| 3/15/2000 | 🖹 | Copy ord. notice entry, afft.svc. | |
| 3/8/2000 | 🖹 | Order to show cause RPT CT EVALUATOR, AFFIRMS, AFFTS, ETC | |
| 3/8/2000 | 🖹 | Order, Judgment, Commission to auth pymt and appt GUARDIANS MINNIE SIMMONS & EUGENE BERNARD DAVIS, SR W/ BOND FOR $65,000,00, | |
| 9/14/1999 | 🖹 | Certif of compliance w/ Notice of Appt | |
| 6/17/1999 | 🖹 | Req. judical interven. fee paid unsigned osc | |
| 4/19/1999 | 🖹 | Notice of pendency | |

Total: 37

No. 650729

STATE OF NEW YORK,
COUNTY OF KINGS, SS:
I, NANCY T. SUNSHINE,
COUNTY CLERK & CLERK
OF THE SUPREME COURT,
KINGS COUNTY, DO
HEREBY CERTIFY ON

05/04/2012

THAT I HAVE COMPARED THIS
COPY WITH THE ORIGINAL
FILED IN MY OFFICE ON

MAY 04 2012

AND THE IT IS A TRUE AND
CORRECT TRANSCRIPT
THEREFROM AND OF
THE WHOLE OF SUCH
ORIGINAL.
IN WITNESS WHEREOF,
I HAVE HEREUNTO SET
MY HAND AND AFFIXED
MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, KINGS COUNTY

FACSIMILE PRODUCED
PURSUANT TO SEC. 93
COUNTY LAW

AP97

AP-96

5/7/2012

# EXHIBIT 3

In re Charles Brown
Kings County Supreme Court
107103/1999
Guardianship Bond

# TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF **KINGS**

In the Matter of the Application of

EUGENE BERNARD DAVIS, SR. and
MINNIE SIMMONS,

Pursuant to Article 81 of the Mental Hygiene Law
for the Appointment of a Guardian of the Person
and Property of

CHARLES BROWN,

An Alleged Incapacitated Person.

BOND NO. 103349845

*SUPREME COURT
KINGS COUNTY
BOND APPROVED
DATE: 3/08/01
INITIALS: JWC*

GUARDIAN'S BOND
INDEX NO. 107103/99

KNOW ALL MEN BY THESE PRESENT:

That we, **MINNIE SIMMONS**, , 893 Jefferson Avenue, Brooklyn, New York 11221, as principal, and *TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA*, having an office and principal place of business for the State of New York at 1080 Pittsford—Victor Road, Suite 202, Pittsford, NY 14534 as Surety, are held and firmly bound unto **CHARLES BROWN, an incapacitated person**, in the sum of *SIXTY FIVE THOUSAND AND 00/100 ($65,000.00) DOLLARS* lawful money of the United States, to be paid to the said **CHARLES BROWN, an incapacitated person**, his heirs, executors or administrators; for which payment, well and truly to be made, the said **Guardian** binds herself, her heirs, executors and administrators and the said Surety binds itself, its successors and assigns, jointly and severally, firmly by these presents.

Sealed with our seals and dated the **28th** day of **August 2000.**

Whereas by a resettled order of the above-entitled Court, made at I.A.S. Part 76 thereof, on the 3rd day of August, 2000, the above named **MINNIE SIMMONS**, was duly appointed  **Guardian** of personal needs and property management of the said **CHARLES BROWN**, an incapacitated person.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That if the above MINNIE SIMMONS, shall in all things faithfully discharge the trust reposed in her as Guardian of personal needs and property management of the said **CHARLES BROWN, an incapacitated person**, and obey all lawful directions of the said Court, touching the trust, and shall in all respects, render a just and true account of all moneys and other property received by her, and of the application thereof, and of her whenever required so to do by a Court of competent jurisdiction, then this obligation to be void; otherwise, to remain in full force and virtue.

_____LS
**MINNIE SIMMONS**

*TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA*

_____
**CAROLYN OFFENHARTZ
ATTORNEY-IN-FACT**

100% Recycled   30% PCW

Sep 22 09 04:06p    OFFENHARTZ & PEDERSEN LTD          12122333113          p.2

# TRAVELERS CASUALTY AND SURETY COMPANY
## OF AMERICA

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

In the Matter of the Application of                          BOND NO. 103349845

EUGENE BERNARD DAVIS, SR. and
MINNIE SIMMONS,

Pursuant to Article 81 of the Mental Hygiene Law
for the Appointment of a Guardian of the Person
and Property of

CHARLES BROWN,                          **GUARDIAN'S BOND**
                                        *INDEX NO. 107103/99*

An Alleged Incapacitated Person.

KNOW ALL MEN BY THESE PRESENT:

That we, MINNIE SIMMONS, , B93 Jefferson Avenue, Brooklyn, New York 11221, as principal, and *TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA*, having an office and principal place of business for the State of New York at 1080 Pittsford—Victor Road, Suite 202, Pittsford, NY 14534 as Surety, are held and firmly bound unto CHARLES BROWN, an incapacitated person, in the sum of *SIXTY FIVE THOUSAND AND 00/100 ($65,000.00) DOLLARS* lawful money of the United States, to be paid to the said CHARLES BROWN, an incapacitated person, his heirs, executors or administrators; for which payment, well and truly to be made, the said Guardian binds herself, her heirs, executors and administrators and the said Surety binds itself, its successors and assigns, jointly and severally, firmly by these presents.

Sealed with our seals and dated the 28th day of August 2000.

Whereas by a resettled order of the above-entitled Court, made at I.A.S. Part 76 thereof, on the 3rd day of August, 2000, the above named MINNIE SIMMONS, was duly appointed   Guardian of personal needs and property management of the said CHARLES BROWN, an incapacitated person.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That if the above MINNIE SIMMONS, shall in all things faithfully discharge the trust reposed in her as Guardian of personal needs and property management of the said CHARLES BROWN, an incapacitated person, and obey all lawful directions of the said Court, touching the trust, and shall in all respects, render a just and true account of all moneys and other property received by her, and of the application thereof, and of her whenever required so to do by a Court of competent jurisdiction, then this obligation to be void; otherwise, to remain in full force and virtue.

_____ LS.
    MINNIE SIMMONS

*TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA*

_____
    CAROLYN OFFENHARTZ
    ATTORNEY-IN-FACT

AP-99

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
TRAVELERS CASUALTY AND SURETY COMPANY
FARMINGTON CASUALTY COMPANY
Hartford, Connecticut 06183-9062

## POWER OF ATTORNEY AND CERTIFICATE OF AUTHORITY OF ATTORNEY(S)-IN-FACT

KNOW ALL PERSONS BY THESE PRESENTS, THAT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, corporations duly organized under the laws of the State of Connecticut, and having their principal offices in the City of Hartford, County of Hartford, State of Connecticut, (hereinafter the "Companies") hath made, constituted and appointed, and do by these presents make, constitute and appoint: Carolyn Offenhartz, William J. Pedersen, of New York, New York, their true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred to sign, execute and acknowledge, at any place within the United States, or, if the following line be filled in, within the area there designated

the following instrument(s): by his/her sole signature and act, any and all bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking and any and all consents incident thereto

and to bind the Companies, thereby as fully and to the same extent as if the same were signed by the duly authorized officers of the Companies, and all the acts of said Attorney(s)-in-Fact, pursuant to the authority herein given, are hereby ratified and confirmed.

This appointment is made under and by authority of the following Standing Resolutions of said Companies, which Resolutions are now in full force and effect:

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her.

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary.

VOTED: That any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary, or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority.

This Power of Attorney and Certificate of Authority is signed and sealed by facsimile under and by authority of the following Standing Resolution voted by the Boards of Directors of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, which Resolution is now in full force and effect:

VOTED: That the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.

IN WITNESS WHEREOF, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY have caused this instrument to signed by their Senior Vice President, and their corporate seals to be hereto affixed this 1st day of June, 2000.

STATE OF CONNECTICUT

}SS. Hartford

COUNTY OF HARTFORD

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
TRAVELERS CASUALTY AND SURETY COMPANY
FARMINGTON CASUALTY COMPANY

  

By _____

George W. Thompson
Senior Vice President

On this 1st day of June, 2000 before me personally came GEORGE W. THOMPSON to me known, who, being by me duly sworn, did depose and say:  that he/she is Senior Vice President of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, the corporations described in and which executed the above instrument; that he/she knows the seals of said corporations; that the seals affixed to the said instrument are such corporate seals; and that he/she executed the said instrument on behalf of the corporations by authority of his/her office under the Standing Resolutions thereof.



My commission expires  June 30, 2001  Notary Public
Marie C. Tetreault

CERTIFICATE

I, the undersigned, Assistant Secretary of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, stock corporations of the State of Connecticut, DO HEREBY CERTIFY that the foregoing and attached Power of Attorney and Certificate of Authority remains in full force and has not been revoked; and furthermore, that the Standing Resolutions of the Boards of Directors, as set forth in the Certificate of Authority, are now in force.

Signed and Sealed at the Home Office of the Company, in the City of Hartford, State of Connecticut. Dated this _28 TH_ day of

_Av g s s_          , 2000.

  

By _____

Kori M. Johanson
Assistant Secretary, Bond

AP-101

## TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
### HARTFORD, CT. 06183

#### ATTORNEY-IN-FACT JUSTIFICATION
#### PRINCIPAL'S ACKNOWLEDGMENT — IF A CORPORATION

... of New York, County of                                    } ss.

On this            day of                              , before me personally appeared
to me known, who, being by me duly sworn, deposes and says: That he/she resides in the City of
that he/she is the                                                             of
corporation described in and which executed the within instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that
it was so affixed by order of the Board of Directors of said corporation, and that he/she signed his/her name thereto by like order.

#### PRINCIPAL'S ACKNOWLEDGMENT — IF INDIVIDUAL OR FIRM

State of New York, County of                           } ss.

On this            day of                              , before me personally appeared
to be (the individual) (one of the firm of                                              ) described in and who executed the within instrument, and
he/she thereupon duly acknowledged to me that he/she executed the same (as the act and deed of said firm).

#### SURETY COMPANY'S ACKNOWLEDGMENT

State of New York          }
                           } ss.:
County of N Y              }

On the 28 th day of August in the year 2000 before me, the undersigned, personally appeared CAROLYN OFFENHARTZ personally known to me or proved to
me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their/capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the
instrument.

WILLIAM J. PEDERSEN
NOTARY PUBLIC, State of New York
No. 31-4997302
Qualified in New York County
Commission Expires June 1, 200_                                              Notary Public

### TRAVELERS CASUALTY AND  SURETY COMPANY OF AMERICA
### Hartford, Connecticut  06183

#### FINANCIAL STATEMENT AS OF DECEMBER 31, 1999
#### AS FILED WITH THE INSURANCE DEPT. OF THE STATE OF NEW YORK
#### CAPITAL STOCK $ 6,000,000

| ASSETS | | | LIABILITIES | | |
|---|---|---|---|---|---|
| ...ash & Invested Cash | $ | 32,861,608 | Unearned Premiums | $ | 151,365,139 |
| ...onds | | 1,021,084,755 | Losses | | 261,237,044 |
| ...tock | | 36,031,758 | Loss Adjustment Expenses | | 73,915,852 |
| ...ther Invested Assets | | 17,761,265 | Accrued Expenses and other | | |
| ...vestment Income Due | | | Liabilities | | 147,509,717 |
| ...and Accrued | | 15,331,517 | Provision for Reinsurance | | 11,084,820 |
| ...remium Balances | | 23,292,453 | | | |
| ...einsurance Recoverable | | 5,282,632 | Total Liabilities | | 645,112,572 |
| ...deral Income Tax Recoverable | | | | | |
| ...ceivable for Securities | | 2,831,655 | Capital Stock | 6,000,000 | |
| ...her Assets | | 360,800 | Paid in Surplus | 198,297,402 | |
| | | | Other Surplus | 305,428,668 | |
| | | | Surplus to Policyholders | | 509,726,070 |
| ...tal | $ | 1,154,838,643 | Total | $ | 1,154,838,643 |

...urities carried at $14,238,049 in the above statement are deposited with public authorities, as required by law

# EXHIBIT 4

In re Charles Brown
Kings County Supreme Court
107103/1999
Decision and Order
February 24, 2010
(Pesce, J.)

107103/1999 Decision and order Accepting F/A, Granting Motion to Settle F/A, Submit Affirms, etc, Motion, Opp to Motion, Rpt of Counsel, Certification & Rpt Guardian Ad Idn

# ORIGINAL

At an IAS Part 76 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, located at Civic Center, Borough of Brooklyn, City and State of New York, on the 24th day of February, 2010.

Supreme Court of the State of New York
County of Kings

**P R E S E N T :**

Hon. Michael L. Pesce
Justice

————————————————————x

In the Matter of

**CHARLES BROWN**

An Incapacitated Person

————————————————————x

**DECISION AND ORDER**

**Index No. 107103/99**

Charles L. Emma, Esq., the Guardian ad Litem of Charles Brown, the Incapacitated Person, moves to settle the Final Account in this matter in the form of an "Account Stated", directing the Guardian, Minnie Simmons, or her attorney Stephen T. Mitchell, Esq, to turn over the sum of $401,082.50 plus costs and 9% interest, directing the surety, Travelers Casualty and Surety Company, to pay a surcharge in the event Mr. Mitchell, or the Guardian, fail to make said payment, and setting a fee for his services.

Joseph P. McNulty, Esq. of Carroll, McNulty & Kull, L.L.C., representing "Travelers", opposes the surcharge part of the motion in that the Guardian's fiduciary role, as covered by the bond, ended upon the Incapacitated Person's death on June 26, 2003.  Moreover, he argues that the alleged misappropriation of the $401,082.50 with or without Mr. Mitchell's involvement,

Page 1

Printed: 1/8/2015

07/03/1999 Decision and order Accepting F/A, Granting Motion to Settle F/A, Submit Affirms, etc, Motion, Opp to Motion, Rpt of Counsel, Certification & Rpt Guardian ad Litem

occurred more than two years after the Incapacitated Person's death pursuant to Mr. Mitchell's role as attorney for Minnie Simmons, who was appointed the Executrix of the Incapacitated Person's estate in Surrogate Court and not as attorney for Ms. Simmons as Guardian of Charles Brown.

Mr Colin Bull, Esq. as Counsel to Eugene B. Davis, a distributee of the Estate of Charles Brown, in every appearance has opposed Mr. Mc Nulty's position and is in support of that part of the Motion which provides for a surcharge of the Surety.

Mr. Stephen T. Mitchell, Esq. also opposes on the grounds that Mr. Emma has no legitimate role in this matter having been appointed after the death of the Incapacitated Person, that the proper forum for all issues is the Surrogate's Court, that the account is incomplete, and that he will submit the proper accounting.

Sherry Weindorf, Esq. appointed as Counsel to Review Mr. Emma's report, submitted her own report dated August 20, 2009 concluding that Mr. Emma's motion should be granted.

After due consideration of all submissions in this matter, the relevant statues and rules, and the oral arguments made by all parties which appeared in the past two years, it is this Court's opinion that the issue of the surcharge is one properly to be considered by the Surrogate's Court. Albeit at times, the Supreme Court and Surrogate Court have concurrent jurisdictions, the real estate property was ultimately sold pursuant to an Order of the Surrogate Court. Mr Mitchell's inability to account for the $401,082.50 in proceeds from the sale ordered by the Surrogate Court is a matter properly before that Court.

That part of the surcharge relating to the expenses caused by the failure of Mr. Mitchell to properly discharge his fiduciary duties and provide for the necessary motions to terminate the

Page 2

07103/1999 Decision and order Accepting F/A, Granting Motion to Settle F/A, Submit Affirms, etc, Motion, Opp to Motion, Rpt of Counsel, Certification & Rpt Guardian Ad Litem

guardianship, in this case Mr. Emma and Ms. Weindorf's fees and costs, will be acted upon by

this Court at a hearing to be conducted on the adjourned date of May 20, 2010, at 10:00 a.m.

unless previously settled by the surety, Travelers Casualty.

This Court will decline from granting any fees, commissions and costs to either Guardian

and her attorney, Mr. Mitchell, due to their failure to discharge their fiduciary duties.

Now, it is hereby

ORDERED that the Final Account by Mr. Emma is accepted in the form of the "Account

Stated" and that a review by the guardianship clerk's office is waived, given the lack of funds

remaining , and it is

ORDERED that the Motion to Judicially Settle the Final Account is granted, and it is

ORDERED that the issue of a surcharge for the net proceeds of the sale of the real

property be brought before the Surrogate Court, and it is

ORDERED that Mr. Emma and Ms. Weindorf submit their Affirmation of Services to

this Court and to "Travelers" and that all three parties engage in settlement negotiations and

report back to this Court, and it is

ORDERED that if there is no settlement, all parties must appear before this Court on May

20, 2010 at 10:00 a.m.

ENTER,

Hon. Michael L. Pesce, J. S. C.

Page 3

THOSE ON NOTICE:

TO: Richard Balsam, Esq.
New York City Department
of Social Services
180 Water Street, Room 1826
New York, NY 10038

Eugene Davis, Sr.
203 North 13th Street
Wilmington, NC 28401

Linda Simmons
893 Jefferson Avenue
Brooklyn, NY 11221

Marshall Kaplan, Esq.
40 Clinton Street, Suite 1H
Brooklyn, NY 11201

Stephen Mitchell
67 Wall Street
New York, New York 10005

CHARLES L. EMMA, ESQ.
8410 Third Avenue - 2nd Floor
Brooklyn, New York 11209

Colin Bell, Esq.
110 Wall Street, 11th Floor
New York, NY 10005 – 3811

Minnie Simmons
c/o Bishop Henry B. Hucles
Episcopal Nursing Home
835 Herkimer Street
Brooklyn, New York 11233

Joanne Simmons
5613 Tunbridge Wells Road
Lithonia, GA 30058

Travelers
Bond and F.P. Claims
Attn: Peter Zaugardi
10 Sentry Parkway, Suite 300
Blue Bell, PA 19422-2302

Joseph McNulty, Esq.
Carroll, McNulty & Kull
570 Lexington Avenue - 10th Floor
New York, NY 10022

[illegible]
[illegible] 11201

RECEIVED ________ BY ________

# EXHIBIT 5

In the Matter of Charles Brown
Kings County Surrogate Court
3350/2003
Decree
Granting Probate
(Feinberg, J.)

35

Present, Hon.  MICHAEL H. FEINBERG , Judge of the Surrogate's Court of Kings County

In the Matter of Proving the Last Will and Testament of

**Charles Brown**

File No.  ∂∂50-19-2009

Decree Granting Probate.

**SATISFACTORY PROOF** having been made that jurisdiction has been obtained of all persons entitled to notice of this proceeding.

And the witnesses to said Last Will and Testament dated  **Nov. 6, 1998**   having been sworn and examined, their examination having been reduced to writing, and filed, and it appearing that said Will  **was**  duly executed, and that the Testat **or**  at the time of executing  **it** , was in all respects competent to make a Will, and not under restraint; and this Court being satisfied of the genuineness of the Will  , and the validity of its execution; and the Probate thereof not having been contested;

**IT IS DECREED**, that the instrument  offered for probate herein be, and the same hereby  **is**  admitted to probate as the Last Will and Testament  of the said

**Charles Brown**  deceased,

valid to pass Real and Personal property, and that the said Will and this Decree be recorded, and that Letters Testamentary be issued to the Execut **rix  Terrance Simmo**  who may qualify thereunder.

**00771**

AP-11

Hon. MICHAEL H. FEINBERG,
Surrogate

# EXHIBIT 6

In the Matter of Charles Brown
Kings County Surrogate Court
3350/2003
Affidavit of Heirship
August 21, 2003
(Marshall Kaplan, Attorney)

SURROGATE'S COURT : KINGS COUNTY
-----------------------------------------------------------x
Probate Proceeding, Will of

     CHARLES BROWN,               File No.

                       Deceased.        AFFIRMATION OF HEIRSHIP
-----------------------------------------------------------x

State of New York, County of Kings:

          MARSHALL G. KAPLAN, an attorney admitted to practice in all Courts of New

York, under the penalty of perjury states:

          I am the attorney for the petitioner herein and make this affirmattion of heirship.

The sources of my information are proceedings in the Supreme Court of the State of New York

County of Kings, Index No. 107103/99, in the Matter of Charles Brown, an alleged incapacitated

person. In that proceeding, the petitioners, Eugene. Bernard Davis, Sr. a nephew of the deceased

and Minnie Simmons, the petitioner herein, a sister-in-law, provided information to the Supreme

Court in their petition as to the heirs at law and distributees of Charles Brown. In addition, I had

spoken with these people as well as to Dorene Smith, a niece, and I have reviewed information

provided to the scrivener of his last will and testament.

          Based on the foregoing, I ascertained that the decedent was married to GLadys

Brown, who predeceased him. They were each married only once and did not have any children

either natural or adopted. The decedent had two sisters, Lucille Myers and Dolly Smith, both of

whom predeceased him. Lucille Myers left her surviving a son, Eugene Bernard Davis, Sr.. She

was married only once and had no other children, either natural or adopted. Dolly Smith was

married only once and left her surviving three daughters, Dorene Smith, Robin Johnson and

Darlene Smith Chadwick, and had no other children. either natural or adopted. The decedent had

**AP-8**

a brother, Simon Brown, who predeased him. He was never married and had no children, either natural or adopted. The parents of the decedent were Simmon Brown and Lillie Augusta Perdy, both of whom are deceased. The decedent was approximately 94 years of age at the time of his death.

Therefore, the only survivings heirs at law and distributees of the decedent are Eugene Bernard Davis, Sr., Dorene Smith, Robin Johnson and Darlene Smith Chadwick.

Dated: Brooklyn, New York
      August 21, 2003

MARSHALL G. KAPLAN

**AP-9**

# EXHIBIT 7

In the Matter of Charles Brown
Kings County Surrogate Court
3350/2003
Order
Granting Probate
October 20, 2003
(Feinberg, J.)

SURROGATE'S COURT : KINGS COUNTY

PROBATE PROCEEDING : WILL OF

*Charlie Brown*

DECISION

FILE NO. 8 85

-----------------------------------------------

Deceased.

-----------------------------------------------

F E I N B E R G, S.

    The court is satisfied that the propounded instrument
was validly executed and that at the time of execution decedent
was of sound mind, competent in all respects to make a will and
not under restraint or undue influence (EPTL 3-2.1; SCPA 1408).

    The decree admitting the will to probate has been
signed on this date.

MICHAEL H. FEINBERG
SURROGATE

DATED: 10-20-2003 Brooklyn, New York

# EXHIBIT 8

In the Matter of Charles Brown
Kings County Supreme Court
107103/99
Order Discharging Guardian and
Appointing Guardian Ad Litem
June 26, 2008
(Pesce, J.)

FROM : C.EMMA                         PHONE NO. : 7326070966          Aug. 19 2008 02:45PM P2

At an IAS Part 76 of the Supreme
Court of the State of New York, held
in and for the County of Kings, at the
Courthouse, located at Civic Center,
Borough of Brooklyn, City and State
of New York, on the _26_ day of
June, 2008.

Supreme Court of the State of New York
County of Kings

**P R E S E N T :**

        Hon. Michael L. Pesce
              Justice

———————————————————x

In the Matter of

**CHARLES BROWN**

**An Incapacitated Person (Deceased).**

———————————————————x

**ORDER DISCHARGING
GUARDIAN AND
APPOINTING  GUARDIAN
AD LITEM**

**Index No. 107103/99**

     Upon the conferences held on March 10, 2008, April 10,2008, and June 26, 2008

and upon the Guardian Stephen T. Mitchell's failure to abide by previous Orders of this

Court to submit the Final Account of his proceedings in this matter, the Incapacitated

Person having died in 2003, and

     Now, on the Court's own motion, *Sua Sponte*, it is

     ORDERED, that Stephen T. Mitchell, Esq. is discharged as Guardian of Charles

Brown, and Charles L. Emma, Esq., 8008 20th Avenue, Brooklyn, New York 11214,

telephone # 718-232-3001, is hereby appointed Guardian ad Litem in his stead to

investigate, to subpoena records, marshal the assets, and it is further

<div align="center">1</div>

FROM : C. EMMA                      PHONE NO. : 7326070966        Aug. 19 2008 02:47PM P3

ORDERED, that Mr. Emma investigate and initiate proceedings to surcharge the surety in this matter if necessary, and it is further

ORDERED that Mr. Emma is granted permission and directed to prepare and file a Final accounting for Mr. Mitchell covering that period from the date of his appointment to the date of this Order within 60 days, and it is further

ORDERED, Pursuant to Mental Hygiene Law section 81.33 (d),  Sherry Weindorf, Esq., of 1776 Broadway, New York, N.Y.  10019 telephone # (212)575-0250, be and she is hereby appointed Counsel to review the Final Accounting, and it is further

ORDERED that Stephen T. Mitchell, Esq. and any and all parties in this matter, as it relates to the assets of the Guardianship of Charles Brown, are directed to fully cooperate with Mr. Emma in the orderly transfer of all financial records,  and it is further

ORDERED, that Mr. Emma need not obtain a bond until further order of this Court, and it further

ORDERED that any appointee named herein, shall duly qualify and consent according to law, comply with Part 36 of the Rules of the Chief Judge and file the certificate required by § 36.15 and the notice of appointment as required by § 36.3 & 36.4 of the Rules of the Chief Judge, and it is further

ORDERED that any appointee named herein shall comply with § 35-a of the Judiciary Law

E N T E R:

_____
J.S.C.

2

AP-117

# EXHIBIT 9

In the Matter of Charles Brown
Kings County Supreme Court
107103/99
Order Revoking Discharge of Guardian
February 24, 2010
(Pesce, J.)

# ORIGINAL

At an IAS Part 76 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, located at Civic Center, Borough of Brooklyn, City and State of New York, on the 24th day of February, 2010.

Supreme Court of the State of New York
County of Kings

P R E S E N T :

Hon. Michael L. Pesce
Justice

In the Matter of                                          x

**CHARLES BROWN,**                               ORDER

                                                         Index No. 107103/99

An Incapacitated Person(Deceased).              x

WHEREAS, on June 26, 2008 this Court signed an Order discharging Stephen T. Mitchell, Esq. as Guardian of Charles Brown, for his failure to abide by previous Orders of this Court, and appointing Charles L. Emma, Esq. as Guardian ad Litem to investigate and initiate proceedings to surcharge the surety in this matter, if necessary, and

WHEREAS, Mr. Mitchell was not the Guardian in this matter but the attorney for the Guardian, Minnie Simmons,

NOW, on the Court's own motion, it is hereby

ORDERED that the part of the Order discharging Mr. Mitchell in aforementioned June 26, 2008 Order is hereby vacated.

ENTER

_____
J.S.C.
Hon. Michael L. Pesce

107103/1999 Order Vacating Discharge of Guardian

Page 2 of

ORIGINAL

NEW YORK STATE
SUPREME COURT KINGS COUNTY
GUARDIANSHIP DEPARTMENT-ROOM 850
360 ADAMS STREET
BROOKLYN, NEW YORK 11201

RECEIVED  3/2/10  BY

2010 MAR -5 PM 4: 25

KINGS COUNTY CLERK

# EXHIBIT 10

**People v. Mitchell
Kings County Supreme Court
4743-2010
People's Affirmation In
Response to Defendant's <u>Singer</u> Motion
February 8, 2013**

**(Please note ¶¶16 and 53)**

1/6/2013, Pt 11

Δ COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
----------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

       - against -

       STEPHEN MITCHELL,

              Defendant.

----------------------------------------------------X

**AFFIRMATION
IN RESPONSE TO
DEFENDANT'S
SINGER
MOTION**

IND. # 4743/2010

PATRICK F. CAPPOCK, an attorney admitted to practice law before the Courts of the State

of New York, hereby affirms the following to be true under penalty of perjury:

I submit this affirmation in response to defendant's motion to dismiss the instant Indictment

pursuant to the 6th and 14th Amendments of the United States Constitution, as well as Criminal

Procedure Law § 30.20, dated January 6, 2013.

I am an Assistant District Attorney in Kings County assigned to this case and am familiar

with its facts and circumstances by virtue of a review of the files maintained by the Kings County

District Attorney's Office (hereinafter "KCDAO") pertaining to this matter, and discussions had

with various witnesses, as well as assistant district attorneys and investigators assigned to this

investigation.   The People hereby incorporate by reference all of their previous motions,

affirmations and memoranda of law filed in this case. All statements are made upon information and

belief, based upon personal conversations with other assistant district attorneys at the KCDAO, a

review of all records and files of the KCDAO, and other sources of information as expressly stated

in the individual paragraphs below.

Simmons (another daughter of Minnie Simmons), Colin Bull, Esq. (attorney for the current executor of the Estate of Charles Brown) and Edwin Benbitse (the purchaser of 302 St. James Place). In addition, Investigator Verlezza also located and interviewed numerous other individuals who received payments from the defendant's three non-IOLA accounts. Through these interviews, Investigator Verlezza ultimately determined that none of these payees had anything to do with the Guardianship or Estate of Charles Brown, or were given money on behalf of that Guardianship or Estate.

15. At no time during this extensive investigatory process did the People learn of the existence of any diagnosed mental deficiency afflicting Minnie Simmons, nor did there ever come an occasion where any representative of the People observed Minnie Simmons to exhibit symptoms of mental incompetency.

16. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer repeatedly spoke to Charles Emma, who as a civil attorney has no medical expertise. On November 6, 2009, Investigator Verlezza, in the course of one of his interviews with Mr. Emma, wrote a statement in his notes that appears to read that Colin Bull was told to withdraw Minnie Simmons from the Guardianship for a reason that appears to read "incompetency" (see Exhibit A in Defendant's instant motion). However, there was no reference to Minnie Simmons' mental state, or any degradation thereof, in this interview. Mr. Emma has confirmed with the People that he was not referring to any mental incapacity of Minnie Simmons and that he was not and has never been aware of any mental condition afflicting her, diagnosed or otherwise. Rather, Mr. Emma was referring to the physical incapacity of Minnie Simmons and his discussions with Colin Bull regarding that subject, which is an issue that he had previously

9

addressed on February 23, 2009 while in the defendant's presence in Supreme Court in relation to Index Number 107103/99.

17. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer also spoke to Linda Simmons, who is employed as a New York City police officer and has no medical expertise. On May 6, 2010, Investigator Verlezza, in the course of one of his interviews with Linda Simmons, wrote a statement in his notes that appears to read that Minnie Simmons is in the early stages of Alzheimer's (see Exhibit B in Defendant's instant motion). Linda Simmons has no recollection of ever making such a statement, and on numerous subsequent occasions has confirmed with the various representatives of the People, including myself, that this is an untrue statement. Minnie Simmons has never been diagnosed with Alzheimer's or any other disease that would render her mentally incapable, nor has she never been treated for any type of mental incapacity.

18. Upon the conclusion of this investigation, ADA Neubauer presented evidence and charges to a Kings County Grand Jury beginning July 8, 2010.[3] This evidence largely consisted of accounting evidence that established a clear pattern of conduct by defendant designed to convert the proceeds of the sale of 302 St. James Place through a series of business and personal accounts within the space of several months in violation of his fiduciary duties as counsel for the owner of that real property, the Estate of Charles Brown. The Grand Jury also heard testimony from two witnesses, Charles Emma and Linda Simmons, which each included the fact that the defendant made inculpatory admissions in their presence regarding the stolen property.

---

[3] In accordance with this Court's prior request, a copy of these Grand Jury minutes have already been provided for the Court's review.

which such extraordinary relief may be granted; (c) the defendant's claims were not reviewable in an Article 78 proceeding; (d) the Appellate Division should not exercise its discretion to review defendant's claims; and (e) defendant's claims were meritless.

51. On November 28, 2012, by written decision, the Appellate Division denied the defendant's motion in its entirety (a copy of the Decision and Order of the Appellate Division dated November 28, 2012 is attached hereto as <u>Exhibit 16</u>).

52. On or about January 11, 2013, the defendant again filed a new motion to enjoin his prosecution under the instant Indictment, before the New York State Court of Appeals. The Decision on that motion is pending.

53. The People at all times mentioned herein were, and still are, aware of their continuing obligations pursuant to <u>Brady v. Maryland</u>, 373 US 83 (1963) and have been and still are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons's testimony. The People are likewise not in possession of any records pertaining to Minnie Simmons's psychiatric, psychological or medical condition.

54. As can be seen in the above chronology, on multiple dates between December 1, 2010 and the present, the defendant has repeatedly made oral and written applications in Kings County Supreme Court, before Judge Walsh and Judge Patricia DiMango (as well as this Court) to reargue the above rulings of Judge Walsh in regards to the mental state of Minnie Simmons, despite the existence of absolutely no new facts or arguments. Both Judge Walsh and Judge DiMango have admonished the defendant on multiple occasions to refrain from making any more such frivolous and repetitive applications, the only apparent purpose of which are to delay the prosecution of the

26

instant Indictment.  However, the defendant continually refuses to abide by these admonitions, as can be seen most recently through his filing of the instant motion.

55. In support of the instant motion, defendant has once again offered no new facts, evidence, or arguments that had not previously been considered by multiple Courts in issuing the above Decisions and Orders.  Additionally, the defendant has not offered proof of any protracted delay by the People in the investigation, indicting and prosecuting of this case.  In fact, the defendant could not possibly show any proof of intentional delay by the People, since the record clearly shows a long and extensive pattern of delays by the defendant prior to his Indictment, through the years of excuses and repeated adjournments in relation to the Charles Brown Guardianship Proceeding under Kings County Supreme Court, Civil Term, Index Number 107103/99.

**WHEREFORE,** for the reasons set forth in the annexed memorandum of law, the defendant's motion must be denied in its entirety.

Dated:      Brooklyn, New York
            February 8, 2013

                                        Respectfully submitted,

                                        Patrick F. Cappock
                                        Assistant District Attorney
                                        (718) 250-2945
                                        350 Jay Street
                                        Brooklyn, NY 11201

# EXHIBIT 11

In the Matter of Charles Brown
Kings County Supreme Court
107103/1999
Report of Guardian Ad Litem
March 9, 2009

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------X
In the Matter of

CHARLES BROWN,

An Incapacitated Person/Deceased.
------------------------------------------------X

REPORT OF
GUARDIAN AD LITEM

Index No. 107103/99

CHARLES L. EMMA, ESQ., an attorney at law having an office at 8008 20th Avenue,

Brooklyn, New York, was appointed Guardian ad Litem on June 26, 2009 to review a final

account due to the death of the Incapacitated Person. The Court authorized your affiant to

investigate, subpoena records and marshal the assets.

Following my appointment, I executed my Consent, Affirmation of Responsibility, Notice

of Appointment and Certificate of Compliance. This report is dedicated exclusively to my

investigation. A later report will follow concerning the final account.

## BACKGROUND

Originally in 1999, Minnie Simmons was appointed the Guardian for the Incapacitated

Person. The Incapacitated Person died on June 26, 2003. There is an unsigned annual account in

the Court file for 2000. Minnie herself became incapacitated in 2005 and entered a nursing home

early 2006.

I spoke to the following individuals in order to obtain information:

1. Linda Simmons – Daughter of Minnie Simons.
2. Joanne Simmons – Daughter of Minnie Simmons.
3. Eugene Davis – Nephew and Guardian of the IP.
4. Collin Bull – Attorney for Eugene Davis.
5. Marshall Kaplan – Attorney who probated the Estate of Charles Brown.
6. Stephen Mitchell – Attorney who handled the sale of the IP's property.

All of the above individuals have been cooperative in providing information or documentation except Mr. Mitchell, notwithstanding my repeated demands.

Initially, I checked on the status property. A search revealed that the IP's property was sold by his Estate on December 23, 2005. A search by the NYC Department of Finance revealed that the sales price was $650,000. I was told that Mr. Mitchell handled the closing and obtained the buyer, Toju Realty. The deed shows the signature of Minnie Simmons; the signature was obviously that of an elderly, frail individual. Mr. Mitchell advised me that Mrs. Simmons, as Executor, did not attend the closing due to her incapacity, but instead he obtained her signatures at her home.

Since the deed indicated an Estate sale, I then went to Surrogate's Court and found a probate file under File No. 3350-03. I copied the probate petition and the will. The probate petition had the name of Marshall Kaplan as the attorney. He advised me that he had a prospective purchaser, but the deal fell through. In the process he was negotiating a Medicaid lien. Mr. Kaplan was very cooperative and provided me with his entire file. He also told me that the family subsequently retained the services of Stephen Mitchell who obtained a buyer on his own (Toju Realty).

Among the documents provided to me by Mr. Kaplan were sporadic bank statements and checks at Carver Federal Savings Bank from 1999-2003. These were checking account statements and checks for acct. # 800078850. There were many missing statements and checks. The balance on hand (from the 2000 annual unsigned accounting) appears to reconcile with the figures on these statements. It appears that the deposits were mainly from Social Security and rents from the premises 302 St. James Place. All of the check disbursements by Minnie Simmons appear to be appropriate and necessary expenses for the Charles Brown property. I checked both the gas and electric bills,

and they were indeed for the Charles Brown premises. It should be noted this checking account was under the name of Minnie Simmons; it was not a guardianship account. Also provided to me was a bankbook with Carver (# 2260-7249-8) entitled, "Charles Brown Power of Attorney." This must be compared to the unsigned annual accounting for 12/31/00 showing a balance on hand of $29,406.23 which is close to what is stated as the initial amount stated in the bankbook. I requisitioned copies of all statements and checks from Carver Federal Savings Bank. In addition to guardianship accounts, I also requested any Estate accounts they may have. Unfortunately, the accounts remained dormant, and the net amount of $2,095.42 was forwarded to the Comptroller's Office.

The principal beneficiaries of Charles Brown's will are the nephew, Eugene Davis, and sister-in-law, Minnie Davis. Mr. Davis and his attorney, Collin Bull, have been fully cooperative. Similarly, the two (2) daughters of Minnie Simmons, Linda and Joanne, have been fully cooperative. The only other persons who I've attempted to contact were Sherry Weindorf and Dagmar Plaza, both of whom may have some helpful information. I never received their responses to my inquiries.

In addition to the probate in Surrogate's Court, I also discovered a separate Estate file in the Accounting Department of the Surrogate's Court. Apparently, HRA started a compulsory accounting proceeding for a $292,000 unpaid Medicaid lien. This proceeding was withdrawn in October 2007. I contacted HRA, and the attorney advised me that they withdrew the proceeding only because they believed that the Estate assets were already distributed because of the sale of the house in December, 2005. Although the accounting proceeding was withdrawn, the lien is still active.

When I discovered the Estate proceeding and the sale of the house, I requested also copies of documents concerning the Estate and closing documents from Mr. Mitchell. He initially said that the documents are in different parts of the country and in his basement. In this regard, he also failed to cooperate in providing me with any documentation.

From the downloaded ACRIS documents, your affiant was able to ascertain the identity of the purchasers' attorney and the title company. Both immediately cooperated with my investigation. I had requested copies of closing statements, settlements, and checks presented by the buyer at closing. Among the checks I received was a check for $401,082.50 payable to "Minnie Simmons, Exec. of Charles Brown." This was a Chase cashier's check. Annexed hereto as Exhibit "A" is a copy of the check. It took your affiant 2 months with telephone calls and correspondence to ascertain the status of this check. Finally in December 2008, I was advised by an officer at Chase Investigations Branch that the check was deposited into a Chase IOLA account in the name of Stephen Mitchell. I had made a verbal request to Stephen Mitchell to provide me with copies of his IOLA statements and cancelled checks for the period of December 1, 2005 to December 31, 2006. Mr. Mitchell advised me, that like most of his files, these records were lost in either a flood or fire. Subsequently, on December 23, 2008, your affiant issued subpoenas to both Chase Bank and Stephen Mitchell for the production of these IOLA records. Mr. Mitchell did not comply. Mr. Mitchell further attempted to block Chase from responding to the subpoena. Finally, the requested documents were produced in chambers via fax.

Annexed hereto as Exhibit "B" are copies of the Chase IOLA statements of Stephen Mitchell for the months of December 2005 and January 2006. The December 2005 statement shows a deposit of $401,082.50 on December 23, 2005 (same date of the closing). This statement also shows a transfer to checking account (#065-034805) in the amount of $324,000. Annexed hereto as Exhibit "C" is a copy of Mr. Mitchell's Chase business card which shows among his accounts a checking account numbered #65035805. The January 2006 statement shows the following transactions:

| 1/05/06 | Transfer to Acct. #065-034805 | $20,000 |
| 1/17/06 | Cashier's Check Debit | 35,000 |
| 1/20/06 | Transfer to Acct. #065-034805 | 2,000 |
| 1/25/06 | Transfer to Acct. #065-034805 | 4,000 |
| 1/30/06 | Transfer to Acct. #065-034805 | 7,000 |

It should be noted that prior to the $401,082.50 deposit on December 23, 2005, Mitchell had no money in his IOLA account. At the February 23, 2009 conference in Court, Mr. Mitchell was unable to offer an explanation.

## FINDINGS AND CONCLUSIONS

1. The amount of at least $401,082.50 may have been converted by Stephen Mitchell.

2. A Medicaid lien by HRA in the amount of $292,000 is still active.

3. That Minnie Simmons properly administered the guardianship account and spent down the funds to $2,095.42 for the benefit of the IP. These funds are held by the Comptroller's office.

## RECOMMENDATIONS

1. A referral should be made to the District Attorney's office for further investigation.

2. A referral should be made to the Grievance Committee.

3. An alternate executor needs to be appointed in place of Minnie Simmons and pursue possible claims against Stephen Mitchell and possibly a Client Security Fund claim.

4. The Estate will have to make a claim with the Comptroller's office for the balance of the guardianship funds—$2,095.42.

Dated: March 9, 2009

Respectfully submitted,

CHARLES L. EMMA
Guardian ad Litem

# EXHIBIT 12

Vincent Verlezza
Notes

(see page 2 at bottom)

5/6/10
LINDA SIMMONS
VV
LN

Marie Simmons — mother
C. Brown — my uncle → her brother-in-law

C. Brown just got old, his wife was deceased
he named her mother beneficiary and executor.

She always mentioned to take care of him
He lived on St James Place.

He went to NH

He had a couple of years prior to the sale of the
house

Mom becomes incapacitated — goes into a NH
When she went to court the last time the
were going to appoint Gene Brown south
as executor

He still had the ? but could not find
papers when he approached me in court.

He called my mother because there was
problem — She believed me believed and — so I
called him. Mother have a problem with
Kaplan — She was telling me different stuff.

Instead of losing the house he could sell
(she didn't know that mother was taking care
of the house)

— I didn't know that there were problems with house

— We the family would to buy the house

— I spoke to my mother she said OK. Gave him on as atty. He came to her mother signed papers

— He saw her twice presents the sale once a lady came over

— I was there with mom when he gave her but — papers to sell the house

— He was going to work with me — then stoped to my sister in Ct. I didn't get too involved in this. My sister would speak to him.

— First time I met him in court he said but the — papers were damaged in fire, water damage

N.H. [redacted]

— Mother is still in — NH → [redacted]
NH - Nick
[redacted]

— She is in the early stages of Alzimer (74 years old)

Signature of movers not on the check
has signature on the contract.

She never went to the closing — they came.
the house after she signed.

I know this is not at the house
mother would not let anyone in house.

my daughter let him in once (SM)
I let him in twice — 1st time
before came to have papers signed.
(She was someone you hired for the Ag
broker in youbais)

him named in the will
CHARLES Eninus should have copy of the will

Signed: who spoke to SM.

→ Jason Sousa

# EXHIBIT 13

**Minnie Simmons
CPL §190.30(3)
Affidavit**

Dated: June 10, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, GRAND JURY
----------------------------------------X
        IN THE MATTER        :
            OF            :

CONFIDENTIAL INVESTIGATION     :
R09-077                  :        <u>AFFIRMATION</u>
                           :
----------------------------------------X

     I, Minnie Simmons, affirm under penalties of perjury that:

     1.   I am 79 years of age.  I currently reside at ██████ ████████████████████████████████████████████████████████.  I am currently physically incapacitated and immobile.

     2.   I am the Executrix of the Estate of Charles Brown, who was my brother-in-law.

     3.   Real property located at 302 St. James Place, Brooklyn, New York was among the assets owned by the Estate of Charles Brown.

     4.   I did not give a person named Stephen Mitchell or anyone else permission or authority to retain, take, use, possess or distribute any proceeds of the sale of 302 St. James Place, Brooklyn, New York for any purpose other than as I directed to pay to the Estate of Charles Brown.

                             _Minnie Simmons_
                             Minnie Simmons

Sworn to before me
This 10th day of June , 2010

Notary Public

TONIGE S. GLYNN
Notary Public, State of New York
No 01GL6159686
Qualified in Queens County
Term Expires Jan. 22, 2011

                           1

# EXHIBIT 14

**Excerpts From**
**Linda Simmons Grand Jury Testimony**
**Dated: July 8, 2010**

1

```
-------------------------------------x

    INVESTIGATION                          :


       INTO                               :   4743 / 2010


    R09K-077B                             :

-------------------------------------x



                    JULY 8, 2010



CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY

LAURA NEUBAUER, ESQ., Assistant District Attorney




                    NICOLE GRIFFIN

              ASSOCIATE REPORTER/STENOGRAPHER
```

**AP-107**

5

```
 1                          LINDA SIMMONS

 2

 3      Q.    Ma'am, in a loud an clear voice, without

 4    giving your street address where do you live?

 5            A.    Bed Stuy.

 6      Q.    How long have you live in Bed Stuy?

 7            A.    About forty years.

 8      Q.    That's in Brooklyn, right?

 9            A.    Yes.

10      Q.    Do you know somebody named Minnie Simmons?

11            A.    Yes, I do.

12      Q.    Who is that?

13            A.    That's my mother.

14      Q.    And do you know how old she is presently?

15            A.    Seventy-nine years old.

16      Q.    Where does she reside?

17            A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓Nursing Home at this

18    time.

19      Q.    How long since she's been there?

20            A.    Since the beginning of 2007.

21      Q.    Describe her physical and mental condition at

22    present for the Members of the Grand Jury.

23            A.    Mentally, she's all right, but she's

24    unable to walk.

25      Q.    Is it fair to say she's physically
```

**AP-108**

6.

```
1            A.   Yes.

2       Q.   She can't go out?

3            A.   Yes.

4       Q.   But her mental condition is alert as you know

5       it?

6            A.   Yes.

7       Q.   Do you know somebody named Charles Brown?

8            A.   Yes.

9       Q.   And who's Charles Brown?

10           A.   That's my uncle.

11      Q.   Your uncle?

12           A.   That's my mother's brother-in-law.

13      Q.   Is Charles Brown presently alive?

14           A.   No, he's not.

15      Q.   Do you know when he passed away?

16           A.   June of '03.

17      Q.   After Charles Brown passed away, are you aware

18      if there were any estate proceedings taken in his

19      name?

20           A.   Yes.

21      Q.   And was a will probated for Charles Brown?

22           A.   Yes, it was.

23      Q.   Was an Executor named to the Estate of Charles

24      Brown?

25           A.   Yes.
```

**AP-109**

# EXHIBIT 15

Excerpts From
Linda Simmons Grand Jury Testimony
Dated: August 4, 2010

```
---------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK  :


                        PLAINTIFF,    :


            against                   :    4743 / 2010



INVESTIGATION INTO R09-077B           :


                        DEFENDANT(S)  :
---------------------------------------x


                        AUGUST 4, 2010



CHARLES J. HYNES, ESQ., DISTRICT ATTORNEY, KINGS COUNTY
LAURA NEUBAUER, ESQ., ASSISTANT DISTRICT ATTORNEY.




                        DINA SOSNOW
                    REPORTER/STENOGRAPHER


D.S.
```

**AP-110**

6

LINDA SIMMONS

1

2

3   Q.   Ma'am, please state your name.

4        A.   Linda Simmons.

5   Q.   Without giving your address, where do you live?

6        A.   In Brooklyn.

7   Q.   How long have you lived in Brooklyn?

8        A.   About forty years.

9   Q.   I'm going to ask you, do you know someone by the

10  name of Minnie Simmons?

11       A.   Yes.

12  Q.   Who is that?

13       A.   It's my mother.

14  Q.   How old is your mother?

15       A.   79.

16  Q.   Where does she currently reside?

17       .A.   At ████████████ Nursing Home.

18  Q.   For how long has she resided at Bishop Huckles

19  Nursing Home?

20       A.   Since February 2007.

21  Q.   Can you describe your mothers condition, her

22  mental and physical condition?

23       A.   Mentally, she's okay.  Physically, she's

24  incapacitated.

25  Q.   Is it fair to say that she's alert and oriented?

**AP-111**

7

1        A.    Yes.

2    Q.    Is she in a position to be able to leave the

3    nursing home at all?

4        A.    No, she can't walk.

5    Q.    Prior to residing at the nursing home, where did

6    she reside?

7        A.    ▓▓▓▓▓▓▓▓▓▓▓.

8    Q.    In Brooklyn?

9        A.    Yes.

10    Q.    How long had she resided there, do you know?

11        A.    I guess about fifty years.

12    Q.    Do you know someone by the name of Charles Brown?

13        A.    Yes.

14    Q.    Who is Charles Brown?

15        A.    That's my uncle, my mothers brother-in-law.

16    Q.    Is Charles Brown alive today?

17        A.    No, he's not.

18    Q.    Do you know when he passed away?

19        A.    In June of 2003.

20    Q.    After Mr. Brown passed away, did there come a time

21    that there were any Estate proceedings brought in his

22    name?

23        A.    Yes.

24    Q.    Was there a will probated for Charles Brown?

25        A.    Yes.

**AP-112**

# EXHIBIT 16

Indictment: 4743/2010
August 13, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                    -AGAINST-

X - STEPHEN MITCHELL

                    DEFENDANTS.
------------------------------------------------X

INDICTMENT NO.
4743/2010

NON-ALIGNED
RACKETS DIVISION


GRAND LARCENY IN THE SECOND DEGREE (ONE
COUNT)

CRIMINAL TERM AP-3/10
SUPREME COURT KINGS

2010 AUG 13  PM 5: 04

AP-4

<u>COUNT ONE</u>

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT STEPHEN MITCHELL OF THE CRIME OF GRAND LARCENY IN THE SECOND DEGREE [P.L. § 155.40(1)], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN DECEMBER 23, 2005 AND MARCH 31, 2006, IN THE COUNTY OF KINGS AND ELSEWHERE, STATE OF NEW YORK, STOLE PROPERTY HAVING AN AGGREGATE VALUE EXCEEDING FIFTY THOUSAND DOLLARS, NAMELY, A QUANTITY OF UNITED STATES CURRENCY FROM THE ESTATE OF CHARLES BROWN.

CHARLES J. HYNES
DISTRICT ATTORNEY
KINGS COUNTY

**AP-5**

THE PEOPLE OF THE STATE OF NEW YORK,      :      PEOPLE'S STATEMENT OF READINESS
                                                 FOR TRIAL PER CPL 30.30
                      Plaintiff,           :

            v.                             :      Indictment. 4743/2010

            STEPHEN MITCHELL               :

                      Defendant            :
------------------------------------------

       Please be advised that the people are ready for trial in the above
captioned case pursuant to CPL 30.30

                                   CHARLES J. HYNES
                                   District Attorney
                                   Kings County

                        By: _Eileen K. Cagassian_        Date___AUG 1 3 2018___
                             Assistant District Attorney

Filed with the court by attaching to the
indictment at the time of filing                    Date___AUG 1 3 2018___


Served on defense by personal service               Date_____


Served on defense by mailing                        Date_____


**AP-6**

# EXHIBIT 17

People's Notice of Motion and Affirmation in Support of Motion
For a Conditional Examination

October 7, 2010

Supreme Court of the State of New York,
County of Kings: Criminal Term, Part 50

————————————————————X

The People of the State of New York

\- against -

Stephen Mitchell,

Defendant

————————————————————X

Notice of Motion to
permit a Conditional Examination
pursuant to Article 660
of the Criminal Procedure Law
**Indictment Number:** 4743/2010

*PLEASE TAKE NOTICE* that, upon the annexed affirmation of Laura J.
Neubauer, duly affirmed this 7Th day of October, 2010, the indictment herein and all the
papers and proceedings heretofore and herein, the undersigned will move this Court at a
term to be held in and for the county of Kings, at the Supreme Courthouse thereof on the
7th day of October, 2010, at 9:30 a.m., or as soon thereafter as counsel may be heard, for
an order pursuant to Article 660 of the Criminal Procedure Law, permitting the
conditional examination of Minnie Simmons, a witness in the above case, and for further
relief as the court may deem just and proper.

DATED:       October 7, 2010
             Brooklyn, New York

Yours, etc.,

CHARLES J. HYNES
District Attorney
Kings County

By: _____
Laura J. Neubauer
Assistant District Attorney
(718) 250-3199

**AP-124**

Supreme Court of the State of New York,
County of Kings: Criminal Term, Part 50

-------------------------------------------------X

The People of the State of New York

     - against -

Stephen Mitchell,
          Defendant

-------------------------------------------------X

Affirmation in Support of a Motion
to permit a Conditional Examination
pursuant to Article 660 of the
Criminal Procedure Law
<u>Indictment Number:</u>  4743/2010

    1.    Laura J. Neubauer, an attorney duly admitted to practice law before the Courts of the State of New York, and an Assistant District Attorney in and for the County of Kings, hereby under penalty of perjury affirms upon information and belief, the truth of the following.  The source of my information and grounds for my belief  include, unless otherwise indicated, information contained in records and files of the Kings County District Attorney's office and Grand Jury testimony and exhibits.

    2.    I submit this affirmation in support of a motion by the People, requesting an Order pursuant to Article 660 of the Criminal Procedure Law, authorizing the conditional examination of Minnie Simmons, who is currently 79-years old and confined to a full-service nursing home due to chronic illness and physical impairment.  Minnie Simmons resides in Kings County.  Further information concerning her residential address, as is required to be provided pursuant to Section 660.40(a) of the C.P.L., will be furnished to the Court upon request.

    3.    For the reasons detailed below, there is reasonable cause to believe that that Minnie Simmons possesses information material to this criminal action, that she is

<div align="center">AP-125</div>

unable now to appear before this Court, and that she will not be available as a witness at such time in the future time when her testimony will be sought because of physical illness and incapacity.

4.      On or about and between December 23, 2005 and March 31, 2006, the defendant stole in excess of $400,000 from his client, the Estate of Charles Brown, represented by Minnie Simmons as Executrix.  In short, he abused his representation of the Estate by depositing proceeds from the sale of property belonging to the Estate into his attorney IOLA account and subsequently transferred those proceeds to other accounts, including his own personal account, which he spent down to minimal balances in a short period of time.  None of the defendant's expenditures were made to the Estate of Charles Brown

5.      A Grand Jury heard evidence concerning the defendant's above conduct and indicted him for one count of Grand Larceny in the Second Degree.  On September 13, 2010, he was arraigned on this indictment and the case against him is currently pending in Part 50 of the Supreme Court of the State of New York, County of Kings.

6.      Because of Minnie Simmons' physical condition, which rendered her unavailable to appear in the Grand Jury, evidence that she did not give the defendant "permission and authority" to act as he did was introduced in the Grand Jury in the form of the sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown.

**AP-126**

She averred therein that she was 79 years-old and that the defendant lacked permission and authority to take the assets of the Estate for his personal or business benefit.

7.    I am informed by Linda Simmons, adult daughter of Minnie Simmons, that Minnie Simmons was born in 1931 and that she is in poor and deteriorating physical condition.  Specifically, Minnie Simmons is confined to a wheel chair and unable to walk.  As a result of her poor physical condition, Minnie Simmons has been confined to the nursing home for more than two years.  Linda Simmons reported that even at the time of the events contained in the indictment in late 2005, Minnie Simmons was physically incapacitated and confined to her home.  Subsequently, in 2007, when she could no longer adequately function in her own home, she was permanently placed in a nursing care facility where she resides today.  Minnie Simmons requires mechanical assistance to get into and out of wheelchairs and bed.  Her physical incapacity is not a temporary condition.  It has been ongoing since 2003, with a slow and steady decline and no foreseeable improvement in the short or long term.  And finally, the People met with and observed Minnie Simmons at the facility where she resides and observed her to be physically incapacitated and confined to a wheelchair.  She requires the assistance of nursing home staff for basic daily functioning.

8.    Accordingly, given her age and medical condition, there is reasonable cause to believe that Minnie Simmons will be unable to appear and provide trial testimony against the defendant regardless of when this case proceeds to trial.  She is physically ill and of an advanced age, and hence is currently and permanently

**AP-127**

incapacitated as a result of extreme mobility impairment, rendering her in need of constant medical supervision and care.

9. The testimony of Minnie Simmons that the defendant lacked permission to take the money subject to this case is both material and crucial to the prosecution of this case, because the People must prove, in their case in chief, that the defendant did not act with permission and authority with regard to the assets of the Estate of Charles Brown.

10. The People are requesting, therefore, that this Court order that Minnie Simmons be examined conditionally, as soon as possible, at her place of confinement at such time as is convenient to the parties and the Court. The defendant and his attorney will be present and given an opportunity to cross-examine Minnie Simmons. The People will arrange for the proceeding to be recorded stenographically and videotaped. And, if Minnie Simmons is unavailable at the time the case is ready for trial, the People request that her recorded testimony be shown to the jury in lieu of her live testimony.

11. No other applications for an Order to conditionally examine Minnie Simmons have been made.

**AP-128**

*WHEREFORE*, the People respectfully request that the Court order the conditional examination of Minnie Simmons at the earliest possible date, and the videotaping of said testimony, to assure that her testimony will be available at the time of trial.

Dated:    Brooklyn, New York
          October 7, 2010

Respectfully submitted,

Laura J. Neubauer
Assistant District Attorney
(718) 250-3199

AP-129

# EXHIBIT 18

**Order to Permit a Conditional Examination
Pursuant to Criminal Procedure Law Article 660**

Dated: May 10, 2011

Supreme Court of The State of New York
County of Kings: Criminal Term, Part 50

————————————————————X

The People of the State of New York

   - against -

Stephen Mitchell,
       Defendant

————————————————————X

**ORDER** to Permit a Conditional
Examination Pursuant to Article 660
of the Criminal
Procedure Law

Indictment Number: 4743/2010

    Appearing from the annexed affirmation of Laura J. Neubauer, sworn to on the 7th day of October, 2010 that there is reasonable cause to believe that Minnie Simmons is a material witness in the above named case, and the defendant having consented to said motion,

    Further appearing that there is reasonable cause to believe that Minnie Simmons may be unavailable as a witness at the time when her testimony may be required, due to her age, illness and/or incapacitation, it is now on motion of Laura J. Neubauer, Assistant District Attorney in and for the County of Kings, Brooklyn, New York,

    **ORDERED** that Minnie Simmons be examined conditionally before this court, on May 18, 2011.

    *IT IS FURTHER ORDERED* that such examination be stenographically recorded by a court reporter, and that such examination additionally be videotaped.

    The within order is hereby granted.

Justice John P. Walsh
Supreme Court of the State of New York,
County of Kings

Dated: May _2_, 2011
Brooklyn, New York

AP-41
Hon. John P. Walsh

AP-159

# EXHIBIT 19

**The Conditional Examination of Minnie Simmons**
**May 18, 2011**

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF KINGS  - CRIMINAL TERM  - PART 26
    ------------------------------------------------X
3   THE PEOPLE OF THE STATE OF NEW YORK

4            -against-                    INDICTMENT NO.
                                          4743-10
5   STEPHEN MITCHELL,                     Preliminary
                                          Examination
6

7                              Defendant.
    ------------------------------------------------X
8                   Bishop Henry B. Nucles Nursing Home
                    835 Herkimer Street
9                   Brooklyn, New York
                    May 18, 2011

10

11  B E F O R E:

12                   HONORABLE MARK DWYER,

13                           Justice

14
    A P P E A R A N C E S:
15

16       FOR THE PEOPLE:
              CHARLES J. HYNES, ESQ.
17            District Attorney, Kings County
         BY:  LAURA J. NEUBAUER, ESQ.
18            Assistant District Attorney

19       FOR THE DEFENDANT:
              LESLIE JONES-THOMAS, ESQ.
20            299 Broadway
              New York, New York

21

22

23

24
                              NORA LEE, RPR
25                            OFFICIAL COURT REPORTER

                                                            nl

2

Proceedings

1        COURT CLERK:  Remain seated and come to

2    order, Part 26 of the Kings County Supreme Court is

3    now in session, the Honorable Judge Mark Dwyer presiding.

4        Number three on the calendar, Indictment

5    4743 of 2010, the People of the State of New York

6    against Defendant Stephen Mitchell.  Both parties are

7    present.  Give your appearances, please.

8        MS. NEUBAUER:  Laura Neubauer, for the

9    Office of the District Attorney; N-E-U-B-A-U-E-R.

10   Good morning.

11       MS. JONES-THOMAS:  Leslie Jones-Thomas, 299

12   Broadway, Suite 920, New York, New York, appearing on

13   behalf of the defendant, Stephen Mitchell.

14       THE COURT:  And will the defendant be

15   joining us now?

16       MS. JONES-THOMAS:  Yes.  He went to the

17   restroom while --

18       THE COURT:  Okay.  What we've done before we

19   turned the camera on, we just have to note for the

20   record a couple of stipulations about exhibits, and we

21   can do that without the defendant being here.

22       MS. NEUBAUER:  All right.  We have agreed

23   that People's Number 1 stipulated into evidence will

24   be the probate file.  It's labeled Surrogate's Court,

25   State of New York, Kings County.

nl

3

Proceedings

1          People's Number 2, stipulated and agreed

2   upon going into evidence as People's 2, is a deed.

3   And it's labeled "deed."

4          And People's 3, agreed and stipulated going

5   into evidence as People's 3, is an abstract file, and

6   it's labeled Class Abstract Services, Inc.

7          And People's 4, stipulated and agreed to

8   going into evidence, is an affirmation, a mislabeled

9   affirmation, of Minnie Simmons.

10          THE COURT:  And our purpose today, of

11   course, is to take a conditional examination of

12   Miss Simmons.

13          MS. NEUBAUER:  Correct.

14          THE COURT:  That was ordered by

15   Justice Walsh.  And as soon as the defendant appears,

16   we'll be ready to go.

17          MS. JONES-THOMAS:  Mm-hmm.

18          THE COURT:  Okay.

19          (Pause in proceedings.)

20          THE COURT:  What we've just did was mark

21   into evidence the four exhibits that are going to be

22   introduced and relevant here, and we can now bring in

23   the witness.

24          MS. NEUBAUER:  Okay.

25          (Whereupon, Mr. Stephen Mitchell entered the

                                                    nl

4

Proceedings

1    conference room.)

2                MS. NEUBAUER:  And I believe for purposes of

3    the video, they've instructed us that the witness be

4    here at the head of the table next to you, your Honor,

5    and the questioner will have to sit in this seat, so

6    defense counsel and I will move to that seat during

7    her questioning.

8                THE COURT:  Very good.

9                (Whereupon, Ms. Minnie Simmons entered the

10   conference room.)

11               THE COURT:  And why don't you let us know

12   when you're ready.

13               THE VIDEOGRAPHER:  I will; thank you.

14               THE COURT:  I'm Mark Dwyer.  How are you?

15               THE WITNESS:  Fine, thank you.

16               THE COURT:  Nice to meet you.  Have you met

17   everybody here?

18               THE WITNESS:  I met her (indicating).

19               THE COURT:  Okay.

20               THE VIDEOGRAPHER:  I think we need her to

21   move just a little in this direction.

22               (Pause in proceedings.)

23               THE VIDEOGRAPHER:  That's good.

24               COURT OFFICER:  Is that good?

25               THE VIDEOGRAPHER:  That's good.

nl

5

Simmons - People

1          Okay, you may begin.

2          THE COURT:  And can we swear in the witness,

3    please.

4          (Whereupon, Ms. Minnie Simmons, after having

5    been duly sworn by the clerk of the court, testified

6    as follows:)

7          COURT CLERK:  Can you please state your

8    name.

9          THE WITNESS:  Minnie Simmons.

10         COURT CLERK:  Please spell your name.  Spell

11   your name.

12         THE WITNESS:  Ma'am?

13         THE COURT:  Could you spell your name, please.

14         THE WITNESS:  Spell it?

15         THE COURT:  Yes, so we make sure we get it

16   right.

17         THE WITNESS:  M-I-N-N-I-E S-I-M-M-O-N-S.

18         COURT CLERK:  Thank you.

19         THE COURT:  Thank you.  Your witness.

20   EXAMINATION BY

21   MS. NEUBAUER:

22      Q   Good morning, ma'am.

23      A.  Good morning.

24      Q   What is your name again for the record.

25      A.  Minnie Simmons.

nl

Simmons - People

1    Q    All right. And, Miss Simmons, how old are you?

2    A.   Beg your pardon?

3    Q    How old are you?

4    A.   80.

5    Q    And where do you live right now?

6    A.   Here. I can't remember the name.

7    Q    You don't know the name. And what is this place?

8    A.   A nursing home.

9    Q    And do you know how long you've been here,

10   approximately?

11   A.   Seven years.

12   Q    Prior to living here, where did you live?

13   A.   893 Jefferson Avenue.

14   Q    And is that in Brooklyn?

15   A.   Yes.

16   Q    And how long did you live there, approximately?

17   A.   Oh, God, oh, God, around 50 years, I think.

18   Q    All right. Now, do you have children?

19   A.   Yes.

20   Q    What are their names?

21   A.   Joanne, Linda, and Sharon.

22   Q    And what are their last names?

23   A.   Simmons.

24   Q    Okay. And when were they born?

25   A.   When?

nl

7

Simmons - People

1   Q   Yeah.

2   A.   One born in '57, '58, and '59.

3   Q   Okay.  Now, Miss Simmons, do you know somebody

4   named Charles Brown?

5   A.   Yes.

6   Q   Who is that?

7   A.   He was my brother-in-law.

8   Q   Okay.  When you say "was," is he alive today?

9   A.   No.

10   Q   Okay.  Do you recall when it was Mr. Brown passed

11   away?

12   A.   I can't really recall.  I can't recall.

13   Q   Is it before you were here in the nursing home?

14   A.   I'm sure -- I think so, ma'am.

15   Q   Okay.  Now, after -- after Mr. Brown passed away,

16   was somebody named the executor of his estate?

17   A.   Not that I know of.

18   Q   Okay.  Was somebody -- was somebody appointed to

19   handle Mr. Brown's estate?

20   A.   I don't know, ma'am.

21               THE VIDEOGRAPHER:  Some interference from

22   the cell phone.

23               THE COURT:  Does anyone have a cell phone on?

24               (Pause in proceedings.)

25   Q   All right, Miss Simmons, I'm going to ask you

nl

8

Simmons - People

1   another question.

2         Are you familiar with a property at 302 Saint

3   James Place, in Brooklyn?

4         A.   I was, yes.

5         Q.   Okay.  And what -- when -- who owned that property?

6         A.   Charles Brown.

7         Q.   Okay.  And did Mr. Brown own that property at the

8   time of his death?

9         A.   Yes.

10        Q.   And at the time of his death or the last time

11   that you saw the property, what condition was it in?

12        A.   Beautiful.

13        Q.   What type of property is it, if you can describe

14   it.

15        A.   It was an apartment house but they made it into a

16   rooming house, and he kept it beautifully.

17        Q.   All right.  Now, are you aware of that property

18   being sold sometime after Mr. Brown's death?

19        A.   No, I don't -- I don't recall.

20        Q.   Did you attend any meeting or closing with

21   respect to the sale of that property?

22        A.   No, ma'am.

23        Q.   All right.  Now, I'm going to show you what has

24   been previously marked as People's Number 1 in evidence,

25   and I'm just going to show you a few pages from this, okay.

nl

9

Simmons - People

1      A.    Mm-hmm.  Thank you.

2      Q     Can you read from the first page that's labelled

3   "Petition For Probate," just down under the number two.

4   What is that name?

5      A.    That's Charles Brown.

6      Q     And can you read that date that's shown?

7      A.    6/26/03.

8      Q     Okay.  And going to the third page of that

9   document at the bottom, do you see a signature there?

10     A.    Yes.

11     Q     Do you recognize that?

12     A.    Minnie Simmons.

13     Q     Is that your signature?

14     A.    It looks like it.

15     Q     Okay.  And is it dated July 28, 2003?

16     A.    Yes.

17     Q     And on the following page that's labeled

18  "combined verification" at the top, do you see a signature

19  in the middle there?

20     A.    Yes.

21     Q     And whose signature is that?

22     A.    Mine.

23     Q     Is that also dated July 28, 2003?

24     A.    Mm-hmm.

25     Q     Yes?

nl

10

Simmons - People

1    A.   Yes.

2    Q    Okay.  Now, I'm going to a page that's labelled

3  Surrogate's Court, Kings County, and it has a notary,

4  Marshal Kaplan.  Do you see the signature next to that

5  notary?

6    A.   Yes, it is.

7    Q    And whose signature is that?

8    A.   Mine.

9    Q    Now, I'm going to a page that is a letter.  It's

10  dated at the top December 6, 2003.  You see that, but at

11  the bottom it has a notary, December 7, 2005.

12    A.   Mm-hmm.

13    Q    Now, do you see a signature beneath a stamp there

14  (indicating)?

15    A.   Yes, I do.

16    Q    Whose signature is that?

17    A.   It looks like mine.

18    Q    Okay.  Is that your signature, from what you can

19  tell (indicating)?

20    A.   From what I can tell, I don't know now, ma'am.

21    Q    It looks like your signature?

22    A.   It's mine -- I don't know --

23    Q    Take your time.  Do you need to look closer?

24    A.   No, I can see, but my hand was getting shaky at

25  the time, so maybe it is.  Maybe.  I don't know.

nl

11

Simmons - People

1    Q    Okay, all right.  I'm going to go to People's 2,

2  which is labeled a deed.  And I'm going to ask you on

3  page 2 of that deed at the bottom, do you see a signature?

4    A.   Yes.

5    Q    Whose is that?

6    A.   Mine.

7    Q    All right.  And are there initials below it?

8    A.   Yes.

9    Q    And are those yours?

10   A.   Mm-hmm.

11   Q    Is it typewritten "Minnie Simmons, Executrix"?

12   A.   Yes.

13   Q    Okay.  And I'm going to go to People's Number 3,

14  which is the Class Abstract Services file.  And I'm just

15  going to show you on the back here, there's a copy of a

16  driver's license.

17   A.   Okay.

18   Q    And you can't see the photo real well, but can

19  you make out the signature on that driver's license?

20   A.   Yes.  It's mine.  It looks like mine.

21   Q    And then the next two pages, one that says

22  "Consul General of the United States of America"?

23   A.   Mm-hmm.

24   Q    "Minnie Simmons" at the top, do you see a

25  signature there?

nl

12

Simmons - People

1     A.   Yes.

2     Q    Is that yours?

3     A.   Yes.

4     Q    Okay.  And that's dated March 11, 1960?

5     A.   Yes.

6     Q    All right.  And the second page has a photograph;

7  is that correct?

8     A.   Mm-hmm.

9     Q    And who is that?

10    A.   Me and my three kids.

11    Q    Okay.  Do you know what document this is?

12    A.   No, I don't, ma'am.

13    Q    Is it your identification?

14    A.   Uh-huh.

15    Q    Yes?  What kind of identification?

16    A.   Hmm?

17    Q    What kind of identification is it; do you recall?

18    A.   Which one?  Which one?

19    Q    This one with the picture.

20    A.   Those are my three kids.  A passport picture, if

21  I'm not mistaken.

22    Q    Is that your signature above the picture?

23    A.   Yes, ma'am.

24    Q    Okay.  And I'm going to go back to People's

25  Number 1, and I'm going to show you this page that has an

nl

13

Simmons - People

1    image of a check from Chase Bank, and I'm going to ask

2    you, if you can read just what the payee, who the check is

3    made out to?

4         A.   Minnie Simmons.

5         Q    Okay.

6         A.   Minnie Simmons.  And what's that -- what's that

7    word next to it?

8         Q    The executor --

9         A.   -- of Charles Brown.

10        Q    Okay.  And do you see a figure on that check?

11        A.   Yes.

12        Q    What is it?

13        A.   401,000 -- $401,082.50.

14        Q    Okay.  Did you ever receive this check?

15        A.   Never.

16        Q    On behalf of the -- as executor of the estate of

17   Charles Brown?

18        A.   No, ma'am.  No, ma'am.

19        Q    Okay.  And I'm going to turn it sideways so you

20   can see.  Do you see some handwritten signatures on the

21   back there?

22        A.   Mm-hmm.

23        Q    Do you know those signatures?

24        A.   No, I don't.

25        Q    Are any of them yours?

n1

14

Simmons - Defense

1    A.    No.

2    Q    Do you recall endorsing any check in the amount

3    of $401,082.50 for the estate of Charles Brown?

4    A.    No, no.

5    Q    Did you give any permission to anybody to endorse

6    any check for you?

7    A.    No.

8    Q    Did you give permission to anybody to take any

9    monies that were the proceeds of the sale of 302 --

10   A.    No, no.

11   Q    -- Saint James Place?

12   A.    No, no.

13   Q    For any other purpose other than for the estate

14   of Charles Brown?

15           THE COURT:  If you could answer out loud,

16   please, the last question.

17   A.    Oh, no; I'm sorry.  No.

18           MS. NEUBAUER:  Okay, thank you, ma'am.  I

19   have no further questions.

20           THE WITNESS:  Okay.

21           THE COURT:  And you may proceed.

22   EXAMINATION BY

23   MS. JONES-THOMAS:

24   Q    Good morning, ma'am.

25   A.    Good morning.

nl

15

Simmons - Defense

1   Q    My name is Leslie Thomas, and I'm just going to

2   ask you a few questions.  If there's anything that you

3   don't understand, feel free to let us know.

4        Could you tell us how long -- you indicated that

5   you've been in this nursing home for about seven years?

6   A.   About seven years.

7   Q    And before that, you were residing at 302 -- no,

8   not 302.  You were residing in your home at 893 Jefferson

9   Avenue?

10  A.   Yes.

11  Q    Now, you indicated that your brother-in-law was

12  Charles Brown?

13  A.   Yes.

14  Q    And Charles Brown used to live at 302 Saint James

15  Place?

16  A.   Yes.

17  Q    And what was located there?  Was that a private

18  house?

19  A.   It was an apartment house, where they made it

20  into more or less a rooming house.

21  Q    Mm-hmm.  Charles did that?

22  A.   I don't know who did.  Yeah, it was done while he

23  was living there.

24  Q    And during the time that he was living there, was

25  he responsible for administering the house and taking care

nl

Simmons - Defense

1    of it?

2        A.   Yes.  Well, for awhile, and then he got sick, you

3    know.

4        Q    Okay,  And when you say he got sick, what do you

5    mean?  What happened to him?

6        A.   Well, he couldn't do nothing.  He couldn't go to

7    the bathroom, you know.

8        Q    Mm-hmm.

9        A.   And they had a lady there helping him with things

10   like that, you know.  And he didn't want to come to the

11   nursing home, that's for sure, because he was always

12   independent, you know.

13       Q    And Mr. Brown used to be married to your sister?

14       A.   Yes.

15       Q    And she's deceased?

16       A.   Uh-huh, yes.

17       Q    Now, did there come a time when you had to start

18   managing his affairs?

19       A.   Yes.

20       Q    And was that while he was alive?

21       A.   Hmm?

22       Q    Was that while he was alive?

23       A.   Yes, mm-hmm.

24       Q    And why?  What happened, why you had to start

25   taking over?

nl

Simmons - Defense

1      A.   He couldn't -- he could not read or write, you

2   know.  He could scribble his name a little bit.  And I

3   used to go to the bank and do a little business for him,

4   you know.

5      Q    So there came a time when he actually passed

6   away, Charles?

7      A.   Yeah.

8      Q    And after he passed away, someone had to take

9   care of his affairs?

10     A.   Right.

11     Q    Now, who did you get to help you take care of his

12  affairs?

13     A.   I can't even remember who it was.

14     Q    Well, do you recall conferring with an attorney

15  by the name of Mr. Kaplan?

16     A.   I think so, Kaplan.

17     Q    Marshall Kaplan?

18     A.   Yeah.  Yes, yes.

19     Q    Was that an attorney that you hired to help take

20  care of his affairs, Mr. Brown's affairs?

21     A.   I really can't remember where he came from.  I

22  can't remember how or why he was there.

23     Q    Well, at the time that Mr. Brown died, what was

24  the condition of his house which was located at

25  302 Saint James Place?

nl

18

Simmons - Defense

1    A.   Like I said, it was beautiful then.  I don't know

2   what it's like now.

3    Q    What do you mean when you say it was beautiful?

4    A.   He had all his work done, you know, all -- he was

5   retired, and he made sure everything was right,

6   everything.  The floor was polished like a mirror.  You

7   could almost see yourself in it, you know.  And he was

8   just a good man.

9    Q    And before Mr. Brown retired, what did he do?

10    A.   He worked.  I don't know exactly where he worked

11   at, but it was down there near the navy yard.

12    Q    Mm-hmm.  Was he a dock worker?

13    A.   Hmm?

14    Q    Was he a dock worker?

15    A.   I don't know what he did down that way.  I don't

16   know what it was, but he worked near the -- in the navy

17   yard or near the navy yard.

18    Q    Mm-hmm.  Okay.  Now, after Mr. Brown died, did

19   you actually go to his home to inspect the condition of

20   the property?

21    A.   Yeah, I went there.

22    Q    And you said that while he was alive, the house

23   had been converted into a rooming house?

24    A.   Yes.

25    Q    And were there people living there?

nl

19

Simmons - Defense

1     A.   Yes.

2     Q    Do you recall how many people were living there?

3     A.   I don't know how many, but the last one I

4  remember was Curtis.

5     Q    Mm-hmm.

6     A.   Curtis was his name.  He was a good guy.  He was

7  very good.  He always looked out for Charlie, you know.

8     Q    And what was the condition of the property after

9  Mr. Brown died?

10    A.   The last time I went there, it was beautiful.

11    Q    And do you recall what year that was?

12    A.   Hmm?

13    Q    Do you recall what year it was that you saw the

14 property?

15    A.   Do I what?

16    Q    Do you recall what year it was that you saw the

17 property after he died?

18    A.   Don't know how many years he been dead.  I -- I

19 can't remember that one either.

20    Q    Well --

21    A.   It wasn't -- it wasn't long, ma'am, because I got

22 sick myself with arthritis.

23    Q    Now, I'm just going to show you this page

24 where -- the Surrogate's petition in which it says the

25 date of death.  You see that?

nl

20

Simmons - Defense

1      A.   I see it, uh-huh, but I can't remember the date.

2      Q    It says --

3      A.   I see that.

4      Q    -- June 26, '03?

5      A.   Okay.

6      Q    Does that sound about right?

7      A.   He died in '03, yes.  I can't remember the month.

8      Q    And did he die in a hospital?

9      A.   Yes, I'm sure he did.  Yeah.

10     Q    Okay.  Now, at the time that Mr. Brown died, were

11   your children assisting you with respect to taking care of

12   his property?

13     A.   I didn't understand you.

14     Q    Were your children helping you in terms of taking

15   care of Charles' property?

16     A.   I don't remember that either.

17     Q    Okay.  Do you recall if your daughters or any of

18   your sons may have gotten an attorney to take care of

19   Mr. Brown's property?

20     A.   No, I don't, ma'am.

21     Q    Okay.  Now --

22     A.   And I have no sons.

23     Q    Oh, I see.

24     A.   I wish I did.

25     Q    At the time that Mr. Brown died, what was your

nl

21

Simmons - Defense

1    physical condition?  Were you working?

2         A.   I was almost in a wheelchair.

3         Q    And that was as a result of a medical condition?

4         A.   Mm-hmm.

5         Q    And were you at home or were you in a nursing

6    home?

7         A.   No, I wasn't at home, I'm sure, when he died.

8         Q    Now, did three come a time when you were notified

9    by any -- any persons regarding some conditions that

10   existed on Mr. Brown's property that needed to be repaired?

11        A.   No, I don't remember that.

12        Q    Okay.  Did you sign documents after your

13   brother-in-law died as a result of the will that he had?

14        A.   I don't remember that, ma'am.  Maybe I did.  I

15   don't remember.

16        Q    Okay.

17        A.   After he died, how would I get them?

18        Q    Well, the district attorney showed you this

19   exhibit with your signature (indicating).

20        A.   Yeah, that's my signature, but --

21        Q    Do you recall signing documents so that your

22   brother-in-law's will could be admitted into court?

23        A.   I don't remember that, ma'am.

24        Q    Okay.  Let me show you something else.

25             Have you ever seen this document which is right

nl

22

Simmons - Defense

1    here (indicating)?

2        A.   That's too much for me to read, ma'am.  My eyes

3    are bad to read it for you.

4        Q    Have you ever seen this document, which is listed

5    as the last will and testament of Charles Brown?

6        A.   I never seen that -- that -- no.

7        Q    Were you ever shown this document by Mr. Kaplan?

8        A.   No, not that I remember.  I don't remember.

9        Q    Okay.

10       A.   I --

11       Q    Do you recall anyone ever telling you that your

12   brother-in-law had put in his will that he wanted you to

13   manage his affairs after he passed away?

14       A.   I don't know, ma'am.  Like I said, I did it as

15   long as I could.

16       Q    Now, after your brother passed away -- your

17   brother-in-law, did you make a decision to try to sell his

18   house?

19       A.   No, I didn't make no decision like that, but they

20   needed money -- I don't know how that happened.  You know,

21   I was out of the picture then, because I was sick myself.

22       Q    When you say you were sick, with arthritis?

23       A.   Yes, and I couldn't hardly walk.

24       Q    And your condition that prevented you from

25   walking, was that osteoporosis or something?

nl

23

Simmons - Defense

1  A. Mm-hmm.

2  Q It's osteoporotic arthritis?

3  A. Yes.

4  Q And during the time that you were employed, what

5 did you do for a living?

6  A. During the time I was employed?

7  Q When you were working?

8  A. Yes, I worked in a factory.

9  Q Now, was there ever a discussion within your

10 family about the need to sell the property that

11 Charles Brown used to have?

12  A. No, because all of my family was gone.

13  Q Okay.

14  A. All of my sisters were gone, and brothers.  I'm

15 the only one out of nine children.

16  Q What about your children?  Did --

17  A. No.

18  Q Did your children ever discuss that?

19  A. No, nobody got involved in that.

20  Q Now, did there come a time when you first met an

21 attorney by the name of Stephen Mitchell?

22  A. Yeah, but I can't remember him.  I can't remember

23 what he looked like, but there's a lot of things I don't

24 remember, so --

25  Q Do you recall meeting this gentleman right here

nl

24

Simmons - Defense

1   (indicating)?

2       A.   No.

3       Q    Ever before?

4       A.   I'm getting senile, ma'am.

5       Q    Well --

6       A.   Yes.

7       Q    When did you -- do you recall when you began to

8   feel like you weren't remembering anything, how old you

9   were at the time?

10      A.   No, I don't.  I don't remember when.  I don't

11  remember when.

12      Q    Did your doctors ever tell you that you were

13  starting to forget things and say that your --

14      A.   No, I never did ask them.

15      Q    Now, when did you stop living at your residence

16  at 893 Jefferson Avenue?

17          How old were you when you came here?

18      A.   Was that 97?  I mean -- oh, boy, oh, boy.  77.  I

19  can't remember.  77, something -- I think I was 77, I

20  believe.

21      Q    Now, when you were living at 893 Jefferson

22  Avenue, did you ever get complaints from any of the

23  neighbors of your brother-in-law's property about problems

24  with the property?

25      A.   Did I ever get any complaints from my neighbors?

nl

Case 23-705, Document 31, 07/24/2023, 3547452, Page188 of 333

25

Simmons - Defense

1    Q    The neighbors of your brother-in-law's property

2   about problems?

3    A.    One lady, don't even remember her name.  She

4   was -- more or less would tell me what was happening.

5   When Charles got -- he couldn't make no calls.  And then I

6   would go down there and see what was happening down there,

7   you know.

8    Q    Do you recall telling anyone that the property

9   that your brother-in-law used to own was having problems

10   with the sewage pipe?

11    A.    I don't remember that.

12    Q    Did anyone -- any of the neighbors of

13   Charles Brown ever contact you to tell you that they were

14   going to sue you as the executrix of his estate?

15    A.    No.

16    Q    Now, you indicated that while Charles was living,

17   the property was in great condition cause he kept it up,

18   right?

19    A.    Mm-hmm, right.  When he was able, he kept it up

20   beautiful.

21    Q    Now, did there come a time when Charles Brown

22   became ill?

23    A.    Mm-hmm.

24    Q    Did he have to go to the hospital?

25    A.    I don't know if it was the hospital or the

nl

26

Simmons - Defense

1    nursing home.  I imagine he did go to the hospital.  And

2    he didn't want to go, you know.  Yeah, he was that kind of

3    a guy.  He didn't want to go to the hospital.

4         Q    Did he eventually come out of the hospital?

5         A.   Not that I know of.  I think he died in the

6    hospital.

7         Q    Now, after he passed away, who was taking care of

8    the property?

9         A.   I went down there for a couple of times, but

10   there was nobody living there but one guy.  His name was

11   Curtis.  And I was afraid to go in that big house by

12   myself, you know, so I just stopped going there because I

13   was sick myself.

14        Q    And when you went down there and Curtis was

15   living there, what was the condition of the property?

16        A.   It was still nice.

17        Q    Mm-hmm.  And you said that you stopped going down

18   there?  Was there someone else designated by you to go to

19   the property and look and keep it up?

20        A.   No, ma'am.  I didn't know who I could even ask.

21        Q    So did you ever talk to any realtors or anyone

22   about selling the property?

23        A.   No, ma'am.

24        Q    While Charles was alive and before he got sick,

25   did you ever visit the property at 302 Saint James?

nl

27

Simmons - Defense

1    A.    My sister was -- yeah.  Right, my sister -- he

2    handled the house when my sister died.  So when she died,

3    I would still go visit him.  And then after a while I got

4    sick; I couldn't go.

5    Q    Now, after Charles passed away, do you recall --

6    well, I showed you the document, and it indicates that

7    Charles passed away in June of 2003.

8    A.    Mm-hmm.

9    Q    Do you recall when the last time, what year was

10   the last time that you actually went to 302 Saint James

11   Place?

12   A.    I don't know what year it was really, but they

13   had a guy there named Curtis.  I don't know if he's still

14   there or did he go away, you know what I mean.  He was a

15   good guy.  He would be looking out for things.

16   Q    Do you recall anyone coming to visit you at your

17   home at 893 Jefferson Avenue to talk to you about

18   302 Saint James Place after?

19   A.    I don't know that.  I don't remember that.

20   Q    Now, during the course of the time that -- well,

21   withdrawn.

22        After your brother-in-law passed away, you said

23   that you were housebound.

24   A.    Mm-hmm.

25   Q    And were you living with anyone in your house?

nl

28

Simmons - Defense

1    A.   Yeah, my children lived there.

2    Q   And what floor did you live on?

3    A.   I lived on the third floor.

4    Q   Okay.  And how would you access the third floor?

5  Was there an elevator?

6    A.   Hmm?

7    Q   How would you access the third floor?  Was there

8  an elevator?

9    A.   No, ma'am.

10    Q   Stairs?

11    A.   Mm-hmm.

12    Q   And your children lived on the third floor also?

13    A.   No, no, they lived -- one lived on the first

14  floor.  I can't even remember who lived on the second, but

15  I didn't want to move down because my husband had that

16  apartment fixed up so beautifully, you know.

17    Q   Mm-hmm.  Did anyone ever come to visit you at

18  893 Jefferson Avenue to discuss Charles Brown's house?

19          MS. NEUBAUER:  Objection.  I think --

20    A.   Charles what?

21          THE COURT:  I'll allow this.  Let's try not

22  to repeat.

23          MS. JONES-THOMAS:  Okay.

24    Q   Did anyone ever come to visit you after

25  Charles Brown died to discuss how to sell the house?

nl

29

Simmons - Defense

1    A.    Not that I know of, ma'am.

2    Q    Do you recall leaving your home and going to a

3    closing for the sale of Charles Brown's house?

4    A.    No, I don't remember that cause I was scared at

5    the time.   I was sick at that time.

6              THE COURT:   What are you looking for, the

7         deed?

8              MS. JONES-THOMAS:   Yes.

9              THE COURT:   I thought the deed was that

10        exhibit -- no, the one underneath it.

11             MS. JONES-THOMAS:   Oh, that's right.

12   Q    I'm going to show you what Miss Neubauer had

13   showed you before, with your signature (indicating).

14   A.    Yeah, this is mine, but I said my hand was

15   getting shaky at the time.

16   Q    Right.

17   A.    Mm-hmm.

18   Q    Now, this is a document that's dated December 23,

19   2005, and it's a deed for your brother-in-law's property.

20   A.    Mm-hmm.

21   Q    And it appears that it is signed by you, and it's

22   being transferred to Toju Realty Corp.

23   A.    I don't know nothing about that, but that's my

24   signature.

25   Q    Did you ever have any conversations with any

nl

30

Simmons - Defense

1   realtors, any real estate brokers or agents?

2       A.   No, none that I know of.

3       Q    Do you have a recollection of what may have

4   happened on December 23, 2005?

5       A.   "December 23, 2005."  No, I don't, ma'am.

6       Q    In 2005, were you living at 893 Jefferson?

7       A.   Yes, mm-hmm.

8       Q    And at the time, were you on any particular

9   medications?

10      A.   Maybe arthritis pills and pressure pills, probably.

11      Q    Okay.  And this appears to have been around

12  Christmas.  You don't recall selling Mr. Brown's house?

13      A.   No, I don't recall that at all.  I can't sell

14  nobody's house, you know.

15      Q    Well, do you recall being appointed to be the

16  executrix of this property for Mr. Brown?

17      A.   I don't know.  I can't even remember that, ma'am.

18  It's been a long time.  It's been a long time.

19      Q    Do you recall going to court with an attorney by

20  the name of Marshall Kaplan and getting letters

21  testamentary so that you could take care of Mr. Brown's

22  affairs?

23      A.   No, I don't remember that either.

24      Q    Now, after Mr. Brown passed away and, you know,

25  you were the relative who was taking care of

nl

31

Simmons - Defense

1  302 Saint James, did you ever have any problems with any

2  of the people who were living there as tenants?

3       A.   Like I said, none of them was paying rent.

4       Q    Mm-hmm.

5       A.   And nobody but Curtis, he was taking care of

6  things.

7       Q    Okay.  Did you ever have to hire an attorney?

8       A.   Hmm?

9       Q    Did you ever have to hire an attorney to sue the

10  tenants who weren't paying the rent?

11      A.   I think I did, ma'am.  I believe I did.  It's

12  been so long.

13      Q    Did you ever have to have anyone evicted for not

14  paying rent?

15      A.   No, I didn't do that.

16      Q    While you were -- after your brother died, did

17  you ever have to have repairs done on the property that he

18  used to own?

19      A.   No.

20      Q    Who was responsible for collecting the rent from

21  the tenants once your brother died?

22      A.   My brother-in-law.  Curtis was -- Curtis was the

23  last one there.  Nobody was paying rent.

24      Q    Mm-hmm.

25      A.   Nobody was paying rent.

nl

32

Simmons - Defense

1    Q    Did there come a time when Curtis was no longer

2  there at 302 Saint James?

3    A.    I don't know.  I don't know what happened.  I

4  don't know if he's still there or did he move.  I don't

5  know.  And Eugene used to come up, his nephew.

6    Q    And Curtis, was he a tenant or was he --

7    A.    A tenant.

8    Q    Okay.

9    A,    But a nice tenant.

10    Q    And Curtis used to help assist Charles and you in

11  terms of taking care of the property?

12    A.    He would help in any kind of way, you know, but

13  he -- he would help, but he -- he didn't -- he just didn't

14  take over, you know what I mean?

15    Q    Mm-hmm.  Now, did you ever give an attorney by

16  the name of Stephen Mitchell any money to handle the

17  property located at 302 Saint James Place?

18    A.    I didn't give -- I don't remember giving him no

19  money.  No, I don't even remember him.

20    Q    Do you ever recall having any conversations with

21  the attorney, Marshall Kaplan, about the sale of

22  302 Saint James?

23                MS. NEUBAUER:  I'm objecting, I think.

24                THE COURT:  Counsel, I think we have

25    exhausted this questioning.

nl

33

Simmons - Defense

1    Q    Now, I'm going to show you what has been marked

2  as People's Exhibit 4.  Actually, People's -- yeah.

3              MS. NEUBAUER:  It's 4.

4    Q    4.  And show you this (indicating).  Do you

5  recognize that signature?

6    A.   Let me see.  Let me see.

7              (Pause in proceedings.)

8    A.   It looked like mine but it's not mine.  It's

9  similar to mine, but like I said, my hand was getting --

10  what year was this?

11    Q    This says June 10, 2010.

12    A.   Oh, Lord, no.  2010.  No, that's -- 2010?

13    Q    Mm-hmm.

14    A.   No, ma'am.  No, ma'am.

15              (Ms. Jones-Thomas conferring with defendant.)

16    Q    So you're saying that that's not your signature?

17    A.   Don't look like it.  2010?

18    Q    Okay.  I'm going to show you this document which

19  is dated July 28, 2003.

20    A.   Mm-hmm.

21    Q    Do you see that signature?

22    A.   Yes.

23    Q    Is that your signature?

24    A.   Yes.

25              THE COURT:  Counsel, could you identify that

nl

Simmons - Defense

1    document for the record.

2              MS. JONES-THOMAS:  And that document is the

3    signature page of the probate petition.

4              THE COURT:  Is that part of an exhibit?

5              MS. JONES-THOMAS:  Yes, it is.

6              THE COURT:  Okay.

7              MS. JONES-THOMAS:  Let me see.

8              (Pause in proceedings.)

9        Q    The fourth page of the exhibit which is People's

10   Exhibit 1, do you see this signature (indicating)?

11       A.   Yes.

12       Q    This is the fifth page.

13       A.   Yes, that's it.

14       Q    Is that your signature?

15       A.   It looks like -- I don't know, ma'am.  I'm not

16   too sure about that one.

17       Q    Now, this affidavit, it states -- this exhibit,

18   which you have a copy in front of you, it states that you

19   are the executrix of the estate of Charles Brown, who was

20   your brother-in-law.

21       A.   Mm-hmm.

22       Q    Do you know what an executrix is?

23       A.   Hmm?

24       Q    Do you know what an executrix is?

25       A.   Yeah, but you tell me again.

nl

Simmons - Defense

1    Q    It says that, I am the executrix of the estate of

2    Charles Brown, who was my brother-in-law.

3         Did you know you were the executrix of

4    Charles Brown's estate?

5    A.    Yes, I know that.

6              THE COURT:  I'm sorry, could you repeat that

7         answer.

8              THE WITNESS:  Yes, I knew that.  I know

9         that.  But like I said, nobody was paying rent, and I

10        got sick and I couldn't take it no more, and that's

11        how -- that's how this happens.

12   Q    Well, when you say that's how this happens,

13   because you couldn't really take care of the property

14   anymore, did you make a decision to have the property sold?

15   A.    No, I didn't make no decision.  I don't know who

16   sold it.  I imagine Gene sold it.

17   Q    Gene?

18   A.    Eugene, mm-hmm.

19   Q    Eugene, the nephew?

20   A.    Mm-hmm.

21   Q    Did Eugene ever tell you that he had sold it?

22   A.    No.

23   Q    Did he ever have discussions with you about the

24   fact that it should be sold?

25   A.    If he did, I don't remember that one.

nl

Simmons - Defense

1    Q    Did Eugene try to sell the property while your

2  brother was alive?

3    A.    Not that I know of, ma'am.

4    Q    Your brother-in-law; I'm sorry.

5         (Ms. Jones-Thomas conferring with defendant.)

6    Q    Before -- before we came here today, had you ever

7  seen this document before?

8    A.    No, ma'am.

9    Q    Now --

10   A.    If I did, I forgot it.

11   Q    Okay.  I'm going to show you a document that

12 probably should be deemed marked Defense Exhibit A.

13         THE COURT:  And could you let me see that

14    for a moment.

15              (Pause in proceedings.)

16         THE COURT:  It appears to be captioned

17    Surrogate's Court, Kings County, probate proceeding,

18    will of Charles Brown, deceased.  We'll deem that

19    Defense A.

20              (Whereupon, an affidavit of Minnie Simmons

21    was deemed marked and received in evidence as Defense

22    Exhibit A.)

23   Q    I'm going to show the witness what is page 10 of

24 the People's Exhibit 1, and ask you to take a look at

25 that.

nl

37

Simmons - Defense

1        THE COURT:  And is that the same document
2    you'll be referring to?
3        MS. JONES-THOMAS:  Yes.
4        THE COURT:  Okay.
5    Q    And, Miss Simmons, I just ask you to look at
6    that, and that is an affidavit in which it states that
7    Minnie Simmons, being duly sworn, deposed and says, I had
8    possession of the last will and testament of
9    Charles Brown.  After his death, a variety of people
10   requested copies of the will from me, and in order to make
11   such copies, I removed the staples from the will.
12        Is that your signature (indicating)?
13   A    It looks like mine, but then it flares off, you
14   know what I mean?
15   Q    And do you recall in 2003, being in possession of
16   the last will and testament of your brother -- of your
17   brother-in-law, Charles Brown?
18   A    No, I don't remember that.
19   Q    Do you recall signing this document in front of
20   Marshall Kaplan, who notarized your signature?
21   A    I don't remember that either, ma'am.
22   Q    Okay.  Did you ever give anyone, any person,
23   money in order to make any repairs to the property located
24   at 302 Saint James Place?
25        (Witness shaking head.)

nl

38

Simmons - Defense

1      THE COURT:   The witness shook her head no.

2      A.   No.

3      Q    Okay.   Were you ever interviewed about

4  Mr. Brown's property by Charles Emma?

5      A.   I don't -- Charles who?

6      Q    Emma.

7      A.   "Charles Emma."

8      Q    Emma?

9      A.   Emma?

10     Q    Mm-hmm.

11     A.   Not that I remember, ma'am; I'm sorry.

12     Q    And today, as you sit here, are you on any

13  medications that would prevent you from understanding

14  these proceedings?

15     A.   No, not really.

16     Q    And since you've been here in the nursing home,

17  have you visited 302 Saint James Place?

18     A.   No.

19     Q    Did there come a time when someone told you the

20  property had been sold?

21     A.   Yes, somebody told me.   I can't even remember who.

22     Q    Do you know when you first learned that the

23  property had been sold?

24     A.   No, I don't know when.

25           MS. JONES-THOMAS:   Nothing else.

nl

39

Simmons - People

1    Just a minute, your Honor.

2    THE COURT:  Very well.

3    (Ms. Jones-Thomas conferring with defendant.)

4    MS. JONES THOMAS:  Your Honor, we have no

5    further questions.

6    THE COURT:  Anything further for the People?

7    MS. NEUBAUER:  Just briefly.

8    THE COURT:  Mm-hmm.

9    MS. NEUBAUER:  Just to clarify one or two

10   things.

11   EXAMINATION BY

12   MS. NEUBAUER:

13   Q    Just a couple of more questions, ma'am.

14   With respect to People's Number 4, I just want to

15   ask you, do you recall -- this has the date of June 2010,

16   right?

17   A.   Mm-hmm.

18   Q    On it?

19   A.   Yes, ma'am.

20   Q    Do you recall that an investigator, a tall

21   gentleman from the district attorney's office, came to the

22   nursing home last year to talk to you about this case?  Do

23   you remember him?

24   A.   I don't remember.

25   Q    Okay, all right.  I just want to read through

nl

40

Simmons - People

1   this.

2          Can you see that?  It says, I, Minnie Simmons,

3   affirm under penalties of perjury.

4      A.    Mm-hmm.

5      Q     That I am 79 years of age, and I currently reside

6   at Bishop Henry Hucles at 835 Herkimer Street, Brooklyn,

7   and I am currently physically incapacitated and immobile.

8      A.    Yes.

9      Q     Okay.  Do you recall this being read to you at

10  some time?

11     A.    I don't remember that, ma'am.

12     Q     Okay.  All right.

13          I am the executrix of the estate of

14  Charles Brown, who was my brother-in-law, okay.  Real

15  property located at 302 Saint James Place, Brooklyn, New

16  York, was among the assets owned by the estate of

17  Charles Brown.

18          You remember this?  Do you remember reading this?

19     A.    No, I don't remember.  I don't remember.

20     Q     Is this correct?

21     A.    What, read it again.

22     Q     302 Saint James Place is property among the

23  assets owned by the estate of Charles Brown.  Did

24  Charles Brown own 302 Saint James?

25     A.    Yes, he did, he did.

nl

41

Simmons - People

1    Q    And you didn't give permission to anybody to take

2  any money from the sale of 302 Saint James Place?

3    A.   No, I didn't.

4    Q    Okay.  Is it fair to say that your memory is

5  fading on the details as you get older?

6    A.   Yes, mm-hmm.

7    Q    And it's fair to say if there was a sale

8  regarding Charles Brown's property at 302 Saint James

9  Place, you don't remember it?

10   A.   No.

11   Q    You don't remember?

12   A.   Somebody told me that they were taking it for

13  taxes.

14   Q    Okay.  And if there were -- if the monies -- if

15  there was a sale of 302 Saint James Place that you learned

16  about, you didn't receive any money from that?

17   A.   No.

18   Q    As the executor of the estate, right?

19   A.   Uh-uh.

20   Q    Okay.  You didn't see the check that I showed you

21  before?

22   A.   No.

23   Q    You didn't endorse that check; is that correct?

24   A.   No.

25   Q    And you didn't give anybody permission to take

nl

42

Simmons - People

1   that money?

2       A.   No.

3       Q       Except for it to go to the estate of

4   Charles Brown; is that right?

5                   MS. JONES-THOMAS:   Objection.

6       Q    Is that correct?

7                   THE COURT:   I'll allow it.   Could you repeat

8       the question.

9       Q    You didn't allow anybody to take any money -- if

10  302 Saint James was sold, you didn't permit, give

11  authority --

12      A.   No, ma'am.

13      Q    -- to anybody to take that money?

14      A.   No.

15      Q    Except to go to the estate of Charles Brown; is

16  that correct?

17                  MS. JONES-THOMAS:   Objection.

18                  THE COURT:   I'll allow the question.   If you

19      can answer it.

20      A.   No, I didn't -- I didn't give anybody permission

21  to do anything with the money.

22                  MS. NEUBAUER:   Okay, I have no further

23      questions at this time.

24                  THE COURT:   And for the defense?

25                  MS. JONES-THOMAS:   I have no further questions.

nl

43

Proceedings

1          THE COURT:  Very well, ma'am.  Thank you

2   very much.  We're done with you.

3          THE WITNESS:  Oh, thank you.

4          THE COURT:  You were a big help.  Thank you.

5          THE WITNESS:  I hope I was.  Thank you.

6          MS. NEUBAUER:  Thank you, Miss Simmons.

7          THE COURT:  And before we stop the tape, the

8   video --

9          THE VIDEOGRAPHER:  Oh, yes.  Okay, go ahead.

10          THE COURT:  The one thing before the tape

11   was turned on, both sides stipulated, am I correct, to

12   the admission of People's 1 through 4 is what we've

13   been referring to throughout this discussion; is that

14   correct?

15          MS. JONES-THOMAS:  Correct.

16          MS. NEUBAUER:  Correct.

17          THE COURT:  Very good.  You can close the

18   tape now, and thank you very much.

19          THE WITNESS:  Thank you.

20          MS. JONES-THOMAS:  Thank you very much.

21          THE WITNESS:  Thank you.

22                    *         *         *

23          It is hereby certified that the foregoing is
     a true and accurate transcript of the
24   stenographic notes of these proceedings.
          -------------------------
25                    NORA LEE, RPR
               OFFICIAL COURT REPORTER

nl

Proceedings

## INDEX OF WITNESS

PAGES:

<u>EXAMINATION BY:</u>

Ms. Neubauer                           5-14
                                       39-42

Ms. Jones-Thomas                       14-38


## INDEX OF EXHIBITS

EVD

<u>FOR THE PEOPLE:</u>

1. Probate file                        2

2. Deed                                3

3. Abstract file                       3

4. Affirmation of Minnie Simmons       3


<u>FOR THE DEFENSE:</u>

A. Affidavit of Minnie Simmons         36


          *        *        *        *        *

nl

# EXHIBIT 20

Excerpts From Defendant's Omnibus Motion

Dated: December 20, 2010

(Brady v. Maryland Requests)

CRIMINAL TERM ARR/MOT

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 50
--------------------2019 DEC 20  P 12: 16--------x
THE PEOPLE OF THE STATE OF NEW YORK

       - against -

STEPHEN MITCHELL,

                     Defendant.

------------------------------------------x

ATTORNEY'S COPY

NOTICE OF
OMNIBUS
MOTION

Ind. No.:
4743/10

TO:  HON. CHARLES J. HYNES
     DISTRICT ATTORNEY
     COUNTY OF KINGS

     ATTN:  A.D.A. LAURA NEUBAUER


       PLEASE TAKE NOTICE, that upon the annexed affirmation of

LESLIE JONES THOMAS, ESQ., the exhibits annexed hereto and the

prior proceedings herein, the undersigned will move this Court at

Part 50, on the 20th day of December, 2010 at 9:30 o'clock in the

forenoon of that day, or as soon thereafter as counsel may be

heard for orders granting:

     (1)   A Bill of Particulars pursuant to CPL Section 200.95;
          Discovery pursuant to CPL Section 240.40, Subdivision
          1(a) and 1(c);

     (2)   Inspection of the Grand Jury minutes of Indictment No.
          4743/10;

     (3)   Dismissal of said indictment for legal insufficiency of
          the evidence and/or defects in the proceedings before
          the Grand Jury;

(4)   Release thereof to defense counsel of the Grand Jury minutes and the charge;

(5)   Motion to Preclude introduction of Defendant's prior bad acts and/or crimes pursuant to Sandoval; and

(6)   Reservation of Rights and for such other and further relief as to this Court may seem just and proper.

DATED: NEW YORK, NEW YORK
       December 1, 2010

Respectfully,

LESLIE JONES THOMAS, ESQ.
299 Broadway, Suite 920
New York, New York  10007
(212) 385-4840

TO: Clerk, Kings County Supreme Court

    A.D.A. Laura Neubauer

defendant's rights to a Bill of Particulars and to effective discovery."

10.   WHEREFORE, the defendant respectfully requests an Order be granted directing the District attorney to furnish the defendant with a Bill of Particulars.

## MOTION FOR DISCOVERY

11.   Attached hereto and made a part hereof, is the Demand to Produce made pursuant to CPL Section 240.20.

12.   The request for information concerning the circumstances surrounding the charges against the defendant is essential in that said information should explain the substance of defendant's illegal conduct, as required by CPL Section 200.90.  See also, People v. Davis, 41 N.Y.2d 678.

13.   The defendant further requests information about any and all witnesses to the alleged crime.  This request is the right of the accused, under the Sixth Amendment of the United States Constitution, to be confronted in a criminal proceeding with the witnesses against him.

14.   Furthermore, any witnesses to the alleged crime herein may possess exculpatory information and under the case of Brady v. Maryland, 373 U.S. 82; their identity must be disclosed.

4

alleged crimes given to the Police Detectives, or representatives of any law enforcement or criminal investigating body by any persons on or after the date of the alleged crimes.  Also state the names and addresses of the persons who gave the description.

19.  To whom in the Police Department or District Attorney's Office were the alleged incidents in the complaint first reported.

20.  Whether it is alleged that the defendant received warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436.  If so, provide the name, shield number and command of the officer who allegedly gave the warnings.

21.  Whether any person to be called as a witness by the prosecution is known, or with due diligence could be known by the prosecution, to (a) have been charged with a crime, (b) been convicted of a crime, (c) is or has been under psychiatric care or treatment.  If the prosecution is unwilling to make such inquiry of its witnesses (i.e., exercise due diligence), the defense demands that it be supplied with the names and addresses of such witnesses sufficiently in advance of trial so that it may make its own investigation or inquiry of them.

22.  The names, addresses and birth dates of any and

8

all civilian witnesses present at the time of the alleged occurrence.

    23.  The names, shield numbers and command of all police officer present at the times of the alleged occurrence.

    24.  The names, shield numbers and commands of any and all police officers present at the time of defendant's arrest and the date, time and location of said arrest.

    25.  Anything required to be disclosed, prior to trial, to the defendant by the prosecutor, pursuant to the Constitution of this State of the United States.

    26.  Furnish defendant, now and on a continuing basis all evidence or information which may tend to exculpate the defendant, either by indication of innocence or by potential impeachment of a prosecution witness, within the meaning of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>People v. Rosario</u>, 9 N.Y. 2d 286 (1961) and <u>People v. Wright</u>, 74 Misc. 2d 419 (1973), including but not limited to:

        Any statements made by witness, participant, or other person to any law enforcement officer, or any person acting in concert with incriminatory or otherwise favorable to the defendant whether or not the District Attorney intends to use such statements in any future proceedings, the existence of which are or should be known by the exercise of due diligence to the District Attorney.

<div align="center">9</div>

# EXHIBIT 21

People's Affirmation in Response to Defendant's (Omnibus) Motion

Dated: February 1, 2011

CLIENT'S COPY

received

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 50
-------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

    - against -

Stephen Mitchell,

               Defendant.

-------------------------------------------------------------X

**AFFIRMATION
IN RESPONSE
TO
DEFENDANT'S
MOTION**

4743/2010

     LAURA NEUBAUER, an attorney admitted to practice law before the Courts of the State of New York, hereby affirms the following to be true under penalty of perjury:

    I submit this affirmation in response to defendant McKenzie's Omnibus Motion dated November 30, 2010, in which defendant seeks:

| | |
|---|---|
| I. | BILL OF PARTICULARS; |
| II. | MOTION TO INSPECT THE INDICTMENT; |
| III. | MOTION TO DISMISS THE INDICTMENT; |
| IV. | MOTION TO RELEASE GRAND JURY MINUTES TO DEFENSE COUNSEL; |
| V. | MOTION FOR A SANDOVAL HEARING; |
| VI. | RESERVATION OF RIGHTS. |

I am an Assistant District Attorney in Kings County assigned to this case and am familiar with its facts and circumstances by virtue of a review of the files maintained by the New York City Police Department and Kings County District Attorney's Office pertaining to this matter, and discussions had with various assistant district attorneys and detectives assigned to the investigation.

Defendant is charged under Kings County Indictment Number 4743/2010 with Grand Larceny in the Second Degree [P.L. § 155.40(1)] stemming from his involvement in the stealing of client funds, namely money in excess of $400,000.00 from the Estate of Charles Brown, without permission or authority.

The People hereby incorporate by reference all of their previous motions, affirmations and memoranda of law filed in this case. All statements are made upon information and belief, based on personal conversations with other assistant district attorneys at the Kings County District Attorney's Office, a review of all records and files of the Kings County District Attorney's Office and New York City Police Department, and other sources of information as expressly stated in the individual paragraphs below.

Except where expressly acknowledged herein, the People disclaim, dispute, and contest each and every factual allegation and representation contained in defendant's applications, including defendant's request for evidentiary hearings in these motions, except where expressly consented.

2

The People respond in seriatim to each of defendant's seven motions presently before the Court. Where extended legal discussion would aid the Court in the resolution of issues raised by the defendant, memoranda of law have been attached to this response and incorporated herein.

I.    People's Response to Defendant's Request for a Bill of Particulars, Demand for Discovery and Motion for Discovery

People's Response to Defendant's Request for a Bill of Particulars

[Note: Defendant's paragraphs under the Request for Bill of Particulars begin with paragraph number 1, and Respondent has adhered to that numbering in making the following response]:

1.  Memoranda, notes, memobooks entries shall all be made available at the appropriate time prior to trial.

2.  See arrest report attached to the VDF previously served upon defense counsel.  All other police and investigation reports pertaining to this investigation shall be made available prior to trial.

3.  Any other reports relevant to this investigation shall be made available prior to trial.

4.  See VDF previously served upon defense counsel.  Names of any other investigators shall be provided in a witness list prior to trial.

3

5. Defendant acted as principle and/or accomplice.

6.   A copy of the indictment and Voluntary Disclosure was previously served upon the defendant which contains factual allegations of the defendant's conduct. The incidents occurred as a continuous course of conduct from on or about and between December 23, 2005 through March 31, 2006 in Brooklyn, New York, and various other locations in New York. The indictment and VDF specify the approximate dates, times and places applicable to the charge.

On or about and between December 23, 2005 and March 31, 2006 defendant, representing the Estate of Charles Brown, sold real property located at 302 St. James Place, Brooklyn, New York and deposited the proceeds into defendant's IOLA Account. From there and through March 31, 2006, defendant transferred those monies among various other bank accounts, and spent the balances of said accounts down to nominal amounts. Defendant was not given permission or authority to retain, take, use, convert or possess the proceeds of the sale of 302 St. James Place, Brooklyn, New York for any purpose other than to pay said proceeds to the Estate of Charles Brown.

To the extent defendant seeks further details distinguishing and/or analyzing specific counts, that request is beyond the scope of a Bill of Particulars. To the extent defendant requests material encompassing confidential grand jury testimony, the People oppose such a request, and reference II below, People's Response to Defendant's Motion to Inspect and Dismiss or Reduce Counts in the Indictment. To the extent defendant requests material that is evidentiary in nature, that request is beyond the scope of discovery.

The People oppose all other demands contained in the defendant's Bill of Particulars as being improper demands and seeking material which is evidentiary in nature.

4

<u>People's Response To Defendant's Demand For Discovery and</u>

<u>Motion for Discovery</u>

The People provided above a Bill of Particulars as set forth in C.P.L § 200.95. Additionally, counsel has been advised of the facts of the case as presented at defendant's arraignment and in the voluntary disclosure form, together with this response to the Request for a Bill of Particulars and Demand for Discovery, all of which provide the particulars to which the defendant is entitled. They specify "the substance of the defendant's conduct . . . which the people intend to prove at trial on their direct case" <u>See</u> C.P.L. § 200.95(1)(a). The other information requested is evidentiary detail, or beyond the scope of a Bill of Particulars, or not authorized to be included in a Bill of Particulars and is not necessary to enable the defendant to adequately prepare to conduct his defense. <u>See</u> C.P.L. § 200.95(1)(4); <u>People v. Davis</u>, 41 N.Y.2d 678 (1977) ("[a] bill of particulars serves to clarify the pleading: it is not a discovery device"). The People reserve the right to file an amended bill of particulars prior to or at trial pursuant to C.P.L. § 200.95(8).

<u>Demand for Discovery</u> [Note:   Defendant's paragraphs under the Demand for Discovery begin with paragraph number 1, and Respondent has adhered to that numbering in making the following response]

Demand 1:   None presently known to the People.

Demand 2:   None presently known to the People.

5

Demand 3:   None presently known to the People.

Demand 4:   All photographs shall be provided prior to hearing and trial.

Demand 5:   None presently known to the People.

Demand 6:   Opposed.   Beyond the scope of discovery.

Demand 7:   No property presently known to the People was recovered from the defendant.   The People oppose any other request as being beyond the scope of discovery.

Demand 8:   None presently known to the People.

Demand 9:   Any and all reports and property which the People intend to introduce as evidence at trial shall be made available for inspection prior tot trial.

Demand 10:  None presently known to the People.

Demand 11:  None presently known to the People.

Demand 12:  None presently known to the People.

Demand 13:  Opposed.  This request is not properly the subject of discovery. A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 14:  Opposed.  This request is not properly the subject of discovery. A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 15:  Opposed.  This request is not properly the subject of discovery. A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 16:  Any photographs related to the investigation which the People intend to introduce as evidence as trial shall be made available for inspection prior to trial.

6

Demand 17:   Defendant was arrested pursuant to an arrest warrant issued upon the filing of the indictment.

Demand 18:  Opposed.  Beyond the scope of discovery.

Demand 19:  Opposed.  Beyond the scope of discovery.

Demand 20.  None presently known to the People.

Demand 21: Opposed.  This request is not properly the subject of discovery. A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 22: Opposed.  This request is not properly the subject of discovery. A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 23:  See the VDF previously served upon defense counsel.  Names of any other officers/investigators relevant to this investigation shall be provided in a witness list prior to trial.

Demand 24:  See the VDF previously served upon defense counsel.  Names of any other officers/investigators relevant to this investigation shall be provided in a witness list prior to trial.

Demand 25:  The People are aware of their continuing obligation pursuant to the United States and the New York State Constitutions as well as Brady v. Maryland.  None presently known to the People.

Demand 26:  The People are aware of their continuing obligation pursuant to the United States and the New York State Constitution as well as Brady v. Maryland.  None presently known to the People

Demand 27: A witness list and Rosario and Giglio material shall be provided at the appropriate time prior to trial.

Demand 28:   All written material which the People intend to introduce as evidence at trial shall be made available to the defense prior to trial.

Demand 29:  None presently known to the People.

7

Demand 30: Not applicable.

The People oppose all other demands contained in defendant's Demand for Discovery as being improper demands and seeking material which is evidentiary in nature.   The defendant is not entitled to discovery beyond the scope of that authorized by C.P.L. § 240.20 unless the defendant shows, with particularity and for each item requested, that such discovery is material to the preparation of the defense and a reasonable demand on the People. C.P.L. § 240.20(1)(c).   A conclusory statement that the requested information is necessary for trial preparation is insufficient to demonstrate the materiality of the requested information. People v. Miller, 106 A.D.2d 787 (3d Dep't 1984).   Rather, the defendant must either present special circumstances which entitle him to the requested information or demonstrate the harm that would result if the requested information is not disclosed. Miller, 106 A.D.2d at 788. Because the defendant has failed to make such showing, and merely asserts without factual support the necessity of the requested material, the motion should be denied.

Moreover, the sum of defendant's further discovery request under this motion amounts to discovery of the People's entire file regarding the above-captioned case. The defendant "is not generally to be afforded free access to the prosecutor's entire file." People v. Tabora, 139 A.D.2d 540 (2d Dep't 1988).

8

As stated above, defendant will receive, prior to trial, all Rosario material to which he is entitled, as well as a list of the witnesses to be called at trial. Information such as the names, dates of birth and addresses of the witnesses the People intend to call at trial on their direct case is not discoverable pursuant to C.P.L. § 240.20, nor is this information the proper subject of a Bill of Particulars. Article 240 of the Criminal Procedure Law does not permit the discovery of the identities of the People's witnesses upon demand. Unlike various other items of property or records, addresses are not "property" and may not be obtained merely upon request. See Miller, 106 A.D.2d at 787 (names and addresses of witnesses are not property and are not subject to pre-trial discovery). Nor may such information be obtained through a Bill of Particulars. The names and addresses of witnesses are certainly not necessary to inform the defendant of the charges against him. C.P.L. §§ 200.95(1), 240.44, and 240.45 require that, prior to any pre-trial hearing, or before trial, the People provide the defendant with any statements by witnesses concerning the crime actions. Thus, to the extent defendant is concerned with being afforded the information needed for effective cross-examination, such information will be provided at the statutorily designated time. Furthermore, the defendant will receive, prior to trial, all Rosario material to which he is entitled and a list of witnesses whom the People intend to call at trial.

9

In the instant case, the People have complied above with defendant's Demand for Discovery, and have provided defendant with a Bill of Particulars, as well as providing a Voluntary Disclosure Form relating to this case. Moreover, a comprehensive discovery package is being prepared and will be provided to the defendant in the upcoming weeks; any additional discovery will be served upon receipt of same by this Office.

II.     Defendant's Motion to Inspect and Dismiss the Indictment (210.20(1)©

The People oppose any disclosure of the grand jury minutes to the defense. The issues raised in the defendant's motion are straightforward, and disclosure of the grand jury minutes is not necessary for their resolution. See C.P.L. § 210.30(3). Once the court determines that legally sufficient evidence was adduced before the Grand Jury, it has no authority to direct the People to provide the grand jury minutes to a defendant. See Matter of Brown v. Rotker, 215 A.D.2d 378 (2d Dep't 1995); Matter of Attorney General v. Firetog, 94 N.Y.2d 477 (1999); see also, People v. Harris, 94 N.Y.2d 873 (2000); People v. Tolbert, Kings Co. Ind. 11616/98 (Sup. Ct. Kings Co. 9/12/2000) (Juviler, J.). Further where the court is able to decide defendant's motion on the basis of its reading the grand jury minutes without the assistance of defense counsel, it may not direct the release of those minutes to the defendant. See People v. Elmhurst Milk & Cream Co., Inc., 116 Misc.2d 140. (Sup.

10

Ct. Kings Co. 1982); People v. Dairylea Co-op., Inc., 114 Misc.2d 421 (Sup. Ct. Bronx Co. 1982).

The People have consented to an in camera review of the grand jury minutes and previously provided to the Court copies of the grand jury minutes. As this Court is well aware, in reviewing the grand jury minutes, the Court must view the evidence in the light most favorable to the prosecution.

The Court's inspection of the minutes will reveal that the evidence before the Grand Jury amply supports all of the offenses charged, that the Grand Jury was properly instructed on the law, and that the integrity of the proceedings was unimpaired. The People deny all allegations to the contrary and oppose dismissal or any reduction of the charge.

### III.   Defendant's Motion to Inspect and Dismiss the Indictment

On a motion to dismiss an indictment for legal insufficiency, the Court may consider only whether or not the evidence is legally sufficient. Issues regarding the adequacy of the proof are the exclusive province of the Grand Jury. See People v. Mills, 1 N.Y.3d 269 (2003); People v. Swamp, 84 N.Y.2d 725, 730 (1995).

CPL § 70.10 (1) defines legally sufficient evidence as "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof." Under this definition, legally sufficient

11

evidence means a prima facie case, not proof beyond a reasonable doubt (see People v. Swamp, 84 N.Y.2d at 730, citing People v. Mayo, 36 N.Y.2d 1002, 1004 (1975).

Accordingly, this Court should limit its inquiry to the consideration of "whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted and deferring all questions as to the weight or quality of the evidence would warrant conviction." People v. Swamp, 84 N.Y.2d at 730, citing People v. Mikuszewski, 73 N.Y.2d 407, 411 (1989); see also People v. Jennings, 69 N.Y.2d 103, 114-15 (1986).

Applying this standard, the evidence was factually and legally sufficient to support each count in the indictment against defendant Bruce. Therefore, defendant McKenzie's motion to dismiss the indictment on the ground of legal insufficiency should be denied.

IV. People's Response to Motion for a Sandoval Hearing

The People consent to a Sandoval hearing but oppose any relief requested.

12

### V. People's Response To Defendant's Motion For Other Relief

The People oppose the filing of additional pre-trial motions by the defendant. Defendant has been afforded more than ample opportunity to make all necessary pre-trial motions. The People request that any additional pre-trial motions filed after the date set by the Court for defendant's pre-trial motions, be summarily denied absent a showing of good cause by the defendant. See C.P.L. § 255.20(3). C.P.L. § 255.20(2) mandates that all pre-trial motions "shall be included within the same set of motion papers, and shall be returnable on the same date." As counsel can cite no authority for a truncated pre-trial motion practice, this Court should reject such a notion and summarily deny any further motions, absent a showing of good cause.

In addition, while defendant references certain other motions (including a motion to preclude evidence of identification and a motion to suppress property seized from defendant and defendant's home) in defendant's Notice of Motion, there is no further discussion of these motions in defendant's affirmation. In any event, both of those motions would not be applicable to the case at hand. There were no out-of-court police arranged identification procedures known to the People. Nor was there any property seized from the defendant or her home that the People seek to introduce at trial. Thus, those motions referenced in the notice of motion should be summarily denied.

13

## People's Request for Reciprocal Discovery and Preclusion

Pursuant to C.P.L. 250.20, the People have demanded that the defendant supply (a) the place or places where the defendant claims to have been at the time of the commission of the crime, and (b) the name or names, residential addresses, places of employment and addresses thereof of every alibi witness the defendant intends to rely upon to establish the defendant's presence elsewhere than the scene of the crime at the time of its commission. More than eight (8) days has elapsed since service of that demand and the defendant has not responded to it. Accordingly, the People renew their application and request that the defendant be precluded from offering alibi testimony at trial, if he fails to respond promptly.

Pursuant to C.P.L. § 240.30(1), the People served upon the defendant a demand that defendant supply (a) any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test, experiment, or comparison, made by or at the request or direction of the defendant, if the defendant intends to introduce such a report or document at trial, or if the defendant has filed notice of intent to proffer psychiatric evidence and such report or document which relates thereto or if such report or document was made by a person other than the defendant, whom the defendant intends to call as a witness at trial; and (b) any photograph, drawing, tape or other electronic recording which defendant intends to introduce at trial. We have received no response to our request and renew it at this

14

time, and request that the defendant be precluded from so offering any such evidence if he fails to respond promptly.

More than thirty (30) days has elapsed since defendant pleaded not guilty to the indictment and the defendant has not served notice of an intention to present psychiatric evidence at trial. Accordingly, the defendant should be precluded from presenting such evidence. See C.P.L. § 250.10(2).

**WHEREFORE**, except as otherwise expressly stated herein, the defendant's motion should be denied in its entirety.

Dated:      Brooklyn, New York
            February 1, 2011

Respectfully submitted,

Laura Neubauer
Assistant District Attorney
(718) 250-2982
350 Jay Street
Brooklyn, NY 11201

Note:      Any defense motion, response, or request addressed to the above-captioned information should be directed to the attention of the Assistant District Attorney named above, who is assigned to this case.

15

AP-226

# EXHIBIT 22

People v. Mitchell
4743-2010
Decision and Order
(Walsh, J.)

Dated: March 28, 2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 50
---------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

      -against-                       DECISION AND ORDER

STEPHEN MITCHELL,                    Indictment No. 4743/2010

           Defendant
---------------------------------------------------x
JOHN P. WALSH, J.

    Defendant Stephen Mitchell's Omnibus Motion, dated December 1, 2010, upon consideration of the People's Response, dated February 1, 2011, are decided as follows:

    1. Defendant's motion to inspect the Grand Jury minutes pursuant to CPL 210.30(2) is granted to the extent of the court examining them *in camera*.

    2. Defendant's further motion to dismiss and/or reduce the charges in the indictment pursuant to CPL 210.30 and CPL 210.35(5) will be decided in a separate *Memorandum*.

    2(a) Any request by the defendant for release of the Grand Jury minutes is denied in the absence of a finding that the court finds the assistance of the parties necessary to its determination pursuant to CPL 210.30(3).

    3. The defendant's motion for a *Bill of Particulars*, pursuant to Criminal Procedure Law 200.95, is granted to the extent that the People's Voluntary Discovery Form ("VDF") supplies the requested information.

    4. Defendant's demand for *Discovery*, pursuant to Criminal Procedure Law 240.20, is granted to the extent that the People are directed to *forthwith* disclose to the defendant and make available for inspection, photographing, copying or testing, the following property:

        (A)    Any written, recorded or oral statement of the defendant made, other than in the course of the criminal transaction herein charged, to a law enforcement public servant or to a person acting under his or her direction or in cooperation with him or her;

        (B)    Any transcript of the defendant's testimony before the Grand Jury which voted the indictment herein;

**AP-25**

(C)   Any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test or experiment, relating to the criminal action or proceeding herein which was made by, at the request of or pursuant to the direction of a law enforcement public servant;

(D)   Any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test or experiment, relating to the criminal action or proceeding herein which was made by a person whom the People intend to call as a witness at trial, or which the People intend to introduce at trial;

(E)   Any photograph or drawing relating to the criminal action herein which was made or completed by a law enforcement public servant whom the People intend to call as a witness at trial, or which the People intend to introduce at trial;

(F)   Any photograph or drawing relating to the criminal action herein which was made by a person whom the People intend to call as a witness at trial, or which the People intend to introduce at trial;

(G)   Any photograph, photocopy or other reproduction made by or at the direction of a police officer, peace officer or prosecutor of any property prior to its release pursuant to Penal Law 450.10, irrespective of whether the People intend to introduce the property, photograph, photocopy or other reproduction at trial;

(H)   Any other property obtained from the defendant;

(I)   Any audio or video tapes or other electronic recordings which the People intend to introduce at trial, irrespective of whether such recording was made during the course of the criminal transaction herein.

5. A *Sandoval/Ventiminglia* hearing, pursuant to *People v. Sandoval*, 34 NY2d 371 and *People v. Ventimiglia*, 52 NY2d 350, is granted but is also referred to the trial court for its decision prior to trial.

6. The People are reminded of their continuing obligations to provide exculpatory material, pursuant to *Brady v. Maryland*, 373 U.S. 83 and impeachment material, pursuant to *United States v. Giglio*, 405 U.S. 150.

7. Further motions may be made as allowed by Criminal Procedure Law 255.20.

**AP-26**

8. The People's motion for *Reciprocal Discovery* is granted as to the material specified in Criminal Procedure Law 240.30.

The foregoing constitutes the decision and order of the court.

Dated: Brooklyn, New York
     March 28, 2011

JOHN P. WALSH, J.S.C.

AP-27

# EXHIBIT 23

**People's Voluntary disclosure Form**
**Dated: October 5, 2010**

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF KINGS, PART 50

---------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK        :

    -against-        :

STEPHEN MITCHELL        :

                   Defendant        :

---------------------------------------------------------X

Office of the
District Attorney
Kings County
CHARLES J. HYNES

Indictment
# 4743/2010

Form prepared by: A.D.A. LAURA NEUBAUER   Date:   October 5, 2010

Form served by: _____   Upon:_____
Date:_____

(1)  Approximate date, time and place of offense:

| Offense | Date | Place |
|---|---|---|
| Grand Larceny in the 2nd Degree P.L. § 155.40(1) | 12/23/2005 - 3/31/2006 | Kings Co. and elsewhere |

(2)  Approximate date, time and place of arrest:

| Date | Time | Place |
|---|---|---|
| 9/8/10 | 2:49pm | 542 Hartford Ct. South Orange, NJ |

(3)  Arresting Officer:

| Name | Shield | Command |
|---|---|---|
| Det. Jose Rivera | 6754 | NYPD/KCDA Squad |

(4)  Other police officers, excluding any officer whose identity must be confidential, known
by the prosecutor to have been present at the time of arrest.

| Name | Shield | Command |
|---|---|---|
| To be provided | | |

**AP-95**

AP-232

(5)   The following written reports or documents or portions thereof, relating to this case were made by or at the request or direction of a public servant engaged in law enforcement activity, or were made by a person whom the prosecutor intends to call as a witness on the People's direct case at trial, and are either appended or will be made available to counsel at a mutually convenient time. Addresses of witnesses have been redacted, and in appropriate cases, names of witnesses will also be redacted.

| | | | | |
|---|---|---|---|---|
| (X) | Arrest Report | ( ) | Handwriting Analysis |
| ( ) | Arrest Warrant | ( ) | Medical Examiner's Report |
| ( ) | Ballistics Report | ( ) | Mental Examination |
| ( ) | Breathalyzer Report | ( ) | Narcotics Lab Report |
| ( ) | Complaint Report ("UF 61") | ( ) | Physical Examination |
| ( ) | Complaint Follow-up | ( ) | Police Aided Card |
| | Report ("DD 5") Numbers: | ( ) | Search Warrant |
| ( ) | On Line Booking Sheet | ( ) | Serology Report |
| ( ) | Other: | | |

(6)   The following property is either appended or will be made available to counsel at a mutually convenient time:

Photograph(s) or drawing(s) relating to the case which were made or completed by a public servant engaged in law enforcement activity, or which was made by a person whom the prosecutor intends to call as a witness on its direct case at trial or which the People intend to introduce on its direct case at trial.

Tapes or other electronic recordings, in addition to those disclosed pursuant to C.P.L. 710.30, which the People intend to introduce on its direct case at trial, and irrespective of whether such recording was made during the course of the criminal transaction.

Any other property obtained from the defendant or other co-defendant to be tried jointly, as reflected in police property voucher that is appended or will be made available to counsel at a mutually convenient time.

(7)   Type of weapon, if any, involved: <u>NONE</u>

( ) Weapon was recovered.   ( ) Weapon was not recovered.

(8)   The People intend to prove at trial that each defendant acted as principal, accomplice, or both, as indicated:

| Principal | Accomplice | Both |
|---|---|---|
| (XX) | (XX) | (XX) |

**AP-96**

(9)    Copies of any transcript of testimony relating to this case, if given before the Grand Jury by the defendant, or by a co-defendant(s) to be tried jointly, will be provided as soon as possible and before trial.

(10)    Anything the District Attorney determines is required to be disclosed, prior to trial, to the defendant, by the prosecutor, pursuant to the constitutions of New York State or of the United States is listed below:

THE PEOPLE ARE AWARE OF THEIR CONTINUING OBLIGATION UNDER BRADY. ANY SUCH MATERIAL WILL BE TURNED OVER AS IT BECOMES KNOWN TO THE PEOPLE.

(11)    If subsequent to the disclosure of the items specified above, additional items are revealed which the District Attorney believes would be subject to disclosure under the provisions of this form, such items will be disclosed unless a protective order to prohibit their discovery would be warranted, in which case a notice to that effect will be provided.

**AP-97**

PLEASE TAKE NOTICE that pursuant to Criminal Procedure Law § 240.30, the District Attorney hereby demands that within 20 days of the date of service of this demand the defendant disclose and make available to the District Attorney for inspection, photographing, copying and testing:

(a)   Any written report or document or portion thereof concerning a physical or mental examination, or scientific
test, experiment, or comparisons, made by or at the request or direction of the defendant, if the defendant intends to introduce such report or document at trial, or if the defendant has filed a notice of intent to proffer psychiatric evidence and such report or document was made by a person, other than the defendant, whom the defendant intends to call as a witness at trial; and

(b)   Any photograph, drawing, tape, or other electronic recording that the defendant intends to introduce at trial.

II.  PLEASE TAKE NOTICE that pursuant to Criminal Procedure Law § 250.20, the District Attorney hereby demands that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged the defendant was at some place or places other than the scene of the crime, and to call witnesses in support of such defense the defendant must, within eight days of service of the demand, serve upon the people, and file a copy thereof with the court, a "notice of alibi," reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment and the addresses thereof of every such alibi witness upon whom the defendant intends to rely.

III. PLEASE TAKE NOTICE that pursuant to C.P.L. article 255, the defendant must make all pre-trial motions generally within forty-five days after arraignment and before commencement of trial.  Upon expiration of the applicable period within which defendant must make pre-trial motions, the People will move the court to preclude any pre-trial motions made thereafter.

AP-98

# EXHIBIT 24

People's Letter to Justice Walsh to Memorialize
Disclosures
Dated: November 22, 2011



**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**
RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
718 250-2000

November 22, 2011

Hon. John P. Walsh
Supreme Court State of New York
Criminal Term, Part 50
Brooklyn, New York  11201

RE:   People v. Stephen Mitchell, et al., Ind. #4743/2010

Dear Judge Walsh:

This letter is submitted to memorialize additional discovery material provided to defense
counsel in the above captioned case. The following was provided to defense counsel in
the above captioned case:

1)   Notes – Simmons, Linda 5/6/10
2)   Notes – Randi Burger 8/31/09
3)   Notes – Ushkow 6/7/11
4)   Notes – Simmons, Linda/JoAnn 6/8/11
5)   Notes – Bull 6/9/11
6)   Notes – Molloy 6/20/11
7)   Notes – Ryan 6/20/11 & Victory 6/28/11
8)   Notes – Emma 5/7/10
9)   Notes – Bull 5/25/10
10)  Notes – Bull 9/8/09
11)  Notes – Benebitse 6/15/10
12)  Notes – Emma 5/1/09
13)  Notes – Emma 11/6/09
14)  Notes – Abdelfattah 5/13/10
15)  Notes – Abdelfattah 6/10/10
16)  Notes – Ikezi 5/10/10
17)  Notes – Ohayon 5/12/10
18)  Photos St. James Pl.

AP-83



19)   Transunion and Equifax – Mitchell
20)   Victory Contracting
21)   Report of Guardian ad Litem (Emma) – in the
      Surrogate's file previously turned over
22)   6/10/03 Minutes – Sup Court Trial Term 76
23)   9/8/04 Minutes – Sup Court Civil Term 76
24)   3/10/08 Minutes – Sup Court Civil Term 76
25)   4/10/08 Minutes – Sup Court Civil Term 76
26)   6/26/08 Minutes – Sup Court Civil Term 76
27)   8/27/08 Minutes – Sup Court Civil Term 76
28)   2/23/09 Minutes – Sup Court Civil Term 76
29)   Victory Contracting
30)   Notes/Docs from Simmons, JoAnn
31)   Carver Federal Savings Accounts (Guardian and Simmons)
32)   Report of Counsel to Review Final Afcount – Weindorf
33)   DMV Photo – Simmons, Minnie
34)   Affirmation of Services Rendered by Guardian ad Litem – Emma
35)   Notes – Sal
36)   Notes – Abula
37)   Notes Abdelfattah
38)   NYC Dept of Finance payment history – 302 St. James
39)   NYC Buildings printouts

If you have any questions please forward them to me at (718) 250-2982 or via email at
neubauel@brooklynda.org.

Sincerely,

Laura Neubauer
Assistant District Attorney

ACKNOWLEDGE RECEIPT OF ABOVE LISTED MATERIAL:

Wadeedah Shecheed
Attorney for Stephen Mitchell

AP-84

# EXHIBIT 25

**Letter from Justice Michael Pesce to Charles Emma, Esq.**
**Re: Charles Brown**
**Dated: August 28, 2008**



**Appellate Term**
**Supreme Court of the State of New York**
**2nd and 11th Judicial Districts**

**MICHAEL L. PESCE**
PRESIDING JUSTICE

SUPREME COURT CHAMBERS
360 ADAMS STREET
BROOKLYN, N.Y. 11201-3712
(347) 296-1007

August 28, 2008

Charles L. Emma, Esq.
8008 20th Avenue
Brooklyn, NY 11214

Re: Charles Brown
Index No. 107103/99

Dear Mr. Emma:

Thank you for your comprehensive report dated August 26, 2008. Mr. Mitchell appeared in Court on August 27, 2008 in spite of his representation to you that he was on vacation and that his wife was ill. I again advised him of the urgent need for him to cooperate.

In reviewing this matter yet again, it has occurred to me that the issues involving the sale of 302 St. James Place as well as the proceeds from the life insurance policies are in the jurisdiction of Surrogate Court proceedings and this Court will defer to its purview.

What remains, therefore, is the completion of the annuals and/or final. At this point I do not expect the Guardian or Mr. Mitchell will be able to comply. Perhaps you should consider submitting an "account stated" and if applicable a surcharge proceeding for those amounts not satisfactorily documented or explained by the Guardian.

Very truly yours,

Hon. Michael L. Pesce

MLP/ks

cc: Stephen T. Mitchell, Esq.
    Collin Bull, Esq.
    Eugene B. Davis, Sr.
    Minnie Simmons
    Marshall Kaplan, Esq.

# EXHIBIT 26

**People v. Mitchell**
Supreme Court Appellate Division: Second Department
Docket: 2014: 05910
Indictment: 4743/2010
Decision and Order
Dated: November 18, 2020

# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

D64284
L/htr

_____AD3d_____

Argued - September 14, 2020

RUTH C. BALKIN, J.P.
JEFFREY A. COHEN
SYLVIA O. HINDS-RADIX
FRANCESCA E. CONNOLLY, JJ.

———————————————

2014-05910

DECISION & ORDER

The People, etc., respondent,
v Stephen Mitchell, appellant.

(Ind. No. 4743/10)

———————————————

Stephen T. Mitchell, named herein as Stephen Mitchell, New York, NY, appellant pro se.

Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove and Jean M. Joyce of counsel), for respondent.

Appeal by the defendant from a judgment of the Supreme Court, Kings County (William E. Garnett, J.), rendered May 23, 2014, convicting him of grand larceny in the second degree, upon a jury verdict, and imposing sentence.

ORDERED that the judgment is affirmed.

A grand jury indicted the defendant, an attorney, for grand larceny in the second degree (Penal Law § 155.40[1]), based upon the defendant's alleged theft of the proceeds from the sale of certain real property belonging to the estate of Charles Brown (hereinafter the estate). At the jury trial, the testimony and evidence presented by the People established, inter alia, that the defendant was retained to represent the estate in the sale of the subject property, which was sold in December 2005, that the defendant received a check made payable to the executor of the estate in the sum of $401,082.50, at the closing on the property, and thereafter received a second check made payable to the estate in the sum of $10,000, and that the defendant deposited those checks in his attorney IOLA account which, prior to the sale of the property, had a balance of $29.27. The evidence also demonstrated that between December 2005 and March 2006, the defendant transferred different amounts from his attorney IOLA account into his various other bank accounts, that as of

November 18, 2020

Page 1.

PEOPLE v MITCHELL, STEPHEN

March 2006, the balance in the defendant's IOLA account was $411.77, and that the estate did not receive any of the proceeds from the sale of the property. Following the jury trial, the defendant was convicted of grand larceny in the second degree.

The defendant's contention that the grand jury proceeding was defective within the meaning of CPL 210.35(5) based on the prosecutor's failure to instruct the grand jury with regard to certain provisions of the Mental Hygiene Law and the EPTL is, as the defendant concedes, unpreserved for appellate review (*see* CPL 470.05[2]; *People v Tunit*, 149 AD3d 1110, 1110; *People v Forde*, 140 AD3d 1085, 1087). In any event, this contention is without merit inasmuch as the prosecutor's failure to provide that instruction did not impair the integrity of the grand jury proceeding or give rise to the possibility of prejudice to the defendant (*see People v Sealy*, 181 AD3d 893, 894; *People v Burch*, 108 AD3d 679, 680-681; *People v Kurth*, 82 AD3d 905, 906).

Viewing the evidence presented at trial in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620), we find that there was legally sufficient direct and circumstantial evidence that the defendant, without permission or authority, used a portion of the sale proceeds in excess of $50,000, for purposes unrelated to the payment of the debts and expenses of the estate, to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348; *People v Romero*, 7 NY3d 633).

Contrary to the defendant's contention, the Supreme Court providently exercised its discretion in limiting the defendant's cross-examination of one of the People's witnesses since the proposed line of questioning was only marginally relevant and concerned collateral issues (*see People v Elmore*, 175 AD3d 1423, 1423; *People v Best*, 152 AD3d 617, 618; *People v Frumusa*, 134 AD3d 1503, 1504, *affd* 29 NY3d 364). Furthermore, the court's charge to the jury, viewed in its entirety, adequately explained the concepts of reasonable doubt and the People's burden of proof, and did not improperly shift the burden of proof to the defendant (*see People v Enoksen*, 175 AD3d 624, 626).

The defendant's contention concerning the alleged nondisclosure of certain *Rosario* material (*see People v Rosario*, 9 NY2d 286) is unpreserved for appellate review, and we decline to review it in the exercise of our interest of justice jurisdiction (*see People v Bloom*, 149 AD3d 1462, 1463; *People v Jacobs*, 71 AD3d 693, 693; *People v Lorenzo*, 272 AD2d 184; *People v Rodriguez*, 262 AD2d 428; *People v Swinson*, 227 AD2d 508).

The defendant's remaining contentions are without merit.

BALKIN, J.P., COHEN, HINDS-RADIX and CONNOLLY, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

November 18, 2020                                                                                        Page 2.

PEOPLE v MITCHELL, STEPHEN

# EXHIBIT 27

**People v. Mitchell**
Supreme Court Appellate Division: Second Department
Docket: 2014: 05910
Indictment: 4743/2010

DENIAL OF LEAVE TO APPEAL
COURT OF APPEALS
STATE OF NEW YORK
Dated: March 31, 2021

# State of New York
# Court of Appeals

BEFORE: LESLIE E. STEIN, Associate Judge

---

THE PEOPLE OF THE STATE OF NEW YORK,

<div style="text-align:center">Respondent,</div>

-against-

STEPHEN MITCHELL,

<div style="text-align:center">Appellant.</div>

ORDER
DENYING
LEAVE
(2015-02703)

---

Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure Law § 460.20 from an order in the above-captioned case;*

UPON the papers filed and due deliberation, it is

ORDERED that the application is denied.


Dated: *March 31, 2021*
    at Albany, New York

_____
Associate Judge

*Description of Order:  Order of the Appellate Division, Second Department, dated November 18, 2020, affirming a judgment of the Supreme Court, Kings County, rendered March 2, 2015.

# EXHIBIT 28

<u>People v. Mitchell</u>
Indictment: 4743/2010

Defense Motion to Re-Open Conditional Examination
And
For Disclosure of Psychiatric and Medical Records
For
Minnie Simmons

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: PART 50
----------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK    :

                                                            :        **NOTICE OF MOTION**

            -against-                                       :        IND. 4743-2010

**STEPHEN MITCHELL,**                                       :

                                            Defendant.      :
----------------------------------------------------------X

     PLEASE TAKE NOTICE, upon the affirmation of **WADEEDAH SHEEHEED**, an attorney admitted to the practice of law before the courts of the State of New York, assigned counsel for the defendant, the annexed exhibits and the prior proceedings therein, the undersigned will move this Court at Part 50, 320 Jay Street, Brooklyn, New York, on the 13th day of January 2012, at 9:30 A.M., or as soon thereafter as counsel can be heard for:

1. An Order directing disclosure to the defense and a defense expert the entire psychiatric, psychological and medical records of the complaining witness Minnie Simmons pursuant to *People v. Gissendanner*, 48 NYS2d 893 (1979); *Brady v. Maryland*, 373 US 83 (1963); the defendant's federal and New York State Constitutional rights [U.S. Constitution, Amendments 5, 6, 14; New York Constitution, Article I § 6] and in the interest of justice;

2. An Order directing that Minnie Simmons undergo a psychiatric/psychological examination to aid the jury assessing her credibility, ability to perceive, recall and recount events pursuant to *United States v. Benn*, 476 F2d 1127 (US APP DC 1973), the defendant's federal and New York State Constitutional rights [U.S. Constitution, Amendments 5, 6, 14; New York Constitution, Article I § 6] and in the interest of justice;

3. An Order re-opening the conditional examination hearing to afford the defendant the opportunity to cross-examine Minnie Simmons related to any psychiatric, psychological and medical history pursuant to *People v. Baranek*, 733 NYS2d 704 (2001)the defendant's federal and New York State Constitutional rights [U.S. Constitution, Amendments 5, 6, 14; New York Constitution, Article I § 6] and in the interest of justice;

    And for such other and further relief as may seem just and proper.

Dated:       Brooklyn, New York
             December 7, 2011

                                          WADEEDAH SHEEHEED
                                          Attorney for the Defendant
                                          45 Main Street, Suite 230
                                          Brooklyn, New York 11201
                                          (718) 855-8417

To:

ADA Laura Neubauer
Office of the District Attorney
Kings County
350 Jay Street
Brooklyn, New York 11201

Clerk of Court
PART 50

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 50
-----------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,                    AFFIRMATION

    -against-

STEPHEN MITCHELL,                                       IND. 4743-2010
                 Defendant.

-----------------------------------------------------------------X

      **WADEEDAH SHEEHEED** an attorney duly admitted to practice law in the

State of New York and assigned counsel for the defendant hereby affirms and states:

1. I am familiar with all the facts and proceedings of this case herein to date.

2. This affirmation is made in support of the instant motion pursuant to Civil Rights

   Law Section § 50-a for an Order requiring the complete disclosure of all

   psychiatric, psychological and medical records of Minnie Simmons to the defense

   and a defense expert as relevant and material to the issue of guilt or innocence.

   See *People v. Gissendanner*, 48 NY2d 543 (1979).

3. This affirmation is made upon information and belief, the sources of which

   include court proceedings and records, conversations with assistant district

   attorneys, other individuals and independent investigations.


                        **FACTUAL BACKGROUND**

4. On September 8, 2010 the defendant was arrested at his home on an arrest warrant

   related to an 'X' indictment for one count of grand larceny in the second degree.

   The indictment charges the defendant with stealing proceeds from the sale of real

<center>3</center>

property located at 302 St. James Place, Brooklyn, NY on various dates between December 23, 2005 and March 31, 2006.

5. It is alleged the defendant, an attorney,[1] stole $401,082.50 from the sale of that property which belonged to the Estate of Charles Brown.[2] It is further alleged the defendant took the proceeds from the sale of that property without permission or authority from Minnie Simmons who is the sister-in-law and executrix for the estate of Charles Brown.

6. According to discovery by stipulation (hereinafter 'DBS') the alleged theft was brought to the Kings County District Attorney's Office not by Minnie Simmons but by Supreme Court Justice Michael Pesce who was overseeing guardianship proceedings before the death of Charles Brown. Prior to his death Charles Brown had become incapacitated and Minnie Simmons was appointed his guardian.

7. Upon information and belief, Minnie Simmons hired attorney Marshall Kaplan to assist her with the estate of Charles Brown after Mr. Brown died.

8. Upon information and belief, subsequent to hiring attorney Marshall Kaplan, Minnie Simmons hired the defendant to assist her with the estate of Charles Brown after Mr. Brown died.

9. Upon information and belief, Minnie Simmons executed the documents necessary close on the sale of property located at 302 St. James Place on December 23, 2005.

10. The People did not offer live testimony of Minnie Simmons in their grand jury presentation but instead opted to present a one page typed affirmation purportedly

---

[1] The defendant is no longer a licensed practicing attorney having voluntarily resigned from the bar.
[2] Charles Brown died on June 26, 2003.

4

signed by her before notary Tonige S. Glynn. The affirmation denies she gave permission or authority to the defendant to retain, take, use, possess, or distribute any of the proceeds from the sale of the property at 302 St. James Place. The affirmation dated June 10, 2010 and also states that Minnie Simmons is 79 years of age, physically incapacitated and immobile. (See Exhibit A)

11. The People also presented the testimony of Linda Simmons, the daughter of Minnie Simmons in the grand jury. Linda Simmons testified twice, first on July 8, 2010 and again on August 4, 2010. During her testimony on each date she was asked by the Assistant District Attorney (hereinafter 'ADA') to describe her mother's condition mentally and physically.[3] Linda Simmons testified: "Mentally, she's all right, but she's unable to walk" (*GJ testimony of Linda Simmons* 7/8/2010 P5:L21-24); "Mentally, she's okay. Physically, she's incapacitated" (*GJ testimony of Linda Simmons* 8/4/2010 P6:L21-24). The People have indicated their intention to call Linda Simmons at the defendant's trial.

12. Linda Simmons also testified two times that she met the defendant approximately three times and that two of those occasions were when he came to the house Minnie Simmons lived in prior to her moving into a nursing home so that Minnie could sign some papers saying he can handle her business for her. (*GJ testimony Linda Simmons* 7/8/2010- P8:L23-25;P9:L1-28 and 8/4/2010 - P9:L11-21)

13. At the conditional hearing conducted before Honorable Justice Mark Dwyer on May 18, 2011 at the nursing home, Minnie Simmons testified that she was getting senile and that she could not remember a lot of things related to the sale of the property, her interactions with the District Attorney's Office and her interactions

---

[3] Upon information and belief Linda Simmons is not a doctor.

5

with the defendant. Specifically, at the conditional examination hearing she testified on direct-examination by the ADA :

    a.  She could not remember the name of the place she is currently living. (P6:L5-7)

    b.  She could not recall when her brother-in-law passed away. (P7:L10-12)

    c.  She could not recall if somebody was appointed to handle the Estate of Charles Brown. (P7:L15-20)

    d.  She could not recall if the property located at 302 St. James Place was ever sold. (P8:L17-19)

    e.  When asked about a several signatures purporting to be hers in the Petition for Probate and other documents related to Charles Brown she testified with uncertainty stating that she didn't know or remember if it was her signature and that her hand was getting shaky at the time so 'maybe' it was. (P10:L18-25;*cross* P34:L9-16;P37:L5-14)

14. On cross-examination at the conditional hearing Minnie Simmons testified:[4]

    a.  After Charles Brown died she could not remember who helped her take care of his affairs. (P17:L10-13)

    b.  She could not remember where an attorney she apparently hired by the name of Marshall Kaplan came from or why he was there. (P17:L14-22)

    c.  She cannot recall how many people were living at that property. (P19:L2-4)

    d.  She cannot remember when was the last time she saw the property after

---

[4] The defendant was represented by another attorney at the conditional examination. The prior attorney was relieved due to a conflict and the undersigned was assigned to this case on October 18, 2011.

Charles Brown died. (P19:L13-19)

e.   She could not remember exactly when Charles Brown died. (P20:L7)

f.   She could not remember if her children were helping her take care of the property. (P20:L14-20)

g.   She does not remember if her daughters got an attorney to take care of the property. (P20:L17-20)

h.   She doesn't remember being told the property needed repairs. (P21:L8-11)

i.   She doesn't remember signing documents after Charles Brown's death. (P21:L12-23)

j.   She denies having possessed Charles Brown's last will and testament or having been shown it by Marshall Kaplan, Esq. (P22:L4-8;P37:L15-21)

k.   She cannot remember the defendant. (P23:L20-22;P32:L15-19)

l.   She cannot remember what the defendant looks like. (P23:L23-24)

m.   She admits there are a lot of things she cannot remember. (P23:L23)

n.   She cannot ever recall meeting the defendant. (P23:L25;P24L1-4)

o.   She admits to getting senile. (P24:L4)

p.   She cannot recall when she started getting senile (P24:L7-11)

q.   She cannot recall how old she was when she came to the nursing home (P24:L17-20)

r.   She cannot recall if when her brother Charles became ill he was in a hospital or nursing home. She states she 'imagine' he did go to the hospital. (P25:L21-25;P:26:L1-3)

s.   She has no memory of anyone coming to the home she lived in prior to the

7

nursing home to discuss the sale of 302 St. James Place. (P27:L16;19; P28:L17-25;P29:L1)

t.  She admits she signed a deed that transferring the property to a Toju Realty Corp. but says she does not know anything about it. (P29:L18-24)

u.  She states she has no memory of selling the house. (P30:L11-14)

v.  She states she has no memory of going to court and getting letters of testamentary. (P30:L19-23)

w.  She testified she cannot remember being appointed executrix. (P30:L15-18)

x.  She testified that the signature on Peoples #4 (the notarized affirmation purportedly from Minnie Simmons presented to the grand jury) looks like her signature but is not hers and she has no memory of an investigator from the District Attorney's Office coming to the nursing home to talk about the case. Further that she has no memory of the affirmation being read to her and that her memory is fading. (P33:L1-17;P39:L20-24; *re-direct* P40:L1-19;P41:L1-6)

y.  She cannot recall who sold the property. (P35:L12-25)

z.  She cannot recall who told her of the sale of the property or when she first learned of the sale. (P38:L19-24; re-direct P41:L7-11)

15. Upon information and belief Minnie Simmons gave the defendant permission to utilize the proceeds from the sale of property located at 302 St. James Place.

8

## MEMORANDUM OF LAW

### THE COMPLAINING WITNESS'S PSYCHIATRIC, PSYCHOLOGICAL AND MEDICAL RECORDS SHOULD BE FULLY DISCLOSED TO THE DEFENSE AND A DEFENSE EXPERT

16. A criminal defendant is entitled to discovery and inspection of psychiatric, psychological and medical records of a complaining witness that contains information that may have bearing on witness credibility and ability to perceive, remember and accurately recount events. Although psychiatric records are confidential the court has discretions to disclose the records if it finds in the interest of justice there is significant need for their disclosure outweighing the need for confidentiality. *People v. Knowell*, 512 NYS2d 190 (2nd Dept. 1987).

17. The admission at the conditional examination by Minnie Simmons that she is going senile and cannot recall the onset of her senility is a sufficient showing of a reasonable likelihood that her records will contain material bearing on reliability and accuracy of witness testimony. *People v. Gissendanner*, 48 NYS2d 893 (1979).

18. The normal procedure may be for the court to order the production of the records and hold an *in camera* inspection however the defendant submits this case presents a compelling cause to depart from the normal procedure and order the complaining witness's records be disclosed in their entirety to the defense and a defense expert.

19. The People have indicated their intention to play at trial the video recording of Minnie Simmons' testimony given during the conditional examination conducted on May 18, 2011 at the Bishop Henry B. Hucles Nursing Home where she

9

currently resides. Since the complaining witness is not going to testify in person at a trial the opportunity to confront and cross examine her regarding her psychiatric, psychological and medical history as it relates to her ability to perceive, recall and recount events is lost.

20. This is a compelling reason to warrant departure from the normal *in camera* inspection of records by the court. The main issue at the trial will be whether the defendant had permission or authority to utilize the proceeds from the sale of the property in the manner he did. Given that Minnie Simmons has testified under oath at the conditional hearing that she is: a) senile b) cannot remember when she started getting senile and c) cannot remember the defendant (and many other pertinent facts and details related to her role as executrix and in selling the property in question), the ability to fully evaluate whether any weight should be given to her testimony through a thorough examination of her medical and mental health history is crucial.

21. Minnie Simmons own daughter Linda Simmons corroborates the defendant did in fact meet Minnie on at least two occasions, yet Minnie testified twice during the conditional examination that she did not remember the defendant (who was physically present at the hearing sitting just a short distance away from her) and she could not recall who he was or what he looked like. This is yet another compelling reason for the Court to order her psychiatric, psychological and medical records be turned over to the defendant and defendant's expert who is best able to determine what, if any, information contained in those records is relevant and material to the defense.

10

facing the possibility of a felony conviction and a significant prison sentence should he be convicted after trial. The defendant has the right to confront his accuser related to any mental health issue that would impact her ability to perceive, recall and recount events. See *People v. Baranek*. Since the defendant did not have access to her records prior to the first conditional examination, fairness requires the hearing be reopened to afford him this opportunity.

## THE COURT SHOULD ORDER A PRETRIAL
## PSYCHIATRIC/PSYCHOLOGICAL EXAMINATION OF MINNIE SIMMONS

26. Although there is no New York case which expressly grants the court the authority to order a witness undergo a mental health examination there are cases which impliedly grant courts authority to do so. Pursuant to federal case law courts are more explicitly granted this authority. The defense submits this court has discretion to order that Minnie Simmons undergo a psychiatric/psychological examination for the purpose of aiding the jury in assessing her credibility as a witness. *People v. Baier*, 73 422 NYS2d 734 (2nd Dept. 1979); *People v. Griffin*, 524 NYS2d 153 (Supreme Ct. Kings Co. 1988); *People v. Lowe*, 408 NYS2d 873 (Criminal Ct. Bx. Co. 1978) *United States v. Benn*, 476 F2d 1127 (US APP DC 1973). The decision regarding whether a court should order a mental examination of witness "involves difficult balancing of respective needs and dangers presented by individual case and is committed to sound discretion of trial judge." *United States v. Butler*, 481 F2d 531 (US APP DC 1973).

27. Courts have held where there is overwhelming extrinsic evidence corroborating

12

the witness testimony the court need not order an examination. *United States v. Benn*. In the instant case, extrinsic evidence corroborating Minnie Simmons denial of permission or authority is none existent. Not one of the People's witnesses can corroborate Minnie Simmons denial of permission or authority. This fact coupled with Minnie Simmons own sworn statements during the conditional examination that she is getting senile and cannot recall when she began getting senile presents the court with substantial justification for a court ordered mental health examination.

28. Moreover, because the People intend to use her video recorded testimony at trial an evaluation of her psychiatric/psychological health will no doubt prove valuable to assist the jury in determining what weight, if any, to give her testimony.

29. While it may be burdensome to have Ms. Simmons undergo a mental health examination it is necessary in light of the fact that the defendant is facing a possible felony record and significant prison sentence if convicted after trial on the word of this crucial prosecution witness who has testified under oath that she is senile and does not remember the defendant.

WHEREFORE, the defendant respectfully requests that the Court sign the attached subpoenas and grant the relief sought and for such other relief as is just and proper.

13

DATED:      December 7, 2011
            Brooklyn, New York

                                        Respectfully submitted,


                                        Wadeedah Sheeheed
                                        Attorney for the Defendant
                                        45 Main Street, Suite 230
                                        Brooklyn, New York 11201
                                        718-855-8417

14

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, GRAND JURY
------------------------------------------X
             IN THE MATTER       :
               OF            :

CONFIDENTIAL INVESTIGATION      :
R09-077                  :     AFFIRMATION
                               :

------------------------------------------X

    I, Minnie Simmons, affirm under penalties of perjury that:

    1.   I am 79 years of age.  I currently reside at ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  I am currently physically incapacitated and immobile.

    2.   I am the Executrix of the Estate of Charles Brown, who was my brother-in-law.

    3.   Real property located at 302 St. James Place, Brooklyn, New York was among the assets owned by the Estate of Charles Brown.

    4.   I did not give a person named Stephen Mitchell or anyone else permission or authority to retain, take, use, possess or distribute any proceeds of the sale of 302 St. James Place, Brooklyn, New York for any purpose other than as I directed to pay to the Estate of Charles Brown.

                                *Minnie Simmons* (signature)
                                Minnie Simmons

Sworn to before me
This 10ᵗʰ day of June , 2010

(signature)
Notary Public

TONISE S. GLYNN
Notary Public, State of New York
No. 01GL6159686
Qualified in Queens County
Term Expires Jan. 22, 2011

                                1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - PART 50
--------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

        -v-

    **JUDICIAL SUBPOENA DUCES TECUM**

    IND. NO. 4743-2010

STEPHEN MITCHELL,

              Defendant.

--------------------------------------------------------------X

To:   ***Henry B. Hucles Episcopal Nursing - 835 Herkimer Street, Brooklyn, NY 11233 and affiliates***

     WE COMMAND YOU that all business and excuses being laid aside, you and each of you **PRODUCE** all records, documents, notes, reports, logs and materials of whatever kind and nature concerning <u>Minnie Simmons</u>, a resident at Henry B. Hucles Episcopal Nursing, Brooklyn, New York, including, but not limited to:

1.   The entire contents of all Psychiatric/Mental Health files in your possession or under your control, including but not limited to all:

    a.  Files,
    b.  Charts,
    c.  Reports,
    d.  Notes, writings, and diagrams,
    e.  Forms,
    f.  Printouts,
    g.  Test results,
    h.  Lab results,
    i.  All correspondence and telephone conversation notes to and from all sources, *<u>including but not limited to other medical facilities and doctors</u>*, and to and from any representative of any insurance company, employer, investigator and attorneys.;
    j.  All records, including emergency room records, inpatient records, outpatient records, reports, tests and test results, consultant reports, admit sheets, histories, x-rays, x-ray reports, radiographic reports, electroencephalograms, lab reports, nurses notes, physicians notes and orders, charts, graphs, discharge summaries, operative reports, correspondence, and any and all other records including psychiatric records and materials pertaining to Minnie Simmons.

Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed one hundred fifty dollars and all damages sustained by reason of your failure to comply.

WITNESS, Hon. _____, Justice of said Court, at 320 Jay Street, Brooklyn, New York the ___ day of_____ 2011

SO ORDERED

Wadeedah Sheeheed, Esq.
Attorney for Defendant
45 Main Street, Suite 230
Brooklyn, New York 11201
(718)855-8417

_____
Hon. Justice of Supreme Court

Dated: _____, 2011

# EXHIBIT 29

<u>People v. Mitchell</u>
Indictment: 4743/2010

People's Response to
Defense Motion to Re-Open Conditional Examination
And
For Disclosure of Psychiatric and Medical Records
For
Minnie Simmons

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 50
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

    - against -

STEPHEN MITCHELL,

            Defendant.

-------------------------------------------------------------------X

**AFFIRMATION IN RESPONSE TO DEFENDANT'S MOTION**

4743/2010

LAURA NEUBAUER, an attorney admitted to practice law before the Courts of the State of New York, hereby affirms the following to be true under penalty of perjury:

I submit this affirmation in response to defendant's Motion to Disclose and Re-Open Conditional Exam dated December 7, 2011.

I am an Assistant District Attorney in Kings County assigned to this case and am familiar with its facts and circumstances by virtue of a review of the files maintained by the New York City Police Department and Kings County District Attorney's Office pertaining to this matter, and discussions had with various assistant district attorneys and detectives assigned to this investigation. The People hereby incorporate by reference all of their previous motions, affirmations and memoranda of law filed in this case. All statements are made upon information and belief, based

**AP-130**

on personal conversations with other assistant district attorneys at the Kings County District Attorney's Office, a review of all records and files of the Kings County District Attorney's Office and New York City Police Department, and other sources of information as expressly stated in the individual paragraphs below.

Except where expressly acknowledged herein, the People disclaim, dispute and contest each and every factual allegation and representation contained in defendant's applications.

Defendant is charged under Kings County Indictment Number 4743/2010 with Grand Larceny in the Second Degree [P.L. § 155.40(1)] stemming from his involvement in the stealing of client funds, namely money in excess of $400,000.00 from the Estate of Charles Brown, without permission or authority.

1. On or about and between December 23, 2005 and March 31, 2006, the defendant stole in excess of $400,000 from his client, the Estate of Charles Brown, represented by Minnie Simmons as Executrix. In short, he abused his representation of the Estate by depositing proceeds from the sale of property belonging to the Estate into his attorney IOLA account and subsequently transferred those proceeds to other accounts, including his own personal account, which he spent down to minimal balances in a short period of time. None of the defendant's expenditures were made to the Estate of Charles Brown

2

**AP-131**

2.A Grand Jury heard evidence concerning the defendant's above conduct and indicted him for one count of Grand Larceny in the Second Degree.  On September 13, 2010, he was arraigned on this indictment and the case against him is currently pending in Part 50 of the Supreme Court of the State of New York, County of Kings.

3.Because of Minnie Simmons' physical condition, which rendered her unavailable to appear in the Grand Jury, evidence that she did not give the defendant "permission and authority" to act as he did in retaining the above mentioned monies was introduced in the Grand Jury in the form of a sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown.  She averred therein that she was 79 years-old and that the defendant lacked permission and authority to take the assets of the Estate for any other purpose than for the benefit of the Estate of Charles Brown.

4.Upon information and belief, Minnie Simmons was born in 1931 and she is in poor and deteriorating physical condition.  Specifically, Minnie Simmons is confined to a wheel chair and unable to walk.  As a result of her poor physical condition, Minnie Simmons has been confined to a nursing home for more than two years.  Linda Simmons, daughter of Minnie Simmons, reported that even at the time of the events contained in the indictment in late 2005, Minnie Simmons was physically incapacitated and confined to her home.  Subsequently, in 2007, when she

3

**AP-132**

could no longer adequately function in her own home, she was permanently placed in a nursing care facility where she resides today.

5. Accordingly, upon previous motion by the People dated October 7, 2010 and on consent of defendant the Court ordered a conditional exam of Minnie Simmons. That conditional exam was conducted on May 18, 2011 before the Honorable Mark Dwyer at the Bishop Hucles Nursing Home in Brooklyn, New York (residence of Minnie Simmons). The prosecutor, defense attorney and defendant were present, along with a court reporter, court clerk, and court officers. A copy of the transcript of the conditional exam was certified and placed into the Court file. A copy of the videotaped recording of the conditional exam is being submitted to the Court with this Answer.

6. In the conditional exam, Ms. Simmons was questioned by the prosecutor and extensively cross-examined by the defense attorney. In fact, there was extensive examination of Ms. Simmons concerning her memory (or lack thereof) of the facts and circumstances of the case. A review of the transcript will reveal that Ms. Simmons understood the proceedings – she took the oath and answered each and every question to the best of her ability. While there is no doubt that Ms. Simmons lacked the memory to recount specific details of the transactions involved in the charged indictment, her testimony was clear, coherent and competent.

4

**AP-133**

7. The People are aware of their continuing obligations pursuant to Brady v. Maryland, 373 US 83 (1963) and are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Ms. Simmons' testimony. Nor are the People in possession of any records pertaining to Ms. Simmons' psychiatric, psychological or medical condition.

8. The Court previously granted defendant's motion for an *in camera* review of any and all psychiatric, psychological and medical records pertaining to Minnie Simmons that may be obtained by defendant through a so-ordered subpoena to Bishop Hucles Nursing Home.

9. The People oppose any disclosure of such records to the defendant unless and until such *in camera* review reveals that there is material that bears on the competency of Minnie Simmons.

10. There is no authority to in New York State which grants the Court the power to order a witness to undergo a mental health examination and as such, the People oppose defendant's Motion requesting the Court to order such exam.

11. The defendant had a full and fair opportunity to cross examine Minnie Simmons pertaining to her memory (or lack thereof) for specific facts surrounding the transactions involved in the charged indictment. The fact that Ms. Simmons may or may not remember certain details of the events certainly bears upon her credibility

5

**AP-134**

and as such, may be a factor relevant to the weight of her testimony to be given by the jury.  It does not, however, bear upon her competency, and as such, defendant's motion should be denied.

   **WHEREFORE**, for the reasons set forth in the annexed memorandum of law, the defendant's motion must be denied in its entirety.

Dated:        Brooklyn, New York
              January 12, 2012

                                     Respectfully submitted,


                                     Laura Neubauer
                                     Assistant District Attorney
                                     (718) 250-2982
                                     350 Jay Street
                                     Brooklyn, NY 11201

**AP-135**

# EXHIBIT 30

<u>People v. Mitchell</u>
Indictment: 4743/2010

Defense Reply to People's Response to
Defense Motion to Re-Open Conditional Examination
And
For Disclosure of Psychiatric and Medical Records
For
Minnie Simmons

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: PART 50
---------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK                  :
                                                     :
                                                     :
                                                     :     **REPLY TO PEOPLE'S**
                                                     :     **OPPOSITION TO DEFENSE**
                                                     :     **MOTION TO DISCLOSE**
                                                     :     **PYSCHIATRIC RECORDS AND**
                                                     :     **OTHER REQUESTED RELIEF**
                     -against-                        :
                                                     :     IND. 4743-2010
STEPHEN MITCHELL,                                    :
                                                     :
                                      Defendant.     :
---------------------------------------------------------------X

        PLEASE TAKE NOTICE, upon the affirmation of **WADEEDAH SHEEHEED**, an

attorney admitted to the practice of law before the courts of the State of New York, assigned

counsel for the defendant, the annexed exhibits and the prior proceedings therein, the

undersigned will move this Court at Part 50, 320 Jay Street, Brooklyn, New York, on the 10th

day of February 2012, at 9:30 A.M., or as soon thereafter as counsel can be heard for:

> 1.  An Order directing disclosure to the defense and a defense expert the
>     entire psychiatric, psychological and medical records of the
>     complaining witness Minnie Simmons pursuant to *People v.
>     Gissendanner*, 48 NYS2d 893 (1979); *Brady v. Maryland*, 373 US
>     83 (1963); the defendant's federal and New York State Constitutional
>     rights [U.S. Constitution, Amendments 5, 6, 14; New York
>     Constitution, Article I § 6] and in the interest of justice;
>
> 2.  An Order directing that Minnie Simmons undergo a
>     psychiatric/psychological examination to aid the jury assessing her
>     credibility, ability to perceive, recall and recount events pursuant to
>     *United States v. Benn*, 476 F2d 1127 (US APP DC 1973), the
>     defendant's federal and New York State Constitutional rights [U.S.
>     Constitution, Amendments 5, 6, 14; New York Constitution, Article I §
>     6] and in the interest of justice;
>
> 3.  An Order re-opening the conditional examination hearing to afford
>     the defendant the opportunity to cross-examine Minnie Simmons
>     related to any psychiatric, psychological and medical history
>     pursuant to *People v. Baranek*, 733 NYS2d 704 (2001)the



defendant's federal and New York State Constitutional rights [U.S. Constitution, Amendments 5, 6, 14; New York Constitution, Article I § 6] and in the interest of justice;

And for such other and further relief as may seem just and proper.

Dated:        Brooklyn, New York
              February 6, 2012


                                           WADEEDAH SHEEHEED
                                           Attorney for the Defendant
                                           45 Main Street, Suite 230
                                           Brooklyn, New York 11201
                                           (718) 855-8417


To:

ADA Laura Neubauer
Office of the District Attorney
Kings County
350 Jay Street
Brooklyn, New York 11201

Clerk of Court
PART 50

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 50
--------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,                              AFFIRMATION

    -against-

**STEPHEN MITCHELL,**                                                IND. 4743-2010
           Defendant.

--------------------------------------------------------------X

      **WADEEDAH SHEEHEED** an attorney duly admitted to practice law in the State of New York and assigned counsel for the defendant hereby affirms and states:

1. I am familiar with all the facts and proceedings of this case herein to date.

2. This affirmation is made in support of the instant Reply to the People's opposition to the defense motion for an Order requiring the complete disclosure of all psychiatric, psychological and medical records of Minnie Simmons to the defense and a defense expert as relevant and material to the issue of guilt or innocence and other relief requested.

3. This affirmation is made upon information and belief, the sources of which include court proceedings and records, conversations with assistant district attorneys, other individuals and independent investigations.

<u>**REPLY TO THE PEOPLE'S OPPOSTION PAPERS**</u>

4. The annexed exhibits A-D are in response to the People's reply to the defense motion filed on December 7, 2012 for an Order: 1) disclosing the complaining witness Minnie Simmons' psychiatric, psychological and medical records, 2) directing she undergo a psychiatric/psychological examination to aid the jury in

3

assessing her credibility, ability to perceive, recall and recount events related to these criminal charges and 3) re-opening the conditional hearing to allow the defendant to cross-examine her related to her psychiatric, psychological and medical history.

5. In their opposition papers, the People claim[1] that they are aware of their *Brady* obligations "and are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Ms. Simmons' testimony."

6. The annexed Exhibits A - C are the handwritten notes of District Attorney Investigator Vincent Verlezza that were turned over as pretrial discovery by the People on November 22, 2011. Investigator Verlezza interviewed multiple witnesses related to this case, testified in the Grand Jury, prepared a chart analyzing the defendant's bank records and is a witness the People intend to call at the defendant's trial.

7. Exhibit A is one page of Investigator Verlezza's notes which appear to document an interview of Charles Emma an attorney witness who testified in the grand jury for the People. The notes indicate they were recorded on November 6, 2009. The initials VV and ADA LN[2] appear at the top. The last notation on the page indicates the assigned ADA and the Investigator Verlezza were informed by Mr. Emma that he told Colin Bull to withdraw Minnie Simmons from the guardianship and vacate the letters for "incompetency".[3] (See attached Exhibit A)

---

[1] Page five at paragraph seven; page eight at paragraph one.
[2] The assigned ADA on this case is Laura Neubauer.
[3] Upon information and belief, the reference is to letters of Testamentary as Minnie Simmons was the executrix for the Estate of Charles Brown and had been previously issued the letters.

4

8. Exhibit B are Investigator Verlezza's notes which indicate they were taken by him on May 6, 2010. The notes are from an interview of Minnie Simmons daughter Linda Simmons (also a Grand Jury witness). Again the initials VV and LN appear on the first page. The last notation at the bottom of page two of these notes indicates Linda Simmons told the assigned ADA and Investigator Verlezza of Minnie Simmons: "She is in the early stages of Alzheimer's." (See attached Exhibit B)

9. Exhibit C are still more of the Investigator Verlezza's notes related to his interview of attorney witness Colin Bull. These notes appear to have been recorded on May 25, 2010. The initials VV and LN are also on the first page. In the middle of page two of these notes, Investigator Verlezza writes that Colin Bull told him and the assigned ADA that Marshall Kaplan, Minnie Simmons' first attorney, "referred to her with diminished competence." (See attached Exhibit C)

10. Exhibit D is a document filed in Surrogates Court on December 2, 2011 which removes Minnie Simmons as the guardian of the Charles Brown based upon a finding that she is incapacitated. (See attached Exhibit D)

11. As the court can see despite the assigned ADA's claim to the contrary in her opposition papers, discovery possessed and turned over by the People indicate the People were certainly aware from multiple sources of mental competency issues related to Minnie Simmons.

12. It is important to note that Investigator Verlezza's relevant notes attached as exhibits were recorded *before* the People obtained the one page June 10, 2010 affirmation from Minnie Simmons which denies permission or authority.

5

13. It is also worth noting that Investigator Verlezza took over forty pages of handwritten notes when interviewing witnesses related to this case however he took no notes to memorialize his interview(s) of Minnie Simmons.

14. The defendant urges the court to further note of the lack of supporting documentation in the People's opposition papers to support their claim that Minnie Simmons is/was a competent witness. The People present no affirmation or affidavit from anyone in a position to have personal knowledge (ie. a doctor, a nurse or the notary who notarized the June 10, 2010 affirmation) as to the competency of Minnie Simmons in support of their claim that she is/was a competent witness.

WHEREFORE, the defendant respectfully requests that the Court grant the relief sought in the defendant's December 7, 2011 motion and for such other relief as is just and proper.

DATED:       February 6, 2012
             Brooklyn, New York


                                        Respectfully submitted,


                                        Wadeedah Sheeheed
                                        Attorney for the Defendant
                                        45 Main Street, Suite 230
                                        Brooklyn, New York 11201
                                        718-855-8417

# EXHIBIT A

CHARLES GMOA

11-6-09  ADA LN                                    1/1

— Court - report that I wasn't paid yet appx $15,000
Judge wanted me to surcharge the bond.


Status now
(1) surcharge proceeding - change the bond legal fees
(2) case on the estate - money was stolen from
   the estate.
— Morrell substituted for prior atty on the
   estate — Daughter police officer got S.M. on
   it

— DSS filed lien w/ $90,000 and withdrew it.
   they now have an active lien on the estate

— Told John Bull to withdraw MINNIE
   Simmons — guardian — vacate the letter
   of ML for incompetency, replace with Linda
   as?

# EXHIBIT B

5/6/10
LINDA SIMMONS                                    1/3
VV
LN

MINNIE SIMMONS + mother
C. Brown - my uncle → her brother-in-law

C Brown first got old, his wife was deceased
he named my mother heafing and executive.

She always went over to take care of him
He lived on St Thomas Place.

He went to NH

He lived a couple of yrs prior to the sale of the
house

Mom became incapacitated - goes into a NH.
When she went to court the last time they
were going to appoint GENE down south
as executor.

He still had the $ but could not find
papers when he approached me in court.

He called my mother because there was
a problem - She didn't understand - so I
called him. Mother have a problem with
Kaplan St He was telling me different $. to.

instead of losing the house he could settle
(we didn't know that mother was taking care
of the house)

AP-281

Case 23-705, Document 31, 07/24/2023, 3547452, Page285 of 333

2/3

— I didn't know that there were problem with the house

— We the family would to buy the house

— I spoke to my mother she said ok sign him on as atty. He came to house mother signed papers.

— He saw her three priorto the sale Once a body came also

— I was there with mom when he gave the first time - she papers to sell the house

— He was going to work with me - then sterole to my sister in 64. I didn't get too involved in this. My sister would speak to him

— First time I met him in court he said he had the $ - papers were damaged in fire/ water damage

— Mother is still in - N.H. → Nursing Home
NH. ( _____ )  BISHOP MUGAVERO
Bishop Mugavero

— She in the early stages of Alzimers 79 years old.

3/3

→ Signature of mover not on the deed
has signature on the contract

→ She never went to the closing - they came to
the house and she signed.

→ I know that ~~Jim signing~~ was not at the house
mother would not let anyone in house.

→ My daughter let him in once (S M)
I let him in Twice  - 1st Time
Lady came to have papers signed.
(She was someone you hired for the Clg -
lived in Yonkers)

→ I'm named in the will
CHARLES Emma  should have copy of the will

Sister  who spoke to SM.

→ JoANN SIMMONS

# EXHIBIT C

5/25/10 - Cabin Bull
          - LN                                                    1/4

STEVEN RANDOS) informed atty
(GOTHAM ASSET LOCATORS (UCKNOW - ?)
for my client sent to Randos in a earlier
communication about the property.

SURROGATES court - Mitchell was a letter
signed by Mvnnie Simmons
+ the copy of letter -
letter dated 2008 not any done in 2005

GUARDIANSHIP court

bond secured for $65,000

FINAL HEARING (PESCE)
- Lowggty Ins Co.
- CHARGE? $umm
- Bull (-can be paid from the estate
        (-can be paid from the bond
- court wants to take $ from the bond
and pay the lawyers who worked on the case

Nov 0 - $umm - $ 50,000 to the estate
Ins Co. wants to pay the lawyers not the
estate.

There was an attempt to sell the
property through ~ Guardianship
MARSHAL KARAN - I kept $ firm
judge was going to allow it.
a letter offer was made

AP-285

1/4

- I don't know how Mitchell got involved

- was in three parts:
  → Guardian part (been there since 1995)
  - Surrogates part
    MTG Foreclosure part

- My client was first contacted

- I had one conversation with MINNIE
  2008 or early 2009
  (Kaplan referred to her with involved
  irregularities)

Daughter to move in minute
Sherry was try to speak to MINNIE
She was appointed as guardian ad litem
for MINNIE (2005)

SHERRY is still guardian ad litem for
MINNIE

- I thought I was really the
  daughter woman answers the door
  I ask for daughter this is MINNIE
  Simmons — 2 minutes conversation.

- She has physical issues — can't get around

3/4

- I didn't speak to her about the details of the case

- I would rather ~~you talk~~ talk to my other daughter in Atlanta - she understands everything

- Kaplan still on the case. no I have a new lawyer - speak to my daughter.

- I haven't had another conversation with her.

- If she's competent I would rather also I with MINNIE

- There is no conflict between my client and MINNIE.

- Someone from the guardianship office find MINNIE was dead. Guardian office & people goes to the house MINNIE is dead Doo not here found not here - (I have his card)

at the Court House, 2 Johnson Street
the _____2nd_____ day of _November 2011_
in the year two thousand and eleven

SCANNED

PRESENT HON. DIANA A. JOHNSON, SURROGATE
--------------------------------------------------

In then Matter of the Application of

EUGENE DAVIS Sr.

the Estate of                                                    ORDER DISPENSING
                                                               GUARDIAN AD LITEM

CHARLES BROWN            Deceased                    Index No. 2003-3350/B

--------------------------------------------------

(SUCCESSOR LETTERS TESTAMENTARY)


IT IS ORDERED, that the appointment of a Guardian Ad Litem be dispensed with in the

aforementioned estate for:

MINNIE SIMMONS   (INCAPACITATED)


                                         person or persons under disability.


                          _Diana A. Johnson_
                          Hon. Diana A. Johnson
                          Surrogate

# EXHIBIT 31

People v. Mitchell
Indictment: 4743/2010

Decision and Order
(Walsh, J.)
February 10, 2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS : CRIMINAL TERM : PART 50
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                                 **DECISION and ORDER**

                -against-

STEPHEN MITCHELL                          **Indictment No.: 4743/2010**

                          **Defendant**
-------------------------------------------------------------------x
JOHN P. WALSH, JUSTICE

     The process of the conditional examination in this matter began with a Notice of Motion by the People to Permit a Conditional Examination, dated October 7, 2010. In the prosecutor's Affirmation in Support, the grounds for requesting the conditional examination were clearly stated (in paragraph [7]), to wit., Ms. Simmons was 79 years old, and "in poor and deteriorating physical condition . . . confined to a wheel chair and unable to walk . . . confined in a nursing home for more than two years . . . requires mechanical assistance to get into and out of wheelchairs and bed." Moreover, "Her physical incapacity is not a temporary condition" as it has been "ongoing since 2003, with a slow and steady decline and no foreseeable improvement in the short or long term."

     These statements were never disputed by the defendant nor was the alleged condition of Minnie Simmons challenged at the time of the People's application. In effect, the People's application for a conditional examination, which the defendant was free to dispute at the time, was unopposed. As a result, the prosecutor's request formed the basis on which the court ultimately ordered the conditional examination on May 10, 2011.

     Seven months later, on December 7, 2011, the defense filed a motion requesting (1) "an Order directing disclosure to the defense and a defense expert the entire psychiatric, psychological and medical records of" Minnie Simmons; (2) "an Order directing that Minnie Simmons undergo a psychiatric/psychological examination to aid the jury assessing her credibility, ability to perceive, recall and recounts events;" and (3) "an Order re-opening the conditional examination hearing to afford the defendant an opportunity to cross-examine Minnie Simmons related to any psychiatric, psychological and medical history pursuant to *People v. Baranek*, 733 NYS2d 704 (2001).

     That motion was met by the People's Affirmation in Response, dated January 12, 2012. In turn, the defendant filed a Reply to People's Opposition, dated February 6, 2012 and attached exhibits. Neither of the two of the defendants submissions offer an explanation whatsoever as to the reason(s) which compelled the defense to wait seven (7) months after the conditional examination to make its present requests.

Obviously found competent to testify at the conditional examination, the defendant points out that Minnie Simmons "testified that she was getting senile and that she could not remember a lot of things related to the sale of the property, her interactions with the District Attorney's Office and her interactions with the defendant." The motion goes on to list five (5) specific items in which Minnie Simmons could not remember or recall during the prosecutor's direct examination and 26 instances during counsel's cross examination.

The motion does not acknowledge that, given its position that Minnie Simmons suffers from senility, her medical condition at the present time is not the same medical condition seven months before when she testified. Nor does the motion offer any basis for an investigation into the psychiatric or psychological state of Minnie Simmons other than her senility and inability to recall, which already existed at the time of the conditional examination and can only be assumed to have worsened in the interceding seven months.

The defendant's motion cites _People v. Baranek_, 287 AD2d 74 in support of "an Order re-opening the conditional examination hearing to afford the defendant the opportunity to cross-examine Minnie Simmons related to any psychiatric, psychological and medical history. However, the defendant's reliance ignores four key factors distinguishing the present matter from _Baranek_.

First, the Court made it clear at the outset that their ruling in _Baranek_ was limited "under the circumstances of this case."

Second, since the defendant was charged with three instances of Burglary which purportedly occurred in December 1995 and January 1996, the complainant's hospitalization records which included the following notations made in November 1994, "Persecutory delusions. People break into my house" while also offering the observation that the complainant "intermittently experiences auditory hallucinations and appears to be talking to inanimate objects; that she develops heightened suspiciousness of her environment whereby she feels that she is being monitored," directly relates to the specific charges against the defendant and directly implicated the fundamental factual issue the trier of fact had to resolve.

Third, after a hearing on the complainant's competency to testify, the hearing court ruled that the complainant was competent to testify while noting that the defense would not be precluded from crossing examining the complainant about her psychiatric condition and history "in order to help the jury decide whether her testimony is accurate or delusional." This ruling was contradicted by the trial court when it ruled that the complainant's medical condition one year prior to the alleged burglaries was "irrelevant."

The Court found that the trial court, while having the authority to determine the competency of a witness to testify, usurped the jury's role to the extent that the jury determines the complainant's credibility and the weight to be given her testimony.

Fourth, unlike the trial counsel in _Baranek_, no claim here is made that the defense

was curtailed or limited in the cross-examination of Ms. Simmons.

New York law allows for the conditional examination for the purpose of preserving the testimony of potentially unavailable witness. CPL 660.20 enumerates the pre-conditions necessary before a conditional examination may be ordered. Here, CPL 660.20(1) and (2)(b) are
the relevant subsections. If the conditional examination is completed in accordance with the requirements in CPL Article 660 and the witness does, indeed, prove unavailable, the conditional examination may be received in evidence at a trial as long as the requirements of CPL 670 are satisfied as well.

In the Grand Jury presentation of this matter, "because of Minnie Simmons' physical condition, which rendered her unavailable to appear in the Grand Jury, evidence that she did not give the defendant 'permission and authority' to act as he did was introduced in the Grand Jury in the form of a sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown," which was purportedly the defendant's client.

According to the defendant's motion, on two occasions, July 8, 2010 and August 4, 2010, Minnie Simmons' daughter, Linda, testified that her mother was "mentally . . . all right" and, again, "mentally, she's okay."

In accordance with CPL 660.60, the conditional "examination proceeding must be conducted in the same manner as would be required were the witness testifying at a trial . . ."
In the instant case, a conditional examination of the witness, Minnie Simmons, took place on May 18, 2011 at the Bishop Henry B. Nucles Nursing Home, 835 Herkimer Street, Brooklyn, New York. The Hon. Mark Dwyer presided; the prosecutor, Laura J. Neubauer conducted the direct examination; defense counsel, Leslie Jones-Thomas, conducted the cross-examination.

Acknowledging that the court has discretion review *in camera* the psychiatric records of a complainant and to disclose those records if it finds the interest of justice outweigh the need for confidentiality, the defendant requests the court to bypass any *in camera* inspection and turn over the records in their entirety to the defense. The court finds that the defendant has not proffered any basis for the court to ignore "normal procedure" and turn over the records to the defense. Moreover, the motion fails to provide a basis on which the court should examine the psychiatric, psychological or medical records 7 months after the event.

Moreover, from the initial request by the People in October 2010, the defense was alerted to the prospect of Minnie Simmons not testifying at a trial before a jury existed - why else would the People even request a conditional examination. At the conditional examination, defense was presented with Minnie Simmons' condition - senility - and was free to cross-examine her. Apparently, counsel explored this issue and has used 26 examples of what was developed through cross-examination as a basis to make a present

inquiry into a past medical condition. The proper time for the defense to have explored these issues was between the People's motion in October 2010 and May 18, 2011. That it failed to do so does not justify a present inquiry.

The very observations which the defense seeks to rely on for its present motion were the same observations which existed at the time of the conditional examination. The defendant's motion fails to make relevant how Ms. Simmons present condition is relevant to her condition when the defense had the opportunity to cross-examine her.

It is beyond any dispute that the right of an accused to confront the witnesses against him or her through cross-examination is a fundamental right arising to constitutional dimension (see United States Constitution, 6th Amendment; New York State Constitution, Article I, section 6; *Davis v. Alaska*, 415 U.S. 308). It is also beyond dispute that "where a primary prosecution witness is shown to suffer from a psychiatric condition, the defense is entitled to show that the witness's capacity to perceive and recall events was impaired by that condition" (*Baranek*, supra, 78). On occasion, courts have ordered a new trial based upon newly-discovered evidence that a witness who had implicated the defendant had a history of mental illness (*People v. Rensing*, 14 NY2d 210).

In this matter, the defense had an opportunity to show that Ms. Simmons' capacity to perceive and recall events was impaired by her condition. As the transcript of the conditional examination demonstrates, counsel's cross-examination was free of People's objection except at two points - repetition and exhausting the subject. The defendant's opportunity to show that Ms. Simmons' capacity to perceive and recall events was at the conditional examination 7 months after the defense was made aware of the defendant's worsening medical condition; nor has any claim been advanced, nor can one be, that the witness' condition is "newly discovered evidence."

Lastly, the defendant argues an apparent *Brady* violation in that the pre-trial discovery material turned over by the People on November 22, 2011 indicate the diminished mental capacity of Minnie Simmons. Exhibit A are the notes of Investigator Vincent Verlezza, recorded on November 6, 2009, in which he remarks that he was informed by Mr. Emma, an attorney witness, that Mr. Emma told Colin Bull to withdraw Minnie Simmons from guardianship for "incompetency;" Exhibit B are notes of Investigator Verlezza, recorded on May 6, 2010, in which Linda Simmons remarked that Minnie Simmons "is in the early stages of Alzhaimer's;" Exhbit C are also notes of Investigator Verlezza, recorded on May 25, 2010 in which Colin Bull informed him that Ms. Simmons' first attorney referred to her "diminished competence."Exhibit D is a document filed in Surrogates Court on December 2, 2011 - seven months after the conditional examination and years after the defendant's alleged theft - removing Ms. Simmons as guardian of Charles Brown's estate.

The defendant pointedly comments that these remarks were made to the District Attorney's Office prior to Affirmation by Minnie Simmons that was introduced into the Grand Jury.

On May 11, 2011 and at the conditional examination on May 18, 2011, the defendant never challenged the competency or mental ability of Ms. Simmons to testify as a witness. Moreover, the alleged theft in this matter occurred between December 23, 2005 and March 31, 2006. How the witness' mental capacity in 2010 rises to *Brady* material is difficult for the court to discern.

In *Brady v. Maryland*, 373 U.S. 83, the United States Supreme Court held that due process requires the prosecution to disclose to the defense material evidence in its possession that "would tend to exculpate" the accused. Unlike *Rosario* material, which is limited to written or recorded statements of prosecution witnesses, *Brady* material may encompass a broad range of written or unwritten information or physical evidence that originated from any person or any thing (see *People v. Berreras*, 92 AD2d 871).

Moreover, the Supreme Court has held that *Brady* material includes not only eivdence that relates to substantive questions of guilt or innocence but also evidence involving the credibility of prosecution witnesses (*U.S. v. Bagley*, 473 U.S. 667, 676; *Giglio v. U.S.*, 405 U.S. 150, 154). Thus prosecutors may be required to disclose information that reveals a witness' bias against the defendant (*People v. Baxley*, 84 NY2d 208), that raises questions about an identifying witness' power of perception (*People v. Davis*, 81 NY2d 281) and that suggests a complainant's possible motive to fabricate (*People v. Wallert*, 98 AD2d 47).

Notably, a failure to disclose material exculpatory evidence violates due process regardless of the good faith or bad faith of the prosecution (*Brady*, supra, at 87). Thus, a good faith but negligent prosecutorial effort to disclose *Brady* evidence may still require a reversal of a conviction (*People v. Simmons*, 36 NY2d 126).

In *U.S. v. Agurs*, 427 U.S. 97, the Supreme Court developed a two-tiered standard for determining whether exculpatory evidence is material: (1) if the defense had made a specific request for exculpatory evidence, the evidence is material if, had it been disclosed, it "might have affected the outcome of the trial;" (2) if the defense had made no request or only a general request for exculpatory evidence, the evidence is material if, had it been disclosed, it would have created "a reasonable doubt which did not otherwise exist." Later, in *U.S. V. Bagley*, supra, the Court replaced the two-tiered standard with a single standard: regardless of the nature of the defendant's request or whether a request is made at all, exculpatory evidence is material only if there is a "reasonable probability" that it "would" affect the outcome of the trial (at 682).

However, in New York, the Court of Appeals, as a matter of state constitutional law, has rejected the *Bagley* standard and insisted on the *Agurs* two-tiered approach (*People v. Vilardi*, 76 NY2d 67). Accordingly, in New York, undisclosed exculpatory evidence

specifically requested by the defense is deemed material, and thus will require reversal of a conviction, if the defendant demonstrates a "reasonable possibility" that the failure to disclose the material "contributed to the verdict." If the defense made only a general request for exculpatory evidence, or no request at all, undisclosed exculpatory evidence is deemed material only if the defendant demonstrates that the evidence creates a reasonable doubt that did not otherwise exist.

Remarkably, the defendant's Omnibus motion, dated December 1, 2010, failed to make any specific or even general request for *Brady* material. Despite that, the court's decision on March 28, 2011, reminded the People of their *Brady* obligations. It would thus appear that under *Vilardi*, the undisclosed exculpatory evidence is material only if the defendant demonstrates that the evidence creates a reasonable doubt that did not otherwise exist.

But under either standard, the present motion merely mentions *Brady* as if no other assertions are necessary. The motion merely assumes the notes to be *Brady* material without any regard for its materiality. This is submission is simply facially insufficient. Moreover, not one argument is advanced as to how the disclosure would have altered the cross-examination of Ms. Simmons especially after a finding of her competency as a witness and no challenge whatsoever to such a finding by the defense.

Since the court has previously determined that it would conduct an *in camera* examination of the material requested, the People are directed to forthwith furnish the medical records and any psychiatric records to the court for inspection.

In all respects other than an *in camera* inspection, the defendant's motion is denied.

This constitutes the decision and order of the court.

Dated: February 10, 2012
    Brooklyn, New York

John P. Walsh, J.S.C.

# EXHIBIT 32

<u>People v. Mitchell</u>
Indictment: 4743/2010

Re-Argument Petition for
February 10, 2012
Decision and Order

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL PART 50

THE PEOPLE OF THE STATE OF NEW YORK,

-AGAINST-

STEPHEN T. MITCHELL,

DEFENDANT.

Indictment: 4743/2010

Notice of Motion
For Reargument
Of an Order
Of
February 10, 2012

(CORRECTED VERSION)

SIRS:

PLEASE TAKE NOTICE, that upon the annexed affidavit of Stephen Mitchell, the defendant in the action herein, on behalf of himself, duly sworn to on the 9th day of March 2012, the attached Memorandum of Law, and upon all the pleadings and proceedings hereto had herein, the undersigned will move this court at a Criminal Term, Part 50, held at the Courthouse, 320 Jay Street, Brooklyn, New York, on March 9, 2012, at 3:00 o'clock in the afternoon of that day or as soon thereafter as counsel can be heard, for the following relief:

1. For an Order, pursuant to C.P.L.R. §2221(d)(2), to reargue the court's Order of February 10, 2012;

2. For an Order granting the defendant an immediate *Brady* hearing;

3. For an Order directing that the defendant, independent of the People, be granted subpoenas to enable him to collect the medical, psychiatric, and administrative records of Minnie Simmons;

CRIMINAL TERM ARR/MOT
SUPREME COURT KINGS
2012 MAR 12  PM 4: 00

4. For an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not testimony offered by Minnie Simmons on or about May 18, 2012 was competent and admissible testimony that can be considered by a jury at trial.

5. For an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not a written statement purportedly offered by Minnie Simmons on or about June 10, 2010 was competent and admissible evidence that could have been be considered by a Grand Jury or could be considered by a petit jury at trial.

6. For an Order directing that Minnie Simmons undergo a psychiatric/psychological examination.

7. For such other and all further relief as to this Court may deem just and proper and for such relief that is mandated by the United States Constitution and the Constitution of the State of New York.

Dated: Essex County, New Jersey
      March 9, 2012

Yours, etc.

Stephen T. Mitchell
E-Mail Address: STM 7615@aol.com

TO:    Laura Neubauer, Esq.
       Assistant District Attorney
       Kings County District Attorney

       Clerk of the Court

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS: CRIMINAL PART 50

---

THE PEOPLE OF THE STATE OF NEW YORK,

-AGAINST-

STEPHEN T. MITCHELL,

DEFENDANT.

Indictment: 4743/2010

Memorandum of Law

In Support of a

Motion

For Reargument

of an Order

of

February 10, 2012

---

## MEMORANDUM OF LAW IN SUPPORT OF A MOTION TO REARGUE PURSUANT TO C.P.L.R. §2221(d)(2)

### PRELIMINARY STATEMENT

Due Process is denied when representatives of the state allow for a court record that is relied upon to determine the fate of an individual's liberty to be contrived. *See Mooney v. Holohan, 294 U.S. 103, 112 (1935); see also Napune v. Illinois, 360 U.S. 264, 269 (1959).* The Fourteenth Amendment to the United States Constitution is violated when representatives of a state, although not soliciting false evidence, allow it to go uncorrected. *Napune at 269.* It has been the established law

1

of the United States that a conviction obtained through statements the prosecutor knows to be false is repugnant to the United States Constitution. *See Drake v. Portuondo, 553 F.3d 230, 240 (2d Cir. 2009).* New York State's highest court is no less tolerant of state representatives having knowledge of falsehoods infecting the fair administration of justice and doing nothing about it and like the federal courts has placed the task of insuring that justice is done without sacrificing truth upon the prosecutor.

**It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.**

*People v. Savvides, 1 N.Y. 2d 554, 557 (1956).*

**[I]n order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost.**

*Drake at 240; see also Jenkins v. Artuz, 294 F.3d 284, 296 n. 2 (2d Cir. 2002). (noting the duty of prosecutors under New York law "to seek justice, not merely to convict").*

Unfortunately, these axioms have not yet been followed by this court with regard to its Order of February 10, 2012. The court has adopted and relied upon several misrepresentations of fact in order to support its Order of February 10, 2012 and the prosecution, failing its duty, has not moved to correct them. Unless the court reconsiders much of its February 10, 2012 decision the defendant's Due Process rights pursuant to the Fifth and Fourteen Amendments to the United States

2

Constitution will be violated.   The defendant timely moves, pursuant to C.P.L.R.
§2221(d)(2), for an Order to allow him to reargue the February 10, 2012 decision of
the court in order to protect his right to Due Process of Law and a fair trial as
guaranteed by the United States Constitution.

## THE DEFENDANT MOVES FOR REARGUMENT OF THE FEBRUARY 10, 2012 ORDER OF THE COURT

The defendant moves, pursuant to C.P.L.R. §2221(d)(2) for a motion for leave
to renew and reargue the court's decision and order of February 10, 2012.  This
motion is timely made and based upon the fact that there were matters of both fact
and law that the court overlooked and misapprehended in rendering its decision.
All of the facts presented either were or should have been considered by the court
because all either were presented as exhibits by the parties or were a part of the full
court record and proceedings.

## INVESTIGATOR VERLEZZA'S NOTES CONSTITUTE *BRADY* MATERIAL THAT PERTAINS TO A MATERIAL WITNESS AND MATERIAL TESTIMONY FOR THIS CASE

Kings County District Attorney Investigator, Vincent Verlezza, prepared
handwritten notes as a part of his investigation of this matter.   Mr. Verlezza
prepared some of his handwritten notes prior to the August 2010 indictment of this
matter. *See Exhibits "A" and "B"*.

3

Exhibit "A" is one page of Investigator Verlezza's notes that documents the interview of Charles Emma.  Mr. Emma is an attorney who appeared before the Grand Jury in this case as a witness.

The notes designated Exhibit "A" indicated that they were recorded on November 6, 2009.  The initials VV and ADA LN appear at the top.  The Assistant District Attorney assigned to this case is Laura Neubauer, Esq.

The last notation on the page of the November 6, 2009 notes indicated the assigned Assistant District Attorney Laura Neubauer and Investigator Verlezza were informed by Mr. Emma that he told another attorney, Colin Bull, to withdraw the chief complaining witness in the criminal case, Minnie Simmons, from a guardianship status and vacate the Surrogate's Court letters for, "incompetency."

Exhibit "B" includes notes prepared by Investigator Verlezza on May 6, 2010.  The notes are from an interview of the complaining witness, Minnie Simmons, daughter, Linda Simmons.

Linda Simmons is a New York City Police Detective who testified in the Grand Jury for this case on July 8, 2010 and August 4, 2010.  *See Exhibit "C" and "D".*

The initials VV and LN appear on the first page of the May 6, 2010 notes.  The last notation at the bottom of the second page of these notes indicated that Linda

4

Simmons told the assigned Assistant District Attorney and Investigator Verlezza that Minnie Simmons was in the early stages of Alzheimer's.

Alzheimer's is well known to be a mentally degenerative disease that can have a severe and negative impact upon an individual's ability to remember facts and circumstances that occurred in the past.

Linda Simmons testified in the Grand Jury for this matter on or about July 8, 2010. The prosecutor asked Linda Simmons the following question during her proffer of testimony in the Grand Jury. "Describe her (Linda Simmons' mother Minnie Simmons) physical and mental condition at present for the Members of the Grand Jury." Linda Simmons responded, "[m]entally, she's all right, but she's unable to walk." *See Exhibit "C" at 6.*

Linda Simmons testified in the Grand Jury for this matter on or about August 4, 2010. The prosecutor asked Linda Simmons the following question during her proffer of testimony in the Grand Jury. "Can you describe your mother's condition, her mental and physical condition?" Linda Simmons answered, "[m]entally, she's okay. Physically, she's incapacitated." *See Exhibit "D" at 5-6.*

The prosecutor moved for a conditional examination of Minnie Simmons in October 2010, approximately one month after the defendant was arrested. *See Exhibit "K" at page 1; see also Exhibit "L" at page 4 ¶5.*

5

The process of the conditional examination in this matter began with a Notice of Motion by the People to Permit a Conditional Examination, dated October 7, 2010. In the prosecutor's Affirmation in Support of their motion the grounds for requesting the conditional examination were clearly stated (in paragraph {7}, to wit; "Ms. Simmons was 79 years old, and "in poor and deteriorating physical condition...confined to a wheel chair and unable to walk...confined to a nursing home for more than two years...requires mechanical assistance to get into and out of wheelchairs and bed." Moreover, "her physical incapacity is not a temporary condition" as it has been "ongoing since 2003, with a slow and steady decline and no foreseeable improvement in the short or long term." *See Exhibit "K" at page 1; see also Exhibit "L" at page 4 ¶5.*

The People's Notice of Motion and Supporting Affirmation for a Conditional Examination for Minnie Simmons dated October 7, 2010 did not include any references to Minnie Simmons suffering from Alzheimer's disease or any other impairment or potential impairment of her mental state.

The People always have maintained that notwithstanding their awareness of their continuing obligations pursuant to *Brady v. Maryland, 373 U.S. 83 (1963)* that they are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition, that would bear upon the competency of Minnie Simmons' testimony. *See Exhibit "L" the January 12, 2012 Affirmation of Assistant District Attorney Laura Neubauer at page 5 ¶7.*

6

The reason why the People sought use of a Conditional Examination for Minnie Simmons is delineated in an affirmation signed and filed with the court by Assistant District Attorney Laura Neubauer on or about January 12, 2012. Paragraph "3" of the aforesaid affirmation states as follows:

> "Because of Minnie Simmons' physical condition, which rendered her unavailable to appear in the Grand Jury, evidence that she did not give the defendant "permission or authority" to act as he did in retaining the above mentioned monies was introduced in the Grand Jury in the form of a sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown. She averred therein that she was 79 years old and that the defendant lacked permission and authority to take the assets of the Estate for any other purpose than for the benefit of the Estate of Charles Brown."

> *See Exhibit "L" the January 12, 2012 Affirmation of Assistant District Attorney Laura Neubauer at page 3 ¶3.*

The investigator's notes constitute *Brady* material because they serve to diminish the credibility of a witness, Minnie Simmons. *See Giglio v. United States, 405 U.S. 150, 154-155 (1972); see also People v. Cwikla, 46 N.Y. 2d 434, 441-442 (1979); People v. Saddy, 84 N.Y. 2d 175, 178 (2nd Dept. 1981); see also People v. Clausell, 182 A.D. 2d 132, 135-137 (2d Dept. 1992).*

The notes are material to the case for two reasons. First, Minnie Simmons is a material witness. Both parties stipulated to the fact of her materiality for the purposes of the People obtaining an order for the conditional examination pursuant to C.P.L. §660.20. As noted above the People's application for the conditional

7

examination pursuant to C.P.L. §660.20 emphasized the materiality of the witness. *See Exhibit "L" at page 3 ¶3.*

The witness also is material because she is the sole witness that can give testimony to an element of the charge. Again this is noted above. *See Exhibit "L" at page 3 ¶3; see also People v. Clausell, 182 A.D. 2d 132, 135-137 (2d Dept. 1992).*

### SPECIFIC REQUESTS FOR PSYCHIATRIC MATERIAL PERTAINING TO THE MENTAL CAPACITY OF MINNIE SIMMONS WERE REQUESTED BY MOTIONS FILED WITH THE COURT AND SERVED UPON THE DISTRICT ATTORNEY

The court in this case erroneously concluded that there were no specific or general requests made by the defense for exculpatory material pursuant to *Brady v. Maryland* for this case. The February 10, 2012 order states as follows:

**Remarkably, the defendant's Omnibus motion, dated December 1, 2010, failed to make any specific or even general request for *Brady* material. Despite that, the court's decision on March 28, 2011, reminded the People of their *Brady* obligations. It thus would appear that under *Vilardi*, the undisclosed exculpatory evidence is material only if the defendant demonstrates that the evidence creates a reasonable doubt that did not otherwise exist.**

This determination is wrong and the prosecutor had a duty to correct it. Since the People have not moved to correct the court's erroneous findings the task of correcting the factual record of this case and adjusting the consequences of any

8

decision based upon facts that are not true must fall upon the judge assigned to the case who has sworn to uphold the United States Constitution.

The defendant made two specific requests for exculpatory material that were a part of the record for this case before the court's February 10, 2012 Order. There is no dispute that the defendant's December 2010 Omnibus Discovery Motion includes a section entitled a "Request for a Bill of Particulars and a Demand to Produce" pursuant to C.P.L. §240.20. Paragraph 21 of the Defendant's December 2010 "Request for a Bill of Particulars and Demand to Produce" **specifically requested** of the Kings County District Attorney's Office, "whether any person to be called as a witness by the prosecution is known, or with due diligence could be known by the prosecution is or has been under psychiatric care or treatment." *See Exhibits "E and "F".*

Paragraph 21 also stated that, "if the prosecution is unwilling to make an inquiry of its witnesses (i.e., exercise due diligence), the defense demands that it be supplied with the names and addresses of such witnesses sufficiently in advance of trial so it may make its own investigation." *See Exhibits "E and "F".* The court did not take notice of these paragraphs in the Defendant's Ominbus Discovery Motion notwithstanding the fact that they are a part of the court record. The defendant requests that the court take note of this information now.

9

The court also failed to note that the prosecutor responded to Paragraph 21 of the Defendant's Request for a Bill of Particulars and Demand to Produce in early February 2011. *See Exhibit "G"*. The People opposed the specific request by the defense for information pertaining to whether or not it was known "whether any person to be called as a witness by the prosecution is known, or with due diligence could be known by the prosecution is or has been under psychiatric care or treatment" and stated that the request was not the proper subject of discovery. The prosecutor also assured the defendant and his counsel that, "a witness list and *Rosario* and *Giglio* material shall be provided at the appropriate time prior to trial." *See Exhibit "H"*.

The notes that Investigator Verlezza prepared on November 6, 2009 and May 6, 2010 were not furnished to the defense upon their December 2010 request. These notes were not furnished to the defense until after November 22, 2011, more than six months after the conditional examination of Minnie Simmons. Instead, the People ignored the specific request for this exculpatory material. Worse the People deliberately misled the defendant further by denying that exculpatory material existed in general in response to a query posed by the defense in the December 2010 Omnibus Motion.

As noted above the defendant also made two general requests for exculpatory materials known to the prosecution in their December 2010 Request for a Bill of Particulars and Demand to Produce. *See Exhibit "I"*. Paragraph 26 of the

10

aforesaid Request for a Bill of Particulars and Demand to Produce states as follows: "[f]urnish defendant, now and on a continuing basis all evidence or information which may tend to exculpate the defendant, either by indication of innocence or by potential impeachment of a prosecution witness, within the meaning of *Brady v. Maryland, 373 U.S. 83 (1963), People v. Rosario, 9 N.Y.2d 286 (1961),* and *People v. Wright, 74 Misc. 2d 419 (1973)* including but not limited to:

> "[a]ny statements made by witness, participant, or other person to any law enforcement officer, or any person acting in concert with incriminatory or otherwise favorable to the defendant whether or not the District Attorney intends to use such statements in any future proceedings, the existence of which are or should be known by the exercise of due diligence to the District Attorney." *Id.*

The People, in a February 2011 sworn to affirmation provided by Assistant District Attorney Neubauer, responded to the defendant's December 2010 Request for a Bill of Particulars and a Demand to Produce by denying they were aware of any exculpatory material pursuant to the requirements of the New York State Criminal Procedure Law, the New York State and the United States Constitutions, and the United States Supreme Court case of *Brady v. Maryland. See Exhibit "J"; see also Exhibit "L" the January 12, 2012 Affirmation of Assistant District Attorney Laura Neubauer at page 5 ¶7.*

The defendant and his counsel relied upon Assistant District Attorney Neubauer's February 2011 affirmation prior to Minnie Simmons' May 18, 2011 and believed the People did not possess exculpatory material pertaining to Minnie

11

Simmons prior to the hearing.  No exculpatory material was provided to the defense before or at the hearing.

The defense also relied upon the sworn to testimony of Linda Simmons. Linda Simmons is the daughter of Minnie Simmons and New York City Police Detective who testified in the Grand Jury for this case on July 8, 2010 and August 4, 2010. *See Exhibit "C" and "D".*

Linda Simmons testified in the Grand Jury for this matter on or about July 8, 2010.  The prosecutor asked Linda Simmons the following question during her proffer of testimony in the Grand Jury.  "Describe her (Linda Simmons' mother Minnie Simmons) physical and mental condition at present for the Members of the Grand Jury." Linda Simmons responded, "[m]entally, she's all right, but she's unable to walk." *See Exhibit "C" at 6.*

Linda Simmons also testified in the Grand Jury for this matter on or about August 4, 2010. The prosecutor asked Linda Simmons the following question during her proffer of testimony in the Grand Jury.  "Can you describe your mother's condition, her mental and physical condition?" Linda Simmons answered, "[m]entally, she's okay.  Physically, she's incapacitated." *See Exhibit "D" at 5-6.*

The prosecutor provided the defendant copies of Linda Simmons Grand Jury testimony before Minnie Simmons testified on May 18, 2011. The People, however,

12

did not provide copies of Investigator Verlezza's notes before the May 18, 2011 hearing in spite of the specific and general requests for exculpatory material made by the defense in writing that were filed with the court and served and answered, in writing, by the People at least six months prior to the May 18, 2011 hearing. Although all of these facts are part of the record of the case it appears the court overlooked them in making its decision.

The defendant also made a second specific request for material pertaining to the psychiatric condition of Minnie Simmons. On September 19, 2011, at the first calendar call for the case after the May 18, 2011 hearing, save one calendar call in July 2011 during the summer recess, the defendant, independent of his attorney, filed motions to dismiss the indictment for this case with the Clerk of the Kings County Supreme Court Criminal Division by hand. These motions were filed after being served, by hand, upon the Kings County District Attorney's Office on September 19, 2011. *See Exhibit "Q"*. The defendant also personally served, by hand, a copy of the aforesaid motions to dismiss upon Assistant District Attorney Laura Neubauer on September 19, 2011. Courtesy copies of the aforesaid September 19, 2011 motions also were filed and served upon the court via the United States Postal Service.

The September 19, 2011 motions filed and served by the defendant, independent of his counsel, made specific requests of the prosecution for information pertaining to the mental capacity of Minnie Simmons. The aforesaid

13

motions stressed the importance of material pertaining to Minnie Simmons' mental capacity to the defense and outlined how the defense intended to use the material. *See Exhibit "P" excerpts of the defendant's September 19, 2011 motion.*

The September 19, 2011 motions filed and served by the defendant, independent of his counsel alerted both the court and the prosecution that the defense believed that Minnie Simmons was mentally incompetent and that the indictment for the case should be dismissed because it was procured with incompetent evidence, to wit, documents signed and notarized for an incompetent person. The defendant also asked for a hearing to determine the competency of Minnie Simmons and for any discoverable evidence pertaining to her mental competence. *See Exhibit "P" excerpts of the defendant's September 19, 2011 motion.*

On September 19, 2011 the prosecutor, once again, was placed on notice that the defendant specifically requested information pertaining to the mental competence of Minnie Simmons and was provided the specific reasons why the defense wanted the discovery. *See Exhibit "P" excerpts of the defendant's September 19, 2011 motion; see also Exhibit "F" and "I".*

Although the aforementioned September 19, 2011 motions were part of the record of the court and court proceedings it appears these motions were not considered. The court chose not to consider the motions made by the defendant independent of his attorney. However, the fact the court determined not to require

14

the district attorney to respond to those motions or rule upon them does not mean that the motions are without relevance or force in this case. These motions provided the district attorney with a specific request for material pertaining to the mental capacity of Minnie Simmons and provided the prosecutor with a multitude of reasons, legal and factual, why this information was important to the defense.

Instead of immediately providing copies of Mr. Verlezza's notes or identifying the notes after they were provided among the dozens of loose papers given to the defense after November 22, 2011 the prosecutor falsely continued to claim they were unaware of any exculpatory material. On or about January 12, 2012 Assistant District Attorney Neubauer stated in an affirmation filed with the court that: "[t]he People are aware of their continuing obligations pursuant to *Brady v. Maryland, 373 U.S. 83 (1963)* and are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Ms. Simmons' testimony. Nor are the People in possession of any records pertaining to Ms. Simmons' psychiatric, psychological, or medical condition." *See Exhibit "L".*

This court has ignored the fact that two specific requests were made for information pertaining to the mental capacity of Minnie Simmons and both of these requests were met with false responses claiming the material did not exist. Both the United States Supreme Court and the New York State Court of Appeals are intolerant of the prosecutor's actions with regard to their failure to turn over exculpatory

15

material they had in their possession. These courts have recognized that it is fundamental for material evidence which is in the possession of the prosecution that is exculpatory in nature to be turned over to the defendant in order to give meaning to the constitutional right to a fair trial. *See Brady v. Maryland, 373 U.S. 83 (1963); see also People v. Cwikla, 46 N.Y. 2d 434, 441 (1979).* These courts also have stated that the People's failure to turn over specifically requested material seldom is excusable and borders on prosecutorial misconduct. *See United States v. Agurs, 427 U.S. 97, 106-107 (1976); see also People v. Vilardi, 76 N.Y. 2d 67, 73-74, 82-83 (1990); see also Cwikla at 441-442.*

This court's erroneous review and conclusions of the facts will serve to deny the defendant a fair trial and his Due Process rights pursuant to the United States Constitution if not corrected. The court erroneous conclusion that the defense only made general requests for exculpatory evidence means that a determination that the defense was prejudiced is subjected to a higher standard: only if the evidence creates a reasonable doubt that did not otherwise exist. *See Vilardi at 73-74.* The defendant in this case should be subjected to the lower *Vilardi* standard: that he was prejudiced if the evidence might have affected the outcome of the trial. *Id. at 73.*

The defense was severely prejudiced in this case in accord with the less stringent *Vilardi* standard and this court is obligated to impose sanctions because specifically requested material was not turned over to the defense prior to the trial testimony of the witness the information concerned. *See People v. Martinez, 71 N.Y.*

16

AP-314

2d 937, 940 (1988); People v. Kelly, 62 N.Y. 2d 516, 520-521 (1984); People v. Saddy,
84 A.D. 2d 175-180 (2d Dept. 1981); People v. Clausell, 182 A.D. 132, 132-137
(1992).

The defendant was prejudiced because he was denied a competency hearing
in order to determine whether or not the witness was competent to provide any
evidence at all for this case, either in the Grand Jury or at a hearing or trial. Where a
primary prosecution witness is shown to suffer from a psychiatric condition, the
defense is entitled to show that the witness's capacity to perceive and recall events
was impaired by that condition. People v. Rensing, 14 N.Y. 2d 210, 213-215 (1964);
see also People v. Baraneck, 287 A.D.2d 74, 78-79 (2nd Dept. 2001). The People by
refusing to turn over information pertaining to the psychiatric condition of the
witness in their possession for more than eighteen months prior to the May 18,
2011 hearing deliberately impeded the ability of the defendant prepare a
meaningful cross examination of the witness. The defense was hobbled by a lack of
knowledge of information crucial to their ability to prepare for a full and fair cross-
examination of the witness. The People's withholding of the investigator's notes
violated the 6th Amendment Right to Confront Witnesses and his Due Process rights
by insuring the defense was not adequately prepared to cross-examine Minnie
Simmons.

For example, the defendant was entitled to consult experts to prepare his
cross-examination of Minnie Simmons. See Baraneck at 80-81. A psychiatric expert

17

might have been able to help the defense cobble together different questions that were asked that might have been able to disable any part of the testimony of the witness that was supportive of the People's case.

There was no competency hearing for this case. This too is a serious denial of the defendant's Right to Confront pursuant to the 6th Amendment to the United States Constitution because he should have had the option to object to any evidence put forth by the People and that option was taken away because the People withheld the investigator's notes. *Rensing at 213.*

The reason there was no competency hearing before the witness testified is because the People withheld information before the hearing that would have given the defense a basis to seek such a hearing.  An expert may have been able to testify at such a hearing that the witness was not capable at all of providing evidence at trial because they completely lacked the ability to, "give a reasonably accurate account of what he has seen and heard vis-à-vis the subject about which he is interrogated." *Rensing at 213.*  The defense also was deprived of Minnie Simmons medical records prior to the hearing and thus was denied the chance to examine, with an expert, whether or not there was pertinent material that were a part of those records that would have helped disable any favorable evidence the People believed they had. *Baraneck at 80-81.*

18

A defendant must be given exculpatory material in order to engage witnesses against him in a meaningful cross-examination. It is unquestioned in New York State that a defendant's right to a fair trial is violated when the prosecution denies the defense evidence that would allow a meaningful opportunity to use exculpatory material to cross-examine the People's witnesses or as evidence during his case. *See People v. Geaslen, 54 N.Y. 2d 510, 514-517 (1981); see also People v. Cortijo, 70 N.Y. 2d 868, 870 (1987); see also Kelly at 519-521; see also People v. Barnes, 200 A.D. 2d 751, 751-752 (2d Dept. 1994).*

Another critically important reason why exculpatory material must be furnished to the defense is to enable the defense to develop a more effective trial strategy. Exculpatory evidence is not limited to evidence that only supports the defense theory at trial. Evidence that would lead to a different trial strategy also is within the *Brady* rule. *See United States v. Bagley, 473 U.S. 667, 682-683 (1985).* In *Bagley* the United States Supreme Court stressed the importance of providing exculpatory material to the defense in order for the defendant to make appropriate trial strategy decisions.

The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor

19

on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. This possibility of impairment does not necessitate a different standard of materiality, however, for under the *Strickland* formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Bagley at 682-683.*

Usually, the People generally are charged with preserving evidence until a request for disclosure is made. *People v. Kelly, 62 N.Y. 2d 516, 520 (1984); People v. Saddy, 84 A.D. 2d 175, 177-179 (2d Dept. 1981).* However in this case if the defendant had known of the witness' degenerative mental disease the defendant could have applied for a conditional examination pursuant to C.P.L. §660.20 in order to preserve the witnesses memories at a time closest to the events. The defense was denied this opportunity to examine the witness early on in the prosecution and thus potentially was deprived of evidence that might have helped him. *Saddy at 177-179.*

The defendant also would have been in an excellent position to seek the dismissal of the case because of a defective indictment if the investigator's notes, which were available pre-indictment, were made available to the defense immediately after his arrest. *United States v. Agurs*, whose tenets were adopted by the New York State Court of Appeals in *Vilardi*, states that when material has

20

obvious exculpatory value the People are obligated to turn it over. *Agurs at 110-111.*
The entire defense strategy regarding this case would have changed but for the
People's intransience with regard to unlawfully withholding evidence they were
obligated to furnish to the defense.

### THE COURT OVERLOOKED EVIDENCE THAT THE PROSECUTION'S DECISION TO WITHHOLD THE INVESTIGATOR'S NOTES WAS MALICIOUS

The facts are these and they are undisputed. Investigator Verlezza, an
employee of the prosecutor and acting on their behalf, prepared notes that indicated
Minnie Simmons mental capacity was compromised on November 6, 2009 and May
6, 2010. These notes were prepared before the indictment. Minnie Simmons
daughter, a Police detective, testified falsely in the Grand Jury that her mother,
Minnie Simmons, was not mentally compromised. Her testimony took place within
two months of her reporting to Investigator Verlezza that her mother was suffering
from Alzheimer's disease. The defendant specifically requested twice information
pertaining to the competency of Minnie Simmons. The first request took place in
December 2010 about six months prior to a conditional hearing. The second
request took place three months after the conditional hearing. The People
petitioned the court for the May 18, 2011 conditional hearing and in their petition
they did not mention that they had written indications from their investigator that
Minnie Simmons was suffering from Alzheimer's disease. Instead, the People's
application for a conditional examination focused solely upon Minnie Simmons'
physical and not mental incapacities. All along, throughout the pre and post

21

indictment of this case the People possessed Investigator Verlezza's notes that indicated Minnie Simmons mental capacity was compromised. The People as late as January 2012, a few weeks ago, insisted they had no information that indicated Minnie Simmons was mentally compromised in spite of the fact that such information was turned over to the defense in a mass of papers given to them after November 22, 2011.

This court should conclude based upon the above that the withholding of the investigator's notes was done with malice and intent to conceal. The court should not allow for the People to be trusted with furnishing the court a compete set of medical, psychiatric, and administrative records to the court for an in camera review because it appears the People are set upon denying the defense evidence of Minnie Simmons' mental incapacity in order to bolster their case. This court also should conclude, based upon the above misconduct by the People that the purpose of their misconduct was to deny the defense the hearings and access to discovery they have requested in this motion.

Further, it would be error for this court to conclude that the defendant made any untimely request for exculpatory material. The facts are that the defense specifically asked for material pertaining to the mental capacity of witnesses at the first appropriate opportunity, a motion for discovery filed at the onset of the case. The defendant, independent of his attorney, made a second request for material pertaining to the competency of Minnie Simmons at the first adjournment after the

22

summer recess. The defendant's request for this material was not untimely. The reason the information was not available to him at a time he could most use it, before the conditional hearing, was because the prosecutor illegally withheld the material.

For all of the aforesaid reasons this court should:

1. Order, pursuant to C.P.L.R. §2221(d)(2), a reconsideration of the court's Order of February 10, 2012;

2. Issue an Order granting the defendant an immediate *Brady* hearing;

3. Order that the defendant, independent of the People, be granted subpoenas to enable him to collect the medical, psychiatric, and administrative records of Minnie Simmons;

4. Order granting the defendant an immediate competency hearing for the purpose of determining whether or not testimony offered by Minnie Simmons on or about May 18, 2011 was competent and admissible testimony that can be considered by a jury at trial.

5. Order granting the defendant an immediate competency hearing for the purpose of determining whether or not a written statement purportedly offered by Minnie Simmons on or about June 10, 2010 was competent and admissible evidence that could have been be considered by a Grand Jury or could be considered by a petit jury at trial.

23

6.  Order directing that Minnie Simmons undergo a psychiatric/psychological examination.

7.  And Order for such other and all further relief as to this Court may deem just and proper and for such relief that is mandated by the United States Constitution and the Constitution of the State of New York.

March 9, 2012

Stephen T. Mitchell

Defendant

24

# EXHIBIT 33

<u>People v. Mitchell</u>
Indictment: 4743/2010

Decision and Order
April 9, 2012
(Walsh, J.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 50
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,               By:   JOHN P. WALSH
                                                         J.S.C.

             -against-                                    Dated: April 9, 2012,
STEPHEN T. MITCHELL,                                      Indictment No. 4743/2010

                                                         DECISION and ORDER

                        Defendant

-------------------------------------------------------------------x

     In an exhaustive filing, the defendant, acting in a *pro se* capacity, pursuant to CPLR 2221(d)(2), has requested the court to reconsider its ruling of February 10, 2012.

     Since the court's decision on February 10, 2012 decided all the issues raised in this latest filing, and since this latest voluminous filing offers nothing new in the way of argument, the defendant's request for reconsideration of the court's ruling is in all respects denied.

     The defendant is directed not to file additional motions relating to its decision of February 10, 2012 when predicated not on any new factors but based on the defendant's unhappiness and disagreement with the court's decision.

     This constitutes the decision and order of the court.

Dated: April, 2012
    Brooklyn, New York

_____
John P. Walsh, J.S.C.

**AP-34**

# EXHIBIT 34

**People v. Mitchell**
Indictment: 4743/2010

Decision and Order
May 1, 2012
(Walsh, J.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM:   PART 50
---------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                                DECISION AND ORDER

    - against -

STEPHEN MITCHELL,

                                           IND. No. 4743/2010

                       Defendant
---------------------------------------------------------------x

    JOHN P. WALSH, JUSTICE

    This decision is intended to resolve all outstanding issues raised by the defendant either through motions or by requests for subpoenas.

    Prior to sending this case forthwith to TAP on April 9, 2012, the court issued a decision, dated February 10, 2012 upon the defendant's *pro se* motion(s) for (1) an Order directing disclosure to the defense and to the defense's expert, the entire psychiatric, psychological and medical records of the complainant, Minnie Simmons; (2) an Order directing that Minnie Simmons undergo a psychiatric/psychological examination "to aid the jury in assessing her credibility, ability to perceive, recall and recount events;" and (3) an Order re-opening a previous concluded conditional examination of Minnie Simmons "related to any psychiatric, psychological and medical history" pursuant to *People v. Baranek*, 733 NYS2d 704.

    In every respect but an *in camera* inspection of Minnie Simmons medical records, the defendant's motion was denied. *In camera* inspection revealed no material relative to the requests made by Mr. Mitchell. The defendant's contention that had he been aware that Ms. Simmons allegedly suffered from Alzheimer's disease, he would have requested a competency hearing is without any merit whatsoever for two reasons: first, nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness; second, as conveyed to the defendant by the court, the records reviewed *in camera* do not substantiate any claim of Alzheimer's disease.

In an exhaustive filing, the defendant, again acting in a *pro se* capacity, pursuant to CPLR 2221(d)(2), requested the court to re-consider its February 10, 2012 decision. That motion was denied on April 9, 2012 inasmuch as it did not raise any new issue not raised in the defendant's previous motion. In addition, as it became obvious that the basis for any additional motions directed at the decision on February 10, 2012 was the defendant's "unhappiness and disagreement" with that decision, he was directed not to file any additional motions relating to that decision and the subject matter he had requested.

With the matter now before Justice Patricia Di Mango, the defendant sought to take advantage by the submission of numerous other requests all by way of requests for the issuance of *Judicial Subpoena Duces Tecum*.

    (1)    To: Richard Balsam, Esq.
             Department of Social Services
             Human Resources Administration
             New York City

             Ordering his personal appearance as a "witness for trial"

             The court declined the subpoena

    (2)    To: Diane Keller
             Director of Social Work
             Bishop Henry Hucles Nursing Home
             Brooklyn, New York

             Ordering production of "the names, addresses, and contact information for all present and former employees, nurses and physicians of the Bishop Henry Hucles Nursing Home . . . who treated, nursed, aided, or serviced Minnie Simmons and had the opportunity to observe and converse with Minnie Simmons on a regular basis." Seeking to avoid the court's Order on April 9, 2012, the defendant added that "the purpose of this subpoena is not to obtain privileged personal, medical, or psychiatric information about Minnie Simmons."

             The court refused to sign the subpoena

**AP-36**

The following requests for *Judicial Subpoena Duces Tecum* are still pending:

> Five (5) directed To: Human Resources Administration
> Department of Social Services
> New York City

In effect, ordering all documents, materials, tapes, recordings, correspondence, diagrams, and manuals pertaining to methods, standards, policies, practices and procedures regarding the practices of the New York City Human Resources Administration (HRA) its Office of Legal Affairs and its Recovery Litigation United regarding Compulsory Accounting procedures in Civil and Surrogate Courts within New York City for a period of years. Four (4) of the requests specify all the documents of whatever kind and character related to Guardianship Proceedings pertaining to Charles Brown.

Three (3) directed at three (3) attorneys for HRA also requesting the same documents, materials, diagrams, and manuals pertaining to methods, standards, policies, practices and procedures from the same offices. One (1) of the requests also requests the same materials related to the Guardianship Proceedings of Charles Brown.

All of the requested subpoenas are far too broad. Nor is the relevance of any of the voluminous material requested made remotely relevant to these proceedings. Nor is the proffered reason for these subpoenas, to wit., the defendant's concern "that the court records from third parties . . . for Surrogates' Court and Supreme Court matters pertinent to the criminal case are incomplete" (Defendant's letter, April 24, 2012, to Judge Kamins) a sufficient basis inasmuch as it rests on sheer speculation and assumes the incompetence of the courts.

Furthermore, the submission of these subpoenas on the eve of trial in a case which has been pending for a considerable period of time and in which the defendant has filed motion after motion, including specific requests for discovery, raises a substantial issue that the purpose of these subpoenas is to delay the trial.

To the extent that the defendant seeks to rely on Judge Di Mango's advisement to write to the attorneys he wants to subpoena, that advisement, not being a court Order, has no force or effect on this court. The defendant is instructed not to offer the absence of any response to his letters as a basis for any further adjournment.

**AP-37**

In his letter to Judge Kamins, the defendant seeks the following: first, "a brief delay of the trial so that" he has "the opportunity to argue for the evidence." That request on that basis is denied. Second, "assignment to a judge who can review the subpoenas and respond to any motion practice necessary for" him "to try to enforce the subpoenas." The defendant's request for a third judge has obviously been denied by Judge Kamins who has re-assigned this matter to this court. Having reviewed the subpoenas and the proffered basis for them, the court declines to sign them. Third, "the opportunity to have the competency issues and the Brady issues responded to by the prosecution." There are no competency issues to be resolved. Furthermore, the prosecution is obligated to search its files and turn over exculpatory material under *Brady*. Their failure to do so can and may very well result in a reversal of any conviction in this matter. It is not the court's obligation to search the files for potential *Brady* material. However, the prosecution here was previously admonished and reminded of their *Brady* obligations and are so again.

The defendant's request for a second review of the documents inspected *in camera* is denied.

As to other basis for requesting a "delay" of the trial, since the defendant is to undergo a medical procedure, this matter will have to be adjourned. That adjournment should also solve the defendant's concerns as to the availability of the second and newly appointed legal advisor.

This constitutes the decision and Order of the court.

Dated: May 1, 2012
Brooklyn, New York

John P. Walsh, J.S.C.

AP-38