# 23-705

---

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

STEPHEN T. MITCHELL

Plaintiff-Appellant,

-against-

THE STATE OF NEW YORK

Defendants-Appellees.

---

On Appeal from the United States District Court
For the Eastern District of New York

---

APPELLANT'S APPENDIX
VOLUME
2 of 2
by

Stephen T. Mitchell, Pro Se
461 Central Park West Apt. 6B
New York, N.Y. 10025
stm7615@aol.com

# TABLE OF CONTENTS

| | Page(s) |
|---|---|
| Table of contents | i-ii |
| Civil Docket Sheet for case 1:22-cv-1747 | AP-1-5 |
| Notice of Appeal | AP-6 |
| -Memorandum and Order dated 3/31/23 | AP-7-14 |
| -Clerk's Judgment | AP-15 |
| Summons In a Civil Court Action for case 1:22-cv-1747 | AP-16-17 |
| Plaintiff's Affirmation of Service dated 4/29/22 | AP-18 |
| Plaintiff's Amended Petition and Complaint dated 4/6/22 with Exhibits: | AP-19-90 |

### Amended Complaint Exhibits

| | |
|---|---|
| -Kings County Supreme Court Indictment 4743-2010 | AP-91-94 |
| -In Re Charles Brown Guardianship Docket Sheet | AP-95-96 |
| -In Re Charles Brown Guardianship Bond | AP-97-102 |
| -In Re Charles Brown Guardianship Decision and Order dated 2/24/10 | AP-103-107 |
| -Estate of Charles Brown Decree Granting Probate | AP-108-109 |
| -Estate of Charles Brown Affidavit of Heirship | AP-110-112 |
| -Estate of Charles Brown Order Granting Probate dated 10/20/03 | AP-113-114 |
| -In Re Charles Brown Order Discharging Guardian dated 6/26/08 | AP-115-117 |
| -In Re Charles Brown Order Revoking Discharge of Guardian dated 2/24/10 | AP-118-120 |
| -People's Response to Defendant Singer and 14th Amendment Motion | AP-121-126 |
| -In Re Charles Brown Report of Guardian Ad Litem dated 3/9/09 | AP-127-132 |
| -Kings County DA Investigator Vincent Verlezza notes | AP-133-136 |
| -Minnie Simmons New York CPL §190.30(3) Affidavit | AP-137-138 |
| -Excerpts from Linda Simmons Grand Jury Testimony dated 7/8/2010 | AP-139-142 |
| -Excerpts from Linda Simmons Grand Jury Testimony dated 8/4/2010 | AP-143-146 |
| -Kings County Supreme Court Indictment 4743-2010 | AP-147-150 |
| -People's Motion for Conditional Exam of Minnie Simmons dated 10/7/10 | AP-151-157 |
| -Order Permitting Conditional Exam of Minnie Simmons dated 5/10/11 | AP-158-159 |
| -Transcript of Conditional Examination of Minnie Simmons dated 5/18/11 | AP-160-204 |
| -Excerpts of Defense Omnibus Motion dated 12/20/10 | AP-205-210 |
| -People's Response to Defendant's Omnibus Motion dated 2/1/11 | AP-211-226 |
| -Decision and Order for Indictment 4743-2010 dated 3/28/11 | AP-227-230 |
| -People's Voluntary Disclosure Form dated 10/5/10 | AP-231-235 |
| -People's Letter to Court to Memorialize Disclosures dated 11/22/11 | AP-236-238 |
| -Letter from Justice Pesce to Charles Emma dated 8/28/08 | AP-239-240 |
| Appellate Decision: Second Department Decision and Order dated 11/18/20 | AP-241-243 |
| New York Court of Appeals Denial of Leave to Appeal dated 3/31/21 | AP-244-245 |

Defense Motion for Minnie Simmons Medical and Psychiatric Records    AP-246-263
People's Opposition to Disclosure of Minnie Simmons Records    AP-264-270
·Defense Reply to People's Opposition to Disclose M. Simmons Records    AP-271-288
·Decision and Order for Indictment 4743-2010 dated 2/10/12    AP-289-295
·Defense Re-argument Motion for 2/10/12 Decision and Order dated 3/9/12    AP-296-322
·Decision and Order for Indictment 4743-2010 dated 4/9/12    AP-323-324
·Decision and Order for Indictment 4743-2010 dated 5/1/12    AP-325-329
·Letter to Justice Barry Kamins regarding limits of pre-trial disclosures    AP-331-336
·Defense In Limine motion to preclude Minnie Simmons testimony    AP-337-351
·Defense Singer motion    AP-352-373
·People's Response to Defense Motion to Preclude Minnie Simmons    AP-374-406
·People's Response to Defense Singer Motion    AP-407-442
·Decision and Order for Indictment 4743-2010 dated 3/5/13 (Preclusion)    AP-443-444
·Decision and Order for Indictment 4743-2010 dated 3/5/13 (Singer)    AP-445-446
·Excerpts from 6/10/13 Pre-trial Hearing for Indictment 4743-2010    AP-447-488
·Excerpts from 6/11/13 Pre-trial Hearing for Indictment 4743-2010    AP-489-508
·Defense disclosure request letter to court dated 2/19/13    AP-509-511
·Defense disclosure request letter to court dated 4/12/13    AP-512-513
·Defense disclosure request letter to court dated 6/3/13    AP-514-516
·Handwritten objections to trial court rulings dated 6/18/13    AP-517-520
·Second set of handwritten objections to trial court rulings dated 6/18/13    AP-521-522
·People's Trial Witness List for Indictment 4743-2010    AP-523-524
·People's Response to Appellant Disclosure Request dated 9/4/14    AP-525-529
·People's Response to Appellant Disclosure Request dated 7/9/18    AP-530-537
·Excerpts of Peoples Affirmation dated 2/8/13    AP-538-542
·In re Charles Brown Guardianship Docket    AP-543-544
·Decision and Order for Indictment 4743-2010 dated 5/23/14    AP-545-546
·Decision and Order for Indictment 4743-2010 dated 12/20/10    AP-547-548
·Decision and Order for Indictment 4743-2010 dated 9/3/14    AP-549-550
·Decision and Order for Indictment 4743-2010 dated 2/19/13    AP-551-553
·Ian Nelson Curricula Vitae    AP-554-555
·Charles Emma, Esq. Notes    AP-556-557
Letter request for signed subpoenas to Justice DiMango dated 4/21/12    AP-558-564
Letter regarding "Writ of Prohibition to Justice DiMango dated 10/22/12    AP-565-569
Letter to ADA Neubauer regarding disclosure requests dated 4/14/12    AP-570-573

Excerpts from the June 2013 trial of Indictment 4743-2010    AP-574-701

# EXHIBIT 35

<u>People v. Mitchell</u>
Indictment: 4743/2010

April 24, 2012
Letter From Stephen Mitchell to
Justice Barry Kamins



STEPHEN MITCHELL
542 Hartford Court
South Orange, NJ 07079
STM7615 @aol.com

April 24, 2012

*Re: People v. Mitchell*
*4743/2010*

The Honorable Barry Kamins
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dear Justice Kamins:

I write to request your intervention as an administrative judge in a matter pending before the Honorable Justice Patricia Di Mango in her capacity as the TAP judge.

I am a former attorney who practiced for 24 years before resigning from the bar in 2010. Unfortunately, I have been accused of a very serious crime. I was accused of stealing more than $350,000.00 from an estate. This matter has been pending since September 2010 and is scheduled for trial May 1, 2012, next Tuesday. I have pled not guilty to the charge and plan to try the case. I have become indigent since resigning from the bar and I am unable to hire a lawyer to handle my case. For reasons I will discuss in detail below I have elected to defend against the charges pro se in spite of the fact that I do not want to.

My practice included criminal defense for many years. I began practicing as a state prosecutor in 1986 and then moved to criminal defense by 1991. I have tried more than 35 felony criminal matters, including three homicides, to verdict. I actively practiced criminal defense between 1991 and 2002. You and I have met through your involvement with the Brooklyn Bar Association.

From 2002 until I resigned in 2010 my practice primarily included federal employment discrimination and civil rights matters within the federal district and appeals courts in New York. I have argued before the United States Court of Appeals for the Second Circuit at least twenty times and have earned numerous reversals for civil rights matters in that court. A small part of my practice included estate work.

The reason I write to you is because I am not being treated fairly by the courts assigned to my case in Kings County Supreme Court and because of this mistreatment I am concerned that I will not receive a fair trial.

**AP-58**

One primary issue of concern is my inability to obtain signed judicial subpoenas. My last appearance for this case was on April 9, 2010. On that date the case was re-assigned from Justice John Walsh to Justice Patricia Di Mango the TAP judge. On April 9, 2010 I decided to represent myself because the attorney assigned to me had not sought to subpoena information I believed would help me defend my case. Her refusal was one of many instances in which I asked her to seek discovery of information that she refused. I also asked the attorney to file motions important to my defense and crucial to preserve constitutional issues for appeal should an appeal be necessary and she refused.

I raised the need for signed subpoenas before Justice Di Mango immediately. Justice Di Mango instructed me to present the subpoenas to her for review on or about Thursday April 12, 2012 and I began to present her with subpoenas to sign on or near that date. Several of the subpoenas I submitted to Justice Di Mango were to attorneys who likely will be prosecution witnesses. Justice Di Mango told me that it was her practice not to "So Order" subpoenas to attorneys. Instead she instructed me to write to the attorneys and make a demand for the materials I sought. She then told me to inform her of the results of my letters. I sent the letters to the attorneys priority mail. Almost all of them have not responded. The week of April 16, 2012 I appeared before Justice Di Mango three times to try to obtain signed subpoenas for institutions that possess information critical to my defense and each time Justice Di Mango turned me away stating that she was considering the subpoenas.

In fairness to Justice Di Mango I am aware that she is presiding over an extraordinary case that is consuming all of her time. I also took note of the fact that in spite of the extraordinary nature of the trial that she still maintains her TAP responsibilities and has conducted a calendar every morning for the other cases she is responsible for. I appeared before her just prior to her conducting the trial proceedings.

I tried to obtain the signed subpoenas I needed on April 20, 2012 by seeking to approach Justice Di Mango on that date but her part was down so I went to the assigned Miscellaneous Judge for that date, Justice Sheryl Parker. Justice Parker declined to sign the subpoenas I presented her and told me to reach out to Justice Di Mango on Monday. I wrote Justice Di Mango and have tried to reach her without success these last two days. I have been diligent and aggressive in trying to obtain the subpoenas without success. I write to you to ask that you arrange for the case (or at least the remaining discovery issues) to be re-assigned to another judge so that I can obtain the materials necessary for me to be prepared for my trial.

I am not seeking privileged materials from the people and institutions I would like to subpoena. I am seeking information pertaining to third party communications that these individuals may have had regarding this case or court records and communications with the courts. The reason I am seeking court records from third parties is because I am concerned that the court records for Surrogates' Court and Supreme Court matters pertinent to the criminal case are

**AP-59**

incomplete. I expect some of the individuals and institutions to want to challenge the subpoenas issued but I do not expect their challenges to be successful if the law is followed because I am seeking either court records or third party communications and not communications with their clients.

There likely will be a need for a brief motion practice to resolve the subpoena issues. The trial is scheduled for May 1, 2012 and I need to review these materials with enough time before the trial to obtain additional evidence if necessary. I am concerned that I will be "sandbagged" by Justice Di Mango in that she will insist I begin the trial without giving me the chance to obtain the materials because she has adjourned considering my requests. Worse, I am concerned that my subpoena requests will be summarily denied without the court requiring the opponents of the subpoenas to state the reasons why they feel the materials requested should not be turned over and that there will be no appropriate record established for appellate review should an appeal be necessary.

I already have been denied the opportunity to establish an adequate factual record with regard to crucial issues in my case so that an appellate court at the state or federal level could discern whether or not my constitutional rights were violated. See *Drake v. Portuondo, 321 F.3d 338, 345-347 (2d Cir. 2003).*

There are two very important issues that are a part of my case that I already have been denied the chance to make an adequate factual record. One of the prosecution's primary witnesses likely is incompetent to testify. A CPL §660 hearing was conducted for the witness because the prosecution alleged the witness was suffering only from physical disabilities. For the first time, during the CPL §660 hearing, the defense became aware that the witness may be suffering from severe mental defects that have impacted her memory. The witness was unable to recall almost any facts or circumstances pertaining to the case and stated on the record she was going senile. The witness could not remember the name of the place she lived at for seven years. There are no allegations the witness was taken advantage of while she was mentally impaired. The prosecution has continued throughout the case to maintain that their witness is competent to testify.

The reason I am concerned about being treated fairly is because between 18 months and a year before the CPL §660 hearing the prosecutors were aware that the their witness was suffering from Alzheimer's disease and that information was withheld from me long past the date of the CPL §660 hearing. The prosecutor's investigator interviewed the daughter of the witness and he noted she told him that her mother was suffering from Alzheimer's disease. The daughter, a police officer, later testified in the Grand Jury that the mother was mentally fine. The information pertaining to the witness' Alzheimer's disease was not provided to me for the first time until approximately six months after the CPL §660 hearing.

If I had known of the witness' infirmity before the CPL §660 hearing I would have insisted upon a competency hearing. The judge presiding over the hearing was

**AP-60**

denied crucial information necessary to assess whether or not the witness should have been testifying at all. The information withheld by the prosecutor was Brady material that should have been turned over before the CPL §660 hearing. The prosecution was granted a significant advantage by withholding the Brady material. I was denied the opportunity to challenge whether or not evidence the witness presented to the Grand Jury was competent evidence. The witness never appeared before the Grand Jury. The prosecution submitted her affidavit in lieu of her testimony. When shown the affidavit the witness denied the signature on the document was hers. I also was denied a competency hearing to determine if the witness was able to provide competent evidence and the opportunity to question the witness about the extent of her illness or review her medical history before the hearing to prepare for the hearing. I may have wanted to have a physician familiar with Alzheimer's disease available to help me and I was denied that chance.

I brought motions before the Honorable Justice John Walsh regarding these issues. The court summarily denied the motions (wrote no opinion or commented from the bench) on April 9, 2012 without requiring the prosecutor to answer them and ignored the *Drake* case in its entirety. Worse, the court ruled in February 2012 that the defense failed to request Brady material in their motions for discovery and thus should be denied the less strict Vilardi standard. The court's findings completely were untrue. The fact is that the defense asked, in writing, specifically for materials pertaining to any witness' mental capacity in their discovery motions and the trial court completely ignored the request. When I pointed out the court's error in a Motion to Re-Argue Justice Walsh summarily denied that request to without requiring the prosecution to respond to the motion.

The charges for this case were not initiated by my client they were brought by a judge. My fear is that I am being denied the fundamental right to a fair trial because the accusations stem from a judge. I understand the seriousness of the charge and how it could offend any lawyer if true but I am innocent of the charges and should be given every fair chance to defend myself. My fear is that Justice Di Mango's reticence in signing subpoenas for information I am entitled to and then rushing me to trial without the materials I need to defend my case is more of the same I received from Judge Walsh; a summary denial of evidence crucial to my defense without an adequate record to protect my rights to the fullest extent should an appeal be necessary.

I write to ask for the following: 1) a brief delay of the trial so that I have the opportunity to argue for the evidence I believe will help to exonerate me; 2) an assignment to a judge who can review the subpoenas and respond to any motion practice necessary for me to try to enforce the subpoenas; 3) the opportunity to have the competency issues and Brady issues responded to by the prosecution and hearings so that an appellate court has a full record to review whether or not my constitutional rights were violated.

Judge Walsh directed a belated in camera review of the witness medical records and stated he found nothing in the records that supported the belief the

**AP-61**

witness lacked competence.   The defense never was given any information pertaining to the source of the information the District Attorney provided the court to review or its completeness.   Given that the prosecutor deliberately withheld information pertaining to the Alzheimer's disease of the witness I doubt they furnished information to the court that would have prejudiced their case.  I write to ask for a second review of the materials by the defense with a confidentiality agreement imposed.  I ask that this court allow the defense "So Ordered" subpoenas for medical, administrative, and psychiatric records of the witness with a confidentiality provision attached.

There are two other reasons why I ask this court to intercede and delay the trial.  First, I was assigned an adviser for this case to assist me in trial preparation. The adviser is out of town this week and will not be available to assist me in my preparation for trial at all.  The assignment of an adviser who is not available the week before trial is patently unfair and prejudicial to any fair administration of justice.  I asked for an adviser because I have not tried a criminal case in ten years and its difficult to try your own case.  I need and want help that is effective and adequate.  I need at least ten days with him to thoroughly prepare for trial.  Thus far he has been little help because he is unavailable.  I met with him for about twenty minutes thus far and he has not had time to review my file.  Neither of us have conferred with experts hired to assist me.  Further, I have not been able to get him to take care of having orders I need signed to pay for expert witnesses and an investigator.  These people will not speak to me without the orders for them to be paid and so I cannot confer with them until the adviser returns.  I will be completely unprepared for trial without an investigator and some of the experts I need to testify.  Please help in this regard.

Second, I have a painful growth on the back of my head that is growing larger by the week and must be removed.  I have put it off because of the cost of its removal but now it needs to be removed.  It is painful and interfering with my ability to prepare for trial.  I can have it removed sometime in May before the trial.

Thank you for considering my letter.  I can best be reached at the E-mail listed above.

Sincerely,

Stephen T. Mitchell

# EXHIBIT 36

<u>People v. Mitchell</u>
Indictment: 4743/2010

Defense <u>In Limine</u> Motion
To Preclude Testimony of Minnie Simmons

Dated: September 20, 2011

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS-CRIMINAL TERM- PART 50**

THE PEOPLE OF THE STATE OF NEW YORK

-against-

STEPHEN MITCHELL

Defendant.

MEMORANDUM
OF
LAW

Indictment No.
4743/2010

**THE DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF A MOTION TO DISMISS PURSUANT TO THE FOURTEENTH**
**AMENDMENT TO THE UNITED STATES CONSTITUTION AND**
**A MOTION IN LIMINE**

**EXHIBITS**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS-CRIMINAL TERM- PART 50**

THE PEOPLE OF THE STATE OF NEW YORK

-against-

STEPHEN MITCHELL

Defendant.

Affidavit

Indictment No.
4743/2010

Stephen T. Mitchell, certifies that the following documents in support of the defendants' motion to dismiss are true and correct copies under the penalties of perjury of the State of New York:

1.  I am the defendant in this case. I make this affidavit in support of a motion to dismiss pursuant to CPL §210.20(1)(b), CPL §210.20(1)(c); CPL §210.35(5).

2.  Exhibit "A" is a true and correct copy of the transcript of a conditional hearing that took place on May 18, 2011 with Minnie Simmons as a witness in the case of People v. Stephen Mitchell, indictment number 4743/2010.

3.  Exhibit "B" is a true and correct copy of a Grand Jury Exhibit.

4.  Exhibit "C" is a true and correct copy of a Report of Guardian Ad Litem of Charles Emma, Esq.

5.  Exhibit "D" is a true and correct copy of the Grand Jury testimony of Linda Simmons in the case of People v. Stephen Mitchell, indictment number 4743/2010.

Stephen T. Mitchell hereby affirms pursuant to 28 U.S.C. §1746 and declares under the penalties of perjury in the State of New York that the aforementioned facts and circumstances described above are true to the best of his personal knowledge.

1

Dated: September 19, 2011

Stephen T. Mitchell

2

The defendant, Stephen Mitchell, respectfully requests this court to dismiss the indictment for this case and the case in its entirety.  Mr. Mitchell seeks the dismissal of the indictment for this case pursuant to the Fourteenth Amendment to the United States Constitution.  The defendant also seeks an order precluding the use of the testimony of Minnie Simmons at trial in person or via her testimony at a conditional examination that took place on May 18, 2011.

### A. DISMISSAL PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The district attorney presented an exhibit to the Grand Jury during its deliberations that purportedly was signed before a notary by Minnie Simmons on June 10, 2010. *See Exhibit "B"; see also Exhibit "A" at 33.* The document asserts, in part, that Minnie Simmons did not give Stephen Mitchell or anyone else permission or authority to use the proceeds of the estate of Charles Brown. *See Exhibit "B".* Ms. Simmons disputed the authenticity of the June 10, 2010 Grand Jury exhibit that was attributed to her during her testimony at a hearing on May 18, 2011. *Exhibit "A" at 33.* She emphatically testified that she did not sign the Grand Jury exhibit shown to her during the hearing or recognized the signature as hers. *See Exhibit "A" at 33.* Ms. Simmons also testified during this hearing that she did not remember meeting with the investigator from the district attorney's office that allegedly provided her with the June 10, 2010 Grand Jury exhibit to sign or having someone read to her a portion of the affirmation. *See Exhibit "A" at 39-40.*

1

Minnie Simmons is the only witness who could offer evidence of a material fact pertinent to this case that is an essential element of the charge, whether or not Stephen Mitchell had her consent to use the proceeds of the estate in the manner he did. Ms. Simmons testified that the district attorney misled the Grand Jury into believing an exhibit they provided to the Grand Jury for its pre-indictment deliberations, pursuant to CPL §190.30(3), was signed by her when in fact it was not. *See Exhibit "A" at 33; see also Exhibit "B".* Ms. Simmons' testimony, that the signature on the document was not hers, means that the Grand Jury unknowingly and impermissibly relied upon false evidence and hearsay, a forged signature, improperly put forth by the district attorney. *See People v. Pelchat, 62 N.Y.2d 97,106-108 (1984); see also People v. Alexander, 136 A.D.2d 332, 336-337 (1 Dept 1988).*

It is long held that a conviction obtained by means of testimony the prosecutor knew to be false offends the United States Constitution's Fourteenth Amendment. *See Drake v. Portuondo, 553 F.3d 230, 240 (2009); United States v. Agurs, 427 U.S. 103-104 (1976); see also Mooney v. Holohan, 294 U.S. 103, 112 (1935); Napue v. Illinois, 360 U.S. 264, 269 (1959).* New York State courts also have recognized that the prosecution's knowing use of false evidence may impair a defendant's Due Process rights before a Grand Jury and at trial. *Pelchat at 105-107; Alexander at 336-337; see also Drake at 553 F.3d 240-248.* A prosecutor has a duty not to make use of false evidence knowingly during the presentation of matters before a Grand Jury and at trial. *Pelchat at 105-107; Alexander at 336-337; Drake at 553 F.3d 240-248.*

2

Evidence obtained in violation of the constitutional rights of the defendant is not competent evidence in the State of New York and therefore would be inadmissible at trial. *People v. Huntley, 15 N.Y.2d 72, 77-78 (1965); Reyes at 593; Pelchat at 105-106; Drake at 553 F.3d 240-248.*

The prosecution's knowing and continued use of an exhibit their own witness stated, under oath, was a forgery is illegal pursuant to the federal constitution. *Drake at 553 F.3d 240-248.* This case is not one that Ms. Simmons changed her testimony subsequent to an actual appearance before the Grand Jury. Ms. Simmons stated that she never signed the exhibit in question and that it never was presented to her for her signature. *Exhibit "A" at 33; see also Exhibit "B".* It is of no moment that the prosecution found out post indictment that their witness claimed the document was a forgery. *Pelchat at 106-107; Drake at 553 F.3d 241.* Once the prosecution became aware that their witness asserted that the document was a forgery they had an obligation to cease making use of it during the proceedings of the case. *Pelchat at 106-107; Drake at 553 F.3d 241.* Courts have dismissed indictments in New York because the falsity was discovered post indictment and they have dismissed notwithstanding there was sufficient other reliable evidence presented. *Id.; see also Alexander at 336-337*

A prosecutor is duty bound to dismiss the indictment and seek a superceding indictment on proper evidence or disclose the facts and circumstances to the court

3

and seek permission to resubmit the case to the Grand Jury rather than rely upon the false evidence. *Pelchat at 106-107; Alexander at 336-337.* The prosecution in this case has refused to adhere to well settled law and dismiss the indictment for this case because the Grand Jury was provided and relied upon material evidence that the complaining witness testified under oath was a forgery. Instead, the prosecutor illegally has chosen to rely upon the forgery presented to the Grand Jury to support the indictment. The indictment should be dismissed pursuant to CPL §210.20(1)(b) because of the constitutional infirmity of the use of the forged exhibit rendered it inadmissible before the Grand Jury as a matter of law or the evidence should be precluded at trial. *Pelchat at 105-107; Holohan at 294 U.S. 103 at 112; Napue at 360 U.S. at 269; Drake at 553 F.3d at 240-241.*

If it is established that Exhibit "B" was a forgery then the entire case against the accused must be dismissed without leave to re-present because of the outrageous violation of his constitutional rights by the prosecution. *Drake at 553 F.3d at 240-248.*

A hearing is mandated in order to determine all of the facts and circumstances pertaining to the forgery claim and the extent of the violation of the accused Due Process rights pursuant to the federal constitution. *See Drake v. Portuondo, 321 F.3d 338, 345-347 (2d Cir. 2003).* The indictment also must be dismissed. *Huston at 406-411.*

4

The indictment must be dismissed if the prosecutor does not challenge Ms. Simmons' claim that Exhibit "B" is a forgery. Otherwise the court may order the prosecutor to seek an application to re-present the case to another Grand Jury. The reason the prosecutors need to seek application to re-present the case before a new Grand Jury is because should they challenge Ms. Simmons' claim that they introduced a forged document into the Grand Jury only the Grand Jurors can assess who was the more reliable witness, Ms. Simmons, or the people the prosecution may use to challenge her claim of forgery. *See People v. Huston, 88 N.Y.2d 400, 407-411 (1996).* The Grand Jury's investigative function and prerogative renders it the exclusive judge of the facts with respect to any matter before it and the prosecution's misconduct should be a part of the analysis. *Pelchat at 105-108, Huston at 407-411; accord CPL §190.25(5).*

The forgery issue is inexorably entwined with the entire case because the forged exhibit was used to establish a material element of the charge. Therefore the reliability level of the witnesses regarding the forgery issue and the weight to accord each witnesses testimony must be made solely by the Grand Jury because if they believe the document was forged or find reason to doubt the credibility or competency of the evidence presented they could vote to dismiss the case. The Grand Jury's decision should be uninfluenced by the opinion of the prosecutor or the courts. *Huston at 407-411.*

5

## B. MINNIE SIMMONS' TESTIMONY SHOULD BE PRECLUDED

There is evidence that Ms. Simmons was not mentally competent to provide testimony or evidence to the Grand Jury in 2010. There also is considerable evidence that Ms. Simmons is mentally incompetent to testify as a witness at trial and was mentally incompetent to testify as a witness at the May 18, 2011 conditional hearing.

Incompetent evidence is inadmissible. *People v. Swamp, 84 N.Y.2d 725, 730 (1995); see also People v. Reyes, 75 N.Y.2d 592, 593 (1990).* The standard as to witness competency to testify at a trial or hearing is whether the prospective witness "has sufficient intelligence to understand the nature of an oath and to give a reasonably accurate account of what he has seen and heard vis-à-vis the subject about which he is interrogated." *See People v. Parks, 41 N.Y.2d 36, 45-46 (1976); see also People v. Rensing, 14 N.Y.2d 210, 213 (1964).* "The capacity of a witness to observe, remember, and communicate goes to the question of the competency of that witness." *Matter of Luz P., 189 A.D.2d 274, 277 (2 Dept. 1993).*

Minnie Simmons did not testify before the Grand Jury. The prosecution substituted her affirmation, pursuant to CPL §190.30, for her appearance in order to present a material component of the charge, lack of consent, before the Grand Jury. The defense contends that the prerogatives of CPL §190.30 deliberately were

6

AP-346

misused by the prosecutors in this case and the integrity of the Grand Jury proceedings were damaged as a result.

In 2009, prior to the Grand Jury presentation by the District Attorney, there was a court ordered investigation of the matter by an attorney, Charles Emma. Mr. Emma interviewed six people to investigate the matter and he admits he did not interview Minnie Simmons. *See Exhibit "C" at 1.* At the end of his report Mr. Emma concludes that Ms. Simmons should be replaced as executrix of the Estate of Mr. Brown. He does not state how he came to this conclusion without interviewing her. *Id. at 4.* Mr. Emma testified before the Grand Jury in this matter and did not present to the Grand Jury that he recommended Minnie Simmons be replaced as executrix of the estate.

The accused is entitled to establish, via a hearing and by means of discovery, that Ms. Simmons mental acuity was compromised when she testified before the Grand Jury and at trial. He is entitled to a hearing on this issue so that all of the facts and circumstances of the matter have been recorded because his federal constitutional rights may be impacted. *Drake at 321 F.3d 345-346.* This means the court should be compelled to hold a hearing and allow the defense to call Mr. Emma, the notary and investigator for Exhibit "B", and any others who may be aware of the forgery and the mental state of Ms. Simmons at the time she purportedly signed Exhibit "B" so that a full factual record is prepared for any subsequent appeals

7

regarding the potential infringement of the accused constitutional rights with respect to the Grand Jury presentation and any subsequent hearing or trial. *Drake at 321 F.3d 345-346.*

The accused also is entitled to Minnie Simmons' medical, psychiatric, and nursing home records and access to her physicians and medical care takers so that he can defend himself against the prosecutions' accusations pursuant to the Sixth Amendment to the United States Constitution. *See People v. Baranek, 287 A.D.2d 74, 78-82 (2 Dept 2001).* The accused is entitled to show that Minnie Simmons' capacity to perceive and recall events is compromised for the purposes of the May 18, 2011 hearing and any subsequent trial as part of an effort to impeach her or preclude her from testifying.

There were several examples of instances during the May 18, 2011 conditional hearing that indicated Ms. Simmons did not have personal knowledge of the facts and circumstances pertinent to this case and that third parties may have provided her with information regarding material issues. Ms. Simmons admitted after the prosecutor's questioning that her memory as to details was fading. *Exhibit "A" at 41.* For example the most serious incident was when Ms. Simmons could not remember the name of the place that she lived at for seven years at the time of the May 18, 2011 conditional hearing. *Exhibit "A" at 6.* Her inability to remember the

name of the place she lived at for seven years is a strong indication of the severity of her inability to remember basic facts.

Ms. Simmons was asked to identify Stephen Mitchell, who was present at the May 18, 2011 conditional hearing, and she could not. *Id. at 23-24.* She could not remember if she was appointed executrix of Mr. Brown's estate or the lawyer who helped her prepare the materials for her to become executrix and later during the conditional hearing she remembered she was the executrix after hearing several times the suggestion that she was. *Id. at 17, 30, 34-35.* Ms. Simmons testified that she did not remember the property in question being sold in spite of the fact she signed the deed. *Compare Exhibit "A" at pp. 8 with pp. 11-12, 23, 29-30, 35, 38, 41.* At one point Ms. Simmons states she was told the property was taken for taxes. *Id. at 41.* At another point she says she thought Mr. Brown's nephew sold the property. *Id. at 35.* Ms. Simmons testified at the conditional hearing that she has no recollection of any events of December 23, 2005, the day the deed was executed by her for the sale of the property. *Id. at 29-30.* Ms. Simmons also testified at different times at the same hearing that she did not know who the executor of Mr. Brown's estate was and then she did. *Compare Exhibit "A" pp. 7, 22, 30, 34-35.*

In every leading case that pertains to witness competency the witnesses who were allowed to testify could provide a consistent narrative of events. *People v. Parks, 41 N.Y.2d 36, 49-50 (1976); People v. Chan, 110 A.D.2d 158, 159-163(2 Dept*

1985); *People v. Rensing, 14 N.Y.2d 210-214 (1964)*.   Ms. Simmons does not remember crucial points of time related to this case.  For example she testified she has no memory of the facts and circumstances that took place on date of the sale of the property, December 23, 2005. *Exhibit "A" at 29-30*.  It would be impossible for the accused to vigorously and thoroughly cross-examine Minnie Simmons in accord with his Sixth Amendment rights with respect to any instructions she gave or did not give regarding the disposition of the sale proceeds and the crucial issue of consent because she does not remember. *See Chan at 161*.  The fact that she cannot remember where she lives after seven years of residence should be enough to preclude her as a witness at trial and strike her May 18, 2011 testimony. *See Exhibit "A" at p. 6*.  For the record her daughter testified she lived there for four years. *Compare "A" at 6 with Exhibit "D" at 5*.

The only reason the prosecution wants to call Ms. Simmons as a witness or play the video-tape of her testimony is impermissibly to invoke sympathy from jurors because of her age and infirmity.  She cannot offer competent testimony about the facts and circumstances of this case because of her inability to remember facts and her mental infirmity.  Minnie Simmons has no personal knowledge of the facts and circumstances of this case and the defense should be afforded every opportunity to prove her incompetency by a review of her medical and psychiatric history.  Her testimony should be precluded in all respects and the conditional hearing testimony also should be stricken.

10

September 20, 2011

Stephen T. Mitchell

# EXHIBIT 37

<u>People v. Mitchell</u>
Indictment: 4743/2010

Defense <u>Singer</u> Motion to
Dismiss the Indictment Pursuant to The Sixth and Fourteenth
Amendments to the United States Constitution
(Dismissal application for untoward pre-indictment delay)

Dated: January 6, 2013

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS: CRIMINAL TERM:

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, | Indictment: |
|  | 4743/2010 |
|  | Combined Affidavit |
|  | And Memorandum |
| -AGAINST- | Of Law |
|  | In Support Of A |
|  | Motion To |
|  | Dismiss |
| STEPHEN T. MITCHELL, | Pursuant to the 6th and 14th |
|  | Amendments to |
|  | The |
|  | United States Constitution |
| DEFENDANT. | And CPL §30.20 |

I, STEPHEN T. MITCHELL, the defendant, herein, affirms under the penalties of perjury in the State of New York the following:

1. I am the defendant in this action and am acting Pro Se as attorney for myself;

2. This affidavit and a memorandum of law with exhibits attached are made in support of the defendant's application pursuant to the 6th and 14th Amendments to the United States Constitution and CPL §30.20

dismissing the indictment herein, with prejudice, because the accused was denied his Due Process rights to a speedy trial.

WHEREFORE, the defendant respectfully requests that this court dismiss this case, with prejudice, because the accused was denied a speedy trial or order a hearing to determine whether or not the factors necessary to support a dismissal of this action pursuant to the 6th and 14th Amendments to the United States Constitution and CPL §30.20 are present within this action.

January 6, 2013

Stephen T. Mitchell

Pro Se

STM7615@aol.com

2

COMBINED AFFIDAVIT AND MEMORANDUM OF LAW

IN SUPPORT OF A MOTION TO DISMISS

PURSUANT TO THE 6TH AND 14TH AMENDMENTS TO THE UNITED

STATES CONSTITUTION AND CPL §30.20


<u>Facts and Argument</u>


The defendant is accused of Grand Larceny in the Second Degree. The events pertaining to the case took place in 2005 and early 2006. The primary witness for the prosecution in this case is Minnie Simmons who today is more than 80 years old and resides in a nursing home. It will be undisputed that her recollection of facts and circumstances pertaining to this case during her testimony at a pretrial hearing conducted in May 2011 was very poor.


In November 2009 the prosecutors for this case were informed by one of their most important grand jury witnesses, Charles Emma, Esq., that their primary witness, Minnie Simmons, was incompetent. *See Exhibit "A"*. Mr. Emma told one of the prosecutor's investigators about her condition and the investigator wrote down his comments. *Id.* Approximately seven months later Minnie Simmons daughter, Linda Simmons, told the same prosecutor's investigator that her mother was suffering from the early stages of Alzheimer's disease. *See Exhibit "B"*. The accused was indicted in August 2010 and arrested in early September 2010. Prosecutors did not inform the defense that Mr. Emma stated Minnie Simmons was incompetent or that Linda Simmons had told them her mother was suffering from Alzheimer's disease until November 2011, approximately six months after a May 2011 pre-trial hearing. *See Exhibit "C"*.

3

The defense contends that his Right to a Speedy Trial pursuant to the 6th and 14th Amendments to the United States Constitution and CPL §30.20 has been violated because of the unconstitutional prosecutorial delay with regard to bringing charges against the accused and then bringing him to trial. The delay significantly advantaged the prosecution because the memory of Minnie Simmons degraded substantially because of her age during this period of time. It is undisputed that she remembers almost nothing of the operative events of the case. The delay denied the accused the opportunity to effectively cross-examine the witness and perhaps obtain information favorable to his defense. The most critical facts and circumstances of the case took place almost five years before the indictment. Given the age of the witness and the apparent limitations of her mental capacity it should have been incumbent upon the prosecutors either to hasten their investigatory and prosecutorial efforts or alert the defense so that he had a full and fair opportunity to preserve evidence favorable to him from the witness.

This is a case in which the defense was impaired because the prosecutors deliberately withheld the fact that there were serious concerns about Minnie Simmons' capacity to recall facts and circumstances of the case and it turns out those concerns were legitimate. This information was withheld from the defense for two years and withheld notwithstanding <u>Brady</u> obligations attendant to the prosecutors before the pre-trial hearing that took place in May 2011.

The prosecutors' withholding of the materials pertaining to Minnie Simmons mental capacity is akin to the deliberate spoilage of evidence. The accused was denied the opportunity to examine Minnie Simmons at a time

when her memory was intact or perhaps in a better condition than it was at the time of the May 2011 pre-trial hearing. Given that the operative events occurred almost five years before the indictment diligence was important in order for the prosecutors to be fair to the accused given their chief witness's compromised state. The prosecutor's knew as early as November 2009 that Minnie Simmons' mental capacity was seriously impacted enough to compromise her ability to testify. The prosecutors were aware just a few months prior to the grand jury voting an indictment that Minnie Simmons suffered from a debilitating mental disease that progressed with time and could result in severe memory loss. Instead of truthfully informing the grand jury of Minnie Simmons condition her daughter told the grand jurors that her mother was mentally fine, providing the grand jurors with a false portrayal of her mothers mental capabilities. The district attorneys have no reason to justify their delay in prosecuting or for their delay in furnishing the defense investigator's notes that were prejudicial to their case in chief.

It is clear the prosecution acted in bad faith in failing to alert the defense about the witness's compromised mental capabilities. Instead of alerting the defense immediately of their primary witness's condition the prosecutors concealed the information. *Compare Exhibits "A" and "B" with "C".* They concealed the information in spite of their obligations pursuant to <u>Brady</u> to turnover information pertaining to Minnie Simmons mental capacity. The prosecutors failed to turn this information over in spite of the fact that it was specifically requested by the defense in the omnibus motions submitted to the court approximately seven months before Minnie Simmons testified at a pretrial hearing. *See Exhibit "D".* The delays occasioned by the prosecution in this case with respect to turning over materials that would have indicated that their primary witness's ability to remember was compromised was a deliberate attempt by the prosecutors to hamper the

5

accused ability to prepare his defense and for that reason this case should be dismissed. *See People v. Taranovich, 37 N.Y.2d 442, 446 (1975).*

The delay with regard to informing the defense of the witness's mental capabilities was significant given the nature of the disease her daughter described her mother to have. The prosecutors have no justification for their delay in turning the investigator's material over to defense and their delay has resulted in an irreparable Due Process violation of the rights of the accused. The amount of time of the delay in furnishing the material disabled the defendant's chance to obtain valuable information from the witness. Due Process not only requires a speedy process after indictment; it requires diligence with respect to the investigation and processing of the criminal litigation. *See People v. Singer, 44 N.Y.2d 241, 253 (1978).* The prosecutors did neither in this instance and have no explanation for their delay.

A strong reason for dismissal pursuant to CPL §30.20 is that the ability of the witness to remember and articulate what happened has been compromised because of inexplicable prosecutorial delay. *Taranovich at 447; see also People v. Prosser, 309 N.Y.2d 353, 356 (1956).* This case must be dismissed because there was no reason, other than for strategic purposes, for the prosecution not to take steps to accelerate the prosecution of the accused or at least alert the defense of the problems associated with the witness's mental capabilities so that the defense could, on their own accord, seek to preserve the witness's memories.

The fact that the prosecution withheld the investigators notes for six months after the pretrial hearing is a clear indication that they did not want

capacity until such was no longer useful for the accused. The prosecutor's misconduct is compounded by the fact that the operative facts of the case took place almost five years before the indictment. The prosecution was aware of this fact when they were apprised of the compromised mental capacities of the primary witness. Notwithstanding their knowledge of the length of time between the indictment and the events at issue the prosecutors took more than another year before they released the investigator's notes to the defense, notwithstanding their obligations pursuant to <u>Brady</u>.

The delays occasioned by the prosecution were unfair and were deliberate attempts to hinder the defense. The prosecution knew of their witness's compromised mental capabilities and instead of trying to mitigate the circumstance by informing the defense or hastening their prosecutorial efforts they attempted to advantage themselves by concealing the information regarding the compromised state of the witness's mental capacity. The prosecution sought to advantage themselves by delay and for that reason this case should be dismissed.

For all of the aforementioned reasons above the accused asks this court to order a dismissal of this case, with prejudice, pursuant to the 6th and 14th Amendments to the United States Constitution and CPL §30.20.

7

the defense to be aware of the problems associated with the witness's mental

January 6, 2013

Stephen T. Mitchell

Pro Se

STM7615@aol.com

# EXHIBIT "A"

CHARLES OMNA

11-6-09   IOA LN                                      1/1

— Client - upset that I wasn't paid yet appx $15,000.
Judge wanted me to surcharge the bond.

Status now
① surcharge proceeding — change the bond legal fees
② case on the estate — money was stolen from
   the estate.
— Maxwell substituted for prior atty on the
estate. Daughter police officer got S.M. on
it

— DSS filed lien $90,000 and withdrew it.
They now have an active lien on the estate

— Told Colin Brill to withdraw Minnie
Simmons — judgeship — vacate the letter
of M.L. for non-compliance, replace with письмо
etc.

# EXHIBIT "B"

5/6/10
LINDA SIMMONS
VV
LN

'/3

MINNIE SIMMONS - mother
C. Brown - my uncle → her brother-in-law

C. Brown first got old, his wife was deceased
he named my mother benfing and executor.

She always went over to take care of him
He lived on St James Place.

He went to NH

He died a couple of years prior to the sale of the
house

Mom becomes incapacitated - goes into a NH.
When she went to court the last time they
were going to appoint GENE down south
as executor.

He still had the $ but could not find
Gyp... when he approached me in court.

He called my mother, because there was
a problem - She didn't understand - so I
called him. Mother having a problem with
Kaplan - He was telling me different stuff.

instead of losing the house he could sell (
we didn't know that mother was taking care
of the house)

AP-365

2/3

— I didn't know tht there were problem with house

— We the family would to buy the house

— I spoke to my mother she said ok. Gave him on as atty. He came to house mother signed papers.

— He saw her three times tho she said once a lody came over

— I was there with mom when he came & let her - sign papers to sell the house

— He was going to work with me - then started to my sister in GA. I didn't get too involved in this. My sister would speak to him.

— First time I met him in court he said he had the $ - papers were damaged in fire/ water damage

Mother is still in — N.H. → ██████ ████ — ██████

She is in the early stage of Alzheimers 9 years old

3/3

- Signature of mom not on the deed her signature on the contract.

- She never went to the closing - they came to the house after she signed.

- I know that ~~purchase~~ this was not at the house mother would not let anyone in house.

- my daughter let him in once (SM) ~~the time~~
- I let him in twice - 1st time
- both came to have papers signed.
- (She was someone you hired for the Brokerage in Yonkers)

- him named in the will Charles Evins should have copy of the will

Sister who spoke to SM.

██████████ → JoAnn Simmons
██████████

AP-367

# EXHIBIT "C"



**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**
RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
718 250-2000

November 22, 2011

Hon. John P. Walsh
Supreme Court State of New York
Criminal Term, Part 50
Brooklyn, New York  11201

RE:   People v. Stephen Mitchell, et al., Ind. #4743/2010

Dear Judge Walsh:

This letter is submitted to memorialize additional discovery material provided to defense counsel in the above captioned case.  The following was provided to defense counsel in the above captioned case:

1)   Notes – Simmons, Linda 5/6/10
2)   Notes – Randi Burger 8/31/09
3)   Notes – Ushkow 6/7/11
4)   Notes – Simmons, Linda/JoAnn 6/8/11
5)   Notes – Bull 6/9/11
6)   Notes – Molloy 6/20/11
7)   Notes – Ryan 6/20/11 & Victory 6/28/11
8)   Notes – Emma 5/7/10
9)   Notes – Bull 5/25/10
10)  Notes – Bull 9/8/09
11)  Notes – Benebitse 6/15/10
12)  Notes – Emma 5/1/09
13)  Notes – Emma 11/6/09
14)  Notes – Abdelfattah 5/13/10
15)  Notes – Abdelfattah 6/10/10
16)  Notes – Ikezi 5/10/10
17)  Notes – Ohayon 5/12/10
18)  Photos St. James Pl.

19) Transunion and Equifax – Mitchell
20) Victory Contracting
21) Report of Guardian ad Litem (Emma) – in the Surrogate's file previously turned over
22) 6/10/03 Minutes – Sup Court Trial Term 76
23) 9/8/04 Minutes – Sup Court Civil Term 76
24) 3/10/08 Minutes – Sup Court Civil Term 76
25) 4/10/08 Minutes – Sup Court Civil Term 76
26) 6/26/08 Minutes – Sup Court Civil Term 76
27) 8/27/08 Minutes – Sup Court Civil Term 76
28) 2/23/09 Minutes – Sup Court Civil Term 76
29) Victory Contracting
30) Notes/Docs from Simmons, JoAnn
31) Carver Federal Savings Accounts (Guardian and Simmons)
32) Report of Counsel to Review Final Account – Weindorf
33) DMV Photo – Simmons, Minnie
34) Affirmation of Services Rendered by Guardian ad Litem – Emma
35) Notes – Sal
36) Notes – Abula
37) Notes Abdelfattah
38) NYC Dept of Finance payment history – 302 St. James
39) NYC Buildings printouts

If you have any questions please forward them to me at (718) 250-2982 or via email at neubauel@brooklynda.org.

Sincerely

Laura Neubauer
Assistant District Attorney

ACKNOWLEDGE RECEIPT OF ABOVE LISTED MATERIAL:

Wadeedah Sheeheed
Attorney for Stephen Mitchell

# EXHIBIT "D"

Cover
Page

CRIMINAL TERM ARR/MOT
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 50
- - - - - - - - - - - - - - - - - - 2010 DEC 20 PM 12: 16 - - - - - - x
THE PEOPLE OF THE STATE OF NEW YORK

       - against -

STEPHEN MITCHELL,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ATTORNEY'S COPY

**NOTICE OF
OMNIBUS
MOTION**

Ind. No.:
4743/10

TO:  HON. CHARLES J. HYNES
      DISTRICT ATTORNEY
      COUNTY OF KINGS

      ATTN:  A.D.A. LAURA NEUBAUER

      PLEASE TAKE NOTICE, that upon the annexed affirmation of LESLIE JONES THOMAS, ESQ., the exhibits annexed hereto and the prior proceedings herein, the undersigned will move this Court at Part 50, on the 20th day of December, 2010 at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel may be heard for orders granting:

           (1)  A Bill of Particulars pursuant to CPL Section 200.95;
                Discovery pursuant to CPL Section 240.40, Subdivision
                1(a) and 1(c);

           (2)  Inspection of the Grand Jury minutes of Indictment No.
                4743/10;

           (3)  Dismissal of said indictment for legal insufficiency of
                the evidence and/or defects in the proceedings before
                the Grand Jury;

alleged crimes given to the Police Detectives, or representatives of any law enforcement or criminal investigating body by any persons on or after the date of the alleged crimes.  Also state the names and addresses of the persons who gave the description.

19.  To whom in the Police Department or District Attorney's Office were the alleged incidents in the complaint first reported.

20.  Whether it is alleged that the defendant received warnings pursuant to _Miranda v. Arizona_, 384 U.S. 436.  If so, provide the name, shield number and command of the officer who allegedly gave the warnings.

21.  Whether any person to be called as a witness by the prosecution is known, or with due diligence could be known by the prosecution, to (a) have been charged with a crime, (b) been convicted of a crime, (c) is or has been under psychiatric care or treatment.  If the prosecution is unwilling to make such inquiry of its witnesses (i.e., exercise due diligence), the defense demands that it be supplied with the names and addresses of such witnesses sufficiently in advance of trial so that it may make its own investigation or inquiry of them.

22.  The names, addresses and birth dates of any and

8

# EXHIBIT 38

<u>People v. Mitchell</u>
Indictment: 4743/2010

People's Response to Defense <u>In Limine</u> Motion to Preclude the Testimony of
Minnie Simmons
Dated: February 8, 2013

(Please compare ¶9 at page 6 with Trial Record at 144, 166, 279-280)

3/5/2013, Pt 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

       - against -

    STEPHEN MITCHELL,

             Defendant.

-------------------------------------------------------------------X

AFFIRMATION IN
RESPONSE TO
DEFENDANT'S
IN LIMINE MOTION
TO DISMISS AND TO
PRECLUDE TESTIMONY

IND. # 4743/2010

      PATRICK F. CAPPOCK, an attorney admitted to practice law before the Courts of the State of New York, hereby affirms the following to be true under penalty of perjury:

      I submit this affirmation in response to defendant's In Limine Motion to dismiss the instant Indictment or, in the alternative, to preclude the People from using the testimonies of Minnie Simmons and Linda Simmons at trial, dated January 6, 2013.

      I am an Assistant District Attorney in Kings County assigned to this case and am familiar with its facts and circumstances by virtue of a review of the files maintained by the Kings County District Attorney's Office (hereinafter "KCDAO") pertaining to this matter, and discussions had with various witnesses, as well as assistant district attorneys and investigators assigned to this investigation.   The People hereby incorporate by reference all of their previous motions, affirmations and memoranda of law filed in this case. All statements are made upon information and belief, based upon personal conversations with other assistant district attorneys at the KCDAO, a review of all records and files of the KCDAO, and other sources of information as expressly stated in the individual paragraphs below.

Except where expressly acknowledged herein, the People disclaim, dispute, and contest each and every factual allegation and representation contained within the defendant's application.

Defendant is charged under Kings County Indictment Number 4743/2010 with Grand Larceny in the Second Degree [P.L. § 155.40(1)], stemming from his theft of client funds, namely money in excess of $400,000.00 from the Estate of Charles Brown, without permission or authority.

1. On or about and between December 23, 2005 and March 31, 2006, the defendant stole in excess of $400,000 from his client, the Estate of Charles Brown, represented at that time by Minnie Simmons as Executrix. In short, he abused his representation of the Estate by illegally depositing proceeds from the sale of real property at 302 St. James Place, Brooklyn, NY, belonging to the Estate, into his attorney Interest on Lawyer Account (hereinafter "IOLA Account") and subsequently transferred those proceeds to other accounts, including his own personal account, which he spent down to minimal balances in a short period of time. None of the defendant's expenditures were made to the Estate of Charles Brown.

2. Upon information and belief, Minnie Simmons was born in 1931 and she has been in poor and deteriorating physical condition since before the time of the offense charged on the Indictment. Specifically, Minnie Simmons is confined to a wheel chair and unable to walk. As a result of her poor physical condition, Minnie Simmons has been confined to a nursing home at the Bishop Hucles in Brooklyn, New York for some time. Linda Simmons, daughter of Minnie Simmons, reported that even at the time of the events contained in the indictment in late 2005, Minnie Simmons was physically incapacitated and confined to her home. Subsequently, in 2007, when she could no longer adequately

2

function in her own home, she was permanently placed in a nursing care facility where she resides today.

3.   At the time of the events surrounding this Indictment, a Kings County Supreme Court matter entitled <u>In the Matter of Charles Brown,</u> Index Number 107103/99, was pending in the Civil Term, Part 76, before the Honorable Michael Pesce.  This matter related to the pre-existing Guardianship of Charles Brown by Minnie Simmons.  Upon the death of Charles Brown in June 2003, that Guardianship came to a conclusion.[1]  However, before the Guardianship proceeding in Supreme Court could come to a conclusion, the defendant (as the attorney for the Guardian, Minnie Simmons) was required to provide a final financial accounting for the Guardianship of Charles Brown.  Despite the fact that this accounting was initially ordered by the Court in November 2004, the defendant continually failed to produce this accounting in defiance of the Court's repeated orders.  Instead, the defendant repeatedly came to Court and provided a variety of excuses, asking for numerous extensions during which he promised he could complete the final accounting.

4.   As this matter was pending in Kings County Supreme Court, Civil Term, in approximately December 2005, Minnie Simmons was physically incapacitated.  This was a fact known to the defendant, who had gone to Ms. Simmons's home to get her to sign legal paperwork on multiple occasions in the presence of her daughter, Linda Simmons, during that approximate time period.

---

[1] When the Guardianship of Charles Brown ended upon his death, an Estate proceeding began in Kings County Surrogates Court under File Number 2003-3350, in which Minnie Simmons was named as the Executor of Charles Brown's estate.

3

5. On June 26, 2008, Judge Pesce appointed Charles Emma, Esq. as Guardian ad Litem to prepare the accounting for the Charles Brown Guardianship. Mr. Emma, in his capacity as Guardian ad Litem, then investigated the Guardianship and subsequent Estate of Charles Brown, in order to provide the Court with the final accounting that the defendant had failed to produce for over four years. Mr. Emma's investigation revealed that a Chase Bank check dated December 23, 2005, made payable to Minnie Simmons as Executrix of the Estate of Charles Brown, in the amount of $401,082.50 from Toju Realty for the purchase of 302 St. James Place representing the proceeds of the sale of that real property, was deposited into the defendant's IOLA Account on December 23, 2005, the same day as the closing for that property. The bank records further showed that beginning with a $324,000 withdrawal on December 27, 2005, multiple withdrawals totaling almost $400,000 were made from that IOLA account, all of which transferred funds into another account controlled by the defendant and which was unrelated to the Guardianship or Estate of Charles Brown. By March 6, 2006, the defendant's IOLA account had a minimal balance of approximately $411.77.

6. On February 23, 2009, following the Court's receipt of the subpoenaed records from Chase Bank, the defendant appeared in front of Judge Pesce for a scheduled court appearance in Part 76 relating to the Guardianship and Estate of Charles Brown, following the conclusion of Mr. Emma's investigation (the minutes of the February 23, 2009 court appearance are attached hereto in their entirety as Exhibit 1). At that time, the defendant again stated that he did not know the whereabouts of the sales proceeds from 302 St. James Place (see Exhibit 1, Page 7, Line 19 – Page 9, Line 3). ). On that date, the Guardian ad Litem Mr. Emma stated in the presence of the defendant that he

4

had ascertained that Ms. Simmons was incapacitated and was unable to appear at the December 23, 2005 closing of the sale of 302 St. James Place or to participate in the closing in any substantial way as a result (see Exhibit 1, Page 4, Lines 3-4; Exhibit 1, Page 10, Lines 7-8; Exhibit 1, Page 11, Line 17; and Exhibit 1, Page 22, Lines 11-14). At that same court appearance, Richard Balsam of the Department of Social Services confirmed that Ms. Simmons was incapacitated and residing in a nursing home[2] (see Exhibit 1, Page 9, Lines 8-10; and Exhibit 1, Page 10, Lines 13-14). Upon hearing from all parties, including hearing the defendant's request to adjourn the matter once again, Judge Pesce informed the defendant that he would be referring the matter to the District Attorney's Office, as well as the Character and Fitness Committee (see Exhibit 1, Page 13, Line 19 – Page 14, Line 13; and Exhibit 1, Page 15, Lines 5-15).

7. After receiving Judge Pesce's referral letter, ADA Laura Neubauer and Supervising Financial Investigator Vincent Verlezza of the KCDAO, with the assistance of Charles Emma, engaged in an exhaustive investigation into the whereabouts of the sale proceeds from 302 St. James Place. That investigation entailed the examination of four (4) separate bank accounts in the name of the defendant. Through the course of this investigation, Investigator Verlezza did extensive research into the defendant's legal practice and financial dealings, as well as into the specifics of the Guardianship and Estate of Charles Brown and the sale of 302 St. James Place. Investigator Verlezza also interviewed numerous witnesses in the case, including but not limited to Charles Emma, Richard Balsam, Minnie Simmons, Linda Simmons (the daughter of Minnie Simmons),

---

[2] Although neither statement specified with what specific type of incapacitation Ms. Simmons was afflicted, I have been informed by both Charles Emma and Richard Balsam that they were referring to Ms. Simmons's physical incapacitation, in that they were not, and still are not, aware of any mental incapacitation from which Ms. Simmons suffers.

5

Joanne Simmons (another daughter of Minnie Simmons), Colin Bull, Esq. (attorney for the current executor of the Estate of Charles Brown) and Edwin Benbitse (the purchaser of 302 St. James Place).  In addition, Investigator Verlezza also located and interviewed numerous other individuals who received payments from the defendant's three non-IOLA accounts.  Through these interviews, Investigator Verlezza ultimately determined that none of these payees had anything to do with the Guardianship or Estate of Charles Brown, or were given money on behalf of that Guardianship or Estate.

8. At no time during this extensive investigatory process did the People learn of the existence of any diagnosed mental deficiency afflicting Minnie Simmons, nor did there ever come an occasion where any representative of the People observed Minnie Simmons to exhibit symptoms of mental incompetency.

9. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer repeatedly spoke to Charles Emma, who as a civil attorney has no medical expertise.  On November 6, 2009, Investigator Verlezza, in the course of one of his interviews with Mr. Emma, wrote a statement in his notes that appears to read that: Colin Bull was told to withdraw Minnie Simmons from the Guardianship for a reason that appears to read "incompetency" (see Exhibit A in Defendant's instant motion). However, there was no reference to Minnie Simmons' mental state, or any degradation thereof, in this interview.  Mr. Emma has confirmed with the People that he was not referring to any mental incapacity of Minnie Simmons and that he was not and has never been aware of any mental condition afflicting her, diagnosed or otherwise.  Rather, Mr. Emma was referring to the physical incapacity of Minnie Simmons and his discussions with Colin Bull regarding that subject, which is an issue that he had previously

6

addressed on February 23, 2009 while in the defendant's presence in Supreme Court in relation to Index Number 107103/99.

10. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer also spoke to Linda Simmons, who is employed as a New York City police officer and has no medical expertise. On May 6, 2010, Investigator Verlezza, in the course of one of his interviews with Linda Simmons, wrote a statement in his notes that appears to read that Minnie Simmons is in the early stages of Alzheimer's (see Exhibit B in Defendant's instant motion). Linda Simmons has no recollection of ever making such a statement, and on numerous subsequent occasions has confirmed with the various representatives of the People, including myself, that this is an untrue statement. Minnie Simmons has never been diagnosed with Alzheimer's or any other disease that would render her mentally incapable, nor has she never been treated for any type of mental incapacity.

11. Upon the conclusion of this investigation, ADA Neubauer presented evidence and charges to a Kings County Grand Jury beginning July 8, 2010.[3] This evidence largely consisted of accounting evidence that established a clear pattern of conduct by defendant designed to convert the proceeds of the sale of 302 St. James Place through a series of business and personal accounts within the space of several months in violation of his fiduciary duties as counsel for the owner of that real property, the Estate of Charles Brown. The Grand Jury also heard testimony from two witnesses, Charles Emma and Linda Simmons, which each included the fact that the defendant made inculpatory admissions in their presence regarding the stolen property. Linda Simmons also

---

[3] In accordance with this Court's prior request, a copy of these Grand Jury minutes have already been provided for the Court's review.

provided testimony before the Grand Jury, on two separate dates, that Minnie Simmons was physical incapacitated but did not suffer from any mental impairment. The People intend to call Linda Simmons at trial as part of our case-in-chief in relation to the above-captioned Indictment, and upon information and belief, her trial testimony will not contradict the above Grand Jury testimony in any way.

12. Because of Minnie Simmons's aforementioned physical incapacity, which rendered her unavailable to appear before the Grand Jury, evidence that she did not give the defendant "permission and authority" to act as he did in retaining possession of the above mentioned monies was introduced in the Grand Jury in the form of a sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown (see Exhibit O in Defendant's instant motion). This statement was presented to Minnie Simmons by ADA Neubauer and Investigator Verlezza at her nursing home residence on June 10, 2010, in the presence of a notary public employed by the nursing home. Within that signed affirmation, she averred that she was 79 years-old and that the defendant lacked permission or authority to take the proceeds of the sale of 302 St. James Place for any other purpose than for the benefit of the Estate of Charles Brown. Neither ADA Neubauer nor Investigator Verlezza observed Minnie Simmons to exhibit any mental incapacity on that date. Other than the signatures on the affirmation itself, no notes or other written materials were generated at the time of this visit.

13. On August 13, 2010, the Grand Jury voted to indict the defendant on one count of Grand Larceny in the Second Degree under the instant Indictment Number. The People then filed the instant Indictment on the same date, August 13, 2010. On September 13, 2010, the defendant appeared in Kings County Supreme Court and was arraigned on the

8

instant Indictment, which is currently pending in Part 11 of Kings County Supreme Court.

14. On December 20, 1010, following examination of the Grand Jury minutes, the Honorable John P. Walsh issued a written decision, in which the Court found the evidence presented to the Grand Jury by the People to have been legally sufficient and upheld the sole count appearing on the Indictment (a copy of Judge Walsh's December 20, 2010 decision is attached hereto as Exhibit 2).

15. Following this arraignment, upon motion by the People dated October 7, 2010 and on consent of the defendant, the Court ordered a conditional exam of Minnie Simmons. Within her affirmation (a copy of which is attached hereto as Exhibit 3), ADA Neubauer stated that Minnie Simmons was "confined to a full-service nursing home due to chronic illness and physical impairment", and that Minnie Simmons would be unavailable as a trial witness "because of physical illness and incapacity" (see Exhibit 3, Paragraphs 2 and 3). In her affirmation, ADA Neubauer also included information provided by Linda Simmons regarding Minnie Simmons's poor physical condition, physical incapacitation and confinement to a wheelchair (see Exhibit 3, Paragraph 7).

16. That conditional exam was conducted on May 18, 2011 before the Honorable Mark Dwyer at Minnie Simmons's nursing home residence (a copy of the transcript of the conditional exam is attached hereto in its entirety as Exhibit 4[4]). ADA Neubauer, Leslie Jones-Thomas, Esq. (then counsel for the defendant) and defendant were present, along with a court reporter, court clerk, and court officers. At that examination, four

---

[4] A copy of the videotaped DVD recording of the conditional exam was submitted to the Court with an Answer to a prior motion by the defendant, submitted by the People on January 12, 2012, and three separate copies of this disc have previously been provided to the defendant on various dated in accordance with Open File Discovery. The People can make an additional copy of this disc available to the Court upon request, if needed.

documents were entered into evidence by the People, one of which was the signed

affidavit of Minnie Simmons (Defense Exhibit O).

17. In the conditional exam, Minnie Simmons was questioned by the prosecutor, ADA

Laura Neubauer, and extensively cross-examined by Ms. Jones-Thomas.  In fact, there

was extensive examination of Ms. Simmons concerning her memory (or lack thereof) of

the facts and circumstances of the case.  A review of the full transcript will reveal that

Ms. Simmons clearly understood the proceedings, in that she took the oath and

answered each and every question to the best of her ability.       Although she did not

remember many details of the events surrounding the charged Indictment, she most

certainly remembered many others.  Furthermore, she coherently and competently

testified that (a)  she was the executrix of, or managed, the Estate of her deceased

brother-in-law Charles Brown (see Exhibit 4, Page 35, Lines 3-5); (b) that she did not

ever see any of the proceeds of the sale of 302 St. James Place (see Exhibit 4, Page

13, Lines 14-18; and Exhibit 4, Page 41, Lines 14-17); and (c) that she did not give

the defendant or anyone permission or authority to take the proceeds of the sale of

that property for any other use than for the benefit of the Estate of Charles Brown (see

Exhibit 4, Page 14, Lines 8-17; Exhibit 4, Page 41, Lines 1-3; and Exhibit 4, Page 41,

Line 25 – Page 42, Line 21).  Ms. Simmons was even aware of and acknowledged her

lack of memory for detail as time advances, a fact that further demonstrates her

competency (see Exhibit 4, Page 41, Lines 4-6).

18. On December 1, 2010, Ms. Jones-Thomas filed the first of many defense motions in

which the defendant addressed the issue of the competency, or alleged lack thereof, of

Minnie Simmons.  On that date, the defense filed an omnibus motion seeking, among

other relief, a standard Bill of Particulars, Brady material (defined by counsel as including contact information "about any and all witnesses to the alleged crime"), and dismissal of the indictment for legal insufficiency or defects in the Grand Jury proceedings.   The People responded to said omnibus motion on February 1, 2011. By Decisions and Orders dated December 20, 2010, and March 28, 2011 the Court denied the motion to dismiss, upon finding that the evidence was legally sufficient and finding the absence of any defects in the Grand Jury proceedings.  The court also denied, inter alia, the request for witness contact information.

19. Defendant then attempted on September 18, 2011 to file a pro se Motion to renew the motion to Dismiss the Indictment Pursuant to C.P.L. §§ 210.30[1][b] and [c] and 210.35[5], notwithstanding that he was represented by retained counsel at that time. In that motion, Defendant asserted that the Indictment should be dismissed on the ground, inter alia, that the People should be found retroactively to have knowingly admitted "forged evidence" in the Grand Jury, namely the June 10, 2010 affidavit of Minnie Simmons in which Ms. Simmons attested that she had not given defendant permission or authority to take for his own purposes the proceeds of the sale of real property owned by the Estate of Charles Brown.  Defendant further asserted that the indictment should be dismissed pursuant to C.P.L. § 190.30 on the ground that the notarized Simmons affidavit was retroactively rendered inadmissible hearsay by virtue of Ms. Simmons testimony at the conditional examination that she had no current memory of the affidavit and could not recognize her own signature. Defendant further asserted that the indictment should be dismissed pursuant to C.P.L. §§ 210.20(1)(c) and 210.35(5) on the ground that the "use of a forged document

11

AP-385

before the Grand Jury by the prosecution is not fair dealing." Finally, Defendant further asserted the indictment should be dismissed pursuant to C.P.L. §§ 210.20(1)(c) and 210.35(5) on the ground that the "presentation of evidence by the prosecution from an incompetent witness before the Grand Jury is not fair dealing." On September 19, 2011, Judge Walsh declined to consider the pro se motion because defendant was represented by retained counsel, who did not adopt the motion.

20. By motion dated December 7, 2011, defense counsel filed on behalf of defendant a motion alleging that "[u]pon information and belief Minnie Simmons gave the defendant permission to utilize the proceeds from the sale of the property", but made no offer of proof in support of that assertion. Defense counsel also moved, inter alia, for the following: (a) the "psychiatric, psychological and medical records of" Minnie Simmons; (b) an order "directing that Minnie Simmons undergo a psychiatric/psychological examination to aid the jury assessing her credibility, ability to perceive, recall and recount events"; and (c) an order "re-opening the conditional examination hearing to afford the defendant the opportunity to cross-examine Minnie Simmons related to any psychiatric, psychological and medical history."

21. The People filed a written opposition to the defendant's December 7, 2011 demand on January 12, 2012, stating that the People did not possess any psychiatric, psychological and medical records of Minnie Simmons, but that the Court, in any event, had previously granted the defendant's motion for an in camera review of any psychiatric, psychological and medical records of Minnie Simmons that defendant may obtain pursuant to a so-ordered subpoena to her nursing home facility. The People then opposed disclosure of the subpoenaed records unless the Court's in

12

camera review revealed material to which defendant was entitled.   The People opposed the motion to compel Ms. Simmons to undergo a mental health examination in the absence of statutory authority for such an order.   The People concluded by opposing the motion to re-open the conditional examination because the defense had had a full and fair opportunity to inquire into her memory, or lack thereof, of the facts and circumstances of the crime charged during the conditional examination and because her expressed inability to recall some facts during that conditional examination could be weighed by the trier of fact at the trial.

22. Defense counsel submitted a Reply on February 6, 2012, alleging that the People had turned over to the defense discovery materials in November 2011 that contradicted the People's stated opinion as to the competency of Minnie Simmons at the time she executed the permission and authority affidavit (namely Exhibits A and B of defendant's instant motion) which consisted of interview notes predating the Grand Jury presentation that documented that one non-medical source had stated that Minnie Simmons had become at some unspecified time "incompetent[t]" to continue in her role as executrix of the Estate of Charles Brown; that the daughter of Minnie Simmons had stated in May 2010 that her mother was in the "early stages of Alzheimer's;" and that Minnie Simmons was removed in December 2011 as executrix because she was "incapacitated."

23. Judge Walsh issued a Decision and Order on February 10, 2012 (a copy of which is attached hereto in its entirety as Exhibit 5), in which he addressed the various allegations, claims, and demands in defendant's December 7, 2011 and February 6, 2012 submissions, finding and concluding as follows: (a) The People's motion for a

conditional examination of Minnie Simmons was unopposed by defendant, who did not challenge the People's representation that her "physical incapacity is not a temporary one," and that it had been "on-going since 2003, with a slow and steady decline and no foreseeable improvement in the short or long term."; (b) The conditional examination was conducted in conformance with the requirements of C.P.L. Article 660; (c) At the conditional examination, the defendant and his attorney were presented with Minnie Simmons' self-admitted condition – senility – and were free to cross-examine her.  Defense counsel did so at length, inquiring into her medical condition and testing her ability to perceive and recall specific events; (d) The proper time for defendant to have challenged whether Ms. Simmons' condition impaired or impeded his right to confront her at the conditional examination was at the time of the conditional examination, and her condition seven months later was not relevant to her condition when she executed the affidavit or during the conditional examination; (e) Judge Dwyer had "obviously found [Minnie Simmons] competent to testify at the conditional examination," at which she acknowledged her failing and deteriorating memory, because he permitted the examination to take place; and (f) Defendant's motion to re-open the conditional examinations failed to acknowledge that Minnie Simmons' current medical condition was not the same as it had been at the time of the conditional examination, and her condition "can only be assumed to have worsened in the interceding seven months" since the conditional examination. Therefore, the Court found that defendant had failed to establish his right to Minnie Simmons' medical/psychiatric records or why the Court should review them.

Nevertheless, the Court directed the People to furnish those records to the Court for in camera review.

24. In the February 10, 2012 decision, Judge Walsh addressed defendant's allegation of "an apparent <u>Brady</u> violation" relating to statements known to the People concerning the statements of three non-medical individuals about their perceptions of Minnie Simmons condition in 2009 and 2010 – before the conditional examination – and in 2011 – after the examination.    The Court observed that the conduct constituting defendant's crime occurred over the course of 3 and ½ months in 2005-06, and questioned how Minnie Simmons mental capacity 4 to 5 years later constituted <u>Brady</u> material.    In any event, the Court noted that defendant had not included a specific demand for the arguably late-disclosed Brady material in his omnibus motion. Thus, pursuant to the holding of <u>People v. Vilardi</u>, 76 NY2d 67 (1990), the materials at issue constituted <u>Brady</u> only if the defendant demonstrated that the evidence created a reasonable doubt that did not otherwise exist.    In the absence of any factual exposition by defendant on this issue of materiality, and in the further absence of any explanation by defendant as to how the disclosure prior to the conditional examination would have altered his cross-examination of Minnie Simmons in light of the implicit finding by Judge Dwyer that she was competent, the Court denied this aspect of the defense motion.

25. Following the Decision and Order dated February 10, 2012, Judge Walsh conducted an in camera inspection of Minnie Simmons's psychiatric, psychological and medical records, and found that no mental deficiency existed.  The People were not, and at no

15

time after have been, made privy to the contents of these records, nor was any representative of the People present for this in camera review by the Court.

26. On March 12, 2012, the defendant filed a pro-se motion dated March 9, 2012, in which he not only sought to reargue the motion that resulted in the February 10, 2012 decision, but also moved for a "Brady Hearing"; "an Order directing that the defendant, independent of the People, be granted subpoenas to enable him to collect the medical, psychiatric, and administrative records of Minnie Simmons"; an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not testimony offered by Minnie Simmons on or about May 18, 2011, was competent and admissible testimony that can be considered by a jury at trial"; and "an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not a written statement purportedly offered by Minnie Simmons on or about June 10, 2010 was competent and admissible evidence that could have been considered by a Grand Jury or could be considered by a petit jury at trial."  In support of the motion to reargue and in support of these demands, defendant offered no new facts, evidence, or arguments that had not previously been considered by Judge Walsh in issuing the February 10l, 2012 Decision and Order.

27. By letter to the Court dated March 12, 2012, defendant then asked the Court to "accept any motions "put forth on my own behalf in defense of this case.  I am entitled to have these motions responded to and considered by the courts. . . .  My attorney has refused to consider filing these motions on my behalf."

28. The People did not respond in writing to this March 12, 2012 pro se motion because defendant was, at the time of its filing, represented by counsel, who did not join in or adopt said motion.

29. On March 27, 2012, the defendant filed another pro se motion, in which he sought to preclude Minnie Simmons from testifying "at any subsequent trial or hearing of this matter and reiterated his demands for a "<u>Brady</u> hearing," and a competency hearing.

30. These motions remained pending until May 1, 2012, for reasons stated below.

31. By written motion dated April 2, 2012, defendant moved to relieve assigned counsel, to proceed pro se, and requested appointment of a legal advisor employed by an "indigent defense organization and not solo counsel." In support of this motion, defendant averred that he and assigned counsel had "significant," "severe and divergent" "disagreements with respect to procedural and trial strategies to be implemented for the defense of the accused." In particular, the defendant faulted assigned counsel for refusing to adopt and file the March 9, 2012 motion to reargue.

32. On April 9, 2012, Judge Walsh orally granted defendant's motion to relieve counsel, to proceed pro se, and for appointment of a legal advisor.

33. By "Demand Letter" dated April 14, 2012, defendant commanded of Assistant District Attorney Laura Neubauer that she produce all Brady and Rosario material, and all records, documents, notes, logs, accountings, transcripts, court transcripts, court motions, court orders, pleadings, court papers, correspondence, telephone conversation notes, timecards, calendars, printouts, charts, filings, writings, forms, or diagrams of any kind pertaining to the Estate of Charles Brown, including but not limited to Kings County File Number 3350-03, and any and all Guardianship

17

Proceedings pertaining to Charles Brown, including but not limited to Kings County File Number 107103/99, and any of the aforesaid papers requested pertaining to Minnie Simmons, decedent Charles Brown, social security number [included in original motion but omitted herein], Judge Michael Pesce, and any criminal or civil proceedings that name Stephen Mitchell as a party.

34. Defendant further commanded ADA Neubauer to produce:

> all facts known and opinions to be offered at trial, the basis for said opinions, and any and all supporting data considered including but not limited to documents, charts, or materials to establish said opinions by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding. A report of a complete statement of the opinions to be expressed at trial by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, the qualifications of Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, including a list of all publications authored by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding within the preceding ten years, the compensation paid to any of the aforesaid witnesses, and a listing of the cases the aforesaid persons have testified to within the past five years as an expert at a grand jury, hearing or trial, Also include the names, addresses, e-mails, and phone numbers of opposing counsels attached with the aforesaid information.

35. By letter dated April 30, 2012, ADA Monique Ferrell advised counsel that his demand letter was untimely, pursuant to C.P.L. § 240.80, but that, in any event, this Office possessed no undisclosed Brady material; Rosario material is not subject to discovery by demand; the materials relating to the Estate of Charles Brown, etc., were a matter of public record or not in the control or possession of this Office or had previously been provided to defendant or his counsel; and that the remainder of the demands were not subject to discovery by demand or had previously been provided to defendant or his counsel.

18

36. Defendant also demanded that Judge Walsh issue so-ordered subpoenas duces tecum for notes and records from courts, agencies, and individuals relating to the real estate closing in which he had participated, the mental health status of Minnie Simmons, the Supreme and Surrogate's Courts' files in the matter of the Estate of Charles Brown, etc.

37. On April 9, 2012, Judge Walsh orally denied the defendant's pro se March 9, 2012 Motion to Reargue the February 10, 2012 Decision and Order on the ground that defendant had not advanced any new evidence or legal grounds and further ordered defendant not to file any additional motions relating to the February 10, 2012 decision and order.

38. By decision and order dated May 1, 2012, Judge Walsh memorialized his oral decision of April 9, 2012, and further resolved "all outstanding issues raised by the defendant either through motions or requests for subpoenas" (a copy of Judge Walsh's Decision and Order dated May 1, 2012 is attached hereto as Exhibit 6). Judge Walsh ruled, inter alia, that there were no unresolved competency or Brady issues and denied defendant's request for "a second review of the documents inspected in camera." Judge Walsh stated that "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness". Judge Walsh further stated, in reference to Minnie Simmons's medical records, that "the records reviewed in camera do not substantiate any claim of Alzheimer's disease".

39. The People have opposed, and continue to oppose, any disclosure of the above medical records of Minnie Simmons to the defendant, since the in camera review revealed that there was no material issue that bore on her competency.

40. On October 19, 2012, defendant made a long record again without presenting any new facts, and orally argued before Judge Patricia DiMango in Kings County Supreme Court, TAP Part, for the same relief as he requested in his previous Motions to Dismiss and Reargue before Judge Walsh (as recorded in the instant Affirmation), namely the dismissal of the Indictment because of his allegations of the mental incapacity of Minnie Simmons (the minutes of the October 19, 2012 court appearance are attached hereto in their entirety as Exhibit 7). The defendant also once again argued that he was entitled to examine Minnie Simmons's medical records. On that date, Judge DiMango repeatedly and emphatically informed the defendant that she would not accept new applications on matters that Judge Walsh had already decided.

41. On October 22, 2012 the defendant filed a petition with the Appellate Division, Second Department, for a writ of prohibition pursuant to C.P.L.R. Article 78, seeking to permanently enjoin his prosecution under the instant Indictment. In his petition, the defendant also demanded a stay of the trial on the current Indictment. In so petitioning, defendant advanced the following arguments, again based upon no new facts and in a variety of formats and contexts, in support of his contention that he was entitled to the relief sought:

> (a) The "indictment should be dismissed because the jurisdictional basis of the trial court was procured by fraud, to wit: the prosecutor knowingly presented testimony regarding the mental health of a material witness to

the grand jury that they knew was false in order to mislead the grand jurors and fraudulently obtain an indictment against petitioner.   The prosecutor deliberately withheld information regarding the mental health of a material witness from the grand jury in order to convey a false portrayal to the grand jurors of the capacity of the witness to recall facts and circumstances pertinent to the case.   Petitioner contends that the prosecutors' actions have rendered the indictment jurisdictionally defective because they willfully interfered with the investigatory functions of the grand jury by deliberately providing the grand jurors false and misleading material information."

(b) "[T]he prosecution of this case should be discontinued because the district attorney presented the grand jurors with an affidavit to secure an indictment for this case in spite of the fact that the purported signatory did not remember having its contents read to her at any time prior to the document being submitted to the grand jurors on her behalf."

(c) "This Court should prohibit further prosecution of the petitioner in this case and dismiss the indictment, with prejudice, because the prosecutors' maintenance of an indictment procured by fraud is a perversion of the entire criminal proceeding from its inceptions and such abuse denies the trial court jurisdiction to continue a criminal prosecution in the State of New York."

(d) "Prohibition should compel that the indictment be dismissed, with prejudice and the case discontinued immediately because petitioner should

21

not be forced to participate in an illegal criminal proceeding through to an appeal by a court that lacks the jurisdiction to proceed."

(e) "[B]ecause the trial court inappropriately has denied the petitioner's requests to challenge its jurisdictional basis and has prevented the petitioner from obtaining evidence he is entitled to in support of his claims of jurisdictional defect."

(f) An order "[a]llowing petitioner the opportunity to depose and subpoena documents from Charles Emma, Assistant District Attorney Laura Neubauer, Investigator Verlezza, and Colin Bull regarding this matter in support of the application for the writ."

(g) An Order "[a]uthorizing the issuance of subpoenas for the medical, psychiatric, and administrative records of Minnie Simmons in support of the application for the writ."

42. On October 30, 2012, the People filed a written response to the defendant's Article 78 motion, stating in substance that the petition for a writ of prohibition must be dismissed, because (a) the petition was untimely; (b) the defendant had not advanced a claim upon which such extraordinary relief may be granted; (c) the defendant's claims were not reviewable in an Article 78 proceeding; (d) the Appellate Division should not exercise its discretion to review defendant's claims; and (e) defendant's claims were meritless.

43. On November 28, 2012, by written decision, the Appellate Division denied the defendant's motion in its entirety (a copy of the Decision and Order of the Appellate Division dated November 28, 2012 is attached hereto as Exhibit 16).

44. On January 11, 2013, the defendant again filed a new motion to enjoin his prosecution under the Instant Indictment, before the New York State Court of Appeals. The Decision on that motion is pending.

45. The People at all times mentioned herein were, and still are, aware of their continuing obligations pursuant to Brady v. Maryland, 373 US 83 (1963) and have been and still are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons's testimony. The People are likewise not in possession of any records pertaining to Minnie Simmons's psychiatric, psychological or medical condition.

46. As can be seen in the above chronology, on multiple dates between December 1, 2010 and the present, the defendant has repeatedly made oral and written applications in Kings County Supreme Court, before Judge Walsh and Judge Patricia DiMango (as well as this Court) to reargue the above rulings of Judge Walsh in regards to the mental state of Minnie Simmons, despite the existence of absolutely no new facts or arguments. Both Judge Walsh and Judge DiMango have admonished the defendant on multiple occasions to refrain from making any more such frivolous and repetitive applications, the only apparent purpose of which are to delay the prosecution of the instant Indictment. However, the defendant continually refuses to abide by these admonitions, as can be seen most recently through his filing of the instant motion.

47. In support of the instant motion, defendant has once again offered no new facts, evidence, or arguments that had not previously been considered by multiple Courts in issuing the above Decisions and Orders.

**WHEREFORE**, for the reasons set forth in the annexed memorandum of law, the defendant's motion must be denied in its entirety.

Dated:        Brooklyn, New York
              February 8, 2013

Respectfully submitted,

Patrick F. Cappock
Assistant District Attorney
(718) 250-2945
350 Jay Street
Brooklyn, NY 11201

24

AP-398

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

    - against -

       STEPHEN MITCHELL,

         Defendant.

------------------------------------------------------------------------X

                                  MEMORANDUM
                                  OF LAW

                                  IND. # 4743/2010

## MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

     This memorandum is submitted in opposition to defendant's motion to dismiss the instant

indictment or, in the alternative, to preclude the People from using the recorded testimony of

Minnie Simmons or the live testimony of Linda Simmons at trial. For the reasons stated below,

defendant's motion should be summarily denied in its entirety.

### I. THE RECORDED TESTIMONY OF MINNIE SIMMONS IS PROPER TO INTRODUCE AT TRIAL, BECAUSE THE COURT HAS ALREADY ADJUDICATED THAT THE CONDITIONAL EXAMINATION WAS PROPERLY CONDUCTED IN ACCORDANCE WITH THE REQUIREMENTS OF C.P.L. § 660.

     On May 18, 2011, a conditional examination was conducted of Minnie Simmons, in

accordance with the requirements of C.P.L. § 660 that the examination "be conducted in the

same manner as would be required were the witness testifying at trial". The hearing was

conducted by Judge Dwyer, with both defense counsel and the defendant present, at which time

the defense engaged in an extensive cross examination of Minnie Simmons.   At that examination, four documents were entered into evidence, one of which was the signed permission and authority affidavit of Minnie Simmons that was previously presented to the Grand Jury that issued an Indictment against the defendant.

The defendant's repeated focus in his many motions, including the instant one, upon this permission and authority affidavit ignores the other evidence brought out in the Grand Jury, namely that the defendant acted without permission and authority when he converted the entirety of the proceeds of the sale of 302 St. James Place to his own personal use.  The accounting evidence established a clear pattern of conduct by the defendant designed to launder these proceeds through a series of business and personal accounts within the space of several months in violation of his fiduciary duties as counsel for the owner of that real property, the Estate of Charles Brown.  The Grand Jury evidence further proved that the defendant engaged in a continuing course of conduct designed to conceal the larceny from the civil court, which maintained supervisory authority over the administration of that Estate, as well as from the elderly and physically incapacitated executrix, for more than four years.  The Grand Jury also heard testimony from two witnesses that defendant made inculpatory admissions regarding the stolen property.

Thus, although the People chose to introduce this affidavit in the Grand Jury, there was other legally sufficient evidence that the defendant acted without permission and authority. Likewise, although the People sought to preserve Minnie Simmons's testimony for trial through a conditional examination, other legally sufficient evidence that defendant lacked permission and authority is and has always been available for use at trial.[1]  Moreover, it would defy logic for the

---

[1] For this reason, among others, the People at this time do not plan to introduce the recording of this examination at trial during our case-in-chief, although we certainly still reserve the right to alter our strategy and introduce it if developments following the start of the trial make such an action advisable.

People to have forged the affidavit and then presented the "alleged" affiant with that very affidavit at a conditional examination.

There is also no support for defendant's contention that the People intentionally withheld critical Brady material prior to the conditional examination. The alleged Brady material constituted mere passing references by several people that the elderly executrix suffered from the effects of advancing age and declining health in the years following defendant's larceny – facts that were manifest at her conditional examination. Assuming that the People had sought to conceal the fact of her decline from defendant, that purpose would have been defeated by our seeking and pursing the conditional examination. Moreover, the People's conducting of the direct examination at the conditional examination belies defendant's claim because the People and not defendant initially elicited from the executrix the nature and extent of her decline in the months since she had executed the affidavit.

Furthermore, the record of the conditional examination supports the decision of the Court that Minnie Simmons was competent to testify. She was forthright and honest in admitting and not attempting to conceal the deficits in her memory, evincing that she understood and complied with the oath to testify truthfully. The defendant had a full and fair opportunity to cross examine Minnie Simmons pertaining to her memory (or lack thereof) for specific facts surrounding the transactions involved in the charged indictment. The fact that Minnie Simmons may or may not have been able to remember certain details of the events certainly bears upon her credibility and as such, may be a factor relevant to the weight of her testimony to be given by the jury, were the recording to be introduced by the People. It does not, however, bear upon the competency of Minnie Simmons.

The above position of the People has already been conveyed to the Court on multiple prior occasions, in response to various prior motions that the defendant has filed in regards to

this very same issue.  In response to the first of these prior motions, Judge Walsh affirmed the legality of the conditional examination in his February 10, 2012 Decision and Order (Exhibit 5), in which he stated that "the defense had an opportunity to show that Ms. Simmons' capacity to perceive and recall events was impaired by her condition". In that same decision, Judge Walsh ruled that the People had not committed any Brady violation in the case, and even went so far as to say that "not one argument is advanced as to how the disclosure would have altered the cross-examination of Ms. Simmons, especially after a finding of her competency as a witness and no challenge whatsoever to such a finding by the defense."  In his subsequent Decision and Order dated May 1, 2012 (Exhibit 6), Judge Walsh again stated that "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness" and that "there are no competency issues to be resolved".  In that written decision, the defendant was directed "not to file any additional motions relating to that decision".

After the defendant then defied the order of the Court to refrain from making the same motion again, Judge DiMango, as memorialized in the minutes from October 19, 2012 (Exhibit 7), informed the defendant that she would not accept new applications on matters that Judge Walsh had already decided, despite the defendant's repeated attempts to present these decided matters to her.  The ruling of Judge Walsh was then affirmed by the Appellate Division in its written decision dated November 28, 2012 (Exhibit 8).

Given that there are, once again, no new facts offered by the defendant in support of his position, there is no cause upon which to preclude testimony or to dismiss the Indictment. Therefore, this latest motion by the defendant to dismiss the Indictment or, in the alternative, to preclude the recorded testimony of Minnie Simmons, should again be denied in its entirety.

## II. THE RECORDED TESTIMONY OF MINNIE SIMMONS IS PROPER TO INTRODUCE AT TRIAL, BECAUSE THE COURT HAS ALREADY ADJUDICATED THAT THE MENTAL IMPAIRMENT REFERRED TO BY THE DEFENDANT DOES NOT EXIST.

After informing the defendant that it would examine any and all psychiatric, psychological and medical records obtained from Bishop Hucles Nursing Home for Minnie Simmons in camera in order to determine if there was any material relevant to the competency of Minnie Simmons, the Court thereafter conducted such a review. This review took place after the Court's February 10, 2012 Decision and Order. Following this review, Judge Walsh then explicitly stated in his written May 1, 2012 Decision and Order (Exhibit 6) that the results of his ex parte review of her medical records "do not substantiate any claim of Alzheimer's disease". This Decision and Order were the result of two more motions filed by the defendant, in which he continued to attack the mental competency of Minnie Simmons without any new facts to support his position, in which he demanded numerous remedies, including preclusion of the testimony of Minnie Simmons. However, even after receiving the May 1, 2012 Decision and Order, in which he was placed on explicit notice by the Court that his motions were denied because Minnie Simmons does not suffer from a mental incapacity, the defendant has continued to file numerous additional motions, including the instant motion, still attacking Minnie Simmons's mental competency.[2] In fact, in the instant motion, the defendant is explicitly seeking the same relief in regards to Minnie Simmons's recorded testimony – preclusion – that Judge Walsh already denied on May 1, 2012.

Given the fact that Minnie Simmons is not afflicted with a degenerative mental

---

[2] This includes the defendant's outlandish and vague claim in his instant motion that "according to prosecutors, (Minnie Simmons's) mental condition has degenerated to the point now where she cannot testify competently" (Paragraph 18 of Defendant's Motion). This assertion, which does not include the name of any specific declarant, is an outright fabrication by the defendant, in that no member of the District Attorney's Office who has ever been involved with the instant case has ever made such a statement about Minnie Simmons, who does not suffer from any mentally degenerative condition.

condition, there is no legal authority under which her recorded testimony should be precluded, and certainly no reason for which the Indictment should be dismissed.

### III. THERE IS NO LEGAL AUTHORITY UNDER WHICH THE TESTIMONY OF LINDA SIMMONS SHOULD BE PRECLUDED.

Defendant seeks to preclude the trial testimony of Linda Simmons, based upon his perception that she previously provided false testimony to the Grand Jury. However, he offers no legitimate factual basis for such an option, since the contention upon which he relies in his belief has already been ruled by Judge Walsh to be non-existent. Judge Walsh, upon reviewing the medical records of Minnie Simmons in camera, determined that Minnie Simmons did not suffer from any mental incapacity. Linda Simmons testified in the Grand Jury that her mother, Minnie Simmons, did not suffer from any mental incapacity. It is obvious that Linda Simmons's Grand Jury testimony is supported by Minnie Simmons's own medical records.

Defendant, in his instant motion, also focuses upon Linda Simmons' interview with Supervising Detective Investigator Vincent Verlezza on May 6, 2010, which was memorialized in the form of notes taken by Investigator Verlezza (Defense Exhibit B). Within those notes is a purported statement of Linda Simmons that appears to read that Minnie Simmons is in the early stages of Alzheimer's. Linda Simmons has no recollection of ever making such a statement, and on numerous subsequent occasions has confirmed with the various representatives of the People, including myself, that this is an untrue statement. Minnie Simmons has never been diagnosed with Alzheimer's or any other disease that would render her mentally incapable, nor has she never been treated for any type of mental incapacity. This attestation of Minnie Simmons's mental capacity is

6

supported by the medical records reviewed by Judge Walsh.  If the defendant seeks to cross-examine Linda Simmons at trial regarding the alleged "Alzheimer's" statement appearing in Investigator Verlezza's notes, he is certainly within his rights to do so.  However, the appearance of that alleged statement within Investigator Verlezza's notes certainly does not provide any cause to preclude her testimony.

Given that the defendant has not stated any viable reason under which Linda Simmons's trial testimony should be suppressed under the C.P.L or any other legal authority, his motion to dismiss the Indictment or, in the alternative, to preclude her testimony should be denied in its entirety.

7

AP-405

CONCLUSION

FOR THE REASONS STATED ABOVE, THE COURT SHOULD
SUMMARILY DENY DEFENDANT'S
MOTION IN ITS ENTIRETY.

Dated:          Brooklyn, New York
                February 8, 2013

Patrick F. Cappock
Assistant District Attorney

8

# EXHIBIT 39

People v. Mitchell
Indictment: 4743/2010

People's Response to Defense Singer Motion to
Dismiss the Indictment Pursuant to The Sixth and Fourteenth Amendments
Dated: February 8, 2013

(Dismissal application for untoward pre-indictment delay)
(Please compare ¶16 at page 9 with Trial Record at 144, 166, 279-280)

3/5/2013, Pt 11

A COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

     - against -

     STEPHEN MITCHELL,

           Defendant.

------------------------------------------------------------X

**AFFIRMATION
IN RESPONSE TO
DEFENDANT'S
SINGER
MOTION**

IND. # 4743/2010

     PATRICK F. CAPPOCK, an attorney admitted to practice law before the Courts of the State of New York, hereby affirms the following to be true under penalty of perjury:

     I submit this affirmation in response to defendant's motion to dismiss the instant Indictment pursuant to the 6th and 14th Amendments of the United States Constitution, as well as Criminal Procedure Law § 30.20, dated January 6, 2013.

     I am an Assistant District Attorney in Kings County assigned to this case and am familiar with its facts and circumstances by virtue of a review of the files maintained by the Kings County District Attorney's Office (hereinafter "KCDAO") pertaining to this matter, and discussions had with various witnesses, as well as assistant district attorneys and investigators assigned to this investigation. The People hereby incorporate by reference all of their previous motions, affirmations and memoranda of law filed in this case. All statements are made upon information and belief, based upon personal conversations with other assistant district attorneys at the KCDAO, a review of all records and files of the KCDAO, and other sources of information as expressly stated in the individual paragraphs below.

The People oppose the defense motion to dismiss the Indictment because, contrary to the defendant's claim, there was no protracted delay between defendant's commission of the charged crime and the filing of the instant Indictment such that adversely implicated the due process rights of the defendant. Additionally, the alleged mental incompetency of a witness and alleged Brady violations addressed in defendant's motion has already been adjudicated to be non-existent in various post-Indictment court decisions, as detailed within the timeline below.

Except where expressly acknowledged herein, the People disclaim, dispute, and contest each and every factual allegation and representation contained within the defendant's application.

Defendant is charged under Kings County Indictment Number 4743/2010 with Grand Larceny in the Second Degree [P.L. § 155.40(1)], stemming from his theft of client funds, namely money in excess of $400,000.00 from the Estate of Charles Brown, without permission or authority. Below is a time line of the investigation conducted by the KCDAO, as well as events preceding and following that investigation, in relation to the defendant's above actions.

1. On or about and between December 23, 2005 and March 31, 2006, the defendant stole in excess of $400,000 from his client, the Estate of Charles Brown, represented at that time by Minnie Simmons as Executrix. In short, he abused his representation of the Estate by illegally depositing proceeds from the sale of real property at 302 St. James Place, Brooklyn, NY, belonging to the Estate, into his attorney Interest on Lawyer Account (hereinafter "IOLA Account") and subsequently transferred those proceeds to other accounts, including his own personal account, which he spent down to minimal balances in a short period of time. None of the defendant's expenditures were made to the Estate of Charles Brown.

2

2.  Upon information and belief, Minnie Simmons was born in 1931 and she has been in poor and deteriorating physical condition since before the time of the offense charged on the Indictment.  Specifically, Minnie Simmons is confined to a wheel chair and unable to walk.  As a result of her poor physical condition, Minnie Simmons has been confined to a nursing home at the Bishop Hucles in Brooklyn, New York for some time.  Linda Simmons, daughter of Minnie Simmons, reported that even at the time of the events contained in the indictment in late 2005, Minnie Simmons was physically incapacitated and confined to her home.  Subsequently, in 2007, when she could no longer adequately function in her own home, she was permanently placed in a nursing care facility where she resides today.

3.  At the time of the events surrounding this Indictment, a Kings County Supreme Court matter entitled In the Matter of Charles Brown, Index Number 107103/99, was pending in the Civil Term, Part 76, before the Honorable Michael Pesce.  This matter related to the pre-existing Guardianship of Charles Brown by Minnie Simmons.  Upon the death of Charles Brown in June 2003, that Guardianship came to a conclusion.[1]  However, before the Guardianship proceeding in Supreme Court could come to a conclusion, the defendant (as the attorney for the guardian Minnie Simmons) was required to provide a final financial accounting for the Guardianship of Charles Brown.  Despite the fact that this accounting was initially ordered by the Court in November 2004, the defendant continually failed to produce this accounting in defiance of the Court's repeated orders.  Instead, the defendant repeatedly came to Court and provided a variety of excuses,

---

[1] When the Guardianship of Charles Brown ended upon his death, an Estate proceeding began in Kings County Surrogates Court under File Number 2003-3350, in which Minnie Simmons was named as the Executor of Charles Brown's estate.

3

asking for numerous extensions during which he promised he could complete the final accounting.

4. As this matter was pending in Kings County Supreme Court, Civil Term, in approximately December 2005, Minnie Simmons was physically incapacitated. This was a fact known to the defendant, who had gone to Ms. Simmons's home to get her to sign legal paperwork on multiple occasions in the presence of her daughter Linda Simmons during that approximate time period.

5. On March 10, 2008, after already providing excuses to the Court for over three years, the defendant appeared in Part 76 (the minutes of the March 10, 2008 court appearance are attached hereto in their entirety as Exhibit 1). At that time, the defendant requested a sixty-day extension to complete the accounting with the assistance of a colleague (see Exhibit 1, Page 11, Line 5).

6. On April 10, 2008, the defendant appeared in Part 76 without the promised accounting, and asked for another 30 days to complete it (the minutes of the April 10, 2008 court appearance are attached hereto in their entirety as Exhibit 2). At that time, the Court informed him that his actions would be reported to the Grievance Committee and that the matter would be handled by a special referee if the defendant did not submit the final accounting before the next adjourn date (see Exhibit 2, Page 7, Lines 12-14; and Exhibit 2, Page 8, Line 25 -- Page 10, Line 8).

7. On June 26, 2008, the defendant again failed to submit the final accounting and failed to appear in Part 76 (the minutes of the June 26, 2008 court appearance are attached hereto in their entirety as Exhibit 3). At that time, the Court indicated that Charles Emma, Esq.

would be appointed as Guardian ad Litem to prepare the final accounting for the Charles Brown Guardianship (see Exhibit 3, Page 4, Line 6 – Page 5, Line 9).

8.  On August 27, 2008, the defendant appeared in Part 76 and again failed to produce the final accounting for the Charles Brown Guardianship (the minutes of the August 27, 2008 court appearance are attached hereto in their entirety as Exhibit 4).  Additionally, when asked about the whereabouts of the proceeds of the sale of real property belonging to the Estate, the defendant admitted that he had sold the property but was unable to provide an answer to the Court regarding the current location of the funds, making a vague statement about a flood that had prevented him from ascertaining the location of the funds (see Exhibit 4, Page 5, Lines 7-21).  The Court ordered the defendant to cooperate with Mr. Emma, and again alerted the defendant that it may take "appropriate action" depending on the results (see Exhibit 4, Page 8, Lines 7-11).

9.  Following the August 27, 2008 court appearance, Mr. Emma, through his appointed status as Guardian ad Litem, investigated the Guardianship and subsequent Estate of Charles Brown, in order to provide the Court with the final accounting that the defendant had failed to produce for over four years.  As Guardian ad Litem, Mr. Emma was authorized to, among other things, speak to witnesses and issue subpoenas.  During this investigatory process, the defendant not only failed to assist Mr. Emma, but actively sought to foil his attempts to ascertain the location of the missing real property sale proceeds, first by refusing to provide any requested documentation, while proffering a variety of excuses including a flood, a fire, and loss of paperwork to different parts of the country during an alleged relocation.  The defendant then attempted to block Chase Bank from complying with Mr. Emma's December 2008 subpoena for records relating

5

to the defendant's bank accounts, informing Chase Bank that defendant had initiated a Motion to Quash Mr. Emma's subpoena in Supreme Court. However, no such Motion to Quash was ever filed. Via letter dated February 20, 2009, Judge Pesce ordered Chase Bank to provide the requested records to Mr. Emma, (a copy of Judge Pesce's February 20, 2009 letter is attached hereto as <u>Exhibit 5</u>). Following the receipt of this letter, a representative from Chase Bank faxed the pertinent records to Judge Pesce's chambers on February 23, 2009, the day of a scheduled court appearance. These records clearly showed that a Chase Bank check dated December 23, 2005, made payable to Minnie Simmons as Executrix of the Estate of Charles Brown, in the amount of $401,082.50, from Toju Realty for the purchase of 302 St. James Place representing the proceeds of the sale of that real property, was deposited into the defendant's IOLA Account on December 23, 2005, the same day as the closing for that property. The bank records further showed that beginning with a $324,000 withdrawal on December 27, 2005, multiple withdrawals totaling almost $400,000 were made from that IOLA account, all of which transferred funds into another account controlled by the defendant and which was unrelated to the Guardianship or Estate of Charles Brown. By March 6, 2006, the defendant's IOLA account had a minimal balance of approximately $411.77.

10. On February 23, 2009, following the Court's receipt of the subpoenaed records from Chase Bank, the defendant appeared in front of Judge Pesce for a scheduled court appearance in Part 76 relating to the Guardianship and Estate of Charles Brown (the minutes of the February 23, 2009 court appearance are attached hereto in their entirety as <u>Exhibit 6</u>). At that time, the defendant again stated that he did not know the whereabouts of the sales proceeds from 302 St. James Place (see <u>Exhibit 6</u>, Page 7, Line

6

19 – Page 9, Line 3).   On that date, the Guardian ad Litem Mr. Emma stated in the presence of the defendant that he had ascertained that Ms. Simmons was incapacitated and was unable to appear at the December 23, 2005 closing of the sale of 302 St. James Place or to participate in the closing in any substantial way as a result (see Exhibit 6, Page 4, Lines 3-4; Exhibit 6, Page 10, Lines 7-8; Exhibit 6, Page 11, Line 17; and Exhibit 6, Page 22, Lines 11-14).   At that same court appearance, Richard Balsam of the Department of Social Services confirmed that Ms. Simmons was incapacitated and residing in a nursing home[2] (see Exhibit 6, Page 9, Lines 8-10; and Exhibit 6, Page 10, Lines 13-14). Upon hearing from all parties, including hearing the defendant's request to adjourn the matter once again, Judge Pesce informed the defendant that he would be referring the matter to the District Attorney's Office, as well as the Character and Fitness Committee (see Exhibit 6, Page 13, Line 19 – Page 14, Line 13; and Exhibit 6, Page 15, Lines 5-15).

11. On March 9, 2009, Charles Emma submitted his official Report of Guardian ad Litem to the Court (a copy of the Report of Guardian ad Litem is attached hereto in its entirety as Exhibit 7).   After listing his findings that the defendant had converted at least $401,082.50, he also recommended that a referral should be made to the District Attorney's Office for further investigation (see Exhibit 7, Page 5, Line 1 under the heading RECOMMENDATIONS).   He further recommended a referral to the Grievance Committee (see Exhibit 7, Page 5, Line 2 under the heading RECOMMENDATIONS).

---

[2] Although neither statement specified with what specific type of incapacitation Ms. Simmons was afflicted, I have been informed by both Charles Emma and Richard Balsam that they were referring to Ms. Simmons's physical incapacitation, in that they were not, and still are not, aware of any mental incapacitation from which Ms. Simmons suffers.

7

12. On March 26, 2009, the Kings County District Attorney's Office received a letter from Judge Pesce dated March 19, 2009, with Mr. Emma's report attached, referring the defendant's actions in regards to Kings County Supreme Court, Civil Term, Index Number 107103/99 for further investigation (a copy of Judge Pesce's March 19, 2009 letter is attached hereto as Exhibit 8).

13. Judge Pesce's referral letter was then forwarded to the Rackets Division of the Kings County District Attorney's Office, where Assistant District Attorney Laura Neubauer was assigned as the prosecutor and Supervising Financial Investigator Vincent Verlezza was assigned as the investigator.

14. Between April 2009 and June 2010, ADA Neubauer and Investigator Verlezza, with the assistance of Charles Emma, engaged in an exhaustive investigation into the whereabouts of the sale proceeds from 302 St. James Place. That investigation entailed the examination of four (4) separate bank accounts in the name of the defendant. Through the course of this investigation, Investigator Verlezza did extensive research into the defendant's legal practice and financial dealings, as well as into the specifics of the Guardianship and Estate of Charles Brown and the sale of 302 St. James Place. This required the issuance of numerous subpoenas, which resulted in the production of voluminous documents and financial records from various sources, which Investigator Verlezza was then required to analyze. Additionally, the documents received as a result of these subpoenas often led to the discovery of additional documents. Thereafter, subsequent subpoenas were issued. Investigator Verlezza also interviewed numerous witnesses in the case, including but not limited to Charles Emma, Richard Balsam, Minnie Simmons, Linda Simmons (the daughter of Minnie Simmons), Joanne

8

Simmons (another daughter of Minnie Simmons), Colin Bull, Esq. (attorney for the current executor of the Estate of Charles Brown) and Edwin Benbitse (the purchaser of 302 St. James Place). In addition, Investigator Verlezza also located and interviewed numerous other individuals who received payments from the defendant's three non-IOLA accounts. Through these interviews, Investigator Verlezza ultimately determined that none of these payees had anything to do with the Guardianship or Estate of Charles Brown, or were given money on behalf of that Guardianship or Estate.

15. At no time during this extensive investigatory process did the People learn of the existence of any diagnosed mental deficiency afflicting Minnie Simmons, nor did there ever come an occasion where any representative of the People observed Minnie Simmons to exhibit symptoms of mental incompetency.

16. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer repeatedly spoke to Charles Emma, who as a civil attorney has no medical expertise. On November 6, 2009, Investigator Verlezza, in the course of one of his interviews with Mr. Emma, wrote a statement in his notes that appears to read that Colin Bull was told to withdraw Minnie Simmons from the Guardianship for a reason that appears to read "incompetency" (see Exhibit A in Defendant's instant motion). However, there was no reference to Minnie Simmons' mental state, or any degradation thereof, in this interview. Mr. Emma has confirmed with the People that he was not referring to any mental incapacity of Minnie Simmons and that he was not and has never been aware of any mental condition afflicting her, diagnosed or otherwise. Rather, Mr. Emma was referring to the physical incapacity of Minnie Simmons and his discussions with Colin Bull regarding that subject, which is an issue that he had previously

9

addressed on February 23, 2009 while in the defendant's presence in Supreme Court in relation to Index Number 107103/99.

17. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer also spoke to Linda Simmons, who is employed as a New York City police officer and has no medical expertise. On May 6, 2010, Investigator Verlezza, in the course of one of his interviews with Linda Simmons, wrote a statement in his notes that appears to read that Minnie Simmons is in the early stages of Alzheimer's (see Exhibit B in Defendant's instant motion). Linda Simmons has no recollection of ever making such a statement, and on numerous subsequent occasions has confirmed with the various representatives of the People, including myself, that this is an untrue statement. Minnie Simmons has never been diagnosed with Alzheimer's or any other disease that would render her mentally incapable, nor has she never been treated for any type of mental incapacity.

18. Upon the conclusion of this investigation, ADA Neubauer presented evidence and charges to a Kings County Grand Jury beginning July 8, 2010.[3] This evidence largely consisted of accounting evidence that established a clear pattern of conduct by defendant designed to convert the proceeds of the sale of 302 St. James Place through a series of business and personal accounts within the space of several months in violation of his fiduciary duties as counsel for the owner of that real property, the Estate of Charles Brown. The Grand Jury also heard testimony from two witnesses, Charles Emma and Linda Simmons, which each included the fact that the defendant made inculpatory admissions in their presence regarding the stolen property.

---

[3] In accordance with this Court's prior request, a copy of these Grand Jury minutes have already been provided for the Court's review.

19. Because of Minnie Simmons's aforementioned physical incapacity, which rendered her unavailable to appear before the Grand Jury, evidence that she did not give the defendant "permission and authority" to act as he did in retaining possession of the above mentioned monies was introduced in the Grand Jury in the form of a sworn affidavit of Minnie Simmons, the Executrix of the Estate of Charles Brown (a copy of the affirmation of Minnie Simmons is attached hereto as Exhibit 9). This statement was presented to Minnie Simmons by ADA Neubauer and Investigator Verlezza at her nursing home residence on June 10, 2010, in the presence of a notary public employed by the nursing home. Within that signed affirmation, she averred that she was 79 years-old and that the defendant lacked permission or authority to take the proceeds of the sale of 302 St. James Place for any other purpose than for the benefit of the Estate of Charles Brown. Neither ADA Neubauer nor Investigator Verlezza observed Minnie Simmons to exhibit any mental incapacity on that date. Other than the signatures on the affirmation itself, no notes or other written materials were generated at the time of this visit.

20. On August 13, 2010, the Grand Jury voted to indict the defendant on one count of Grand Larceny in the Second Degree under the instant Indictment Number. The People then filed the instant Indictment on the same date, August 13, 2010. On September 13, 2010, the defendant was arraigned on the Indictment in Kings County Supreme Court, at which time the People announced their readiness for trial and at which time the defendant was released on his own recognizance pending his posting of a personal recognizance bond, which was posted two days later. The instant Indictment is currently pending in Part 11 of Kings County Supreme Court.[4]

---

[4] Since a Singer motion addresses pre-Indictment delay only (see attached Memorandum of Law), the recitation of

11

21. On December 20, 1010, following examination of the Grand Jury minutes, the Honorable John P. Walsh issued a written decision, in which the Court found the evidence presented to the Grand Jury by the People to have been legally sufficient and upheld the sole count appearing on the Indictment (a copy of Judge Walsh's December 20, 2010 decision is attached hereto as Exhibit 10).

22. Following this arraignment, upon motion by the People dated October 7, 2010 and on consent of the defendant, the Court ordered a conditional exam of Minnie Simmons. Within her affirmation (a copy of which is attached hereto as Exhibit 11), ADA Neubauer stated that Minnie Simmons was "confined to a full-service nursing home due to chronic illness and physical impairment", and that Minnie Simmons would be unavailable as a trial witness "because of physical illness and incapacity" (see Exhibit 11, Paragraphs 2 and 3). In her affirmation, ADA Neubauer also included information provided by Linda Simmons regarding Minnie Simmons's poor physical condition, physical incapacitation and confinement to a wheelchair (see Exhibit 11, Paragraph 7).

23. That conditional exam was conducted on May 18, 2011 before the Honorable Mark Dwyer at Minnie Simmons's nursing home residence (a copy of the transcript of the conditional exam is attached hereto in its entirety as Exhibit 12[5]). ADA Neubauer, Leslie Jones-Thomas, Esq. (then counsel for the defendant) and defendant were present, along with a court reporter, court clerk, and court officers. At that examination, four

---

facts would normally end at this point. However, given the fact that the defendant's claims of mental incompetency of a witness and Brady violations have already previously been adjudicated, the People are including the facts surrounding those previous adjudications within this Affirmation.

[5] A copy of the videotaped DVD recording of the conditional exam was submitted to the Court with an Answer to a prior motion by the defendant, submitted by the People on January 12, 2012, and three separate copies of this disc have previously been provided to the defendant on various dated in accordance with Open File Discovery. The People can make an additional copy of this disc available to the Court upon request, if needed.

documents were entered into evidence by the People, one of which was the signed affidavit of Minnie Simmons (Exhibit 9).

24. In the conditional exam, Minnie Simmons was questioned by the prosecutor, ADA Laura Neubauer, and extensively cross-examined by Ms. Jones-Thomas.  In fact, there was extensive examination of Ms. Simmons concerning her memory (or lack thereof) of the facts and circumstances of the case.  A review of the full transcript will reveal that Ms. Simmons clearly understood the proceedings, in that she took the oath and answered each and every question to the best of her ability.        Although she did not remember many details of the events surrounding the charged Indictment, she most certainly remembered many others.  Furthermore, she coherently and competently testified that (a)  she was the executrix of, or managed, the Estate of her deceased brother-in-law Charles Brown (see Exhibit 12, Page 35, Lines 3-5); (b) that she did not ever see any of the proceeds of the sale of 302 St. James Place (see Exhibit 12, Page 13, Lines 14-18; and Exhibit 12, Page 41, Lines 14-17); and (c) that she did not give the defendant or anyone permission or authority to take the proceeds of the sale of that property for any other use than for the benefit of the Estate of Charles Brown (see Exhibit 12, Page 14, Lines 8-17; Exhibit 12, Page 41, Lines 1-3; and Exhibit 12, Page 41, Line 25 – Page 42, Line 21).  Ms. Simmons was even aware of and acknowledged her lack of memory for detail as time advances, a fact that further demonstrates her competency (see Exhibit 12, Page 41, Lines 4-6).

25. On December 1, 2010, Ms. Jones-Thomas filed the first of many defense motions in which the defendant addressed the issue of the competency, or alleged lack thereof, of Minnie Simmons.  On that date, the defense filed an omnibus motion seeking, among

13

other relief, a standard Bill of Particulars, Brady material (defined by counsel as including contact information "about any and all witnesses to the alleged crime"), and dismissal of the indictment for legal insufficiency or defects in the Grand Jury proceedings.   The People responded to said omnibus motion on February 1, 2011. By Decisions and Orders dated December 20, 2010, and March 28, 2011 the Court denied the motion to dismiss, upon finding that the evidence was legally sufficient and finding the absence of any defects in the Grand Jury proceedings.  The court also denied, inter alia, the request for witness contact information.

26. Defendant then attempted on September 18, 2011 to file a pro se Motion to renew the motion to Dismiss the Indictment Pursuant to C.P.L. §§ 210.30[1][b] and [c] and 210.35[5], notwithstanding that he was represented by retained counsel at that time. In that motion, Defendant asserted that the Indictment should be dismissed on the ground, inter alia, that the People should be found retroactively to have knowingly admitted "forged evidence" in the Grand Jury, namely the June 10, 2010 affidavit of Minnie Simmons in which Ms. Simmons attested that she had not given defendant permission or authority to take for his own purposes the proceeds of the sale of real property owned by the Estate of Charles Brown.  Defendant further asserted that the indictment should be dismissed pursuant to C.P.L. § 190.30 on the ground that the notarized Simmons affidavit was retroactively rendered inadmissible hearsay by virtue of Ms. Simmons testimony at the conditional examination that she had no current memory of the affidavit and could not recognize her own signature. Defendant further asserted that the indictment should be dismissed pursuant to C.P.L. §§ 210.20(1)(c) and 210.35(5) on the ground that the "use of a forged document

before the Grand Jury by the prosecution is not fair dealing." Finally, Defendant further asserted the indictment should be dismissed pursuant to C.P.L. §§ 210.20(1)(c) and 210.35(5) on the ground that the "presentation of evidence by the prosecution from an incompetent witness before the Grand Jury is not fair dealing." On September 19, 2011, Judge Walsh declined to consider the pro se motion because defendant was represented by retained counsel, who did not adopt the motion.

27. By motion dated December 7, 2011, defense counsel filed on behalf of defendant a motion alleging that "[u]pon information and belief Minnie Simmons gave the defendant permission to utilize the proceeds from the sale of the property", but made no offer of proof in support of that assertion. Defense counsel also moved, inter alia, for the following: (a) the "psychiatric, psychological and medical records of" Minnie Simmons; (b) an order "directing that Minnie Simmons undergo a psychiatric/psychological examination to aid the jury assessing her credibility, ability to perceive, recall and recount events"; and (c) an order "re-opening the conditional examination hearing to afford the defendant the opportunity to cross-examine Minnie Simmons related to any psychiatric, psychological and medical history."

28. The People filed a written opposition to the defendant's December 7, 2011 demand on January 12, 2012, stating that the People did not possess any psychiatric, psychological and medical records of Minnie Simmons, but that the Court, in any event, had previously granted the defendant's motion for an in camera review of any psychiatric, psychological and medical records of Minnie Simmons that defendant may obtain pursuant to a so-ordered subpoena to her nursing home facility. The People then opposed disclosure of the subpoenaed records unless the Court's in

camera review revealed material to which defendant was entitled.   The People opposed the motion to compel Ms. Simmons to undergo a mental health examination in the absence of statutory authority for such an order.   The People concluded by opposing the motion to re-open the conditional examination because the defense had had a full and fair opportunity to inquire into her memory, or lack thereof, of the facts and circumstances of the crime charged during the conditional examination and because her expressed inability to recall some facts during that conditional examination could be weighed by the trier of fact at the trial.

29. Defense counsel submitted a Reply on February 6, 2012, alleging that the People had turned over to the defense discovery materials in November 2011 that contradicted the People's stated opinion as to the competency of Minnie Simmons at the time she executed the permission and authority affidavit (namely Exhibits A and B of defendant's instant motion) which consisted of interview notes predating the Grand Jury presentation that documented that one non-medical source had stated that Minnie Simmons had become at some unspecified time "incompetent[t]" to continue in her role as executrix of the Estate of Charles Brown; that the daughter of Minnie Simmons had stated in May 2010 that her mother was in the "early stages of Alzheimer's;" and that Minnie Simmons was removed in December 2011 as executrix because she was "incapacitated."

30. Judge Walsh issued a Decision and Order on February 10, 2012 (a copy of which is attached hereto in its entirety as <u>Exhibit 13</u>), in which he addressed the various allegations, claims, and demands in defendant's December 7, 2011 and February 6, 2012 submissions, finding and concluding as follows: (a) The People's motion for a

16

conditional examination of Minnie Simmons was unopposed by defendant, who did not challenge the People's representation that her "physical incapacity is not a temporary one," and that it had been "on-going since 2003, with a slow and steady decline and no foreseeable improvement in the short or long term."; (b) The conditional examination was conducted in conformance with the requirements of C.P.L. Article 660; (c) At the conditional examination, the defendant and his attorney were presented with Minnie Simmons' self-admitted condition – senility – and were free to cross-examine her.  Defense counsel did so at length, inquiring into her medical condition and testing her ability to perceive and recall specific events; (d) The proper time for defendant to have challenged whether Ms. Simmons' condition impaired or impeded his right to confront her at the conditional examination was at the time of the conditional examination, and her condition seven months later was not relevant to her condition when she executed the affidavit or during the conditional examination; (e) Judge Dwyer had "obviously found [Minnie Simmons] competent to testify at the conditional examination," at which she acknowledged her failing and deteriorating memory, because he permitted the examination to take place; and (f) Defendant's motion to re-open the conditional examinations failed to acknowledge that Minnie Simmons' current medical condition was not the same as it had been at the time of the conditional examination, and her condition "can only be assumed to have worsened in the interceding seven months" since the conditional examination. Therefore, the Court found that defendant had failed to establish his right to Minnie Simmons' medical/psychiatric records or why the Court should review them.

17

AP-424

Nevertheless, the Court directed the People to furnish those records to the Court for in camera review.

31. In the February 10, 2012 decision, Judge Walsh addressed defendant's allegation of "an apparent Brady violation" relating to statements known to the People concerning the statements of three non-medical individuals about their perceptions of Minnie Simmons condition in 2009 and 2010 – before the conditional examination – and in 2011 – after the examination.   The Court observed that the conduct constituting defendant's crime occurred over the course of 3 and ½ months in 2005-06, and questioned how Minnie Simmons mental capacity 4 to 5 years later constituted Brady material.    In any event, the Court noted that defendant had not included a specific demand for the arguably late-disclosed Brady material in his omnibus motion.  Thus, pursuant to the holding of People v. Vilardi, 76 NY2d 67 (1990), the materials at issue constituted Brady only if the defendant demonstrated that the evidence created a reasonable doubt that did not otherwise exist.   In the absence of any factual exposition by defendant on this issue of materiality, and in the further absence of any explanation by defendant as to how the disclosure prior to the conditional examination would have altered his cross-examination of Minnie Simmons in light of the implicit finding by Judge Dwyer that she was competent, the Court denied this aspect of the defense motion.

32. Following the Decision and Order dated February 10, 2012, Judge Walsh conducted an in camera inspection of Minnie Simmons's psychiatric, psychological and medical records, and found that no mental deficiency existed.  The People were not, and at no

18

time after have been, made privy to the contents of these records, nor was any representative of the People present for this in camera review by the Court.

33. On March 12, 2012, the defendant filed a pro-se motion dated March 9, 2012, in which he not only sought to reargue the motion that resulted in the February 10, 2012 decision, but also moved for a "Brady Hearing"; "an Order directing that the defendant, independent of the People, be granted subpoenas to enable him to collect the medical, psychiatric, and administrative records of Minnie Simmons"; an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not testimony offered by Minnie Simmons on or about May 18, 2011, was competent and admissible testimony that can be considered by a jury at trial"; and "an Order granting the defendant an immediate competency hearing for the purpose of determining whether or not a written statement purportedly offered by Minnie Simmons on or about June 10, 2010 was competent and admissible evidence that could have been considered by a Grand Jury or could be considered by a petit jury at trial." In support of the motion to reargue and in support of these demands, defendant offered no new facts, evidence, or arguments that had not previously been considered by Judge Walsh in issuing the February 10, 2012 Decision and Order.

34. By letter to the Court dated March 12, 2012, defendant then asked the Court to "accept any motions "put forth on my own behalf in defense of this case. I am entitled to have these motions responded to and considered by the courts. . . . My attorney has refused to consider filing these motions on my behalf."

35. The People did not respond in writing to this March 12, 2012 pro se motion because defendant was, at the time of its filing, represented by counsel, who did not join in or adopt said motion.

36. On March 27, 2012, the defendant filed another pro se motion, in which he sought to preclude Minnie Simmons from testifying "at any subsequent trial or hearing of this matter and reiterated his demands for a "Brady hearing," and a competency hearing.

37. These motions remained pending until May 1, 2012, for reasons stated below.

38. By written motion dated April 2, 2012, defendant moved to relieve assigned counsel, to proceed pro se, and requested appointment of a legal advisor employed by an "indigent defense organization and not solo counsel." In support of this motion, defendant averred that he and assigned counsel had "significant," "severe and divergent" "disagreements with respect to procedural and trial strategies to be implemented for the defense of the accused." In particular, the defendant faulted assigned counsel for refusing to adopt and file the March 9, 2012 motion to reargue.

39. On April 9, 2012, Judge Walsh orally granted defendant's motion to relieve counsel, to proceed pro se, and for appointment of a legal advisor.

40. By "Demand Letter" dated April 14, 2012, defendant commanded of Assistant District Attorney Laura Neubauer that she produce all Brady and Rosario material, and all records, documents, notes, logs, accountings, transcripts, court transcripts, court motions, court orders, pleadings, court papers, correspondence, telephone conversation notes, timecards, calendars, printouts, charts, filings, writings, forms, or diagrams of any kind pertaining to the Estate of Charles Brown, including but not limited to Kings County File Number 3350-03, and any and all Guardianship

20

AP-427

Proceedings pertaining to Charles Brown, including but not limited to Kings County File Number 107103/99, and any of the aforesaid papers requested pertaining to Minnie Simmons, decedent Charles Brown, social security number [included in original motion but omitted herein], Judge Michael Pesce, and any criminal or civil proceedings that name Stephen Mitchell as a party.

41. Defendant further commanded ADA Neubauer to produce:

> all facts known and opinions to be offered at trial, the basis for said opinions, and any and all supporting data considered including but not limited to documents, charts, or materials to establish said opinions by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding. A report of a complete statement of the opinions to be expressed at trial by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, the qualifications of Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, including a list of all publications authored by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding within the preceding ten years, the compensation paid to any of the aforesaid witnesses, and a listing of the cases the aforesaid persons have testified to within the past five years as an expert at a grand jury, hearing or trial, Also include the names, addresses, e-mails, and phone numbers of opposing counsels attached with the aforesaid information.

42. By letter dated April 30, 2012, ADA Monique Ferrell advised counsel that his demand letter was untimely, pursuant to C.P.L. § 240.80, but that, in any event, this Office possessed no undisclosed Brady material; Rosario material is not subject to discovery by demand; the materials relating to the Estate of Charles Brown, etc., were a matter of public record or not in the control or possession of this Office or had previously been provided to defendant or his counsel; and that the remainder of the demands were not subject to discovery by demand or had previously been provided to defendant or his counsel.

21

43. Defendant also demanded that Judge Walsh issue so-ordered subpoenas duces tecum for notes and records from courts, agencies, and individuals relating to the real estate closing in which he had participated, the mental health status of Minnie Simmons, the Supreme and Surrogate's Courts' files in the matter of the Estate of Charles Brown, etc.

44. On April 9, 2012, Judge Walsh orally denied the defendant's pro se March 9, 2012 Motion to Reargue the February 10, 2012 Decision and Order on the ground that defendant had not advanced any new evidence or legal grounds and further ordered defendant not to file any additional motions relating to the February 10, 2012 decision and order.

45. By decision and order dated May 1, 2012, Judge Walsh memorialized his oral decision of April 9, 2012, and further resolved "all outstanding issues raised by the defendant either through motions or requests for subpoenas" (a copy of Judge Walsh's Decision and Order dated May 1, 2012 is attached hereto as Exhibit 14). Judge Walsh ruled, inter alia, that there were no unresolved competency or Brady issues and denied defendant's request for "a second review of the documents inspected in camera." Judge Walsh stated that "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness". Judge Walsh further stated, in reference to Minnie Simmons's medical records, that "the records reviewed in camera do not substantiate any claim of Alzheimer's disease".

22

46. The People have opposed, and continue to oppose, any disclosure of the above medical records of Minnie Simmons to the defendant, since the in camera review revealed that there was no material issue that bore on her competency.

47. On October 19, 2012, defendant made a long record, again without presenting any new facts, and orally argued before Judge Patricia DiMango in Kings County Supreme Court, TAP Part, for the same relief as he requested in his previous Motions to Dismiss and Reargue before Judge Walsh (as recorded in the instant Affirmation), namely the dismissal of the Indictment because of his allegations of the mental incapacity of Minnie Simmons (the minutes of the October 19, 2012 court appearance are attached hereto in their entirety as Exhibit 15). The defendant also once again argued that he was entitled to examine Minnie Simmons's medical records. On that date, Judge DiMango repeatedly and emphatically informed the defendant that she would not accept new applications on matters that Judge Walsh had already decided.

48. At all times during the post-Indictment pendency of the case, as described above in paragraphs 20-47, the People have announced and maintained their readiness for trial.[6] Meanwhile, the defendant has announced on numerous dates that he was not ready for trial, even filing several of the above motions on dates that the case was scheduled to be sent out to begin trial.

49. On October 22, 2012 the defendant filed a petition with the Appellate Division, Second Department, for a writ of prohibition pursuant to C.P.L.R. Article 78, seeking to permanently enjoin his prosecution under the instant Indictment. In his petition, the

---

[6] The only date upon which the People have announced that they were not ready was on October 22, 2012 in Part TAP, requesting a 16-day adjournment for trial. However, this is the same date upon which the defendant filed his Article 78 motion (described in paragraph 49), again engaging the parties in motion practice. Therefore, to date no speedy trial time under C.P.L. § 30.30 has been chargeable to the People.

defendant also demanded a stay of the trial on the current Indictment. In so petitioning, defendant advanced the following arguments, again based upon no new facts and in a variety of formats and contexts, in support of his contention that he was entitled to the relief sought:

(a) The "indictment should be dismissed because the jurisdictional basis of the trial court was procured by fraud, to wit: the prosecutor knowingly presented testimony regarding the mental health of a material witness to the grand jury that they knew was false in order to mislead the grand jurors and fraudulently obtain an indictment against petitioner. The prosecutor deliberately withheld information regarding the mental health of a material witness from the grand jury in order to convey a false portrayal to the grand jurors of the capacity of the witness to recall facts and circumstances pertinent to the case. Petitioner contends that the prosecutors' actions have rendered the indictment jurisdictionally defective because they willfully interfered with the investigatory functions of the grand jury by deliberately providing the grand jurors false and misleading material information."

(b) "[T]he prosecution of this case should be discontinued because the district attorney presented the grand jurors with an affidavit to secure an indictment for this case in spite of the fact that the purported signatory did not remember having its contents read to her at any time prior to the document being submitted to the grand jurors on her behalf."

(c) "This Court should prohibit further prosecution of the petitioner in this

24

case and dismiss the indictment, with prejudice, because the prosecutors' maintenance of an indictment procured by fraud is a perversion of the entire criminal proceeding from its inceptions and such abuse denies the trial court jurisdiction to continue a criminal prosecution in the State of New York."

(d) "Prohibition should compel that the indictment be dismissed, with prejudice and the case discontinued immediately because petitioner should not be forced to participate in an illegal criminal proceeding through to an appeal by a court that lacks the jurisdiction to proceed."

(e) "[B]ecause the trial court inappropriately has denied the petitioner's requests to challenge its jurisdictional basis and has prevented the petitioner from obtaining evidence he is entitled to in support of his claims of jurisdictional defect."

(f) An order "[a]llowing petitioner the opportunity to depose and subpoena documents from Charles Emma, Assistant District Attorney Laura Neubauer, Investigator Verlezza, and Colin Bull regarding this matter in support of the application for the writ."

(g) An Order "[a]uthorizing the issuance of subpoenas for the medical, psychiatric, and administrative records of Minnie Simmons in support of the application for the writ."

50. On October 30, 2012, the People filed a written response to the defendant's Article 78 motion, stating in substance that the petition for a writ of prohibition must be dismissed, because (a) the petition was untimely; (b) the defendant had not advanced a claim upon

25

which such extraordinary relief may be granted; (c) the defendant's claims were not reviewable in an Article 78 proceeding; (d) the Appellate Division should not exercise its discretion to review defendant's claims; and (e) defendant's claims were meritless.

51. On November 28, 2012, by written decision, the Appellate Division denied the defendant's motion in its entirety (a copy of the Decision and Order of the Appellate Division dated November 28, 2012 is attached hereto as Exhibit 16).

52. On or about January 11, 2013, the defendant again filed a new motion to enjoin his prosecution under the instant Indictment, before the New York State Court of Appeals.  The Decision on that motion is pending.

53. The People at all times mentioned herein were, and still are, aware of their continuing obligations pursuant to Brady v. Maryland, 373 US 83 (1963) and have been and still are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons's testimony.  The People are likewise not in possession of any records pertaining to Minnie Simmons's psychiatric, psychological or medical condition.

54. As can be seen in the above chronology, on multiple dates between December 1, 2010 and the present, the defendant has repeatedly made oral and written applications in Kings County Supreme Court, before Judge Walsh and Judge Patricia DiMango (as well as this Court) to reargue the above rulings of Judge Walsh in regards to the mental state of Minnie Simmons, despite the existence of absolutely no new facts or arguments.  Both Judge Walsh and Judge DiMango have admonished the defendant on multiple occasions to refrain from making any more such frivolous and repetitive applications, the only apparent purpose of which are to delay the prosecution of the

26

instant Indictment.   However, the defendant continually refuses to abide by these admonitions, as can be seen most recently through his filing of the instant motion.

55. In support of the instant motion, defendant has once again offered no new facts, evidence, or arguments that had not previously been considered by multiple Courts in issuing the above Decisions and Orders.   Additionally, the defendant has not offered proof of any protracted delay by the People in the investigation, indicting and prosecuting of this case.   In fact, the defendant could not possibly show any proof of intentional delay by the People, since the record clearly shows a long and extensive pattern of delays by the defendant prior to his Indictment, through the years of excuses and repeated adjournments in relation to the Charles Brown Guardianship Proceeding under Kings County Supreme Court, Civil Term, Index Number 107103/99.


**WHEREFORE**, for the reasons set forth in the annexed memorandum of law, the defendant's motion must be denied in its entirety.


Dated:        Brooklyn, New York
              February 8, 2013


                                        Respectfully submitted,

                                        Patrick F. Cappock
                                        Assistant District Attorney
                                        (718) 250-2945
                                        350 Jay Street
                                        Brooklyn, NY 11201

27

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                                                         MEMORANDUM
   - against -                                       OF LAW

      STEPHEN MITCHELL,                          IND # 4743/2010

         Defendant.

-------------------------------------------------------------------X

MEMORANDUM OF LAW

<u>PRELIMINARY STATEMENT</u>

      This memorandum is submitted in opposition to defendant's motion to dismiss the instant Indictment pursuant to the 6th and 14th Amendments of the United States Constitution, as well as Criminal Procedure Law § 30.20, dated January 6, 2013.   For the reasons stated below, defendant's motion should be summarily denied in its entirety.

<u>I. CONTRARY TO THE DEFENDANT'S CLAIM, THERE HAS
BEEN NO PROTRACTED OR UNREASONABLE PRE-
INDICTMENT DELAY BY THE PROSECUTION.</u>

      The defendant moves for a dismissal of the Indictment or, in the alternative, for a <u>Singer</u> hearing, on the ground that the People waited more than four years to indict the instant case.  The defendant argues that such a lapse of time between the commission of his alleged larceny in December 2005 through March 2006 and his indictment in 2010 constituted an "unconstitutional prosecutorial delay" that has so prejudiced him as to warrant the comprehensive dismissal of his

1

Indictment.

A delay in prosecution prior to indictment does not raise a Sixth Amendment issue, but is instead governed by the due process clause of the Fifth Amendment. United States v. Marion, 404 U.S. 307, 313 (1971); United States v. Beszborn, 21 F.3d 62, 66 (1994). "There is no Sixth Amendment right to a speedy indictment", and prior to indictment, the defendant's rights are instead protected by the statute of limitations. United States v. Harrison, 918 F.2d 469, 473 (5th Cir. 1990). Because of the guarantee against overly stale criminal charges offered by the statute of limitations, the defendant bears the burden of proof in an alleged case of pre-indictment delay. Id. In order to establish such a due process violation due to an alleged pre-indictment delay, a defendant must establish that the delay resulted in "actual prejudice to the conduct of the defense" and that the prosecution "intentionally delayed to gain some tactical advantage" over the defendant. Marion at 326; see also United States v. Foxman, 87 F.3d 1220, 1223 (11th Cir. 1996) (holding that "substantial prejudice from delay, standing alone, does not violate due process. The delay must also be the product of a deliberate act by the government designed to gain a tactical advantage.")

It is well established that when a defendant alleges that his due process rights under the State Constitution have been abridged by virtue of a pre-indictment delay, the following five factors should be examined: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay." People v Taranovich, 37 N.Y.2d 442, 445 (1975).

In applying those factors to the instant case, the defendant cannot successfully argue in any way that his due process rights have been compromised. Indeed, upon application of the

first factor to the facts of this case, it cannot be concluded that *any* alleged delay, or even any action, attributable to the People occurred before March 2009. In fact, between March 2006 and March 2009, the defendant himself was solely responsible for all delays, as he continually defied the orders of the Court by failing to produce the required accounting for the Guardianship of Charles Brown under Kings County Supreme Court, Civil Term, Index Number 107103/99, and then attempting to obstruct the investigation of Charles Emma into the matter, all the while repeatedly requesting more court adjournments. During that time period, the People were not involved with or even aware of this matter. Therefore, the only time period that should be analyzed for alleged "delay" in the instant case is the period between March 26, 2009 (the date of the referral to the People) and August 13, 2010 (the date of the filing of the instant Indictment).

Following the eventual referral of this matter to the Kings County District Attorney's Office (hereinafter "KCDAO") by Judge Pesce on March 26, 2009, the People initiated an extensive investigation into the defendant's financial activity and background, which ultimately revealed that the defendant had stolen in excess of $400,000 from the Estate of Charles Brown. This investigation involved numerous witness interviews, as well as the issuance of subpoenas for many documents that then had to be analyzed, which would often lead to the discovery of more documents that were then subpoenaed and analyzed as well. Given the nature of this Grand Larceny charge against the defendant, such an extensive investigation was absolutely necessary. In 2010, after the KCDAO had obtained sufficient evidence to prove Grand Larceny against the defendant, the People presented the case to a Grand Jury and obtained an Indictment in August 2010. Following this, the defendant was arraigned on this Indictment in September 2010.

The defendant cannot meet his burden in showing lack of good cause for any "delay"

3

prior to his Indictment, nor can he assert that the burden must be deemed to have shifted to the People due to the length of the alleged delay. See <u>Singer</u> at 254 (holding that "when there has been a protracted delay, certainly over a period of years, the burden is on the prosecution to establish good cause"). As detailed above, there was no delay or even involvement by the People prior to March 2009, and no protracted delay in the subsequent 16 ½ - month period prior to the filing of the instant Indictment. See <u>People y. Henderson</u>, 284 A.D.2d 205 (N.Y. App. Div. 2001) (holding that a "delay of approximately 20 months does not warrant dismissal"). Therefore, no burden shifting is triggered by the facts and circumstances of this case.

Even assuming, for the sake of argument, that the burden is deemed to have shifted to the People, the facts of this case make it clear that the alleged "delay" between March 26, 2009 and August 13, 2010 was absolutely predicated upon good cause. In analyzing the justification for postponement of the initiation of a criminal action, "a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense". <u>People y Singer</u>, 44 N.Y.2d 241, 254 (1978). Furthermore, there is no evidence in this case that even remotely suggests any delay that could be interpreted as "a deliberate attempt by the prosecution to hamper [defendant] in the preparation of his defense," see <u>Taranovich</u> at 446, or that any such delay was motivated by a prosecutorial desire to gain an unfair tactical advantage. <u>People y. Denis</u>, 276 A.D.2d 237, 248 (3rd Dep't 2000).

The defendant's time of incarceration in this matter is not a factor, since the defendant was released on his own recognizance immediately at his Supreme Court arraignment. The defendant has continuously been at liberty since his commission of the alleged crime, and was additionally placed on notice by Judge Pesce before his indictment that his actions were going to

4

be referred to the District Attorney's Office. Therefore, in such a case, the defendant "may not claim that the delay has hindered his ability to gather evidence or contact prospective witnesses". People v. Tomaino, 248 A.D.2d 944, 945 (4th Dep't 1998). In the instant case, the defendant absolutely knew who Minnie Simmons was prior to his indictment, since she was his own client. He was also well familiar, through his representation of Minnie Simmons and his extensive involvement with the Guardianship and Estate of Charles Brown, with all other parties who might be pertinent witnesses in this case. Therefore, any claim by the defendant that the People, through any alleged delay, compromised his ability to preserve evidence relating to Minnie Simmons, or anyone other witness, is completely unsupported by the facts.

Given the foregoing facts, it is clear that the passage of time between the commission of the defendant's crime and his subsequent Indictment was attributable to (i) the defendant's own delay tactics for over three years in Kings County Supreme Court, Civil Term, and (ii) the time required to properly investigate and analyze the defendant's total financial background and activity, through which it was determined that the defendant had utilized multiple bank accounts in his name to attempt to hide his criminal activity. Any "delay" by the People, therefore, reflects legitimate law enforcement activities and was not engineered to deny the defendant his due process.

## II. THE DEFENDANT HAS NOT BEEN PREJUDICED IN ANY MANNER, IN THAT HIS PERCEIVED IMPAIRMENT TO HIS DEFENSE HAS ALREADY REPEATEDLY BEEN ADJUDICATED TO BE NON-EXISTENT.

Given the above analysis of the first four factors under Taranovich, it is clear that the only remaining issue is "whether or not there is any indication that the defense has been impaired by reason of the delay". Taranovich at 445. The defendant has failed to meet his burden of

5

showing prejudice to his case. An analysis of the facts in the instant case clearly show that there has been no impairment to the defense by the passage of time, regardless of how that time is calculated. This is despite the defendant's baseless claim that his defense was hindered by prosecutorial misconduct rising to fraud in the Grand Jury and the denial of his constitutional rights.

After informing the defendant that it would examine any and all psychiatric, psychological and medical records obtained from Bishop Hucles Nursing Home for Minnie Simmons in camera in order to determine if there was any material relevant to the competency of Minnie Simmons, the Court thereafter conducted such a review. Judge Walsh then explicitly stated in his written May 1, 2012 Decision and Order (Exhibit 14) that the results of his ex parte review of her medical records "do not substantiate any claim of Alzheimer's disease". However, despite being placed on explicit notice by the Court that Minnie Simmons does not suffer from a mental incapacity, the defendant has continued to file numerous additional motions, including the instant motion, attacking Minnie Simmons's mental competency. Contrary to defendant's assertion, there has not been any "spoilage of evidence" due to degradation of Minnie Simmons's mental capacity. Likewise, there has not been any spoilage of evidence in any other respect either, in that all pertinent witnesses to the activities of the defendant in relation to the instant Indictment remain available for trial.

There is also no support for defendant's contention that the People intentionally withheld critical Brady material prior to the conditional examination, as was also explicitly stated by Judge Walsh in his February 10, 2012 Decision and Order (Exhibit 13). The alleged Brady material constituted mere passing references by several people with no medical background that the elderly executrix suffered from the effects of advancing age and declining health in the years following

6

defendant's larceny – facts that were manifest at her conditional examination.  Assuming that the People had sought to conceal the fact of her decline from defendant, that purpose would have been defeated by the People moving for the conditional examination, which was done less than a month after the defendant's arraignment.  Moreover, the People's conducting of the direct examination at the conditional examination belies defendant's claim, because the People and not the defendant initially elicited from Minnie Simmons the nature and extent of her decline in the months since she had executed the affidavit.  During this testimony, Ms. Simmons was forthright and honest in admitting, and not attempting to conceal, the deficits in her memory, proving that she understood the proceedings and exhibiting no behavior that would support an opinion that she is mentally incapacitated.

Given the fact that Minnie Simmons is not afflicted with a degenerative mental condition, and since the defendant has not alleged any other hindrance to his ability to prepare his case, it is clear that no possible impairment to the defendant's defense exists under Taranovich,  Id at 445.

7

CONCLUSION

FOR THE REASONS STATED ABOVE, THE COURT SHOULD
SUMMARILY DENY DEFENDANT'S MOTION IN ITS ENTIRETY.

Dated:       Brooklyn, New York
             February 8, 2013

                                    _____
                                    Patrick F. Cappock
                                    Assistant District Attorney

# EXHIBIT 40

**People v. Mitchell**
Indictment: 4743/2010

Decision and Order
Regarding Motion In Limine
(Garnett, J.)

Dated: March 5, 2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 11

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>STEPHEN MITCHELL,<br>                              Defendant. | DECISION AND ORDER<br><br>Ind. #4743/2010<br><br>Date: March 5, 2013<br><br>By: Hon. William E. Garnett |

The defendant has submitted a motion _in_ _limine_ to dimiss the indictment or, in the alternative, to preclude the People from calling Linda Simmons and Minnie Simmons as witnesses at trial or to use Minnie Simmons' video-recorded testimony at trial.

The Court has thoroughly read and reviewed the motion papers.

After due deliberation on those papers, the motion to dismiss the indictment is denied. The motion to preclude the People from calling Linda Simmons and Minnie Simmons as witnesses at trial or to use Minnie Simmons' video-recorded testimony at trial is also denied.

This opinion shall constitute the decision and order of the Court.

Dated: March 5, 2013
       Brooklyn, New York

William E. Garnett
A.J.S.C.

1

# EXHIBIT 41

People v. Mitchell
Indictment: 4743/2010

Decision and Order
Regarding Singer Motion
(Garnett, J.)

Dated: March 5, 2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 11

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | DECISION AND ORDER |
| -against- | Ind. #4743/2010 |
| | Date: March 5, 2013 |
| STEPHEN MITCHELL, Defendant. | By: Hon. William E. Garnett |

The defendant has submitted a motion to dismiss the indictment pursuant to the 6th and 14th Amendments to the United States Constitution and CPL §30.20.

The Court has thoroughly read and reviewed the motion papers.

After due deliberation on those papers, the motions to dismiss are is denied.

This opinion shall constitute the decision and order of the Court.

Dated: March 5, 2013
Brooklyn, New York

William E. Garnett
A.J.S.C.

1

AP-42

# EXHIBIT 49

<u>People v. Mitchell</u>
Indictment: 4743/2010

Excerpts from June 10, 2013
Pre-trial Hearing
(Garnett, J.)

1

```
1   SUPREME COURT OF THE STATE OF NEW YORK.
    COUNTY OF KINGS - CRIMINAL TERM - PART 11
2   -----------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
3
                    -against-
4
    STEPHEN MITCHELL,
5                               Defendant.
    -----------------------------------------------X
6   Indictment # 4743/10        TRIAL

7

8
                        320 Jay Street
9                       Brooklyn, New York 11201
                        June 10, 2013
10
    B E F O R E:
11               HONORABLE WILLIAM GARNETT,
          Justice.
12
    A P P E A R A N C E S:
13
             OFFICE OF CHARLES J. HYNES, ESQ.
14           DISTRICT ATTORNEY - KINGS COUNTY
                 350 Jay Street
15               Brooklyn, New York 11201
             BY:  PATRICK CAPPOCK, ESQ.
16                Assistant District Attorney
                  For the People
17

18           ROBERT REULAND, ESQ.
                 26 Court Street
19               Brooklyn, New York
                 Legal advisor for the Defendant
20
    P R E S E N T:
21
             STEPHEN MITCHELL, Pro se Defendant
22

23
                        Marc Shiffman
24                      Senior Court Reporter

25
```

MS

Proceedings                                    10

1     Court, whether or not the Court has a

2     jurisdictional basis to proceed to trial.   And

3     because I am making an argument with respect to

4     the jurisdictional basis of the trial, that, too,

5     is an exception to the 45 day rule and that's the

6     reason why I am bringing the motion.

7              So what I've done, I filed and served it

8     with the Court.   The Court has a courtesy copy and

9     filed a copy with the Clerk's Office.   The

10    components of this motion have to be responded by

11    the prosecutor and considered by the Court.   There

12    is an issue of fact with regard to whether or not

13    a witness was competent, whether truthful

14    statements were stated with regard to certain

15    issues that go to the jurisdictional basis of this

16    court.

17             So the prosecution is compelled -- by

18    210.45 and 255.20, the prosecution is compelled to

19    respond.   And because of the facts presented, this

20    Court must order a hearing in order to determine

21    the facts and circumstances presented in the

22    motion.

23             It would not be an inconvenience to the

24    Court.   And the reason is because the fact the

25    People have answered ready and the principle

MS

AP-449

Proceedings                                    11

1    witnesses that would be required for the hearing,

2    at most, are here.  At most, there would be

3    disclosure issue with regard to psychiatric

4    records that might take a little bit of time.

5            THE COURT:  What relief do you seek?

6            THE DEFENDANT:  I seek a hearing.  No, I

7    seek dismissal.  I want dismissal initially.  But

8    in the alternative, if I'm not granted a

9    dismissal, then I want a hearing.  And 210.45 and

10   255.20 compel that I be given a hearing on these

11   issues.

12           THE COURT:  All right.  What I'm going

13   to do is I'm going to continue with the

14   preliminaries in anticipation of picking a jury

15   tomorrow.  I'm going to then take a recess and

16   read the motion and then I will decide where we go

17   from there.

18           THE DEFENDANT:  Thank you, sir.

19           THE COURT:  Now, beginning, I'm going

20   over my list that I use in every trial that I do

21   to check to make sure that we have everything in

22   place.

23           Now, Mr. Mitchell, in terms of the

24   discovery that you have received, besides what you

25   believe may be outstanding Giglio material, have

MS

Proceedings                                          12

1     you received the Grand Jury minutes in this case?

2               THE DEFENDANT:  I believe so.

3               THE COURT:  And from your review of the

4     documents that you received, is there anything

5     that comes to your attention that you believe is

6     missing?

7               THE DEFENDANT:  Yes.

8               THE COURT:  From the discovery material?

9               THE DEFENDANT:  Yes, substantial amount.

10    As you know, your Honor, this case involves an

11    allegation of theft from a client.  And there were

12    a number of lawyers that were involved in either

13    the investigation in some respect and in

14    investigating the case.

15              A number of people, as a matter of fact,

16    were involved in investigating the case, different

17    people but mostly attorneys, and some of those

18    people, if not all of these people, are going to

19    be witnesses in the case.

20              For example, Mr. Charles Emma was a

21    person who was appointed as an investigator by the

22    Court in this case, as Ms. Weintraub was involved.

23              THE COURT:  She was also an attorney?

24              THE DEFENDANT:  Yes.

25              Colin Bull is also an attorney.  And a

MS

Proceedings                                              13

1    person by the name of McNulty, who also

2    investigated the case on behalf of Travel

3    Insurance Company.  Because the Travel Insurance

4    Company had a bond as part of the guardianship,

5    they, too, were involved in investigative actions

6    and have made a variety of motions, some of which

7    prevailed in the Supreme Court, in the Civil

8    Supreme Court.

9              I don't have those files.  And if the

10   People are going to call those individuals as

11   witnesses against me, although they are not

12   Rosario witnesses per se, the Rosario -- the

13   penumbra of Rosario follows for these individuals

14   and I should be given their files.  And I've been

15   trying to get their files for a long time and the

16   People have not furnished them.

17             What I would like as a start, with regard

18   to disclosure, is copies of Emma, McNulty, Bull,

19   Weintraub, Mr. Kaplan.  There is a fella named

20   Kaplan who is on the list.

21             THE COURT:  What is Kaplan?

22             THE DEFENDANT:  He is a lawyer.  Also a

23   lawyer.

24             THE COURT:  Everybody is a lawyer here

25   except McNulty?

MS

Proceedings                                   14

1          THE DEFENDANT:  No, McNulty is a lawyer,

2    too.

3          THE COURT:  And Bull?

4          THE DEFENDANT:  Bull's a lawyer.

5          I don't have, Judge Pesce, I don't have

6    correspondence copies.  I believe all the

7    correspondence that Judge Pesce wrote pertaining

8    to this case, he's a lawyer as well, I don't have

9    other than an analysis.

10         I do not have any notes which would be

11   Rosario material from Mr. Gottlein (sic)or -- I

12   don't know if it's a mister or not.  I just

13   remember the last name.

14         MR. CAPPOCK:  Who are you referring to?

15         THE DEFENDANT:  What's your forensic

16   person?

17         MR. CAPPOCK:  Neil Gillon.

18         THE DEFENDANT:  I apologize.  Gillon.

19         THE COURT:  Mr. Gillon is a handwriting

20   expert?

21         MR. CAPPOCK:  No, your Honor, he is a

22   analyst who never put pen to paper on this.

23         THE COURT:  Let Mr. Mitchell finish.

24         THE DEFENDANT:  I'm not done.

25         THE COURT:  I know you're not done.

Proceedings                                          15

1    That's why I said let Mr. Mitchell finish.

2              THE DEFENDANT:  Thank you, sir.

3              With regard to the Rosario issue, I do

4    not have any Rosario notes pertaining to Minnie

5    Simmons who was supposed to be the primary

6    complainant in this case, none.  If none exists,

7    then I would like the assistant district attorney

8    to put that on the record now so I know that and

9    can announce it to the jury at some point in the

10   stipulation.

11             THE COURT:  Now, Minnie Simmons was the

12   executrix of the estate, is that correct, Mr.

13   Cappock?

14             MR. CAPPOCK:  That's correct, your

15   Honor.

16             THE COURT:  And she was also the subject

17   of a deposition, 660.

18             MR. CAPPOCK:  Correct, your Honor.

19   There was a conditional examination.

20             THE COURT:  And that Mr. Mitchell was

21   given a copy of the examination of Ms. Simmons?

22             MR. CAPPOCK:  He was actually given, I

23   think, five copies.

24             THE DEFENDANT:  He did give me a number

25   of videos, no written Rosario material from his

MS

Proceedings                                                16

1    office or from any of the lawyers who I just

2    mentioned who may have interviewed her who might

3    want to testify about the facts or have

4    inconsistencies that I might want to raise in my

5    defense.

6                THE COURT:  All right.  That's it?

7                THE DEFENDANT:  Yes.

8                THE COURT:  Okay.

9                Now, I am going to turn to Mr. Kaplan.

10   Mr. Kaplan, if you do me -- I'm sorry, Cappock, if

11   we can go in order and, perhaps, you can give me

12   your reaction.

13               How about Charles Emma?

14               MR. CAPPOCK:  Actually, before we even

15   start with that, just to make sure everything is

16   complete, I do have one last additional discovery

17   packet, most of which is just ministerial

18   materials, BCI photographs, we have gotten

19   recertified signatures on the minutes from Judge

20   Pesce's proceeding, and some of those represented

21   recertification were formatted differently, I have

22   those printed out.

23               As to Charles Emma, I don't believe he

24   mentioned it here in court, but in communication

25   via e-mail, Mr. Mitchell had requested e-mail

MS

Proceedings                                          17

1    correspondence between the People and witnesses as

2    well.

3            Actually, the first and only e-mail that

4    I have ever had with Mr. Emma, aside from

5    e-mailing me his curriculum vitae, which is

6    attached to this discovery packet, which is an

7    e-mail which I received this morning, which I am

8    going to turn over to Mr. Mitchell now.  I will CC

9    copies to the Court if the Court prefers.

10           And --

11           THE COURT:  All right.  I will take a

12   look at it.  Thank you.

13           MR. CAPPOCK:  Your Honor, as to Mr.

14   Emma, that is the only e-mail correspondence that

15   I have with him that states anything of any type

16   of nature.  And we have met many times, Mr. Emma

17   and I.

18           There were several pages of handwritten

19   notes, which he has, which are the only notes he

20   generated of a handwritten nature.  Virtually all

21   of his handwritten materials are within the final

22   report that he submitted to Judge Pesce, which has

23   been turned over, I believe several times

24   actually, to Mr. Mitchell.  And that's a

25   typewritten report that was submitted to the Court

MS

Proceedings                                                    18

1   that was turned over to Mr. Emma, to Mitchell and

2   was turned over to my office as well.

3            THE COURT:  Was there any Rosario

4   material generated by members of law enforcement,

5   including members of your office, in interviewing

6   Mr. Emma?

7            MR. CAPPOCK:  No.  Actually, your Honor,

8   I take that back.  I think there was.  I'm just

9   going to go through the folder to be sure.

10           I believe when Vincent Verlezza,

11  V-E-R-L-E-Z-Z-A, who I believe is now retired, he

12  actually interviewed Mr. Emma, there were

13  handwritten notes generated by Mr. Verlezza that

14  were previously turned over to Mr. Mitchell.

15           THE COURT:  All right.  You say those

16  notes were previously turned over to Mr. Mitchell.

17           MR. CAPPOCK:  Correct, your Honor.

18           THE DEFENDANT:  And I will confirm that

19  I do have notes from Mr. Verlezza regarding Mr.

20  Emma.

21           MR. CAPPOCK:  And there were not

22  voluminous notes but notes that I took myself,

23  when I first met with Mr. Emma, that I turned over

24  as well.  There actually was never any police

25  interviews or any non-financial investigator

MS

Proceedings                                    19

1    interviews in this case.

2              THE COURT:  All right.  And there again

3    I would include law enforcement any financial

4    investigators employed by your office.  Did that

5    occur?

6              MR. CAPPOCK:  That would actually be Mr.

7    Verlezza was previously assigned financial

8    investigator.  Mr. Gillon, who was referenced

9    before, has not generated notes of interviews of

10   anybody.

11             THE COURT:  If you might just stay with

12   me.  We're done with Emma.  Let's go on to

13   Weintraub.

14             MR. CAPPOCK:  Shari Weintraub, first of

15   all, is not a witness that the People plan to

16   call.

17             THE COURT:  What was her role, if any,

18   in this?

19             MR. CAPPOCK:  My understanding is that

20   she reviewed -- she was a previous guardian ad

21   litem appointed prior to when the alleged larceny

22   took place and she reviewed the financial report

23   that was submitted by Charles Emma.  It's the

24   People's position she doesn't have any real

25   information to provide of any use to the

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page132 of 374

1    prosecution's case in chief.  I have not generated

2    any notes, nobody in my office has generated any

3    notes, and she's not on our witness list.

4              THE COURT:  She was guardian ad litem to

5    the executrix?

6              MR. CAPPOCK:  Right.  She was appointed,

7    I believe, shortly after the deceased's death,

8    Charles Brown.

9              THE COURT:  Now, how about an attorney's

10   last name is Bull, B-U-L-L?

11             MR. CAPPOCK:  B-U-L-L.  He is actually

12   the attorney representing Eugene Davis who is the

13   brother of Minnie Simmons.  I have spoken to him

14   on numerous occasions.  He is actually on our

15   witness list and I believe --

16             THE COURT:  Bull is on your witness list

17   or the --

18             MR. CAPPOCK:  Colin Bull is on my

19   witness list.

20             THE COURT:  And he was the attorney for

21   the brother of Minnie Simmons?

22             MR. CAPPOCK:  Correct.

23             THE DEFENDANT:  Brother-in-law, sir.

24             MR. CAPPOCK:  I am sorry,

25   brother-in-law.

Proceedings                                   21

1          THE COURT:  Was he beneficiary of --

2          THE DEFENDANT:  Yes.

3          MR. CAPPOCK:  Yes, he was co-executrix.

4   Actually, Mr. Verlezza interviewed him on multiple

5   occasions.  I turned over all those notes to Mr.

6   Mitchell.

7          I have spoken to Mr. Bull on numerous

8   occasions.  He's indicated that in the nature of

9   handwritten notes, he has not generated

10  independent interview note.

11         THE COURT:  Did he submit any report to

12  the Court?

13         MR. CAPPOCK:  No.

14         THE COURT:  To Judge Pesce?

15         MR. CAPPOCK:  He has not submitted any

16  note to the court.  Do you mean like in the nature

17  of the Charles Emma report?

18         THE COURT:  As guardian ad litem.

19         MR. CAPPOCK:  No.  I am sorry, he is not

20  a guardian ad litem.  He is actually an attorney

21  who represents a family member.  He didn't submit

22  any report.  He actually did appear in court on

23  multiple occasions and that appears within the

24  minutes that have been turned over to Mr.

25  Mitchell.

MS

Proceedings                                          22

1          THE COURT:  How about McNulty?

2          MR. CAPPOCK:  McNulty is not on my

3    witness list.  He is not somebody who my office

4    had any contact with.  In my opinion, in my

5    assessment of the case, he is somebody that is not

6    relevant to the People's case.  If the defendant

7    wants to call him as a witness, if he thinks there

8    is information and he wants to make an offer of

9    proof to that effect, he is not somebody who is

10   part of the People's case.

11         THE COURT:  Kaplan.

12         MR. CAPPOCK:  Marshall Kaplan was

13   actually the attorney prior to Mr. Mitchell.

14   Given the allegations in this case of Mr. Mitchell

15   having stolen money, it's the People's position

16   that Marshall Kaplan is an irrelevant witness to

17   this case.  Again, I actually --

18         THE COURT:  The property.

19         MR. CAPPOCK:  Marshall Kaplan I did put

20   on the witness.  I do not anticipate calling him.

21         THE COURT:  He was the attorney prior to

22   this, to the sale of the property?

23         MR. CAPPOCK:  Correct, your Honor, and

24   prior to the hiring of Mr. Mitchell.

25         THE COURT:  And now this Mr. Gillon.

MS

Proceedings                                      23

1          MR. CAPPOCK:  Neil Gillon, again, your

2    Honor, is the currently assigned financial

3    investigator following the arrest of the

4    defendant, following the indictment of the

5    defendant.  And following the retirement of

6    investigator Vincent Verlezza, who was the

7    investigator through indictment and arrest, Mr.

8    Gillon, who is our chief financial investigator,

9    was brought in to review the financials, basically

10   to step in as a testimonial witness to testify to

11   all financials in this case.

12          Mr. Gillon has prepared new charts

13   analyzing the subject bank accounts in this case

14   but he has not made any independent notes.  He

15   reviewed Mr. Verlezza's but there is no

16   independent Rosario.  All copies of the new charts

17   have been turned over to Mr. Mitchell.

18          THE COURT:  Now, I know the Brooklyn

19   District Attorney's Office engages in what is

20   referred to as open file discovery.  That is often

21   they go beyond the strictures of People versus

22   Rosario, the requirements of the statute.  Have

23   you used that standard in this case, Mr. Cappock,

24   in giving discovery materials to Mr. Mitchell?

25          MR. CAPPOCK:  Yes, your Honor.  There

Proceedings                                    24

1    are some materials I've turned over that arguably

2    would not even be considered Rosario.  But, yes,

3    we have filed the parameters of open file

4    discovery.

5              THE COURT:  There are no outstanding

6    reports filed with the Court that you're aware of?

7              MR. CAPPOCK:  None that I am aware.

8    None that I'm in possession of.

9              THE DEFENDANT:  Sir, I take issue with

10   one thing he said.  May I be heard?

11             THE COURT:  Go ahead, Mr. Mitchell.

12             THE DEFENDANT:  There were subpoenas

13   that were issued in this case that I believe were

14   unlawfully issued.  It could go to, if I were to

15   examine the financial investigator, I might want

16   to cross-examine with regard to how it was he

17   acquired access to my bank report and records and

18   whether or not those records were acquired

19   lawfully.  The subpoenas were issued in either

20   2008 or 2009.

21             THE COURT:  Were they Grand Jury

22   subpoenas?

23             THE DEFENDANT:  See, that's the thing,

24   they were not Grand Jury subpoenas.  I don't

25   believe the Grand Jury that indicted me was

MS

Proceedings                                    25

1    actually sitting at the time that these subpoenas

2    were issued, which would make them unlawful

3    pursuant to People v. Dodi.

4            So the reason why I am asking -- and what

5    I am asking is for copies of all subpoenas that

6    were issued by the District Attorney's Office from

7    the inception of their investigation, even

8    particularly if they were not Grand Jury

9    subpoenas, that were issued prior to the sitting

10   Grand Jury that indicted me.

11           I was indicted in 2010 and these

12   subpoenas were issued either in 2008 or 2009. I

13   am pretty sure whichever Grand Jury indicted me,

14   these subpoenas had nothing to do with them.

15           THE COURT:  Mr. Cappock, you want to be

16   heard on that?

17           MR. CAPPOCK:  I don't have these

18   subpoenas in front of me, your Honor.  This is the

19   first issue that I have heard of this.  But, your

20   Honor, if the defendant suggested that we

21   empaneled a Grand Jury for -- sitting for years

22   for purposes of waiting to indict him, I take

23   exception with his concept of how a Grand Jury

24   works.

25           This was an investigation, an open

MS

Proceedings                                    26

1    investigation.  It was referred to us by Judge

2    Pesce's office -- I am sorry, referred to us by

3    Judge Pesce specifically, at which point that

4    necessitated a full analysis of the defendant's

5    bank record.  Subpoenas were issued, subpoenas

6    that were granted in the regular course of

7    business, and that were issued -- I am sorry, were

8    served upon Chase Bank.

9          Now, I will note, your Honor, that the

10   defendant had previously been very resistant, even

11   with Charles Emma, in allowing his bank records to

12   be analyzed to the point Judge Pesce himself had

13   to intervene and threaten to hold the bank in

14   contempt if they didn't immediately comply with

15   the subpoena, which the defendant filed a motion

16   to quash seeking to hide his banking activity.

17         So, it was obvious there was no way the

18   defendant was going to voluntarily give over his

19   own banking records.  A subpoena was necessary in

20   this case.  And the defendant was indicted in

21   2010, but the subpoena process that was followed

22   was completely legal.

23         THE DEFENDANT:  May I be heard briefly,

24   sir?

25         THE COURT:  Go ahead.

MS

AP-465

Proceedings                                        36

1    fails.  And the witness said that she didn't sign

2    it and there is no counteraffidavit submitted by

3    the People with a person with knowledge that says

4    otherwise to what she testified to.

5              THE COURT:  And did she testify in the

6    Grand Jury?

7              MR. CAPPOCK:  No, she did not, your

8    Honor.  One thing just to clarify.

9              THE COURT:  Wait, wait.  Did you use the

10   660 in the Grand Jury?

11             MR. CAPPOCK:  No, we did not.  It was

12   done after the Grand Jury.

13             THE DEFENDANT:  No, sir.  They used the

14   affidavit that you have in the Grand Jury.

15             THE COURT:  Okay.  This would seem to be

16   the equivalent of a permission or authority

17   affidavit which is authorized by statute before

18   the Grand Jury.

19             THE DEFENDANT:  Yes, CPL 190.30, I

20   think, (6).

21             THE COURT:  So, I don't know if it

22   was -- this was an exhibit in the Grand Jury?

23             MR. CAPPOCK:  Correct, your Honor, that

24   was an exhibit in the Grand Jury.

25             I would just note, your Honor, my

Proceedings                                                    37

1    position is I cannot pick and chose what pieces of

2    evidence that were previously entered that I want

3    to hand up to the Court.  I am handing up all four

4    pieces of evidence.  It's not the People's

5    intention to submit Exhibit Number 4 to the jury.

6    If he is asking for it not be shown to the jury,

7    I'm not going to oppose that.

8              THE COURT:  I don't think it would be

9    admissible at the trial.

10             THE DEFENDANT:  I understand it wouldn't

11   be admissible at trial.  But the problem --

12             THE COURT:  It goes back to your

13   jurisdiction issue.

14             THE DEFENDANT:  That's it precisely.

15             THE COURT:  Mr. Cappock, you want to say

16   anything in regard to in limine motions?

17             MR. CAPPOCK:  Just one other brief thing

18   I want to make sure I address.  Now, in his -- in

19   his capacity as guardian ad litem, the witness,

20   Charles Emma, is called upon to make certain

21   determinations based upon facts that he

22   investigates in relation to the Judiciary Law in

23   relation to the Rules of Professional

24   Responsibility.

25             Obviously, the Court's job is to instruct

MS

 1              I know Minnie Simmons has been in a

 2     nursing home for many years.  And typically it's a

 3     box a year.  A /HREU /TKPWAEUGS box a year for

 4     medical records for somebody under that type of

 5     care.  I don't know the amount or size or date or

 6     period of time or anything about what was

 7     furnished to the Court to review.  For all I know,

 8     they might have furnished records for a week.

 9              It is completely and patently unfair.  As

10     defense, I should have an opportunity to review

11     those records in camera.  I should have an

12     opportunity to review those.

13              That said, why is the Alzheimer's issue a

14     defense?  If Minnie Simmons was not competent to

15     offer evidence to the Grand Jury.

16              THE COURT:  Listen, you are getting back

17     to the indictment again.  I am worried about the

18     trial here, not the indictment.

19              THE DEFENDANT:  Okay.  I think that the

20     indictment issue is important.  That was one.

21              THE COURT:  If, for example, the jury,

22     they're persuaded by you that Minnie Simmons was

23     suffering from Alzheimer's, the fact that we know

24     the house was sold and if the proceeds can't be

25     accounted for and you were responsible, how does

Proceedings                                                    48

1        the fact she have Alzheimer's --

2                    THE DEFENDANT:  No one is alleging that

3        Minnie Simmons has Alzheimer's at the time of the

4        sale of the house.  That's not being alleged.  And

5        anybody that suggests that should -- the objection

6        should be granted.  That is not a part of the case

7        that she was suffering from Alzheimer's at that

8        time.

9                    What is a part of the case is capacity to

10       offer evidence with regard to what happened at

11       that time and whether or not that capacity was

12       inhibited because of Alzheimer's disease.  In

13       other words, although the People might not --

14                    THE COURT:  How is her capacity, if she

15       had Alzheimer's, how is her a capacity to receive

16       the proceeds of the house from you impaired?  See,

17       that's what I am thinking about.

18                    THE DEFENDANT:  No.  No, sir.  There is

19       no allegation that I stole money from someone who

20       had Alzheimer's disease.  That is not a part of

21       the case and it never was a part of the case.  And

22       if it's being brought as part the case, there

23       would be an objection and it would be stricken

24       because it's not a part of the case.

25                    The People have always maintained, always

MS

Proceedings                                    49

1    maintained that Minnie Simmons is of sound mind.
2    The reason that Alzheimer's is important to the
3    defense, if she has Alzheimer's when she begins to
4    offer evidence against the defendant, it inhibits
5    her ability to recall and remember the details of
6    what actually happened and that is prejudicial to
7    the defense.

8         So, for example, the Article 660 hearing
9    I believe took place in May of 2011, right?  Was
10   it May of 2011?  I am pretty sure it was May of
11   2011.  Right, it was.  Yes, it was May of 20 --

12        MR. CAPPOCK:  May 18, 2011.

13        THE DEFENDANT:  It was May 2011.

14        If the witness was suffering from
15   Alzheimer's at that time and it was withheld from
16   me, it does a couple of things.  First one is
17   prejudices my ability to cross-examine the
18   witness.

19        THE COURT:  Okay.  That's assuming, for
20   the sake of argument, that the People are going to
21   offer that as part of their direct case.

22        THE DEFENDANT:  Well, I might have
23   wanted to offer her testimony, I might have wanted
24   to have called her, and I don't know if that
25   witness's memories were prejudiced or not.

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page144 of 374

Proceedings                                        50

1          THE COURT:  I think I have your argument

2    in regard to this.

3          THE DEFENDANT:  There is another issue.

4          THE COURT:  Go ahead.

5          THE DEFENDANT:  I understand Judge Pesce

6    is a witness in this case.

7          THE COURT:  Is that correct, Mr.

8    Cappock?

9          MR. CAPPOCK:  That is correct, your

10   Honor.

11         THE COURT:  Go ahead.

12         THE DEFENDANT:  Judge Pesce lacked the

13   jurisdiction to proceed with regard to any

14   component of the guardianship case and he admitted

15   it in an order that he prepared regarding Mr.

16   Emma's request to be billed.  So in, other words,

17   everything that Judge Pesce did with respect to

18   this case, he did not have the jurisdiction to do

19   and was unlawful and he knew it at the time.

20         And I don't have -- I don't have the

21   orders with me from the guardianship, but what

22   happened was at some point there was an

23   application to be made by Mr. Emma and who was the

24   guardian ad litem.  It was opposed by Traveller's

25   Insurance Company and myself on jurisdictional

MS

AP-471

Case 23-705, Document 32, 07/24/2023, 3547454, Page145 of 374

Proceedings                                             51

1    grounds.

2              What happened is that Mr. Brown, the

3    ward, the guardian ward and then later the

4    decedent in the estate, Mr. Brown passed away in

5    2003.  Once he passes away, the guardianship is

6    extinguished and then it becomes a surrogate

7    matter.  My permission to sell the house was by

8    means of an order from Surrogates Court.

9              And I raised the jurisdictional issue

10   with Judge Pesce on numerous occasions I did not

11   have an obligation to respond to.  Judge Pesce

12   could have tried to hold me in contempt, if he

13   wanted to, and he would have failed because he

14   didn't have jurisdiction.  He never, in fact, did

15   hold me in contempt for not answering him.

16             And at some point later in the

17   litigation, Mr. Emma sought to be paid, he seeks

18   to be paid, McNulty opposes it and says, Look, we

19   are the bond company for the guardianship.  The

20   premiums were paid for the guardianship.  The

21   guardianship extinguished in 2003.  I don't have

22   to pay Emma because anything that happened, if

23   anything that supposedly happened that was bad,

24   happened long after the guardianship was over.

25   Judge Pesce agreed with that sentiment and

MS

Proceedings                                                52

1     dismissed the surcharge application on that basis.

2          That means that everything was unlawful.

3     And the reason why that's important is because

4     this investigation, the seizure of my bank records

5     by Mr. Emma, the seizure of my bank record by

6     Judge Pesce, all were done at a time when Judge

7     Pesce did not have the jurisdictional authority to

8     do so.

9          THE COURT:  Did you make this motion as

10    part of your application to dismiss the

11    indictment?

12         THE DEFENDANT:  No, sir, I did not.  I

13    did not do that.  I was going to.  The reason why

14    I didn't do it was because I wanted a hearing and,

15    you know, you pressed us so we have to do it.  I

16    wanted a hearing because I want to have Emma

17    answer that question.  I want to put him on the

18    stand.

19         THE COURT:  Either of you can answer

20    this.  Was Emma subsequently reimbursed by the

21    Surrogate Court or did Judge Pesce say, Despite

22    what appears to be a lack of jurisdiction, I am

23    still paying Mr. Emma?

24         THE DEFENDANT:  What you just said.

25         THE COURT:  The second part, is that

Proceedings                                      53

1    what happened?

2              MR. CAPPOCK:  I would have to follow up

3    with Mr. Emma.

4              THE DEFENDANT:  If you want me to tell

5    you what happened, I can, and Mr. Cappock can back

6    it up.  But what happened is that Judge Pesce paid

7    Mr. Emma not for the investigation, the surcharge

8    component of it, he paid him for doing a final

9    accounting.  So because there was supposedly an

10   absence of a final accounting offered, so Judge

11   Pesce paid him for that, but he specifically said

12   I cannot pay him for the investigative part, which

13   includes grabbing at may bank records unlawfully.

14             And, I might add, too, that Mr. Emma

15   assisted the Brooklyn District Attorney in their

16   investigation by reviewing my records.  And at

17   some point Mr. Emma became a state actor, he was

18   deputized in effect.  Although not paid, deputized

19   by the district attorney to rifle through my bank

20   records in support of this case.

21             It's my position, given this egregious

22   behavior, because it is for a judge to on his own

23   act unlawfully cease jurisdiction in a

24   circumstance where he doesn't have it, that all of

25   the evidence against me, all of the bank records

Proceedings                                                54

1   should be stricken as fruit of the poisonous tree.

2            THE COURT:  But their argument there

3   that, Judge Pesce, he found that the accounting

4   was necessary.  The accounting included an

5   investigation of where the proceeds of the sale of

6   the home went as part of the guardianship.

7            THE DEFENDANT:  He did do that.  But the

8   problem with that, sir, is, again, Judge Pesce did

9   not have the authority to do that.  He was not, he

10  didn't, and he admits it.  He acknowledging the

11  cases.

12           The reason I -- why I wanted to call Mr.

13  McNulty to the stand is Mr. McNulty prepared the

14  memorandum of law that convinced Judge Pesce to do

15  what it was that he did.  I prepared similar

16  memorandums, that were ignored by the court, Judge

17  Pesce didn't have in order to do what he did.

18           THE COURT:  Mr. Cappock, the nature of

19  his testimony at this trial would be that he

20  presided over these proceedings in Supreme Court

21  and he made efforts to locate these funds through?

22           MR. CAPPOCK:  He actually made

23  efforts -- repeated efforts to get a straight

24  answer from the defendant as to where the final

25  accounting was, was given all sorts of the

MS

Proceedings                                          55

1      excuses.  Defendant made certain admissions to him

2      and made certain inconsistent statements through

3      the course.

4              THE COURT:  I just wanted to know the

5      nature of his testimony and this was all about

6      getting a final accounting, which Judge Pesce was

7      acting with the parameters of his job overseeing

8      this case.

9              Mr. Mitchell, you get the final word on

10     this issue.

11             THE DEFENDANT:  Thank you.

12             Judge Pesce was only entitled to a final

13     accounting up until the day Mr. Brown died, which

14     was in June of 2003.  He was not entitled to an

15     accounting beyond that point.  That was the

16     purview of the Surrogates Court.

17             So, Judge Pesce only could order Mr. Emma

18     to prepare a final accounting for events up until

19     June of 2003.  Anything beyond that, he did not

20     have jurisdiction to do.

21             THE COURT:  Okay.

22             Mr. Mitchell, anything else that you want

23     to raise at this point?

24             THE DEFENDANT:  One moment, sir.

25             Yeah.  I don't know if this is going to

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page150 of 374

Proceedings                                            56

1   be included in what it is you want us to talk

2   about.

3         THE COURT:  I'd like to hear if you

4   think -- if it's -- let me know right now.

5         THE DEFENDANT:  There is a person named

6   Balsam from HRA who's going to testify.  The

7   People are going to call him as a witness.  I

8   certainly would if they don't.  He has a file and

9   the contents of the file are things that we may or

10  my not be able to stipulate as to them being

11  placed in evidence.  Some of them will be placed

12  in the evidence for the truth of the matter

13  asserted, some of them might be considered notice.

14  They might have a hearsay exception but it's a big

15  file.  It's got a lot of stuff in it, something

16  that's going to be a pain in the neck to go

17  through, and it's important stuff and it's

18  redundant in a way, too.

19        Mr. Cappock was talking about, you know,

20  the guardianship file, the probate file.  There is

21  a lot of stuff in both files so, you know, we kind

22  to have to sort that out.

23        THE COURT:  Mr. Cappock, are you calling

24  Mr. Balsam as a witness?

25        MR. CAPPOCK:  I have him on my witness

MS

AP-477

Proceedings                                           57

1     list, your Honor.  My intension, as I stand here

2     right now, is depending on the cross-examination,

3     I might call him as a witness.  I would say more

4     likely calling him as a rebuttal witness.

5     However, Mr. Mitchell has indicated to me numerous

6     times that he --

7                THE COURT:  I wanted to ask you if he is

8     going to be a witness, for whatever side, then I

9     would ask you to go through the record, whether

10    they're admissible, not admissible.  If you can

11    agree, you can agree.  If you can't, bring the

12    disagreements to my attention and I will make that

13    decision during the trial.

14                THE DEFENDANT:  There is a -- same thing

15    for materials in the guardianship and probate

16    file.  For example, there are obviously hearsay

17    and prejudicial statements in the guardian file

18    saying, Oh, Mitchell is not doing his job, things

19    of that nature, those are, I think, are

20    inadmissible.  But the forms -- I mean, the forms

21    are court records, like the probate form, should

22    be admissible.

23                THE COURT:  We can go through a process

24    of redaction what is admissible, what's not.

25                THE DEFENDANT:  But we have to do that.

MS

.Proceedings                                        58

1          THE COURT:  But there again it's

2     unusual.  My practice is to ask an attorneys'

3     attempt to do that.  If they disagree, I will make

4     a decision as to what should be redacted or not.

5          THE DEFENDANT:  All right.  I mean,

6     that's it then.  If we can do that, the next thing

7     that I have a problem with is, you know, I don't

8     have any resources.  I would really --

9          THE COURT:  If you are getting to the

10    issue of witness availability that you need.

11         THE DEFENDANT:  Yes, and other things as

12    well.

13         THE COURT:  Well, what are the other

14    things besides having witnesses made available?

15         THE DEFENDANT:  You know, I am broke.  I

16    show up here at nine o'clock.  I'm not a flight

17    risk.  I would like my sureties relieved.  I would

18    like -- I need at least some of the bail money

19    released to me, I don't know, sureties.  I show up

20    here every day 8:30.  Every day I come here.  You

21    have my passport.  I'm not going anywhere ever.

22         THE COURT:  I'm not going to reargue or

23    exonerate any portion of the bail at this point.

24    All right?

25         THE DEFENDANT:  I ask, with regard to

Case 23-705, Document 32, 07/24/2023, 3547454, Page153 of 374

Proceedings                                    59

1    that, I do need help in getting witnesses here.

2              THE COURT:  We'll get to that.  That's

3    on my list.

4              What I would like to do now and, please,

5    I must do this as a matter of practice, I am going

6    to have the clerk of the court hand down the to

7    you the Parker Warnings.  And please review them

8    and sign them and I'll go over them with you.

9              THE DEFENDANT:  All right.

10             THE COURT:  Thank you.  Not the

11   Antommarchi.

12             Let me know when you're ready.

13             MR. REULAND:  Judge, I have offered to

14   explain the Parker Warnings to Mr. Mitchell.  He

15   declined my services.

16             THE COURT:  Well, I think Mr. Mitchell,

17   having been a former, with all due respect, former

18   assistant district attorney in New York County and

19   a practicing lawyer, I am sure he should be

20   familiar with Parker Warnings.

21             But please understand, Mr. Mitchell, I

22   don't ask these questions to demean you or

23   question your knowledge.

24             THE DEFENDANT:  There has to be a

25   record.

Proceedings                           60

1            THE COURT:  I must do that.

2            Handed up to me a document is entitled

3    Parker Warnings.  Mr. Mitchell, have you had an

4    opportunity to review this document?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Sir, I'm going to ask you to

7    raise your right hand.

8            (The Defendant was duly sworn and/or

9    affirmed by the Court:)

10            THE DEFENDANT:  I do, sir.

11            THE COURT:  Is the first signature on

12    the right side of this document your signature?

13            THE DEFENDANT:  Yes, it is, sir.

14            THE COURT:  Sir, do you understand this

15    trial will begin tomorrow with the selection of a

16    jury?  If you voluntarily of your own free will

17    fail to appear on a day during the course of your

18    trial, I will consider it your decision to waive

19    your right to be present at trial and, therefore,

20    the trial will continue in your absence.  Do you

21    understand that?

22            THE DEFENDANT:  I do.

23            THE COURT:  And do you understand that

24    by voluntarily failing to come to court and the

25    trial proceeding in your absence, you will give up

MS

Proceedings                                          69

1          THE COURT:  And do you recall what the
2     amount was that he was paid?
3          THE DEFENDANT:  More than $168,000.
4          THE COURT:  All right.
5          THE DEFENDANT:  Or 65.  Somewhere in the
6     one-sixty.
7          THE COURT:  Was it to pay liens on the
8     property?
9          THE DEFENDANT:  Yes.
10          THE COURT:  All right.  Okay.
11          Weintraub, Mickalay.  Who else?
12          THE DEFENDANT:  Fataah.  Mr. Fataah.
13          THE COURT:  F-A-T-A-A-H?
14          THE DEFENDANT:  I think so, F-A-T-A-A-H.
15          THE COURT:  What's his first name?
16          THE DEFENDANT:  I don't remember.  It's
17     an Arab name.
18          THE COURT:  What is his involvement?
19          THE DEFENDANT:  He was a creditor of
20     Minnie Simmons.  He was a person Mr. Verlezza
21     interviewed who participated in the prospect of
22     purchasing this property.
23          THE COURT:  Okay.  He goes to Ms.
24     Simmons to talk about the sale of the property.
25          THE DEFENDANT:  No, he was a buyer.  He

MS

Proceedings                                              70

1    was a buyer that we ultimately did not sell to.

2    But the reasons why we didn't sell to him are

3    important to my defense.  Mr. Verlezza interviewed

4    him and has notes, prepared note based on his

5    discussion.

6              THE COURT:  How is it relevant?

7              THE DEFENDANT:  How is it relevant?

8              THE COURT:  Yes.

9              THE DEFENDANT:  It will show how -- the

10   reason why the expenditures were made in the

11   manner that they were.

12             THE COURT:  There again -- and he is an

13   attorney?

14             THE DEFENDANT:  No, he is not.  Well, I

15   don't know if he is.  I don't think so.

16             THE COURT:  There again I think we're

17   sort of jammed up here.

18             THE DEFENDANT:  He is a person that they

19   did interview.  The District Attorney's Office did

20   interview him.

21             THE COURT:  The DA stated his position

22   there again, that's why I need a -- before I am

23   going to issue a subpoena and perhaps assign an

24   18-B investigator to serve these subpoenas on your

25   behalf, I have to have an offer of proof that

MS

Proceedings                                    71

1           convinces me that that is not a fishing

2       expedition.

3                   THE DEFENDANT:  It's not.

4                   THE COURT:  How is he going to impact

5       whether you did or did not steal this money from

6       the estate?

7                   THE DEFENDANT:  Because he was one of

8       the people -- then I have to -- I have to report

9       my defense, which I don't want to.

10                  THE COURT:  Well, sir, I can't drag

11      people -- I'm not the grand jury and you made a

12      request to have witnesses called and I have

13      agreed.  I'm not going to drag somebody in if I am

14      ultimately going to rule it's irrelevant.  Do the

15      People --

16                  THE DEFENDANT:  Okay.  There are

17      documents that I need authenticated that will

18      demonstrate why it was the money was spent the way

19      it was spent.  And the person who could

20      authenticate the document is a lawyer named Eugene

21      Romano.  He is dead.  He died.  He lived in -- he

22      worked in South Brooklyn and he lives in Jersey

23      and he died a few years ago.

24                  THE COURT:  What would the nature of his

25      involvement be in this case?

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page158 of 374

Proceedings                                          72

1          THE DEFENDANT:  He was Mr. Fataah's

2    lawyer and Mr. Fataah would be able to

3    authenticate the documents that Mr. Romano signed

4    with regard to payment of tenants and things of

5    that nature.

6          THE COURT:  At 302?

7          THE DEFENDANT:  Yes.  Otherwise I might

8    be able to introduce these documents in as my

9    business record.

10          THE COURT:  Was it part of the closing

11   statement?

12          THE DEFENDANT:  No.  No, it's not part

13   of the closing statement.  It's independent of the

14   closing statement.  But Mr. Romano was somebody

15   who got paid by the estate and there were reasons

16   and Mr. Fataah knows those reasons.  Not only does

17   he know those reasons, he is also capable of

18   authenticating the documents in support of it.  He

19   is important.

20          THE COURT:  But they're again I have to

21   consider this.  If the defense -- let me just

22   finish -- if these witnesses are going to be.

23   Called to establish that in other matters you made

24   proper disbursements --

25          THE DEFENDANT:  Not in other matters, in

MS

AP-485

Case 23-705, Document 32, 07/24/2023, 3547454, Page159 of 374

Proceedings                                    73

```
 1    this matter.  In the Simmons matter.  In the 302
 2    sale.  Mr. Fataah is home talking about the 302
 3    sale.  I don't know about any of his other
 4    business other than the 302 sale, that's it.
 5              THE COURT:  Mr. Fataah was what in
 6    regard to 302?
 7              THE DEFENDANT:  A prospective purchaser.
 8              THE COURT:  Did he purchase the
 9    property?
10              THE DEFENDANT:  No.
11              THE COURT:  What is this about Mr.
12    Romano?  Romano is related to Fataah?
13              THE DEFENDANT:  Yes, he is the attorney
14    for Mr. Fataah.
15              THE COURT:  What is this about, rents?
16              THE DEFENDANT:  No, this is paying to
17    get rid of the tenants.  This is about payments
18    made to get rid of tenants.
19              THE COURT:  So the owner of the
20    property, you as the attorney for the estate,
21    entered into negotiations with Mr. Fataah to make
22    payment to the tenants to get out.
23              THE DEFENDANT:  Right.
24              THE COURT:  How is that relevant to the
25    subsequent sale of the building?
```

MS

Proceedings                                              74

1          THE DEFENDANT:  Because we fronted the

2      money so they had to be paid and that's how --

3      that's what happened.

4          THE COURT:  Did you ever make this claim

5      before Judge Pesce?

6          THE DEFENDANT:  No.  It wasn't something

7      that I could make.

8          THE COURT:  Because it seems to me now

9      you're arguing sort of like an offset.

10         THE DEFENDANT:  Sir --

11         THE COURT:  Go ahead.

12         THE DEFENDANT:  -- I did not make any

13     arguments to Judge Pesce as to what it is that

14     happened and there were good reasons for it.

15         THE COURT:  Did you give any statements

16     in writing or orally to Mr. Emma when he was

17     investigating the --

18         THE DEFENDANT:  Yes.

19         THE COURT:  -- the money?

20         THE DEFENDANT:  Yes.  That's why they

21     interviewed Mr. Fataah.

22         THE COURT:  And made this assertion

23     before Mr. Emma.

24         THE DEFENDANT:  Yes.  And that's why

25     they interviewed Fataah, either Emma or somebody

MS

Proceedings                                    96

1    understand that this is delicate situation and,

2    please, I hope to make this a civil presentation

3    and have the case decided on the merits.

4              THE DEFENDANT:  Sir, there is one other

5    issue that is very important I just want to bring

6    to your attention and relates to what you just

7    said.  Judge Pesce is going to testify and I think

8    it's very important to instruct the jury that

9    Judge Pesce is to be treated as any other witness

10   as well.  That's very --

11             THE COURT:  There again that's something

12   you would bring to my attention at the end of the

13   case I would be inclined.

14             THE DEFENDANT:  I think they should be

15   told about that before.

16             THE COURT:  That's the police thing.  I

17   don't stop, during regular trials, to tell the

18   jury that they are to consider -- well, there

19   again, depending on whether you voir dire, I may

20   jump in on that issue, but I will make it clear to

21   them that any witness must be judged in the same

22   way as any other witness.  That the status of that

23   judge, of the witness has no role to play in

24   deciding whether the witness is truthful and

25   accurate.

MS

# EXHIBIT 50

**People v. Mitchell**
Indictment: 4743/2010

Excerpts from June 11, 2013
Pre-trial Hearing
(Garnett, J.)

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF KINGS - CRIMINAL TERM - PART 11
 2   ------------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,
 3
                     -against-
 4
     STEPHEN MITCHELL,
 5                                Defendant.
     ------------------------------------------------X
 6   Indictment # 4743/10        VOIR DIRE

 7

 8
                            320 Jay Street
 9                          Brooklyn, New York 11201
                            June 11, 2013
10
     B E F O R E:
11             HONORABLE WILLIAM GARNETT,
          Justice, and jury.
12
     A P P E A R A N C E S:
13
             OFFICE OF CHARLES J. HYNES, ESQ.
14           DISTRICT ATTORNEY - KINGS COUNTY
                350 Jay Street
15              Brooklyn, New York 11201
             BY:  PATRICK CAPPOCK, ESQ.
16              Assistant District Attorney
                For the People
17

18           STEPHEN MITCHELL
                Pro se
19
             ROBERT REULAND, ESQ.
20              Legal Advisor

21

22

23
                            Marc Shiffman
24                          Senior Court Reporter

25
```

MS

Proceedings                                                    19

1             MR. MITCHELL:  Sir?

2             THE COURT:  Yes, sir.

3             MR. MITCHELL:  We didn't address any of

4    the issues regarding disclosures I was supposed to

5    get.  There was no rulings with respect to those

6    things.  For example, I don't know -- I would like

7    a representation by the assistant district

8    attorney with regard to any other -- any Rosario

9    material by the district attorney with respect

10   specifically to Minnie Simmons or notes,

11   correspondence, letters, whatever from the lawyer,

12   from the people that they have on their witness

13   list with regard to conversations they may have

14   had with Minnie Simmons, myself or the district

15   attorney's office regarding this case, so I can

16   appropriately cross-examine this witness.

17            MR. CAPPOCK:  The People have turned

18   over everything in their possession, your Honor.

19   I met with Mr. Emma on numerous occasions.  I

20   believe I memorialized all this yesterday.  And

21   all notes that have been generated by the People,

22   all notes in the People's possession, all notes

23   from interviews by investigators by the People are

24   already in the defendant's possession and have

25   been for some time.

MS

Proceedings                                    20

1          THE COURT:  And you have -- you have

2    included in that package any private materials

3    which were turned over to the District Attorney's

4    Office, is that correct, held by third parties?

5          MR. CAPPOCK:  I am not sure what you

6    mean by --

7          THE COURT:  Your Rosario obligation in

8    regard to any statements taken by law enforcement,

9    DA.  But you are also responsible if third parties

10   have created notes that they have.  And it's their

11   property.  But if they turn them over to the

12   district attorney, that should be the subject of

13   Rosario.

14         MR. CAPPOCK:  Everything that's been

15   turned over to the district attorney has been

16   turned over to Mr. Mitchell.  I have had

17   conversations with other witnesses.  I know Mr.

18   Mitchell has made comment to Colin Bull.  I have

19   spoken to him.  He informed me on several

20   occasions that he does not take subjective notes

21   in this case.

22         THE COURT:  He could take notes, but did

23   you come in possession of them?

24         MR. CAPPOCK:  No, nothing that's not

25   already in the defendant's possession.  Everything

MS

Proceedings                                    21

1     that the People -- there are some handwritten

2     notes by Charles Emma, for instance, which I

3     turned over to Mr. Mitchell.  I -- actually, my

4     predecessor turned over to Mr. Mitchell.

5             MR. MITCHELL:  The one thing I'm not

6     clear on, sir, is this:  Does the assistant

7     district attorney have any Rosario material,

8     either prepared by themselves or by third parties

9     who gave it to them, pertaining specifically to

10    conversations with Minnie Simmons?  And I'm not

11    clear on that yet.  Have you turned any of

12    those --

13            MR. CAPPOCK:  Everything that's been

14    done by a representative of the office or has come

15    in the possession of the office has been turned

16    over to the defendant.

17            MR. MITCHELL:  I am asking specifically

18    are there -- I don't have -- let me put it this

19    way.  I have no notes from anyone involved with

20    the district attorney's case, any person that says

21    that they spoke to Minnie Simmons and recorded her

22    statement.  I don't have anything from anybody

23    that says that.  So, do you have that?

24            MR. CAPPOCK:  I do not have that, I

25    don't.

MS

Proceedings                                                22

1          THE COURT:  That's the representation on

2     the record.  If it turns out that's in error, the

3     Court will consider either striking testimony or

4     giving the jury an adverse inference charge.

5          MR. MITCHELL:  Sir, now with respect

6     to -- forgetting about things that were turned

7     over to the district attorney.  These lawyers may

8     have made notes or reference letters, things of

9     that nature that have -- that they didn't turn

10    over to the district attorney.

11         THE COURT:  It's not Rosario material.

12         MR. MITCHELL:  That's true.  But it's

13    certainly discoverable.  It's certainly pertinent

14    for my Sixth Amendment right to cross-examine

15    them.  I mean, that's a slick way of getting

16    around --

17         THE COURT:  Sir, it's three years down

18    the road since you have been indicted in this

19    case.

20         MR. MITCHELL:  I asked for them.

21         THE COURT:  This case had enumerable

22    ajournments for discovery.  There again the

23    discovery I am going to rule is now complete.  Any

24    lapses in discovery --

25         MR. MITCHELL:  There were no lapses,

Proceedings                                    26

1            It's very simple.  Just ask them to make

2    a copy of what they have and bring them with them.

3    If it's burdensome, then they can tell you it's

4    burdensome.  I doubt it is.  It's probably no more

5    than 30 or 40 pages of material for any of them.

6            THE COURT:  This is going to delay the

7    trial.  I'm not going to delay it any further.

8            MR. MITCHELL:  It doesn't delay.

9            THE COURT:  What are you going to do,

10   for example, if an attorney gives you 50 pages of

11   notes?  What are you going to do then?

12           MR. MITCHELL:  I'm going to read them.

13           THE COURT:  Within five minutes of the

14   witness testifying?

15           MR. MITCHELL:  Why should -- okay.

16   Couple of things.  Number one, the Sixth Amendment

17   allows me to cross-examine the witness fully and

18   fairly.  If somebody surprises me with 50 pages of

19   notes, the Court of Appeal's of the State of New

20   York says that a brief continuance would be

21   awarded and that would be an appropriate thing to

22   do.

23           As a matter of fact -- I think the name

24   of the case is People v. Perez -- the Court would

25   be obligated, if somebody surprised me with 50

Case 23-705, Document 32, 07/24/2023, 3547454, Page169 of 374

1    page of notes, to give me an opportunity to review

2    the notes and cross-examine the witness.  And

3    fundamentally that would be unfair.  Why would the

4    Court --

5              THE COURT:  There again, I don't know

6    why this was not a discovery issue and why a trial

7    issue.  Why would a judge in an upfront part not

8    deal with this?

9              MR. MITCHELL:  Because they didn't.  If

10   you peruse the file, they didn't.

11             THE COURT:  This comes to me ready for

12   trial after nearly three years and now I have to

13   decide whether I'm going to ask for additional

14   discovery from private parties?

15             MR. MITCHELL:  Well, sir, there is a

16   record.  There are minutes.  I asked for the

17   material.  I subpoenaed it.  People wouldn't act

18   on the subpoenas.

19             I called the witnesses myself.  I wrote

20   them personal letters myself a year ago asking

21   them for their files.  That is part of your court

22   record.  There's no lack of diligence on my part

23   to get this information.

24             For at least a year and a half, at least

25   that, since we've started saying we're ready to go

Case 23-705, Document 32, 07/24/2023, 3547454, Page170 of 374

1    to trial for real, I've done my part to get this

2    material.  I also have raised it to you when we

3    were on the cusp of going to trial before.  This

4    is not an untoward request and the Sixth Amendment

5    commands that I have it.  Just, please, sir.

6          THE COURT:  Just finish, please.  I have

7    your argument.  I understand what your argument

8    is.  Go ahead.

9          MR. MITCHELL:  What I was saying is not

10   turning the materials over, Emma has a file he

11   doesn't turn it over to the district attorney and

12   he gets on the stand, he gets an unfettered cross

13   because it's just a slick way of getting around

14   the Rosario rule.  That's all it is.  Oh, I didn't

15   give the district attorney that so, therefore, you

16   can't cross-examine me on any inconsistent

17   statements that I have in my personal file.

18   That's ridiculous.

19         THE COURT:  What happened?  You issued

20   subpoenas?  Did you serve them on the parties?

21         MR. MITCHELL:  Yes, I did.

22         THE COURT:  What was their response?

23         MR. MITCHELL:  They didn't respond and I

24   brought them up to the Court and the Court said

25   it's a trial issue.  I absolutely did that and

Proceedings                                           29

1    e-mailed them and I wrote them and it's all in the

2    trial file.

3              THE COURT:  This is my ruling.  I am

4    denying your request for an order for these

5    witnesses to bring in their materials.  I am

6    denying a subpoena at this time.  I am directing

7    the DA, please, have your witness bring all their

8    records with them when they're called to testify

9    and I'll take up the issue at that point.

10             MR. CAPPOCK:  Your Honor, if I can get

11   some clarification on --

12             THE COURT:  Emma is going to testify.

13   He did an investigation.  I am assuming he has a

14   file.  Tell him to bring the file with him.

15             MR. CAPPOCK:  I specifically discussed

16   this issue.  His reaction was I have a drawer full

17   of stuff.  A lot is a duplicate of what I have.  I

18   can attest I have 16 boxes in my office devoted to

19   Stephen Mitchell.  That's why I am saying --

20             THE COURT:  Tell him to bring as much he

21   believes is pertinent to his investigation.

22             MR. MITCHELL:  Your Honor, may I make a

23   specific request as to what it is he can bring?

24   We can cut through all of this.  He does not have

25   to bring anything that is in the court files, so

Proceedings                                              30

1    that eliminates his box, okay, because we have

2    access to -- both of us have copies of the probate

3    file and the guardian file.  So Emma doesn't have

4    to bring that.  That's already in the guardian

5    file or probate files.  Those things are thick and

6    heavy and a lot.  He doesn't have to bring them

7    because we have them.

8         What I don't have are communications that

9    he made with the district attorney, one of which I

10   got yesterday.  Maybe they exchanged letters about

11   this case.  I'd been interested in that.  Specific

12   notes on conversations with Minnie Simmons, if he

13   had them, that is one of the most important

14   things.  Minnie Simmons was the person I

15   represented.  If he has notes regarding --

16   or notes, correspondence that he sent to her.

17         THE COURT:  Well, you see, sir, there

18   again it boggles my mind, with all due respect to

19   the judges who handled this case before me in the

20   upfront parts, that this is not part of discovery.

21         MR. MITCHELL:  Maybe, sir, they didn't

22   treat me fairly and you are.  And that -- to be

23   honest with you, that is what happened.  There is

24   a court record.  You have a file with all of my

25   subpoenas, all of my personal letters.  And I sent

MS

Proceedings                                                           31

1    letters to those people individually, as well to

2    put them on notice because I was concerned about

3    spoilage.  If they spoil the information, then I

4    want to have a predicate to get a spoilage charge.

5             So I know what I am doing.  I did it a

6    year and a half ago.  The notes regarding this is

7    just a slick way of getting around Rosario, sir,

8    that's all it is.

9             THE COURT:  It's not Rosario material.

10            MR. MITCHELL:  No, I am talking about

11   the penumbra of Rosario.

12            THE COURT:  I don't find a penumbra of

13   Rosario either.

14            Mr. Cappock, if your witnesses who are

15   going to testify on your behalf come to court,

16   please ask -- tell to them to bring the notes of

17   any conversations they had with any of the parties

18   involved in the transaction, okay?

19            MR. CAPPOCK:  I will note for two

20   witnesses that the -- Mr. Emma gave me three pages

21   of notes, which I have already given to Mr.

22   Mitchell.  I have had this conversation with him

23   repeatedly.  To make sure, I will note also --

24            THE COURT:  What I think we're going to

25   do, we'll have to make a record as to each witness

MS

Proceedings                                36

1    notes.

2              THE COURT:  You are asking for any

3    handwritten notes in regard to that int --

4              MR. MITCHELL:  No handwritten notes

5    regarding Minnie Simmons, the Mom is it?

6              MR. CAPPOCK:  Investigator Verlezza did

7    talk to Minnie Simmons.  Investigator Verlezza did

8    not make notes in speaking to Minnie Simmons.

9              THE COURT:  That's the record.

10             MR. MITCHELL:  No, Mr. Emma.  I showed

11   Mr. Cappock the guardian report that Mr. Emma

12   wrote, and in the second paragraph there are

13   fiduciary compliance documents that are not part

14   of the guardian file.  And ADA Cappock has agreed

15   to ask Mr. Emma for those fiduciary compliance

16   documents.  I'm going to be a fiduciary.  I'm

17   going to be a good guy.  I am going to do what I

18   have to do.  There are at least three or four of

19   them and Mr. Cappock has agreed to get them for

20   me.

21             THE COURT:  Is that correct?

22             MR. CAPPOCK:  Yes.  If I understand the

23   Court's order properly, your Honor, I am supposed

24   to check on any pertinent documents they can

25   bring.  Mr. Mitchell brought to my attention

MS

Proceedings                           37

1   consent, affirmation of responsibility and notice

2   of appointments, and service of compliance, so I

3   indicated I would ask Mr. Emma about those.

4            MR. MITCHELL:  Two more brief things

5   then we'll be ready to roll.

6            I got notes from Mr. Emma from the

7   district attorney.  These are really the first

8   time I saw them.  I'm not going to disparage Mr.

9   Cappock and say they weren't given to me and/or he

10  engaged in bad faith, I don't know, but I can say

11  I can't read them.  His handwriting is

12  undecipherable, and that is not disclosure, and I

13  would need Mr. Cappock to ask Mr. Emma to decipher

14  these notes.  And the Court can inspect them

15  himself and see they are not decipherable.

16           THE COURT:  I think I saw them in the

17  back.  Maybe I can do that later.  Okay, we'll get

18  to that.

19           MR. MITCHELL:  And the last thing is I'm

20  going to make an application at some point, after

21  the jury's selected, about the jurisdictional

22  ruling with regard to the Court to understand it's

23  full import.  Because the jurisdictional argument

24  is an important part of my defense, claiming as I

25  did, that judge Pesce did not have jurisdiction

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page176 of 374

Proceedings                                                  38

1    throughout my dealings with him and that Mr. Emma
2    did not have jurisdiction is a reason for not
3    responding to what it is that they're asking for
4    and it's a lawful reason.
5                Judge Pesce had options other than doing
6    what he did to compel me or Minnie Simmons to
7    respond to him.  And if he didn't have
8    jurisdiction, he couldn't do it and I would be
9    right, and so we have to take that matter up.
10   Because when Emma testifies and Judge Pesce
11   testifies, I need those thing to be clear to the
12   jury.  Because their contention is that I didn't
13   respond because I was guilty and I have a
14   legitimate explanation to counter that.
15               THE COURT:  All right.  There again, if
16   you want to testify, you can testify.  I'm not
17   going to allow the civil proceeding to be --
18   validity of the civil proceedings be tried as part
19   of this criminal case.
20               MR. MITCHELL:  But then, sir, the
21   prosecutor has to be precluded then from -- from
22   suggesting, because they're trying to do that,
23   from suggesting that, well, hey, this guy didn't
24   respond to a lawful order of the court, he must be
25   guilty.  That's part of their argument.

MS

AP-503

Proceedings                                                  39

1          THE COURT:  That I won't allow as an

2     argument.

3          MR. MITCHELL:  You're not going to allow

4     that as an argument?

5          THE COURT:  There again, Judge Pesce and

6     Judge Emma --

7          MR. MITCHELL:  Not Judge Emma.

8          THE COURT:  -- Mr. Emma will testify to

9     their findings.  There again, they can't conclude

10    you stole the money.  They can testify to their --

11    Judge Pesce his interactions with you, Mr. Emma

12    can testify as to what he did in attempting to

13    find the money.

14         MR. MITCHELL:  But the whole import of

15    Judge Pesce saying I told Mr. Mitchell to answer

16    me and he didn't answer me, the implication is

17    that he had the authority to tell me to answer

18    him.  What I am saying, and what Judge Pesce

19    ultimately agreed in his order, which I read last

20    night, is that, no, he didn't have the authority

21    to compel me to do anything.

22         THE COURT:  I will give you the

23    opportunity to put it on the record at the time of

24    the testimony.

25         Okay.  Anything else?

MS

Proceedings                                                40

1           MR. MITCHELL:  For now, that's it, sir.

2           THE COURT:  Let's begin with the

3    selection of the jury.  Please bring in the jury

4    panel.

5           Mr. Reuland, you are going to withdraw

6    to the first row?

7           MR. REULAND:  I have to say Mr. Mitchell

8    stands before the Court as an indicted criminal

9    defendant and not as an attorney.  I don't think

10   it's his prerogative to order me around and

11   disparage me.

12          MR. MITCHELL:  What does that mean,

13   indicted defendant?

14          THE COURT:  Listen.  This stuff -- I

15   abhor the behavior in the courtroom.  Now, I'm not

16   attributing anything to anybody.  But I want

17   everyone in front of me to act civil and with due

18   respect for everyone.  So that is going to be the

19   standard in this case.  So if something happens

20   that I believe disrupts the court proceedings, I

21   will consider a contempt citation.

22          Now, I'm not going any further.  If you

23   please have a seat, as requested by Mr. Mitchell,

24   in the first row.  I thank you very much.

25          MR. REULAND:  Yes, Judge.

MS

Proceedings                                    41

1              THE COURT:  And, also -- I just want to

2    make also one other point.  Mr. Mitchell, if you

3    decide to testify in this case, Mr. Reuland, I'm

4    asking you to be prepared, you must at least stand

5    up and initiate the questions.  Mr. Mitchell is

6    not going to take the witness stand and go into a

7    narrative.  There have to be questions asked.  So,

8    Mr. Reuland, be prepared with at least some

9    introductory questions, and then you can ask Mr.

10   Mitchell, if he wishes to testify, what happened

11   in this case.

12              MR. REULAND:  Judge, I am prepared right

13   now to try this entire case.

14              MR. MITCHELL:  No, he's not.  Please,

15   God, don't ever do that.

16              THE COURT:  Please, Mr. Mitchell.

17              MR. REULAND:  Judge, I just want the

18   Court to be aware that I'm more prepared in my

19   view than the defendant to try this matter.

20              THE COURT:  Now, we're starting --

21              MR. MITCHELL:  That's outrageous.

22              THE COURT:  Please, Mr. Mitchell.

23   Please, Mr. Reuland, if you will please have a

24   seat in the front row.

25              I have the greatest respect for all

Proceedings                                    42

 1    litigants before me and I want to keep it that

 2    way.  I have great respect for you and I

 3    understand the difficult position you're in, but I

 4    ask you please just to cooperate with the Court.

 5               MR. REULAND:  That's been my intention

 6    from day one, Judge.

 7               THE COURT:  Thank you.

 8               Yes, Mr. Cappock.

 9               MR. CAPPOCK:  Given the issues that we

10    have discussed earlier on this morning, certain

11    things that we said we would address when

12    witnesses come in, Mr. Reuland and I were actually

13    discussing, we're in agreement, can we inquire of

14    the potential jurors of their availability for a

15    possible third week?  We're not saying we

16    anticipate it going for a third week.

17               THE COURT:  There again, I'm not going

18    to open this up.  This is not going to be another

19    Grand Jury investigation.  I'm going to tell them

20    about two weeks.  I think that should cover it.

21    If anybody's close, then we'll take that up.

22               There again, I probably -- you know,

23    there again, I'm not encouraging this, but I would

24    block out the next two weeks and perhaps going at

25    least partially into the week of the 24th of June.

MS

Proceedings                                      43

1              MR. CAPPOCK:  That's why I want to make

2       sure.

3              MR. MITCHELL:  One thing, do we have off

4       days?  We have off days?

5              THE COURT:  No, I work Monday through

6       Friday.

7              MR. MITCHELL:  Okay.

8              THE COURT:  If it turns out there is a

9       reason, I'll consider it, not now.

10             Okay.  Let's all get in position, please.

11             MR. REULAND:  Judge, I understand the

12      People are requesting daily copy transcripts of

13      the testimony only.  I'd like to make a request on

14      Mr. Mitchell's behalf pursuant to County Law

15      Article 18-B for daily copy transcript.

16             THE COURT:  Granted.

17             MR. MITCHELL:  Thank you, sir.

18             COURT OFFICER:  Ready for the jury?

19             THE COURT:  Yes.  Now, please bring the

20      jury in.

21             (Panel enters courtroom.)

22             THE CLERK:  Everyone stand and raise

23      your right hand.

24             (Whereupon, a panel of prospective

25      jurors having been impaneled, were sworn by the

MS

# EXHIBIT 51

<u>People v. Mitchell</u>
Indictment: 4743/2010

February 19, 2013
Defense Disclosure Request Letter to trial Court
(Garnett, J.)

CRIMINAL TERM ARR/HOH
SUPREME COURT KINGS

STEPHEN T. MITCHELL
461 CENTRAL PARK WEST Apt. 6B
NEW YORK, NY 10025
STM 7615@aol.com

2013 FEB 19  PM 3:05

February 19, 2013

Re: People v. Mitchell
Ind. #4743/2010

The Hon. William Garnett
Acting Supreme Court Justice
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

First, the defense does not object to the People's request for an adjournment of the trial to until mid-March 2013 or a later date if agreed upon by all parties and the court.

I also write to request the opportunity to file written replies to the People's responses to my motions in limine and my motion pursuant to CPL §30.20. I propose to file these replies by February 27, 2013. The replies will be filed in advance of the trial date presently scheduled for March 5, 2013 and well in advance of the People's requested trial adjournment date near March 19, 2013.

My trial preparation efforts have led me to conclude that I will need to file additional motions in limine out of time from the schedule the court has set. Please allow me the opportunity to file said motions by the next scheduled appearance date of March 5, 2013.

I need to subpoena witnesses immediately in order to ensure their availability for trial. My understanding is that the People will not be ready on March 5, 2013 because an important witness of theirs will not be available for two weeks. I ask this court to direct that the People ensure that an HRA attorney, Richard Balsam, is available for trial as a witness whenever the trial date is set. Mr. Balsam will be a hostile witness but his testimony is crucial to the defense.

There are other witnesses needed by the defense but because of my very limited resources and the fact I have not been assigned an investigator I have been unable to find them in order to determine their availability for trial. Please sign an order directing that I have an investigator available for me immediately in order for me to find witnesses I need for my defense. I will need trial subpoenas for these witnesses as well.

**AP-67**

This court cannot proceed until the writ is determined because the harm sought to avert is an unconstitutional trial. The case must be discontinued until the writ has been resolved.

Sincerely,

Stephen T. Mitchell

cc: Kings County District Attorneys Office

**AP-66**

# EXHIBIT 52

<u>People v. Mitchell</u>
Indictment: 4743/2010

April 12, 2013
Defense Disclosure Request Letter to trial Court
(Garnett, J.)

STEPHEN T. MITCHELL
461 CENTRAL PARK WEST Apt. 6B
NEW YORK, NY 10025
STM 7615@aol.com

April 12, 2013

*Re: People v. Mitchell*
*Ind. #4743/2010*

The Hon. William Garnett
Acting Supreme Court Justice
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

I write to request that this court order the prosecutors to speak with their trial witnesses and collect and furnish to the defense any and all notes, documents, calendars, correspondence, letters, e-mails, charts, or other written or formulated materials prepared for or by or sent to or received by the People's proposed trial witnesses that pertain to this case. These materials have been requested by the defense on numerous occasions prior to this letter and thus far several listed witnesses have not furnished them. They are essential for the defense to be able to fully cross-examine the People's trial witnesses.

The People furnished a list of individuals they planned to call as witnesses during our last appearance. Some may have created Rosario material the defense is entitled to. Others may have prepared or reviewed materials regarding the facts and circumstances of this case. The defense asks the court to order that copies of all of these materials be produced to the defense forthwith or allow the defense the opportunity to subpoena the materials from the witnesses for delivery immediately. I believe the People have agreed to collect and furnish the materials requested in a prior appearance before this court. This letter asks for this court to order the production of the copies of the materials immediately.

The defense also has not received a working copy of the DVD for the Article 660 hearing. The People promised to provide another copy because one that they sent in the mail was cracked and cannot be played. They never mailed the replacement to me as they promised. Its important the DVD provided is Macintosh compatible; most are so this should not be an issue.

Sincerely,

Stephen Mitchell

cc:    Patrick Cappock, Esq.
       Robert Reuland, Esq.

# EXHIBIT 53

**People v. Mitchell**
Indictment: 4743/2010

June 3, 2013
Defense Disclosure Request Letter to trial Court
(Garnett, J.)

6/10   PT. 11

STEPHEN T. MITCHELL
461 CENTRAL PARK WEST Apt. 6B
NEW YORK, NY 10025
STM 7615@aol.com

June 3, 2013

*Re: People v. Mitchell*
*Ind. #4743/2010*

The Hon. William Garnett
Acting Supreme Court Justice
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

    I write to request that this court order the prosecution to request of all of the witnesses listed in their witnesses list to furnish the defense immediately with copies of their files related to this matter. This request includes but is not limited to memoranda, notes (electronic or hand written), messages, and all other forms of communication available that were prepared by or for or received by or for the aforesaid witnesses on the prosecutor's witness list. My request also includes specifically communications the People's witnesses may have had with the Kings County District Attorney's Office or any other state office.

    I am particularly interested in correspondence in the form of letters and electronic messages that I may have sent to the Hon. Michael Pesce, Mr. Charles Emma, Mr. Colin Bull, Ms. Sherri Weindorf, the abstract company, Minnie Simmons or her daughters, or Mr. Eugene Davis. I also am interested any correspondence (electronic or written) sent to me by witnesses the People have listed on their witness list or the specific aforementioned individuals listed above.

    I also ask this court to order the production of the non-privileged files of the Traveler's Insurance Company per their attorney, Mr. McNulty. Traveler's investigated this matter in order to determine liability for a guardianship bond and fee requests submitted by Mr. Emma and Ms. Weindorf to be paid from insurance proceeds. It is likely they interviewed persons who are expected to become People's witnesses at trial or who the defense may want to call as his own witnesses. The court can ask the People to request the materials from Traveler's or issue a subpoena for the materials to Mr. McNulty.

    Please demand that any claim of privilege be accompanied with a privilege log so that I can make arguments for the materials should I believe they are not entitled to privilege. It is typical of an insurance company to make overbroad claims of privilege in order to avoid providing materials pertaining to their investigations. I remind the court

**AP-70**   1

that what the insurance company investigators told their counsel may be privileged but what they learned from observations or communications with third parties to the insurance company is not privileged.

I am entitled to all of the aforesaid requested materials in order to effectively cross-examine the People's witnesses. I repeatedly have asked the People for these materials before and they have failed to furnish me with the materials or respond to the requests in a complete and appropriate manner. If the witnesses did not maintain files for the case or no longer have the files then I am entitled to know that and receive a stipulation that I can present to the jury reciting the circumstances of the failure to produce. If they have files and have declined to turn them over until the eve of trial that is unfair and prejudicial to the defense, especially given the unlikely chance any request I make for a continuance will be granted. Hopefully the files will not be so voluminous that the defense will be prejudiced by a substantial late production. If they are the court should grant a continuance or a sanction.

Please order the People to furnish the materials to me forthwith or issue subpoenas so that I can have the materials well enough in advance of trial to make use of them.

Sincerely,

Stephen T. Mitchell

cc: Patrick Cappock, Esq.

AP-71

# EXHIBIT 56

<u>People v. Mitchell</u>
Indictment: 4743/2010

June 18, 2013
First Set of Written Objections Filed to Trial Court Trial Rulings
(Garnett, J.)

*[letterhead - illegible]*

June 18, 2013
Re: People v. Hymowitz
Indictment # 4723/2010

Hon. William Garnett
Kings County Supreme Court
320 Jay Street  Part 11
Brooklyn, NY 11201

Dear Sir:

    This letter is to memorialize the defense objections to the court's rulings just prior to Justice Pesce's Testimony. The court promised to allow the defense the opportunity to place the objections on the record and agreed to accept the objections in writing. This letter has been prepared by hand to ensure the objections have been raised in a timely manner and are memorialized as a part of the record for the case. A copy of this letter has been served upon the Assistant District Attorney Simultaneous to its delivery to the court.

    The defense sought and the court denied the defense request to charge the Jury specially before Justice Pesce Testified. The proposed special charges were not discussed on the record because the court refused to allow the discussion prior to Justice Pesce's Testimony. The defense specifically requested the court change the Jurors EPTL 11-1.1(b)(3), EPTL 11-1.1(b)(3), and EPTL 11-1.1(b)(22) prior to Judge Pesce's Testimony.

    The defense also asked the court to change language from ~~Vellozzi v.~~ Brady, ~~and from~~ In Re Leopold, 259 NY 274, 276 (1932), and Justice Pesce's February 24, 2010 order. The language of the change suggested was proposed to ensure the Jury understood Justice Pesce's powers over the distribution of the moneys at issue during the trial extinguished with Mr. Brown's death. The defense wanted to ensure that the Jurors understood that Justice Pesce and Minnie Simmons had legal Authority over Mr. Brown's affairs within different contexts. A proposed change was submitted to the court.

Case 1:22-cv-01747-LDH-LB Document 7-7 Filed 04/06/22 Page 11 of 36 PageID #: 532

The proposed change stated:

(1) " Minnie Simmons in her capacity as executor of Mr. Brown's estate was empowered by the laws of the State of New York to make decisions regarding the distribution of assets of the estate. No other person, including Judge Pesce, had such power bestowed upon them by the Surrogate's Court of Kings County."

(2) " Minnie Simmons while acting in her capacity as executor had lawful authority to approve or deny payments to satisfy claims against the estate. She had lawful authority to determine the legitimacy of these claims and authorize their payment. Minnie Simmons, not Judge Pesce, had lawful authority to authorize claims for reimbursement of estate expenses and lawyers fees. Judge Pesce never had lawful authority to approve or deny claims of any nature pertaining to the estate of Charles Brown.

(3) The defense also insisted the court change the jury prior to Judge Pesce's testimony the People had to prove more than that money was appropriated. The People had to prove the money was appropriated wrongfully in that it was appropriated for purposes known by the defendant not to be for the benefit of the estate. People v. Ricchiut., People v. Chesler, Cupp v. Naughton

The court refused to change the jurors as requested before Justice Pesce testified and told the defense he would not change the above at the end of the case. This letter registers the defense objections pursuant to CPL § 300.10, People v. Watts, the fourteenth amendment's protection of a fair trial. See Cupp v. Naughten, Jackson v. Virginia, Jackson v. Edwards (2d Cir), Strack v. Davis (2d Cir).

The defense reminded Judge Gannett he wanted to cross-examine Judge Pesce regarding his February 24, 2010 order and his decision regarding the extent of his power as an Article 81 Judge. Judge Gannett refused to allow this questioning as he had before. The defense objected citing the Sixth Amendment, Davis v. Alaska,

AP-519

Judge Gannett warned the defense not to raise the issue concerning the request for changes again. The defense objects per 14th Amendment and People v. Watts.

Judge Gannett refused to change the jury that Justice Pesce's recitation of the law as a witness did not control and that Justice Gannett was the Judge of the law for this case. Id.

Judge Gannett refused to order Justice Pesce or the prosecutor to furnish the defense with Judge Pesce's files or correspondence pertaining to the Brown matters. This refusal was made in spite of several prior requests for this information and material made by the defense. The defense specifically noted he would be denied the chance to impeach Judge Pesce or Refresh his memory in violation of the 6th Amendment. In re Oliver, Davis v. Alaska, People v. Rosario, Brady v. Maryland. The defense objects to the denial and asks for the material and if need be a second opportunity to cross Justice Pesce. If the Court continues to deny this opportunity a mistrial is Requested. Objection per 6th and 14th Amendment.

Judge Gannett refused to sign a subpoena for Marshal Kaplan. The defense reminded Judge Gannett Marshal Kaplan was necessary to impeach Mr. Emma and Judge Pesce because Marshal Kaplan was the guardianship lawyer for nearly the entire period of the guardianship. Mr. Kaplan was the guardianship lawyer at Mr. Brown's death and filed probate papers for the estate. The defense objected to this refusal. Davis v. Alaska, In re Oliver, 6th Amendment, Ake v. Oklahoma.

Judge Gannett refused to sign any subpoenas for the defense and refused to assign an investigator to help serve the subpoenas. This was a denial of a fair trial and 14th Amendment, Ake v. Oklahoma, In re Oliver, Washington v. Texas. The defense objects.

The Court Refused to entertain a mistrial application because either the prosecutor or Mr. Emma provided false information regarding Winnie Simmons Clementia as a response to the Singer motion and motions to preclude. The Court stated the application was made too late after Mr. Emma testified. Napue, Savvides objection.

Sincerely,

# EXHIBIT 57

**People v. Mitchell**
Indictment: 4743/2010

June 18, 2013
Second Set of Written Objections Filed to Trial Court Trial Rulings
(Garnett, J.)

461 Central Park West #6B
New York, NY 10025

June 18, 2013
People v. Mitchell
Indictment: 4743-2010

Hon. William Garnett
Part 11
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dean Judge:

This letter is the companion to the earlier letter. It was served on the prosecutor and filed with the clerk at your direction at the end of today's proceedings. The court would not allow further objections on the record and stated I could add these objections to the earlier letter.

The defense objects pursuant to CPL § 240.45 (Rosario) and the 6th and 14th Amendment because he was not furnished, after multiple specific requests, Judge Pesces notes, files, correspondence, and writings for the Brown guardianship. Judge Pesce referred to the aforesaid materials in his testimony. The court declined to address this issue while Judge Pesce testified. I was told to object later. The defense requests these materials and the chance to re-cross Judge Pesce per the 6th and 14th Amendment or a mistrial. There is no waiver of the request for Judge Pesce's materials or the chance to examine him again. I object to the denial of the aforesaid requests.

Judge Pesce withheld his knowledge of Linda Simmons Report of her mother's mental difficulties in violation of Brady. Judge Pesce performed an investigative role for the state and the District Attorney. His knowledge is imputed to the state. Giglio. I object to his not providing this information earlier. Contijo and Lelca

Judge Pesce violated Savvides and Nappe by falsing testifying he had authority to determine if defendant had authority to spend estate money solely on the word of the executor. I object. The court violated Davis v. Alaska by not allowing the defense to use his February 24, 2010 order to examine him. I object. The court also erred by failing to change jurors EPTL 11-1.1(b)(13) and (22) and his role as an Article 81 Judge. He did not have power over an estate under Article 81 and jury was not told this. I object per Cupp, Strack, Jackson, Watts, APC 500.10.

Sincerely,
Stephen T.

cc: Patrick Caddock, Esq.

# EXHIBIT 58

<u>People v. Mitchell</u>
Indictment: 4743/2010

People's Trial Witness List
(Garnett, J.)



**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
(718)-250-2000

**CHARLES J. HYNES**
*District Attorney*

Re:     People v. Stephen Mitchell
        Indictment Number 4743/2010

## Trial Witness List

(1)     Financial Investigator Neil Gillon, Kings County District Attorney's Office
(2)     Charles Emma, Esq.
(3)     Linda Simmons
(4)     JoAnne Simmons
(5)     Hon. Michael L. Pesce
(6)     Colin Bull, Esq.
(7)     Richard Balsam, Department of Social Services (or other authorized representative of DSS or HRA)
(8)     Monica Holguin, JP Morgan Chase Bank (or other authorized representative)
(9)     Daniel Krimmer, Class Abstract  (or other authorized representative)
(10)    Edwin Benebitse, Toju Realty (or other authorized representative)
(11)    Randi Berger
(12)    Marshall Kaplan, Esq.
(13)    Victory Contracting Representative
(14)    New York City Department of Finance Representative

**AP-100**

# EXHIBIT 59

<u>People v. Mitchell</u>
Indictment: 4743/2010
Appellate Division Docket: 2014-05910

People's Response to Appellant's Disclosure Requests of September 4, 2016
Before the Appellate Division: Second Department

Dated: September 30, 2016

SUPREME COURT OF THE STATE OF NEW YORK    Return Date: 9/30/16
APPELLATE DIVISION:  SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                     Respondent,

        -against-

STEPHEN MITCHELL,

              Defendant-Appellant.

AFFIRMATION IN RESPONSE

Appellate Division
Docket Numbers
2014-05910 & 2015-02703

Kings County
Indictment Numbers
4743/2010 & 1521/12

JODI L. MANDEL, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

1. This affirmation is submitted in reply to defendant's pro se motion, dated September 4, 2016, seeking an extension of time to perfect his appeals in the above referenced cases, disclosure of grand jury minutes, and release of documents considered in camera by the trial court, as well as other miscellaneous relief.

2. The following statements are made on information and belief based upon the records and files of the Kings County District Attorney's Office.

3. By judgment dated May 23, 2014, following a jury trial under Kings County Indictment Number 4743/10, defendant, a former attorney, was convicted of Grand Larceny in the Second Degree (P.L. § 155.40[1]), and sentenced to a term of incarceration of four to twelve years. In addition, the court executed a Judgment Order of Restitution against defendant in the amount

constituting the full amount of defendant's theft from the estate of defendant's former client (Garnett, J., at trial and sentencing).

4. By judgment dated March 20, 2015, following a jury trial under Kings County Indictment Number 1521/2012, defendant was convicted of a second count of Grand Larceny in the Second Degree (P.L. § 155.40[1]) for stealing $70,000 from another client in his capacity as an attorney. The Supreme Court sentenced defendant to a term of imprisonment of two to four years, to run consecutively to defendant's four to twelve-year sentence in the earlier case, for an aggregate sentence of six to eighteen years (Garnett, J., at trial and sentence).

5. Defendant is incarcerated pursuant to the two judgments. On January 22, 2016, the Court granted defendant's motions to relieve his assigned counsel and to represent himself on appeal.

6. On June 29, 2016, the Court granted defendant's motion for an extension of time within which to perfect his appeals and ordered that his appeals be perfected by September 27, 2016.

7. Defendant now seeks a further enlargement of time within which to perfect his appeals. The People do not oppose defendant's request for a further extension of time.

8. Defendant also asks the court to issue an order providing him with the grand jury minutes in both of his cases. The People oppose this aspect of defendant's motion. Defendant is not entitled to a copy of those minutes for his appeal. People v. Antonelli, 300 A.D.2d 312, 313 (2d Dep't 2002); Matter of Brown v.

2

orella, 229 A.D.2d 391, 392 (2d Dep't 1996). The People, of course, would comply with an order for an in camera inspection by this Court of the grand jury minutes.

9. Indeed, defendant's claim that he has a compelling and particularized need for access to the grand jury minutes because of alleged insufficiency in the proof submitted to the grand jury in each of his cases (Def. Motion at ¶¶ 8-36) is made in error. It is well settled that a claim of insufficiency in the grand jury is not cognizable on an appeal from a judgment of conviction that was based on legally sufficient trial evidence. See C.P.L. § 210.30(6); People v. Jenkins, 38 A.D.3d 566, 567 (2d Dep't 2007).

10. Furthermore, the People strongly oppose defendant's request to be provided with medical and psychiatric records which were reviewed in camera by the court below under Kings County Indictment Number 4743/2010 (Def. Motion at ¶¶ 37-44). The People are not in possession of, and have never been privy to, this material, which was provided to and reviewed only by the court below, which determined that the materials were not relevant to the defense. Indeed, the witness whose privileged records are sought by defendant was not a trial witness, but rather, was a witness who was subject to a conditional examination related to the grand jury proceedings.

11. Should the Court determine that these materials are relevant to an issue raised on appeal, the Court may obtain the materials from the Supreme Court, Criminal Term, for its own in camera review, along with any other grand jury materials.

3

12.   Finally, defendant asks the Court to allow him to handwrite his brief and file fewer than the nine copies required by the Court rules.   The People take no position on these requests.

DATED:   September 29, 2016
         Brooklyn, New York

Jodi L. Mandel
Assistant District Attorney
(718) 250-2535

cc:  Stephen Mitchell  14-A-3640
     Mid-State Correctional Facility
     Box 2500
     Marcy, New York  13403

4

# EXHIBIT 60

**People v. Mitchell**
Indictment: 4743/2010
Appellate Division Docket: 2014-05910

People's Response to Appellant's Disclosure Requests of July 9, 2018
Before the Appellate Division: Second Department

Dated: July 27, 2018

SUPREME COURT OF THE STATE OF NEW YORK      Return Date: 7/27/18
APPELLATE DIVISION:  SECOND DEPARTMENT

---

THE PEOPLE OF THE STATE OF NEW YORK,

                Respondent,

     -against-

STEPHEN MITCHELL,

         Defendant-Appellant.

AFFIRMATION IN RESPONSE

Appellate Division
Docket Number
2014-05910

Kings County
Indictment Number
4743/2010

     JODI L. MANDEL, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

     1.   This affirmation is submitted in reply to defendant's pro se motion, dated July 9, 2018, seeking dismissal of his conviction or reconstruction of the lower court file, as well as suspension of his appeal.

     2.   The following statements are made on information and belief based upon the records and files of the Kings County District Attorney's Office.

     3.   On or about and between December 23, 2005 and March 31, 2006, defendant, a former attorney, stole in excess of $400,000 from his client, the Estate of Charles Brown, represented at that time by Minnie Simmons as Executrix.   Defendant abused his representation of the Estate by illegally depositing proceeds from the sale of real property at 302 St. James Place, Brooklyn, NY, belonging to the Estate, into his attorney Interest on Lawyer Account ("IOLA Account") and subsequently transferred those

proceeds to other accounts, including his own personal account, which he spent down to minimal balances in a short period of time. None of the defendant's expenditures were made to the Estate of Charles Brown.

4.    By judgment dated May 23, 2014, following a jury trial under Kings County Indictment Number 4743/10, defendant was convicted of Grand Larceny in the Second Degree (P.L. § 155.40[1]), and sentenced to a term of incarceration of four to twelve years.    In addition, the court executed a Judgment Order of Restitution against defendant in the amount of $411,082.50, constituting the full amount of defendant's theft from the estate of defendant's former client (Garnett, J., at trial and sentencing).[1]

5.    On January 22, 2016, a panel of the Appellate Division granted defendant's motions to relieve his assigned counsel and to represent himself on both of his appeals.    Defendant's motions for stays pending appeal in both of his cases were denied; after multiple motions for extensions of his time to perfect his appeal were granted, and other various motions were made by defendant in both Supreme Court and in this Court; defendant has now been ordered to perfect his appeal in the instant case and in his 2015

---

[1] By judgment dated March 20, 2015, following a jury trial under Kings County Indictment Number 1521/2012, defendant was convicted of a second count of second-degree grand larceny for stealing $70,000 from another client.    The Supreme Court sentenced defendant to a term of imprisonment of two to four years, to run consecutively to defendant's four to twelve-year sentence in the instant case, for an aggregate sentence of six to eighteen years (Garnett, J., at trial and sentence).    Appeals from both convictions remain pending.

2

conviction (2015-02703) by July 30, 2018.  A panel of the Court ordered "that no further enlargement of time shall be granted." People v. Mitchell, No. 2014-05910 (2d Dep't May 30, 2018).

6.  Nevertheless, defendant now moves this Court, over four years after his conviction and just weeks prior to the final date for perfecting his appeal, to dismiss his conviction, to reconstruct the lower court's file, and to suspend his appeal in this case.  For the reasons set forth below, defendant's motion should be denied.

7.  The crux of defendant's motion centers on medical records regarding the estate executor, Minnie Simmons, that were reviewed in camera by the lower court prior to defendant's trial and determined not to have been relevant to any issue in the case (see Defendant's Exhibits C and E).[2]  After the court's review of the records, neither party was given access to the records.  The People did not present testimony from Minnie Simmons at defendant's trial, although defendant chose to admit Ms. Simmons' conditional examination during the defense case.  Defendant claims that the medical records which were the subject of in camera review are not available in the Supreme Court file, and that this circumstance requires reversal of the conviction on this motion, reconstruction of the court file, and suspension of the appeal. Defendant has not provided the Court with any indication on the record of the proceedings below that the Supreme Court made the

_____

[2]  The Supreme Court's decision granting the in camera inspection details the sequence of events in the case leading up to that point (Def. Exh. C).

medical records a court exhibit after conducting the in camera review.

8.   The People have contacted the clerks in the Appeals Bureau, the Motion Department, and the Records Room at Supreme Court and the court personnel are endeavoring to locate the sealed medical records.   As of this writing those records have not been located, but efforts are being made to find them.

9.   Nevertheless, even if the records are not located, defendant fails to show that the remedy of dismissal, reconstruction, or suspension of his appeal at this juncture is warranted in any way because the records are not relevant to any issue that could be raised on appeal.

10.   Minnie Simmons neither testified in the grand jury nor at the trial.   Given her physical incapacity, including that she was elderly, in a wheelchair, and unable to walk, she was unavailable to come to court.   In the grand jury, the People entered into evidence a sworn affidavit of Minnie Simmons that stated that defendant lacked permission and authority to take the assets of the Estate for any purpose other than for the benefit of the Estate of Charles Brown.

11.   Prior to trial, the parties and the court conducted a conditional examination of Minnie Simmons at her nursing home. Defendant was represented by counsel at that conditional examination and his counsel cross-examined Ms. Simmons.   Seven months later, defendant moved to have Ms. Simmons subjected to a psychiatric and psychological examination and to review any psychiatric and psychological records.   The court denied the

4

motion, but granted an in camera inspection of medical records (Def. Exh. C).

12. After conducting the in camera inspection, the court determined, "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness; second, as conveyed to the defendant by the court, the records reviewed in camera do not substantiate any claim of Alzheimer's disease." (Def. Exh. E at 1).

13. At trial, the People did not enter into evidence the conditional examination of Minnie Simmons; the People proved their case through other evidence demonstrating that defendant did not have permission or authority to take the proceeds of the sale of real property at 302 St. James Place, Brooklyn, NY.

14. During the defense case, however, defendant entered the conditional examination into evidence.

15. Based on all of these facts, the remedies now sought by defendant, at the eleventh hour, should not be granted. Even if the records examined in camera by the Supreme Court remain unavailable, defendant fails to demonstrate that it would have any impact upon his appeal.

16. First, to the extent defendant endeavors to challenge on appeal the evidence before the grand jury, in the form of Ms. Simmons' sworn affidavit, any such claim is moot. It is well settled that a claim of insufficiency in the grand jury is not cognizable on an appeal from a judgment of conviction that was based on legally sufficient trial evidence. See C.P.L. § 210.30(6); People v. Jenkins, 38 A.D.3d 566, 567 (2d Dep't

5

2007).

17. Second, even if defendant had been able to demonstrate that Ms. Simmons' sworn statement admitted in the grand jury was later rendered unreliable due to an alleged mental incapacity, it would not impact any valid claim on appeal. See People v. Oakley, 28 N.Y.2d 309, 312 (1971) (evidence relied upon in grand jury, which was later ruled inadmissible, did not create an infirmity in the indictment).

18. Nor is the validity of defendant's conviction after trial impacted in any way by the purported unavailability of these records. The People did not rely on the testimony of Ms. Simmons to prove its case at trial. Rather, it was defendant who decided to admit the testimony from Ms. Simmons' conditional examination on his defense case. He cannot now be heard to complain about the validity of that testimony when he saw fit to enter it into evidence, knowing full well that the Supreme Court had ruled that he could not have access to the medical records and that the court's inspection of those records did not provide any relevant information regarding the reliability of the testimony.

19. For all of these reasons, defendant's motion should be denied in its entirety. Defendant's motion at this late juncture, when all of this information has been available to him over the last four years, is merely an effort to delay perfection of his appeal. In fact, over 22 months ago, in a motion dated September 4, 2016, defendant asked the Court to be provided with these records; the motion was denied on December 7, 2016. Moreover, defendant has been on work release in Manhattan, and able to

6

personally view the Supreme Court file, and interact with court personnel, since October 2016.  Therefore, the motion should be denied.


DATED:     July 19, 2018
           Brooklyn, New York

                                     Jodi L. Mandel
                                     Assistant District Attorney
                                     (718) 250-2535



cc:  Stephen Mitchell
     DIN 14-A-3640
     Lincoln Correctional Facility
     31 West 110th Street
     New York, New York 10026

     Stephen Mitchell
     461 Central Park West 6B
     New York, New York  10025

7

# EXHIBIT 61

<u>People v. Mitchell</u>
Indictment: 4743/2010

People's Affirmation in Response to Defendant's <u>In Limine</u> Motion (Excerpts)
(Please note ¶9 at page 6)

Dated: February 8, 2013

3/5/2013, Pt 11                                                              A Copy

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM PART 11
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,                AFFIRMATION IN
                                                    RESPONSE TO
                                                    DEFENDANT'S
        - against -                                 IN LIMINE MOTION
                                                    TO DISMISS AND TO
        STEPHEN MITCHELL,                           PRECLUDE TESTIMONY

                        Defendant.                  IND. # 4743/2010

-------------------------------------------------------------------X

        PATRICK F. CAPPOCK, an attorney admitted to practice law before the Courts of the State

of New York, hereby affirms the following to be true under penalty of perjury:

        I submit this affirmation in response to defendant's In Limine Motion to dismiss the instant

Indictment or, in the alternative, to preclude the People from using the testimonies of Minnie

Simmons and Linda Simmons at trial, dated January 6, 2013.

        I am an Assistant District Attorney in Kings County assigned to this case and am familiar

with its facts and circumstances by virtue of a review of the files maintained by the Kings County

District Attorney's Office (hereinafter "KCDAO") pertaining to this matter, and discussions had

with various witnesses, as well as assistant district attorneys and investigators assigned to this

investigation.    The People hereby incorporate by reference all of their previous motions,

affirmations and memoranda of law filed in this case. All statements are made upon information and

belief, based upon personal conversations with other assistant district attorneys at the KCDAO, a

review of all records and files of the KCDAO, and other sources of information as expressly stated

in the individual paragraphs below.

Joanne Simmons (another daughter of Minnie Simmons), Colin Bull, Esq. (attorney for the current executor of the Estate of Charles Brown) and Edwin Benbitse (the purchaser of 302 St. James Place). In addition, Investigator Verlezza also located and interviewed numerous other individuals who received payments from the defendant's three non-IOLA accounts. Through these interviews, Investigator Verlezza ultimately determined that none of these payees had anything to do with the Guardianship or Estate of Charles Brown, or were given money on behalf of that Guardianship or Estate.

8. At no time during this extensive investigatory process did the People learn of the existence of any diagnosed mental deficiency afflicting Minnie Simmons, nor did there ever come an occasion where any representative of the People observed Minnie Simmons to exhibit symptoms of mental incompetency.

9. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer repeatedly spoke to Charles Emma, who as a civil attorney has no medical expertise. On November 6, 2009, Investigator Verlezza, in the course of one of his interviews with Mr. Emma, wrote a statement in his notes that appears to read that Colin Bull was told to withdraw Minnie Simmons from the Guardianship for a reason that appears to read "incompetency" (see Exhibit A in Defendant's instant motion). However, there was no reference to Minnie Simmons' mental state, or any degradation thereof, in this interview. Mr. Emma has confirmed with the People that he was not referring to any mental incapacity of Minnie Simmons and that he was not and has never been aware of any mental condition afflicting her, diagnosed or otherwise. Rather, Mr. Emma was referring to the physical incapacity of Minnie Simmons and his discussions with Colin Bull regarding that subject, which is an issue that he had previously

6

addressed on February 23, 2009 while in the defendant's presence in Supreme Court in relation to Index Number 107103/99.

10. In the course of investigating this case prior to Indictment, Investigator Verlezza and ADA Neubauer also spoke to Linda Simmons, who is employed as a New York City police officer and has no medical expertise. On May 6, 2010, Investigator Verlezza, in the course of one of his interviews with Linda Simmons, wrote a statement in his notes that appears to read that Minnie Simmons is in the early stages of Alzheimer's (see Exhibit B in Defendant's instant motion). Linda Simmons has no recollection of ever making such a statement, and on numerous subsequent occasions has confirmed with the various representatives of the People, including myself, that this is an untrue statement. Minnie Simmons has never been diagnosed with Alzheimer's or any other disease that would render her mentally incapable, nor has she never been treated for any type of mental incapacity.

11. Upon the conclusion of this investigation, ADA Neubauer presented evidence and charges to a Kings County Grand Jury beginning July 8, 2010.[3] This evidence largely consisted of accounting evidence that established a clear pattern of conduct by defendant designed to convert the proceeds of the sale of 302 St. James Place through a series of business and personal accounts within the space of several months in violation of his fiduciary duties as counsel for the owner of that real property, the Estate of Charles Brown. The Grand Jury also heard testimony from two witnesses, Charles Emma and Linda Simmons, which each included the fact that the defendant made inculpatory admissions in their presence regarding the stolen property. Linda Simmons also

---

[3] In accordance with this Court's prior request, a copy of these Grand Jury minutes have already been provided for the Court's review.

**WHEREFORE,** for the reasons set forth in the annexed memorandum of law, the defendant's motion must be denied in its entirety.

Dated:      Brooklyn, New York
            February 8, 2013

                                    Respectfully submitted,

                                    Patrick F. Cappock
                                    Assistant District Attorney
                                    (718) 250-2945
                                    350 Jay Street
                                    Brooklyn, NY 11201

24

# EXHIBIT 62

**In the Matter of Charles Brown**
Docket: 107103/1999

Docket Sheet

Dated: May 7, 2012

## 107103 / 1999

Opened: 4/16/1999 Type: * CONF Incomp

SIMMONS, M. & E.B. DAVIS, SR. AS CO-GUARDIANS INRE vs. BROWN, CHARLES AN INCAPACITATED PERSON

Atty: PLAZA     Atty:

| Filed | Actions | RecRoom |
|---|---|---|
| 10/7/2010 | Order DISCHARGING GUARDIAN | |
| 9/30/2010 | Decision and order to Pay, Rpt Ad Litem, Rpt of Counsel, Statemt Approval Compensation, Affts, Affirms, etc | |
| 4/2/2010 | Affirm. in Opposition | |
| 3/16/2010 | Affirm. of Serv / G.A.L | |
| 3/5/2010 | Decision and order Accepting F/A, Granting Motion to Settle F/A, Submit Affrms, etc, Motion, Opp to Motion, Rpt of Counsel, Certification & Rpt Guardian Ad Litem | |
| 3/5/2010 | Order Vacating Discharge of Guardian | |
| 3/4/2010 | Affirm. of Serv w/ Statement Approval Compensation | |
| 8/25/2009 | MOTION COVERPAGE fee pd ,guard. | |
| 6/10/2009 | Letter / ATTORNEY | |
| 3/11/2009 | MEMO conference w/ undated misc | |
| 10/2/2008 | Notice of appearance , affirmation of service | |
| 7/24/2008 | Affirm. AFFT, CONSENT, | |
| 7/3/2008 | Order Discharging Guardian & Appointing Charles Emma Guardian Ad Litem, No Bond | |
| 12/5/2007 | Order , Conference copy | |
| 6/6/2007 | Conference Order | |
| 2/26/2007 | Affts, Affrms, Letters, Invoice, Statement Approval Compensation, unsigned & copy Order, Appraisals, Minutes, etc | |
| 9/29/2006 | ORIG. ORDER TO CONSOLIDATE #'S 48049/01 INTO 5261/99 PROPERTY OWNED BY THE AIP, OSC AFRM, ETC | |
| 11/16/2004 | Order Permitting FINAL ACCOUNT | |
| 6/26/2003 | Notice OF SETTLEMENT, unsigned & Letter | |
| 6/18/2003 | Order APPOINTING APPRAISER ETC | |
| 4/30/2003 | Unsigned Order Show Cause, Withdrawn | |
| 3/14/2002 | Annual Report 2000, copy | |
| 1/15/2002 | LETTERS | |
| 3/12/2001 | Designation & Commision and Bond in the amount of BOND $65,000,00 to Guardian Property, Co-Guardian Person, M. Simmons & Co-Guardian Person E. Davis, Sr. TRAVELERS | |
| 8/22/2000 | Copy ord. notice entry, afft.svc. | |
| 8/9/2000 | Order, Judgment, Commission to auth pymt and appt EUGENE BERNARD DAVIS SR. & MINNIE SIMMONS CO-GUARDIANS PERSON & MINNIE SIMMONS GUARDIAN PROPERTY (RESETTLED) W/ BOND FOR $65,000,00 & DESIGNATION/PERSON | |
| 8/4/2000 | Certif of compliance w/ Notices of Appt | |
| 8/4/2000 | DESIGNATION & CONSENT TO ACT | |
| 8/2/2000 | Affidavit of serv. PROOF OF CLAIM | |
| 5/16/2000 | Designations & Consents to Act | |
| 5/16/2000 | Certif of compliance w/ Notices of Appt | |
| 3/15/2000 | Copy ord. notice entry, afft.svc. | |
| 3/8/2000 | Order to show cause RPT CT EVALUATOR, AFFIRMS, AFFTS, ETC | |
| 3/8/2000 | Order, Judgment, Commission to auth pymt and appt GUARDIANS MINNIE SIMMONS & EUGENE BERNARD DAVIS, SR W/ BOND FOR $65,000,00, | |
| 9/14/1999 | Certif of compliance w/ Notice of Appt | |
| 6/17/1999 | Req. judical interven. fee paid unsigned osc | |
| 4/19/1999 | Notice of pendency | |

Total: 37

No. 650729

STATE OF NEW YORK,
COUNTY OF KINGS, SS:
I, NANCY T. SUNSHINE,
COUNTY CLERK & CLERK
OF THE SUPREME COURT,
KINGS COUNTY, DO
HEREBY CERTIFY ON

05/04/2012

THAT I HAVE COMPARED THIS
COPY WITH THE ORIGINAL
FILED IN MY OFFICE ON

MAY 07 2012

AND THAT THE SAME IS A
CORRECT TRANSCRIPT
THEREFROM AND OF
THE WHOLE OF SAID
ORIGINAL.
IN WITNESS WHEREOF,
I HAVE HEREUNTO SET
MY HAND AND AFFIXED
MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, KINGS COUNTY

FACSIMILE SIGNATURES USED
PURSUANT TO SEC. 93
COUNTY LAW

FEE PAID

**AP07**

5/7/2012

# EXHIBIT 63

People v. Mitchell
Indictment 4743-2010

Decision and Order
(Garnett, J.)
Dated: May 23, 2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 11

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | DECISION AND ORDER |
| -against- | Ind. #4743/2010 |
| | Date: May 23, 2014 |
| STEPHEN MITCHELL,<br>                    Defendant. | By: Hon. William E. Garnett |

The defendant has submitted motions to set aside the verdict pursuant to CPL §330.30.

The Court has thoroughly read and reviewed the defendant's two CPL §330.30 motions each dated July 3, 2013 and another dated September 5, 2013, respectively, including the defendant's replies to the People's responses dated July 17, 2013 and October 3, 2013, respectively.

After due deliberation, the motions to set aside the verdict are denied in their entirety.

This opinion shall constitute the decision and order of the Court.

Dated: May 23, 2014
       Brooklyn, New York

*William E. Garnett*

William E. Garnett
A.J.S.C.

1

**AP-44**

# EXHIBIT 64

People v. Mitchell
Indictment 4743-2010

Decision and Order
(Garnett, J.)
Dated: December 20, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 50
-------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                  -against-

STEPHEN MITCHELL,

                              **Defendants**

-------------------------------------------------------------x

By:   **JOHN P. WALSH**
      **J.S.C.**

Dated: December 20, 2010

Indictment No. 4743/2010

DECISION and ORDER

The Court has read the Grand Jury minutes and examined the presentation of the evidence before the Grand Jury *in camera* for the purposes of (1) determining whether the People's presentation was legally sufficient to support the counts in the indictment, (2) whether the instructions provided to the Grand Jury were proper, (3) whether the indictment meets the requirements imposed by the CPL and (4) whether anything in the presentation impaired the integrity of the Grand Jury proceedings.

The *evidence* presented before the Grand Jury was legally sufficient to establish and support the finding(s) in all the count(s) of the indictment (see *People v. Pelchat*, 62 NY2d 97; *Calbud, Inc., et al.*, supra).

The court's second inquiry examines the assistant district attorney's instructions to the Grand Jury with respect to the *applicable law*. Generally, the Grand Jury instructions under consideration did not have to meet the same criteria as the instructions given to trial juries (see *Calbud Inc., et al.*, supra 394).

Moreover, the indictment meets the requirements of the CPL and the integrity of the proceedings was not impaired by the presentation.

The People must amend the first count of the indictment to reflect the date of January 30, 2008 from January 30, 2009.

This constitutes the decision and order of the court.

Dated: December, 2010
      Brooklyn, New York

                                          John P. Walsh, J.S.C.

**AP-24**

# EXHIBIT 65

People v. Mitchell
Indictment 4743-2010

Decision and Order
(Garnett, J.)
Dated: September 3, 2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM, PART 11

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | DECISION AND ORDER |
| -against- | Ind. #4743/2010 |
| | Date: September 3, 2014 |
| STEPHEN MITCHELL, Defendant. | By: Hon. William E. Garnett |

After due deliberation, including a thorough review of the papers submitted by the defendant and the testimony at the trial of this indictment, the defendant's application for a writ of habeas corpus is denied.

The defendant's application merely reiterates legal arguments made by him during the pendency of this case both before Justice John Walsh and this Court. None of these prior motions had merit and this motion, in particular, is without merit. In the Court's judgment, the defendant's prospective appellate arguments are not meritorious.

This decision and order memorializes the Court's decision on the record on May 23, 2014.

Dated: September 3, 2014
      Brooklyn, New York

                              William E. Garnett
                              A.J.S.C.

ENTERED

SEP - 3 2014

NANCY T. SUNSHINE
COUNTY CLERK

# EXHIBIT 66

**People v. Mitchell**
Indictment 4743-2010

Decision and Order
(Garnett, J.)
Dated: February 19, 2013

PT. 11

STEPHEN T. MITCHELL
CENTRAL PARK WEST Apt. 6B
NEW YORK, NY 10025
STM 7615@aol.com

CRIMINAL TERM ARR/MT
SUPREME COURT KINGS
2013 FEB 19 PM 3: 10

February 19, 2013

*Re: People v. Mitchell*
*Ind. #4743/2010*

The Hon. William Garnett
Acting Supreme Court Justice
Kings County Supreme Court
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

First, the defense does not object to the People's request for an adjournment of the trial to until mid-March 2013 or a later date if agreed upon by all parties and the court.

I also write to request the opportunity to file written replies to the People's responses to my motions in limine and my motion pursuant to CPL §30.20. I propose to file these replies by February 27, 2013. The replies will be filed in advance of the trial date presently scheduled for March 5, 2013 and well in advance of the People's requested trial adjournment date near March 19, 2013.

My trial preparation efforts have led me to conclude that I will need to file additional motions in limine out of time from the schedule the court has set. Please allow me the opportunity to file said motions by the next scheduled appearance date of March 5, 2013.

I need to subpoena witnesses immediately in order to ensure their availability for trial. My understanding is that the People will not be ready on March 5, 2013 because an important witness of theirs will not be available for two weeks. I ask this court to direct that the People ensure that an HRA attorney, Richard Balsam, is available for trial as a witness whenever the trial date is set. Mr. Balsam will be a hostile witness but his testimony is crucial to the defense.

There are other witnesses needed by the defense but because of my very limited resources and the fact I have not been assigned an investigator I have been unable to find them in order to determine their availability for trial. Please sign an order directing that I have an investigator available for me immediately in order for me to find witnesses I need for my defense. I will need trial subpoenas for these witnesses as well.

1

**AP-39**

There is the possibility I will not be available after the conclusion of the trial to assist my brother in the manner he needs assistance right now. If the court allows for the requested adjournment I will be able to make significant inroads into taking care of his needs before the trial so that my brother can survive without me.

Emotionally, I am not up to conducting a trial right now. I will not relinquish my right to defend myself. If the court allows me the adjournment requested I will be able to help my brother and prepare myself for trial. Please grant the adjournment requested.

Sincerely,

Stephen Mitchell

cc:   Patrick Cappock, Esq.
      Robert Reuland, Esq.

**AP-40**

# EXHIBIT 67

**Ian Nelson Abbreviated Resume**

# IAN M. NELSON
## CERTIFIED PUBLIC ACCOUNTANT
## LIMITED LIABILITY COMPANY

3 CORNELL STREET WEST ORANGE, NEW JERSEY 07052-2509 Tel: 973-669-3773  Fax: 973-736-0289

## BACKGROUND, QUALIFICATIONS, AND PROFESSIONAL ASSOCIATIONS

- Over 28 years of experience providing accounting, auditing, taxation and consulting services to various individuals, professionals, small businesses, schools and not for profit organizations. He is licensed in both New York and New Jersey since 1982 and 1983 respectively. Corporate background includes banking, petroleum, health care, network television and radio.

- Ian M. Nelson is a member of the New York State Society of CPA's and the New Jersey State Society of CPA's. He is also a former Vice President of the New York State Society of CPAs, member of the Board of Directors and has served on the following committees: Executive, Management Tools & Techniques and Consulting Services & Oversight (Chairman). He has also served as a Government Relations Director, a member of the American Institute of CPA's, a member of the Tax Division Oversight Committee and Professional Ethics Committee.

- The firm is a member of the PCPS Division for CPA firms of the AICPA. The purpose of the division is to strive for professional excellence by regulating the manner in which CPA firms practice and to assure the public of the quality of accounting and auditing services through an effective quality review and continuing education program.

- Counsels and advises many small businesses and Not for Profit organizations in financial planning, management advisory services, computerization, tax planning and preparation.

**AP-99**

# EXHIBIT 68

**Charles Emma People v. Rosario notes**

VV   CHARLES EMMA
11-6-09   ADA LN                                    1/1

Court - upset that I wasn't paid yet approx $15,000
judge wanted me to surcharge the bond

Status now
① surcharge proceeding - charge the bond legal fees
② case on the estate - money was stolen from
     the estate
   Morelli substituted for prior atty on the
   estate - Daughter police officer got $1M on
   it

- DSS filed lien $300,000 and withdrew it.
They now have an active lien on the estate

- told John Brill to withdraw Minnie
Simmons - guardian - vacate the letter
of adm for incompetency, replace with Brill

AP-85

# EXHIBIT 69

<u>People v. Mitchell</u>
Indictment 4743-2010

Letter Request to Justice Patricia DiMango
To Sign Subpoenas

Dated: April 21, 2012

STEPHEN MITCHELL
542 Hartford Court
South Orange, NJ 07079
STM7615 @aol.com

April 21, 2012

*Re: People v. Mitchell*
*4743/2010*

The Honorable Patricia Di Mango
Justice of the Supreme Court of Kings County
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

I write to you with an urgent request for you to sign the "So Ordered" subpoenas that I provided the court. The trial of this action is scheduled for next week, May 1, 2012. I have asked for an adjournment of the trial for a few weeks because of a medical condition that is severe but treatable and because my legal advisor will not be available until the date of the trial. I still plan to have all of the materials I need well before May 1, 2012 and for the past two weeks have been trying to obtain the materials. I have visited your courtroom regularly during the past two weeks in an attempt to obtain signed subpoenas and yesterday, April 20, 2012, I visited the Miscellaneous Part, because your part was down, in order to advance the subpoenas. I was directed to bring my subpoena requests back to you and I am doing so immediately.

I know you are extremely busy because of the extraordinary trial you currently have before you but I ask that you provide this matter some attention or have it reassigned to another court for the purposes of resolving any disputes pertaining to the subpoenas. I expect that my right to some material will be challenged and there likely will be a need for limited motion practice or perhaps a hearing to resolve any disputes regarding turnover. *See Exhibit "A".*

The information requested by the subpoenas is essential to the defense of my case and I am entitled to the information for that purpose. I wrote, at your direction, every attorney involved with this case and made a demand for the production of documents. I provided a copy of my e-mail so that all of the attorneys could respond. As of the date of this letter the only attorneys who have responded are the attorneys for the Human Resources Administration. I have attached a copy of their response with this letter. Please see *Exhibit "A".*

**AP-48**

Below, I will address the reasons why I am entitled to the information requested for each subpoena I have provided the court. Please include this letter with the court file so that it may be available for appellate review. If the court needs the request in motion form please let me know. When we spoke of this issue before the court instructed me to express any problems with attorneys responding to demands to produce by letter.

### A. The Human Resources Administration Subpoenas

I sent a Demand to Produce to the Human Resources Administration's (HRA) Office of Legal Affairs Liens and Recovery Litigation Unit. I sent demands to attorneys within that office who have supervisory positions or who appeared in Kings County Surrogates' Court or New York State Supreme Court on behalf of the agency on the cases that underlie the criminal matter.

HRA contends that the documents I have requested from them are privileged and that they will produce neither the documents nor their attorneys for trial. *See Exhibit "A".* This court should order HRA to produce the materials requested immediately because almost all of the documents requested are indisputably not privileged and most of the knowledge base of the attorneys subpoenaed will not be privileged material either.

### 1. Court Records and Correspondence with Judges and Attorneys Are Not Privileged Materials.

I have asked for HRA to provide materials they filed in court or materials they received from the court or any attorneys associated with the cases that they represented the agency for in court. The court records sought include, but may not be limited to, court records pertaining to the Estate of Charles Brown, including but not limited to Kings County File Number 3350-03, any and all Guardianship Proceedings pertaining to Charles Brown, including but not limited to Kings County File Number 107103/99. HRA also may have made filings in other courts unknown to me. HRA also filed liens and obtained judgments against Charles Brown, his estate, his executrix, and his guardian that would not be privileged material. The agency also claims to have attempted to serve Minnie Simmons, a material witness in this case, with process and determined they could not. See *Exhibit "B".* Evidence related to the attempted service and why it was not accomplished may be crucial to the defense of this action because the issue of the competency of a material witness may be raised as a defense. I also have asked for copies of any correspondence HRA attorneys and officials had specifically with Justice Michael Pesce, Attorney Charles Emma, and any Surrogates' Court judges because of their investigative roles in the Guardianship and Surrogates' Court matters.

**AP-49**

The materials requested from the agency included court records such as pleadings, motions, orders, copies of transcripts, correspondence with judges and attorneys responsible for the aforementioned matters, and correspondence with any and all attorneys responsible for the matters including the respondents' attorneys. None of these documents are privileged because they involve external communications with third parties. The reason I am requesting the agency to provide these materials is because I would have no way of knowing if the court files are complete and I also may not be aware of all of the filings the agency may have made or have access to letters representatives of the agency may have sent to or received from the courts or attorneys involved with the cases the agency was involved with. Many records pertaining to this case were destroyed in a flood and so in order to reconstruct materials that may be crucial to the defense I must rely upon the agency. These materials can and should be turned over immediately because they are not privileged.

I never waived the request for these materials. I have been insisting upon them from the onset of this litigation. The attorneys who represented me declined to request the materials against my wishes in spite of my repeated insistence. That is one of the reasons why I asked to represent myself. Please order the agency to provide the aforesaid materials.

## 2. The HRA Files pertaining to Charles Brown and Minnie Simmons are not Privileged

I am requesting copies of all the material in the HRA files concerning Charles Brown and Minnie Simmons as parties or potential parties to any actions taken by HRA. These files are crucial to the defense in this action because they address material issues pertinent to the case. Charles Emma, Esq. was appointed by Justice Michael Pesce to investigate this matter and filed an affirmation to the court dated March 9, 2009 reporting his findings. He states in that report the following:

**Apparently, HRA started a compulsory accounting proceeding for a $292,000 unpaid Medicaid lien. This proceeding was withdrawn in October 2007. I contacted HRA, and the attorney advised me that they withdrew the proceeding only because they believed that the Estate assets were already distributed because of the sale of the house in December, 2005. Although the accounting proceeding was withdrawn, the lien is still active.**

*See Exhibit "C".*

On February 23, 2009 an attorney for HRA, Richard Balsam, Esq., was before Justice Pesce regarding the Guardianship matter. The following exchange occurred:

**AP-50**

Justice Pesce: Why was your petition withdrawn in Surrogates' Court?
Mr. Balsam: The fiduciary was in a nursing home at that point, and we can't get personal service on the fiduciary.
Justice Pesce: And you let it go—how much was your claim?
Mr. Balsam: No, we did'nt let it go. We just withdrew the petition. We did not waive our claim at any point, your Honor.
Justice Pesce: Well, the surrogate proceeding was that ever completed?
Mr. Balsam: No, your Honor.
Mr. Bull: No, your Honor.
Justice Pesce: So are you going to reinstate your claim?
Mr. Balsam: Well, if there's a substitute executor appointed, absolutely.
Justice Pesce: Well, Miss Simmons, are you the executor?
Mr. Bull: No, she's not, your Honor.
Mr. Emma: If I may be heard, I could explain that. I spoke to Steven Shapega about this. Miss Minnie Simmons was appointed executor as—pursuant to the petition filed by Marshall Kaplan. Now, Miss Simmons is incapacitated herself. My feeling is that Surrogate's Court is going to have to receive a petition to substitute. I did speak to Mr. Bull about this, and the petition by HRA was withdrawn.
Mr. Balsam: It was a compulsory accounting procedure, your Honor. And like I said, because she was in a nursing home and she was incapacitated, we could not force her to compel her accounting. That's why the petition was withdrawn, but we never waived our claim and our claim is still pending.
Mr. Emma: It was withdrawn without prejudice.
Mr. Balsam: Right exactly.
Justice Pesce: So its pending but withdrawn from the court?
Mr. Balsam: Right. No the claim is pending, but the petition for compulsory accounting was withdrawn without prejudice.

*See Exhibit "B".*

Compulsory accounting proceedings are not withdrawn based upon conversation. There must be compelling reasons for the agency to withdraw such a proceeding and those reasons likely are reduced to writing. Mr. Emma's affirmation provides a different reason for the withdrawal of the compulsory accounting proceeding than Mr. Balsom's representations in court and Mr. Emma's affirmation asserts that HRA gave him only one reason. HRA practices would not allow for the withdrawal of a claim of close to $300,000.00 unless there was substantial and verifiable proof that the monies related to the sale of the property were spent appropriately. I am familiar with their practices because of my experiences as an attorney.

The reasons why HRA withdrew their compulsory proceeding are an important component to the defense of this action. The resolution of the discrepancy between Mr. Balsom and Mr. Emma also is important for the defense. If one accepts Mr. Emma's representations then HRA has information from the estate

and its attorney that indicate how the proceeds of the house were distributed and the reasons why. This information is crucial to the defense and discoverable. The practices of the agency also are important to the defense because if it is true that compulsory accountings for amounts exceeding $200,000.00 are not withdrawn unless there is substantive proof of the distribution of the proceeds then a jury either needs to be able to see the proofs submitted or, if no proof is available, obtain an explanation as to why those proofs are not available. The defendant is entitled to obtain the complete HRA files pertaining to Ms. Simmons and Mr. Brown in order to obtain proofs in HRA's possession and discern explanations of their actions regarding the compulsory accounting process.

The reason why the HRA supervisors were subpoenaed was so there could be a means of presenting to the jury the practices of the agency should written policies not be available. HRA does not provide reasons why they consider the discovery requests burdensome. Perhaps the files proposed to be examined to discern the agency's practices could be limited to compulsory accounting procedures initiated for claims exceeding $200,000.00 so that the number of files to be identified is limited. The agency also hires outside legal contractors who handle their claims and are familiar with the practices of the agency. It is likely they keep better records regarding sizable claims because their fees are tied to the recovery on those claims. I have made demands upon one of those contractors and would like to receive information from all of them if it will speed the discovery process.

Information pertaining to the agency practices is not privileged because every respondent who answers a compulsory accounting claim has to negotiate with the agency or its representatives and every court that oversees the proceeding also plays some role in a resolution of the case based upon agency practices. Third parties are intimately and necessarily involved with these practices and so there is no privilege. Although the written policies may not be available for public consumption the practices themselves reveal the policies and would be apparent from a sampled study. The defense seeks the opportunity to examine the records of the agency and complete such a study. It would not be time consuming because it is likely that the agency never withdraws a claim for in excess of $200,000.00 without some form of documentary proof that has been verified thoroughly by the agency. I doubt there is one case where the agency discontinued a claim for more than $200,000.00 without substantial proof that was verified thoroughly. Perhaps a stipulation could be crafted that asserts this as a fact and there would be no need to call HRA lawyers as trial witnesses.

### B. The Non-HRA Lawyer Subpoenas

I sent the letter you suggested to attorneys Charles Emma, Colin Bull, Sherri Weindorf, Adam Mikolay, Russell Coyne, and Joseph McNulty. All of these attorneys were involved with the Surrogates' Court or Guardianship proceedings in an important manner or were involved with the sale of the property. The defense is entitled to discover correspondence and documents among them that is not

privileged.  The materials sought include communications (written, recorded, or electronic) or notes of communications in any form with the principles of the criminal case such as staff and attorneys of any District Attorneys' Office or other state offices, and Minnie Simmons, her daughters, staff at her nursing home, and other family members or friends. Mr. Bull may have a legitimate privilege objection because he represents a family member who now is an executor but his privilege may be qualified. All of the others likely have no claim to privilege.

The defense seeks copies of all court filings made or received by these individuals related to the Surrogates' or Guardianship cases or for the sale of the property in question.  The defense seeks these materials from these individuals because he may not have a complete court file.   The defense also seeks communications of any form sent or received to judges involved with the Guardianship or Surrogates' cases as well as correspondence the defendant may have sent these individuals or that was sent to him by these individuals.   The request is not made to harass or inconvenience anyone. It is made to ensure that the defense has a complete file and has the full capacity to impeach the People's witnesses.

Please order all of the aforementioned attorneys to respond forthwith to the demands issued to them.

I again am requesting some more time to prepare for trial.  I anticipate that there will be delays with the aforesaid requested productions and there may be motion practice that is necessary to determine the scope of any privilege assertions. This is a trial for my life and I implore this court to be fair to me and allow me the fair chance to defend myself against these charges.   Allowing parliamentary maneuvers by potential witnesses in an effort to avoid providing discovery or testifying at trial would be inconsistent with my United States Constitution 5th and 14th Amendments to a fair trial. This case is long in tooth but it is not so old that a few more weeks to obtain crucial discovery for the defense will prejudice either side. Please order the discovery and allow the defense the time to review it and try to make use of it.

Sincerely,

Stephen T. Mitchell

cc: Laura Neubauer, Esq.

**AP-53**

# EXHIBIT 70

<u>People v. Mitchell</u>
Indictment 4743-2010

Letter to Justice Patricia DiMango (at her request)
Regarding a Writ of Prohibition

Dated: October 22, 2012

STEPHEN MITCHELL
542 Hartford Court
South Orange, NJ 07079

October 22, 2012

*Re: People v. Mitchell*
*4743/2010*

The Honorable Patricia Di Mango
Justice of the Supreme Court of Kings County
320 Jay Street
Brooklyn, NY 11201

Dear Judge:

I have attached with this letter a courtesy copy of a Writ of Prohibition I have filed with the Appellate Division this morning. The purpose of filing the writ is to enjoin this trial court and any other trial court from proceeding with this matter to trial because such a trial would be unconstitutional pursuant to the state and federal constitutions.

I have filed a seventy page writ and memorandum of law with the appellate division and briefly below summarize the brief and the *Brady* issues below at your request. Please treat this letter as a motion to be filed with the court papers to preserve my appellate rights on these issues.

Every person accused of a felony in New York State has a state and federal constitutional right to a grand jury of integrity. *People v. Pelchat, 62 NY 2d 97, 104-108 (1984); see also See Napue v. Illinois, 360 U.S. 264, 269-272 (1959); see also California v. Trombetta, 467 U.S. 479, 485 (1984).* When a state prosecutor deliberately uses false testimony before the grand jury to obtain an indictment they violate the integrity of the grand jury and forfeit the jurisdiction of the trial court to proceed against the accused. *See Pelchat at 104-108; see also People v. Hill, 5 N.Y. 3d 772, 773 (2005).* Without jurisdiction the trial court cannot continue criminal proceedings against the accused. *Steel Co. v. Citizens For Better Environment, 523 U.S. 83, 94 (1998); see also Matter of Simonson v. Cahn, 27 N.Y.2d 1 at 4 (1970).* Prohibition is the remedy to use to enjoin a court when a court tries to proceed when it does not have the power to do so. Prohibition is appropriate for this case because the accused cannot be constitutionally tried via an indictment procured by fraud. *Pelchat at 104-108; see also Matter of Rush v. Mordue, 68 N.Y. 2d 348, 352-355 (1986); see also Matter of Holtzman v. Goldman, 71 N.Y.2d 564, 568-569 (1988).* Prohibition may lie where the claim is substantial, implicates a fundamental constitutional right, and where the harm caused by the arrogation of power cannot be adequately redressed through the ordinary channels of appeal. *Rush at 353-355.* All three components are here. The right to a grand jury of integrity is a fundamental right, the use of false testimony to obtain an indictment violates New York State law and the federal constitution. Unconstitutionally forcing the accused to trial on the basis of a fraudulently obtained indictment is considered too great a harm to wait for the appellate

process to cure it. *Id.* I have a clear legal right to a grand jury of integrity and therefore am entitled to the imposition of the writ. *Rush at 352-355; Pelchat at 104-108; Napue at 269-272; Trombetta at 285.*

The indictment came down in August 2010. A principal prosecution witness, Linda Simmons, testified falsely in the grand jury in order for the prosecutors to obtain an indictment. Linda Simmons testified in July and August 2010 that her mother, Minnie Simmons, mentally, was fine when she knew she was not mentally fine. Minnie Simmons is the principal witness for the case. Two and three months before Linda Simmons testified her mother was fine she told the prosecutors' investigator that her mother was suffering from Alzheimer's disease. *See Exhibits "A", "B", and "C".* This was the second time prosecutors were made aware of the mental deficiency of their principal witness. In November 2009 another grand jury witness told the prosecutors that Minnie Simmons should be removed as an executrix because of incompetency. *See Exhibit "D".*

The prosecutors will concede the investigators notes that informed the district attorney of the mental health issues of Minnie Simmons were not turned over to the defense until November 2011, approximately six months after a conditional hearing pursuant to Article 660 was held in May 2011. *See Exhibit "E".* The defense was not told that Minnie Simmons' daughter and another witness told prosecutors several months before the indictment was voted that Minnie Simmons was considered incompetent or suffered from Alzheimer's disease. The defense could have used that information to demand a competency hearing before the conditional examination and sought a dismissal of the case pursuant to CPL §210.20(1)(c) and CPL §210.35(5) because an incompetent witness provided evidence to the grand jury and that witnesses incompetence was known to the prosecution when they provided evidence to the grand jurors. Judge Walsh improvidently refused to entertain motions filed after the conditional hearing pursuant CPL §210.20(1)(c) and CPL §210.35(5). Any delay in filing those motions was occasioned because the prosecutor failed their *Brady* obligations and did not provide the investigator's notes until six months after the conditional hearing.

The *Brady* violation is obvious. The investigators notes should have been given to the defense at arraignment because of the witness mental infirmity and the potential need for the defense to preserve her testimony. Instead, the prosecutors ignored specific requests made by the defense in their December 2010 omnibus motions for information pertaining to the mental health of the People's witnesses and for exculpatory material. The prosecution falsely claimed that they did not know of materials pertaining to any psychiatric illness of their witnesses in response to the defendant's requests. *See Exhibits "F" and "I".* The defense was denied the chance to cross examine the witness as to the impact of her mental illness during the conditional hearing. The defense was not allowed a meaningful opportunity to cross examine Minnie Simmons because the prosecutors did not provide materials specifically requested from them that were in their possession at the time of the conditional examination. *See People v. Cortijo, 70 N.Y.2d 868, 870 (1987).* The people's withholding of the investigator's notes was a violation of the confrontation clause. *See People v. Simmons, 36 N.Y. 2d 126, 131-132 (1975); see also People v.*

AP-64

*Baranek, 287 A.D. 2d 74, 78-79 (2 Dept. 2001)*.  The prosecution concedes Minnie Simmons no longer is available as a witness because of mental illness.  Her entire testimony must be precluded because the defense never was given the opportunity to challenge during cross-examination whether or not she was mentally capable of offering competent evidence during the conditional hearing. *Id.; see also People v. Cwikla, 46 N.Y. 2d 434, 441-442 (1979)*.

Minnie Simmons never testified in the grand jury.  She provided an affidavit that was read aloud to the grand jurors pursuant to CPL §190.30(3) regarding an assertion of no permission or authority, a crucial component of the charge.  When she was confronted with this affidavit during the conditional hearing she emphatically stated that the signature on the document was not hers and that she did not remember having the document read to her before the conditional hearing. *See Exhibit "G"*.  Her testimony was, in short, that the affidavit used to indict the accused was a fraud.  Prohibition is an appropriate remedy to stop this proceeding based upon Minnie Simmons' testimony that the primary affidavit used to indict was a fraud. *See Exhibit "H"*.  The reason why Linda Simmons' testimony was so deceitful is because there is no jurat on the affidavit purportedly signed by Minnie Simmons regarding her soundness of mind.  Linda Simmons testimony was used by prosecutors to assure the grand jurors that Minnie Simmons was sound of mind notwithstanding the fact that at least two grand jury witnesses did not believe she was.

The above is the basis for the writ and for *Brady* relief.  This court has stated it would consider these matters after receiving this letter.  My seeking a writ not a stunt for delay; the claims are legitimate and I need to preserve my rights should an appeal be necessary.  I also must make a record as to the constitutional infirmity of rushing me to trial unprepared.  I was told two adjournments ago by Judge Walsh not to be prepared for trial because the case was on for a decision of a motion brought by the prosecutor.  I was told that the date of the decision and Friday, the day I appeared before you, were to be control dates and that I would have adequate time to prepare for trial.  I have not had time to speak with experts and other than a witness who is a neighbor of mine I do not know the whereabouts or availability of any other person I plan to call as a witness.  It is outrageous that I am being forced to trial for a matter that requires the review of at least 6,000 pages of materials with such short notice, especially when I was assured that I would be given a brief but adequate amount of time to prepare.  I also informed the court that I was disabled by my physician at least a week before appearing before you until the end of the month so that my blood pressure can be medically controlled.  It was callous of the court to ignore my condition after being informed of such especially since I am disabled only until November 1, 2012.  Many federal courts in review of state court decisions have held that expedience never should take the place of justice. *See Drake v. Portuondo, 321 F.3d 338, 344 (2d Cir. 2003)*.  It appears to me the objective is not court efficiency but for the defense not to be well prepared; a constitutionally infirm reason to rush an indigent, pro se defendant to trial.  This court should reconsider the trial schedule should the appellate division deny the writ.

This court cannot proceed until the writ is determined because the harm sought to avert is an unconstitutional trial. The case must be discontinued until the writ has been resolved.

Sincerely,

Stephen T. Mitchell

cc: Kings County District Attorneys Office

# EXHIBIT 71

<u>People v. Mitchell</u>
Indictment 4743-2010

Letter to Assistant District Attorney Neubauer
Regarding Disclosure Requests and a Subpoena

Dated: April 14, 2012

STEPHEN T. MITCHELL
c/o Adrian Mitchell
461 Central Park West
Apartment 6B
New York, NY 10025
EMAIL: STM7615@aol.com

April 14, 2012

*Re: People v. Stephen Mitchell*
*Demand Letter*
*4743/2010*

Laura Neubauer, Esq.
Kings County District Attorney
320 Jay Street
Brooklyn, NY 11201

Dear Ms. Neubauer:

On Friday, April 13, 2012, I appeared before the Honorable Justice Patricia Di Mango of Kings County Supreme Court on behalf of myself concerning the aforementioned matter. I presented Justice Di Mango with a Subpoena Duces Tecum and a trial subpoena to be issued to you for materials pertinent to this case and to demand your appearance as a witness for a trial scheduled to begin May 1, 2012.

Justice Di Mango told me that it was her practice not to sign initially requested "So Ordered" subpoenas that make demands upon attorneys to produce materials or appear at trial. She instructed me to send you a demand letter requesting the materials and to notice you to appear. She stated that if there was an objection that you had to producing anything I requested or appearing as a witness that you state your objections in writing to me immediately and that I was to inform her of your objections to any demands or appearances immediately.

I write to you to request the following list of materials. If you have any objections to the demands for production please state them to me in writing and send them to me. I prefer that you send me any written objections via electronic mail at STM7615@aol.com. If you send the objections to me via electronic mail I will receive them quickly and furnish them to the judge within the next day. Please mail copies of the materials you agree to furnish immediately to the above address or scan the materials and send them to my electronic mail. These materials are needed for a trial scheduled to begin May 1, 2012 so if you have any problems providing what you intend to provide or appearing as a witness for trial please let me know immediately so I can inform the judge.

**AP-45**

I demand that you produce the following materials.  Please send me copies of the following materials to comport with the demands of this letter.

### DEMAND TO PRODUCE FOR
### ASSISTANT DISTRICT ATTORNEY NEUBAUER

WE COMAND YOU, that all business and excuses being laid aside, you and each of you PRODUCE all Brady and Rosario material, and all records, documents, notes, logs, accountings, transcripts, court transcripts, court motions, court orders, pleadings, court papers, correspondence, telephone conversation notes, timecards, calendars, printouts, charts, filings, writings, forms, or diagrams of any kind pertaining to the Estate of Charles Brown, including but not limited to Kings County File Number 3350-03, any and all Guardianship Proceedings pertaining to Charles Brown, including but not limited to Kings County File Number 107103/99, and any of the aforesaid papers requested pertaining to Minnie Simmons, decedent Charles Brown, social security number, 237038068, Justice Michael Pesce, and any criminal or civil proceedings that name Stephen Mitchell as a party.

WE COMAND YOU, that all business and excuses being laid aside, you and each of you also PRODUCE all facts known and opinions to be offered at trial, the basis for said opinions, and any and all supporting data considered including but not limited to documents, charts, or materials to establish said opinions by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding.  A report of a complete statement of the opinions to be expressed at trial by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, the qualifications of Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding, including a list of all publications authored by Vincent Verlezza or any other person or witness who is or purports to be an expert witness for the aforesaid criminal proceeding within the preceding ten years, the compensation paid to any of the aforesaid witnesses, and a listing of the cases the aforesaid persons have testified to within the past five years as an expert at a grand jury, hearing, or trial.  Also include the names, addresses, e-mails, and phone numbers of opposing counsel attached with the aforesaid information.

Please affirm at the end of your response to this demand that the response is complete to the best of your knowledge.

Sincerely,

Stephen T. Mitchell

**AP-46**

cc:   The Honorable Justice Patricia Di Mango
        Kings County Supreme Court

**AP-47**

Case 23-705, Document 32, 07/24/2023, 3547454, Page247 of 374

1  guardian.  It's a whole special referee.

2      Q   What's the purpose of having to renew every

3  couple of years?

4      A   Just to pretty much update and to make sure

5  that you still want to be on the list.  You know,

6  some attorneys they want to withdraw from it and not

7  do that any more.

8      Q   Under what types of circumstances have you

9  been appointed as a guardian ad litem?

10     A   Many different kinds.  For guardian ad litem,

11 I've been receiving last several years, to be

12 appointed to review final accounting and also to

13 investigate.  When a court cannot seem to get

14 answers, they need somebody to do a forensic

15 investigation to locate -- ascertain or locate where

16 the assets are.  I would get quite a few of those

17 appointments.

18     Q   When you use the word forensic, how do you

19 apply that to a situation such as that?

20     A   To explain that meaning you would normally

21 receive subpoena power, you would request financial

22 documents, bank statements, canceled checks and so

23 forth.  See if disbursements were properly made, so

24 the guardian did not put money in his or her own

25 pocket, you would want to make sure that the bills

AP-574

Direct-Emma/Cappock                                    22

1    were properly paid.  You'd want to make sure that

2    there were just no mislodging of any funds in the

3    guardianship account.  And also to ensure that assets

4    were properly marshaled, brought together and placed

5    in the guardianship account.

6        Q    That subpoena power is granted to you by?

7        A    Supreme Court.

8        Q    About how many times in total have you been

9    so appointed as a guardian ad litem?

10       A    Last five years I would say at least 40

11   times.

12                  MR. MITCHELL:  Excuse me, 40?

13                  THE COURT:  40.

14                  THE WITNESS:  40.

15       Q    Can you briefly describe, I know you touched

16   on it a bit, the procedure by which you are brought

17   into a case and appointed?

18       A    I would receive a court order appointing me.

19   Sometimes would get a call from chambers describing

20   the case.  Would you like to handle this?  You have

21   time for it?  Some of these things can be very time

22   consuming obviously.  Or just would receive a court

23   order.  Especially a case to investigate that you

24   know is going to be taking up a lot of your time.

25   But a court order triggers it.

MS

Direct-Emma/Cappock                                    33

1    Again, first question, do you keep individual ledgers

2    for there and every other single individual client

3    for the last three years.

4              So, I assisted a few attorneys when --

5    they were all mistakes.  Sometimes you can take of a

6    zero.  Instead of giving a check for a $1,000, you

7    give a check 10,000, the check is going to bounce.

8    And it's inadvertent, not the attorney stole money,

9    but you do have to go through the whole explanation

10   with the Grievance Committee.  So I kind of assisted

11   a few attorneys in this regard.

12       Q    In the course of your appointments as guard

13   ad litem, do you have to address these sections of

14   the rules of professional conduct and the judiciary

15   law in preparing your final reports?

16       A    No, not really.  They're not related.  The

17   guardian ad litem what you're looking at is a

18   forensic evaluation of the guardianship account,

19   which would have nothing to do with an attorney's

20   escrow account IOLA account as we sometimes call it?

21       Q    Have you ever had to appear in court as a --

22   in your capacity as guardian ad litem to address the

23   ethical and fiduciary responsibilities of guardians?

24       A    Yes, almost every case.

25       Q    And can you just take us through what the

Case 23-705, Document 32, 07/24/2023, 3547454, Page250 of 374

1   purpose is of that?

2      A   Well, the purpose of that is when you, as

3   guardian ad litem, I am appointed to, say,

4   investigate, I could be appointed to investigate what

5   happened to the money or I could be appointed just to

6   review a final accounting, see if it's proper, see if

7   there is any discretion to investigate where the

8   Court really has no information about as to what

9   happened to the guardianship funds.  So you have to

10  appear in court and you have to assess the whole

11  situation.

12     Q   Is there any difference between the term

13  escrow account and IOLA account?

14     A   No difference.  It's all the same.  Lawyers

15  usually call it escrow account, state likes to call

16  it IOLA account?

17     Q   Are you familiar with the term estate

18  account?

19     A   An estate account is totally different.

20  Again, in the Surrogate's Court if a person dies and

21  an administrator or executor is appointed, that

22  administrator or executor is a fiduciary.  That

23  person would have to marshall the assets after he

24  gets a court order either called letters of

25  administration or letters of testamentary.

Direct-Emma/Cappock                                    36

1    account?

2        A    Yes, certainly there is.   The attorney

3    escrow, IOLA account is entrusted funds with the

4    attorney.   The attorney has the fiduciary

5    responsibility in that case.

6             In the estate account, it's the court

7    appointed administrator, executor who's the

8    fiduciary.   And that person would have to be

9    responsible for the money in that account and

10   sometimes with a bond.   Usually without a bond.

11            So it's not the attorney that's

12   responsibility in estate.   An attorney is not a

13   signatory in that account at all.   His client is the

14   administrator or executor.

15       Q    You had mentioned the term executor before.

16   Can you just describe what an executor is?

17       A    Okay.   The executor is appointed by the

18   Surrogate's Court, not the Supreme Court to be

19   executor of an estate because of a will designated

20   that person to be executor.   Administration is

21   something different.   There is no will and the assets

22   get divided up in accordance with state statute

23   Section 4-1.1 of the Estate Powers Trust Law.   What

24   happens in a case like that, the executor is the

25   fiduciary or the administrator is the fiduciary, not

Direct-Emma/Cappock                          37

1   the attorney.

2       Q    Are you familiar with the Supreme Court case

3   regarding an individual named Charles Brown?

4       A    Yes, I am.

5       Q    What did that Supreme Court case entail?

6       A    I was appointed in June of 2008 to act as a

7   guardian ad litem to investigate, had subpoena

8   authority, and to locate where the assets were for

9   the guardianship.  And immediately I started

10  investigating.

11      Q    Did this case exist prior to June 2008 in

12  Supreme Court?

13      A    It existed.  It was a guardianship that was

14  formed in 1999.  And I believe the incapacitated

15  person, Charles Brown, died in 2003.  I was not

16  appointed until 2008.  It was no final accounting for

17  five careers before I was appointed.

18      Q    At the time of the start of this case, what

19  was the subject matter of the guardianship case?

20  What did it entail?

21      A    Back in 1999?

22      Q    Correct.  When it started, Charles Brown was

23  deem to be an incapacitated person.  He was I

24  believe -- I believe at that time, again I was not

25  involved with the case back then, that he was still

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page253 of 374

1    living.

2                 MR. MITCHELL:  Objection.  I mean, it

3        would be hearsay if he was testifying.

4                 THE COURT:  Overruled.

5                 Sir, did you review the records of the

6        guardianship?

7                 THE WITNESS:  Yes, I did, of course.

8                 MR. MITCHELL:  I will withdraw the

9        objection, sir.

10                THE COURT:  Thank you.

11                Overruled.  Go ahead.

12   A    I believe he was still living at home.  Then

13   I think eventually he did go into a nursing home.

14                The Court appointed guardian was Minnie

15   Simmons, who was related to Charles Brown and she was

16   the court appointed guardian.  And, of course, I had

17   to investigate the guardianship account that was

18   handled by Minnie Simmons, which was at Carver Bank.

19   Q    Did there come a time that this guardianship

20   case became -- I will withdraw the question.

21                Did there come a time that another case

22   opened up in relation to Charles Brown?

23   A    There was an estate proceeding.  That was

24   formed, in fact, 2003.

25   Q    What was the purpose of that estate

1  proceeding opening?

2      A   Was probate a will.  In fact, Minnie Simmons

3  was the designated executor in that will.

4      Q   Whose will?

5      A   Charles Brown's will.

6      Q   Did Charles Brown pass away?

7      A   He past away 2003.

8      Q   Can you describe how the -- how in 2003 the

9  guardianship proceeding and the estate proceeding

10  were related, if at all?

11      A   Generally speaking, you can start an estate

12  proceeding even though the guardianship proceeding is

13  not finished.  Upon death, an attorney filed an

14  estate proceeding in 2003.

15          When I was appointed, I was not aware at

16  the time of what happened to the property of Charles

17  Brown.  I started investigating the guardianship

18  account.  And my conclusion was that Minnie Simmons

19  properly spent every dime in that guardianship

20  account for the purposes and care of Charles Brown.

21  And the money was spent down to $2,000 from 80,000.

22  She paid his real estate taxes, she paid his Con Ed

23  bill, she did everything proper.

24      Q   At the time that you were assigned was the

25  guardianship case still opened?

Case 23-705, Document 32, 07/24/2023, 3547454, Page255 of 374

Direct-Emma/Cappock                                    40

1      A    Yes, of course.

2      Q    At the time you were assigned was the estate

3   case still opened?

4      A    Yes, it was.  I was not aware of the estate

5   case until I investigated.

6           What I did was, I had checked -- I saw

7   property owned -- 302 St. James owned by Charles

8   Brown.  So I went online, having access to the ACRIS

9   system, and I saw that the property was sold on

10  December 23, 2005 by the estate of Charles Brown.

11  And that's when I knew that the property was --

12  property was involved and was already sold by the

13  estate in 2005.  Three years later I am discovering

14  this, 2008.

15     Q    Are guardianship cases typically assigned any

16  kind of identifying number?

17     A    Yes.  It's called an index number in Supreme

18  Court.

19     Q    Are estate cases assigned index numbers as

20  well?

21     A    In estate cases, we call it in Surrogate's

22  Court, a filing number.  Just like you have an

23  indictment number Supreme Court, civil is index

24  number, and family court we call it a docket number,

25  Surrogate's Court we call it a filing number.

Case 23-705, Document 32, 07/24/2023, 3547454, Page256 of 374

Direct-Emma/Cappock                                    £1

1      Q     Do you know the index number for the

2   guardianship involving Charles Brown?

3      A     107103 of 1999.

4      Q     Do you know the file number for the estate

5   case involving Charles Brown?

6      A     That was 3350 of '03, I believe.

7      Q     In what county were these cases pending?

8      A     Both in Kings County.

9      Q     Is either matter still pending?

10      A     The estate proceeding is still pending.  The

11   guardianship proceeding is closed.

12      Q     You had previously mentioned the name Minnie

13   Simmons.  What was her -- I am sorry.  Just to recap,

14   what was her relationship to the guardianship case?

15      A     Okay.  She was the court appointed guardian

16   over the person and property of Charles Brown.

17      Q     What did that entail?  What were -- for what

18   purpose was she assigned?

19      A     She would be for personal needs.  She would

20   make certain medical decisions that did Charles Brown

21   need home health care, did he need a nursing home,

22   did he need any kind of particular surgery.

23           As a property guardian -- or as the

24   property guardian, she would collect his assets,

25   collect his social security, or his pension check,

Case 23-705, Document 32, 07/24/2023, 3547454, Page257 of 374

1    and pay all his bills.

2        Q    She have a connection to the estate case as

3    well?

4        A    She was the court appointed -- the designated

5    executor of Charles Brown's will.

6             THE COURT:  Was she also managing the

7        properties that Mr. Brown owned?

8             THE WITNESS:  Yes.

9             THE COURT:  As part of the guardianship?

10            THE WITNESS:  As part of the

11   guardianship she was the property guardian.

12       Q    Is it fair to say while both the guardianship

13   and estate proceedings were pending, she had a dual

14   role?

15       A    Yes, she did.

16       Q    What did that dual role entail?

17       A    Well, the guardianship proceeding she had to

18   do a final account.  Of course, she needed an

19   attorney to do that.  The estate proceeding, she

20   needed an attorney to proceed with the estate.

21   Because what happened here was the property -- the

22   house fell under the estate, the guardianship account

23   fell under the guardianship proceeding.  So it was

24   two separate assets in two different ball parks.

25       Q    You know an individual by the name of Stephan

Case 23-705, Document 32, 07/24/2023, 3547454, Page258 of 374

1   representing Minnie Simmons prior to approximately

2   2005?

3        A    Before Mr. Mitchell there was an attorney

4   that started an estate proceeding in Surrogate's

5   Court, Marshall Kaplan.  During the course of my

6   investigation I debriefed him and he fully

7   cooperated, turned over all his records to me.

8                    THE COURT:  Was he at all involved in

9        the guardianship matter?

10                   THE WITNESS:  Not that I am aware of.

11       Not at that time, no.

12                   Yes, I believe he was.  I'm sorry.

13       Sometime in -- from what the transcripts I saw in

14       the court file, he was involved, I forget the

15       year, 2004, something like that, he appeared in

16       Supreme Court on the guardianship proceeding once.

17       Q    At the point that the defendant took over

18   representation of Minnie Simmons, did Marshall Kaplan

19   have any remaining fiduciary responsibility to the

20   guardianship or estate?

21       A    No.  He was no longer responsibility.  He

22   indicated to me that Stephen Mitchell took over the

23   case so defendant became responsible for that point

24   on.  Again, I'm not sure when the defendant came into

25   the case.  Took it over could have been 2004 or 2005.

EMMA/CAPPOCK/DIRECT

1    Q    In the course of your investigation, did you

2    become familiar with the participants of the sale of 302

3    St. James Place?

4    A    Again, the participants that I knew of, I just

5    knew the corporate name of the buyer which was Toju

6    Realty.  I knew that Norman Ushkow was involved or maybe

7    just initially involved.  And I also knew Umana Oton was

8    the attorney for the buyer.

9    Q    And while going through this investigation, were

10   there any -- withdrawn.

11        Were People's Exhibits 1, 2 and 3 among the

12   documents that you reviewed?

13   A    Yes.  I got copies of everything on this.

14   Q    Were there other documents or other files that

15   you reviewed in the course of your investigation?

16   A    Well, when I got that check for four hundred and

17   one thousand and ascertained it was deposited in the

18   account of Stephen Mitchell, I subpoenaed the IOLA account

19   records of Mr. Mitchell from December 1st of 2005 through

20   December 1st of 2006.

21        Chase bank told me that he as their customer

22   had blocked any of my attempts to receive any documents

23   for that account on the basis that it would have other

24   clients' information.  I advised Judge Pesce about this

25   and we had a court appearance on February 23, 2009.

EMMA/CAPPOCK/DIRECT

1          And when I was in Judge Pesce's chambers, I

2    explained the situation.  And by that time, the judge had

3    received a motion blocking my assess to his escrow

4    account, a motion saying the court had no jurisdiction and

5    I had no authority.

6               And the judge, he got on the phone with the

7    investigative branch at Chase bank.

8         Q    Was this in your presence?

9         A    In my presence in chambers.  And he said you

10   will fax them over to my chambers, attention to Mr. Emma,

11   in fifteen minutes.  I think he used the words "or else"

12   and he was very adamant about that.

13              I looked at my watch and in twelve minutes I

14   got the records for December 2005 and January 2006.  The

15   judge gave me, like, five minutes to review it and he

16   said, let's go put this on the record.

17              And I did.  I explained what I saw on the

18   records.  I only had a few minutes to look at it.  And I

19   saw that on the escrow statement he received $401,082.50

20   on December 23, 2005, which was the same date as the

21   closing.  And from there, monies were withdrawn gradually

22   into another account which was also the attorney account

23   or personal account of Stephen Mitchell.

24        Q    The paperwork that was sent to you via fax that

25   day, do they appear anywhere in People's 4?

1:38

EMMA/CAPPOCK/DIRECT

1    A    The December statement is here.

2    Q    Is that one page or multiple pages?

3    A    That is really just one page, that's all.

4         MR. CAPPOCK:  Would you be able to take that out

5    and have the court officer hand that to me, please.

6         (Document handed)

7    Q    Looking at this on the overhead, Mr. Emma, is

8    this depicted in the overhead so it reflects what happened

9    with the $401,082.50?

10   A    Yes.  It shows a deposit on December 23rd.

11   Q    Approximately where on the top, bottom, middle

12   does that appear?

13   A    Right in the middle.  You see a date to the

14   left, 12/23.  It says deposit.  And at the end it says

15   $401,082.50.

16   Q    Thank you.

17        Besides the bank records and People's 1, 2 and

18   3, did you review any other documents in the course of

19   your investigation?

20   A    Well, in the same fax in chambers, I received --

21   let me just put this back first.

22   Q    Oh, sorry.

23   A    -- in Exhibit 4, a statement which I got at the

24   same fax for January of 2006.  And that shows transfers

25   and also a cashier's check.  And the transfers were to

EMMA/CAPPOCK/DIRECT

1    A    She ended up in a nursing home herself in 2006.

2    Q    Are you talking about physical incapacitation or

3  mental incapacitation?

4    A    More physical.  More physical.

5    Q    Do you remember the specific physical --

6    A    No, I don't.  I do know from the family she was

7  very frail, in a wheelchair, and she was getting some

8  dementia.

9    Q    Now, could you direct your attention to

10  February 23, 2009.  Do you recall where you were at that

11  time?

12   A    Yes.  I was in court.

13   Q    Was anybody else present at that time?

14   A    Yes.  The defendant was present, I recall that.

15   Q    Was anybody else there?

16   A    It may have been Colin Bull on that day; I'm not

17  sure.

18   Q    Was there an official court appearance scheduled

19  for that day?

20   A    Yes.  It was a regularly-scheduled appearance.

21   Q    Was the judge present on that day with a court

22  reporter?

23   A    Yes.

24   Q    Have you had an opportunity to review the

25  minutes of that proceeding?

PROCEEDINGS

1          Mr. Emma, you are reminded that you are still

2      under oath.

3          MR. MITCHELL:  May I inquire, your Honor?

4          THE COURT:  Yes.

5   CROSS-EXAMINATION

6   BY MR. MITCHELL:

7      Q   Good day, Mr. Emma.  How are you today?

8      A   I'm good.

9      Q   That's good.

10          Mr. Emma, you testified earlier that Minnie

11   Simmons had indications of dementia?

12      A   That's what I was told by a family member.  She

13   was in a wheelchair, she was very much handicapped, and

14   also that she actually went to a nursing home in, I think,

15   early 2006.

16      Q   But, my question was someone told you that she

17   had indications of dementia?

18      A   Yes.

19      Q   Do you remember the family member that told you

20   that?

21      A   I spoke to seven family members.  I'm not sure

22   which one.

23      Q   Was it a female or a male family member?

24      A   I think it was female.

25      Q   It was Linda Simmons that you spoke to?

EMMA/MITCHELL/CROSS

1      A      Could have been Linda, could have been Joanne,

2   could have been anyone.

3      Q      Well, there is only -- there are three girls.

4             MR. CAPPOCK:  Objection, your Honor.

5             MR. MITCHELL:  Okay, withdrawn.

6             THE COURT:  Is there anything in your notes that

7      would refresh your recollection as to who told you

8      that?

9             THE WITNESS:  No.

10     Q      All right.  Did you prepare a report for this

11  particular case?

12     A      For this particular case or for the

13  guardianship?

14     Q      For the guardianship.

15     A      Yes, I did.

16     Q      What about for this particular case, did you

17  prepare any reports?

18     A      You mean the criminal case?

19     Q      Yes.

20     A      No.

21     Q      Did you prepare any notes?

22     A      Whatever notes I had, I was obligated to turn

23  them over to the District Attorney.

24     Q      And you turned them over?

25     A      Yes.

EMMA/MITCHELL/CROSS

1    Q    How many pages of notes did you turn over?

2    A    I believe it was two.

3    Q    Two or three pages?

4    A    Something like that.

5    Q    Did you have any correspondence with the

6  District Attorney such as letters that you sent them or

7  they sent you?

8    A    No.  Maybe an email, that's about it.

9    Q    An email, just one email?

10    A    I believe so, yes.

11    Q    Do you remember you and I having a discussion

12  about my inability to furnish records because I said I had

13  a flood?

14    A    Yes.

15    Q    And you also testified that later I said that I

16  had a fire and that I said something else, right, that the

17  records were in another part of the country; is that

18  correct?

19    A    Out of state were the exact words.

20    Q    All right.  Did I tell you that my records were

21  in New Jersey where I live?

22    A    I had thought you said in Georgia.

23    Q    Oh, you thought I said in Georgia?

24    A    Yes.  You said they were out of state.  And I

25  think you said Georgia.

Proceedings                                                184

1    its ruling that you have.  But at this point the

2    fact there was a flood, among many floods, in the

3    State of New Jersey in 2007 is speculative.  And

4    defense has an exception.

5            In regard to the submission of a letter

6    sent to Southern District Judge Castell,

7    C-A-S-T-E-L-L, that is simply hearsay.  It is not

8    being offered for the truth but simply to show

9    that the assertion that a flood had resulted in

10   the damaging of records in another case had been

11   used again by the defendant.  It does not mean it

12   was true.  It just merely invites the jury to

13   speculate, based upon the number of times a flood

14   was invoked, that it was necessarily true.  There

15   again, this merely invites speculation by its

16   admission.

17           And, finally, I just want to make this

18   note in terms of the cross-examination which began

19   yesterday.  I'm going to limit the number of

20   questions that can be asked of Mr. Emma and Judge

21   Pesce in regard to their jurisdiction in this

22   matter.

23           This is not a suppression matter.  This

24   is not a criminal case where the police officers

25   elicited statements from the defendant that are

MS

Proceedings                                           185

 1    suppressible.  Anyone, including beneficiaries,

 2    the executor, friends of the beneficiaries,

 3    executors, attorneys for those parties could have

 4    asked the same questions of the defendant.

 5    Therefore, I'm going to truncate, limit the

 6    challenge that was apparent to Mr. Emma's

 7    appointment as a guardian in this case.  It's

 8    clear that the confusion came up in regard to his

 9    payment and had nothing to do with the questions

10    asked of the defendant.

11            Those are my rulings to each of them.

12    The defense has an exception.

13            MR. MITCHELL:  Your Honor, I just want

14    to note for the record, as a part of my exception,

15    that with respect to the Judge Castell's letter,

16    the effort that I was making was an effort to

17    rebut Mr. Emma's representations with regard to my

18    stating there was a flood as a recent fabrication.

19            I would cite People v. Seit at 86 NY2d,

20    92, page 96, 1995; People v. Singer, 300 NY 120;

21    and People v. McDonnell, 81 NY2d 10 at page 18,

22    1993.

23            All three of those case are New York

24    State Court of Appeals cases.

25            THE COURT:  What do you claim was Mr.

AJAMI/CAPPOCK/DIRECT

1    A    Yes.  It's our report.

2    Q    Does it relate to any specific address?

3    A    302 St. James Place, Brooklyn, New York.

4    Q    Did Class Abstract participate in the closing of

5    the sale of 302 St. James Place?

6    A    Yes, we did.

7    Q    When did that closing occur?

8    A    On December 23, 2005.

9    Q    And what was your company's role in this

10   closing; the same actions that you previously described?

11   A    Yes.

12   Q    I would ask if you could just look through the

13   documents there and just tell us what each one of those

14   documents are just very briefly, and if you had any

15   specific function in preparing any of these documents.

16   A    Uhmm, well, this first page is our cover page.

17   It has the usual details like the address, the block and

18   lot, the address, the seller's and the buyer's attorney,

19   the seller and the buyer.

20        And this is just a cover page.

21        This is our certification page.  And this

22   really addresses on how the deed is to be worded by the

23   seller.  It also has source of title, when the last deed

24   was recorded.  And it also gives the price, the purchase

25   price.  And if there is a mortgage, the mortgage price.

255

AJAMI/CAPPOCK/DIRECT

1    of sale in People's 17.  What is that?

2              First, generally, what is a residential contract

3    of sale?

4        A    It's just a contract between the buyer and

5    seller.  You know, agreement to, you know -- I'm not

6    familiar with the document itself.  I just know that I

7    have to have one present, you know, when -- after it

8    closes.  I have to have one in the file.

9        Q    And this is different than the signed deed?

10       A    Yes.

11       Q    It's a different document.

12            What is the date on this specific residential

13   contract of sale?

14       A    December 23, 2005.

15       Q    Now, in your experience with Class Abstract and

16   your filing of the residential contract of sale, do the

17   parties ever include handwritten provisions?

18       A    Yes, they do.

19       Q    For what purpose?

20       A    Uhmm, sometimes there is -- like, the buyer is

21   leaving behind a washer and dryer, and they would put that

22   in.  Or, there are different reasons.

23            Sometimes, light fixtures are left behind and

24   that's put in.  Or, a tenant is -- they agree a tenant has

25   to be vacated by the time the closing takes place, or that

AJAMI/CAPPOCK/DIRECT

1    the tenant is staying and they both agree upon that.

2              Uhmm, so there is different things that could

3    be handwritten in after, you know -- or that's not in the

4    Contract of Sale, it's not written in the Contract of

5    Sale.

6        Q    When you say "not written --

7        A    Typed.

8        Q    -- not written out?

9        A    Yes.

10       Q    Are the parties signing the Contract of Sale

11   bound to those handwritten conditions?

12       A    Yes.

13       Q    In this specific Contract of Sale, are there any

14   such handwritten conditions?

15       A    Yes.

16       Q    Could you give an example and if you could just

17   state what page you're referring to?

18       A    It's the first page and it's on the right side.

19   This is an "as is" sale that includes -- I can't --

20   responsibility for tenancies and removal of tenants by

21   purchase -- that's all I can read.

22       Q    By purchase or would that be purchaser?

23       A    By purchaser.

24       Q    And if you could turn to the last page of this

25   document.

AJAMI/CAPPOCK/DIRECT

1    Are signatures required on the last page of this
2 document?

3    A    Yes.  There are signatures and there are
4 attorneys' information.

5    Q    And when you say signature, what parties to the
6 transaction or what parties to the contract are required
7 to sign this document?

8    A    Well, in this case, the estate, the person that
9 owns the property is deceased, so the executor, Minnie
10 Simmons, signed as the seller.  I'm not sure who signed as
11 the buyer; I can't read their handwriting.

12    Q    But, the buyer or purchaser is required to sign?

13    A    Yes.

14    Q    Are the attorneys required to sign?

15    A    No.

16    Q    Is there a listing who the attorney is, though,
17 for the parties?

18    A    Yes.

19    Q    Does that appear on this document?

20    A    Yes.

21    Q    Are you able to make out the attorney for the
22 seller on this document?

23    A    Uhmm, Stephen Mitchell.

24    MR. CAPPOCK:  Thank you.  No further questions.

25    THE COURT:  What was the date of the contract

Case 23-705, Document 32, 07/24/2023, 3547454, Page272 of 374

Cross-Emma/Mitchell                                    279

1      A    Yes.

2      Q    Where there times that you spoke with Mr.

3   Cappock and investigator -- I mean Investigator

4   Verlezza?

5      A    I don't think so.  I think Mr. Verlezza was

6   replaced on the case by Mr. Gillion about the same

7   time Mr. Cappock replaced Ms. Neubauer.  So, I don't

8   think they were together.

9      Q    Could you tell the jury who Vincent Verlezza

10  is?

11     A    He's an investigator at the District

12  Attorney's Office.

13     Q    So he is employed by the district attorney?

14     A    Yes, sir.

15     Q    Sir, isn't it true that yesterday, during

16  your cross-examination, you stated that one of Minnie

17  Simmons' daughters told you that Minnie Simmons was

18  suffering from dementia?

19     A    She mentioned frail.  She mentioned -- I

20  could have sworn she used the word dementia and also

21  incapacitated, needed a wheelchair.  These are the

22  descriptions I used yesterday.

23     Q    I asked you about your testimony yesterday?

24     A    Yes.

25     Q    Did you testify yesterday that one of Minnie

Case 23-705, Document 32, 07/24/2023, 3547454, Page273 of 374

```
 1   Simmons' daughters told you that Minnie Simmons was
 2   suffering from dementia?
 3       A   Yes.
 4       Q   And you couldn't remember which daughter it
 5   was --
 6       A   No.
 7       Q   -- is that correct?  Right.
 8               Well, when did the statement that Minnie
 9   Simmons was suffering from dementia that was said by
10   a daughter, when did that occur?
11       A   That occurred during my initial
12   investigation.  I started late June or early July
13   investigating.  Same time I was speaking with you.
14       Q   June or July what year?
15       A   2008.  And I contacted all members of the
16   family.  Managed to reach almost everybody in the
17   family except for Minnie Simmons, of course.
18       Q   Except for Minnie Simmons?
19       A   Yes.  Never spoke with her.
20       Q   You never spoke with Minnie Simmons?
21       A   No.
22       Q   In your entire life?
23       A   No.
24       Q   Did you tell anyone at the District
25   Attorney's Office that Minnie Simmons' daughter --
```

MS

Cross-Emma/Mitchell                                                    285

1              THE COURT:  Did you report to the DA's

2     Office your discussion with one of the daughters

3     that they believe that the mother was suffering

4     from dementia?

5              THE WITNESS:  I'm not sure if I relayed

6     that to the DA's Office.  I wouldn't think that

7     would be relevant.

8     Q   Well, that's not my question.

9              MR. MITCHELL:  Your Honor --

10             THE COURT:  No.  I am just trying --

11    that was my question.

12             MR. MITCHELL:  Okay.  I understand.

13    Q   My question is this:  Did you ever tell the

14    District Attorney's Office that you never were aware

15    of any mental condition afflicting Minnie Simmons?

16    A   No, those are definitely not my words.

17    Q   So you never said that?

18    A   No, that's not my words.

19    Q   So if an assistant district attorney filed an

20    affidavit with the Court stating just that, that

21    affidavit would be false; is that correct?

22             MR. CAPPOCK:  Objection.

23             THE COURT:  Objection is sustained.

24    A   I would --

25             THE COURT:  It was sustained.  You don't

Case 23-705, Document 32, 07/24/2023, 3547454, Page275 of 374

1    was held between the Court and counsel.)

2              THE COURT:  Go ahead, Mr. Mitchell.

3    Q    Mr. Emma, would it have been diligent of you

4    to speak to Minnie Simmons about what it was that she

5    performed as a guardian?

6    A    No, when she's represented by counsel in

7    court, which was you at the time.

8    Q    Would it have been possible for you to get a

9    waiver from Minnie Simmons regarding being able to

10   speak to her?

11   A    I would only speak to the attorney

12   representing her, which was you at the time.

13   Q    I understand that.  But that's not the

14   question I asked.

15             Would you have approached Minnie

16   Simmons, told her that you suspected that Mr.

17   Mitchell had stolen $400,000 from her, and asked her

18   for a waiver from me so you can speak to her?

19   A    No.  I would speak to the attorney that

20   represents her.

21             THE COURT:  So that wasn't a possible

22        avenue?

23             THE WITNESS:  No.  I would speak with

24        the children, which I did, but I -- I would want

25        to speak with the attorney.

Cross-Emma/Mitchell                                    294

1       Q    But that's not my question.  My question is,

2   was it possible for you to -- first, tell the jury

3   what a waiver is?

4       A    You tell me what kind of waiver you're

5   speaking of.

6            THE COURT:  All right.  Mr. Emma,

7       whatever the circumstance is, is it possible to

8       get a waiver of the attorney/client privilege from

9       a guardian in order to speak to that guardian out

10      of the presence of his or her attorney?  Is that a

11      possible avenue?

12           THE WITNESS:  That would be a

13      possibility, yes.

14           THE COURT:  Go ahead, Mr. Mitchell.

15      Q    That would a possibility?

16      A    Yes.

17      Q    So let me ask you a question.  Did you

18  consider that possibility, given that I was accused

19  of stealing $400,000 from Minnie Simmons?

20      A    You were not accused at that time.

21      Q    At any time during before the criminal

22  proceedings while you were investigating the case as

23  a guardian, did you consider the possibility of

24  asking Minnie Simmons to waive attorney/client

25  privilege so you can speak to her about the

MS

AP-603

Case 23-705, Document 32, 07/24/2023, 3547454, Page277 of 374

1   accusations against me?

2       A   No.   There was no need to.

3               THE COURT:   Let's move on.

4       Q   Why not?

5       A   There was no need to.

6               THE COURT:   All right.   Let's please

7   proceed.

8       Q   Let me ask you this:   You -- as a part of

9   your investigation, you saw closing papers that

10  Minnie Simmons signed; correct?

11      A   Correct.

12      Q   Would it have been important to approach

13  Minnie Simmons with those closing papers and discuss

14  with her the circumstances of the closing in order

15  for you to have a thorough investigation?

16      A   Number one, she wasn't there.   Number two, I

17  had made a conclusion in my report to the court that

18  Minnie Simmons had no wrongdoing in the operation of

19  the guardianship account.

20      Q   Minnie Simmons had no role in the operation?

21      A   No wrongdoing.

22      Q   No wrongdoing.

23      A   None.

24      Q   But you didn't speak to her?

25      A   Doesn't matter.   I did a forensic audit.

Case 23-705, Document 32, 07/24/2023, 3547454, Page278 of 374

Cross-Emma/Mitchell                          296

1    Q    I see.   You did a forensic audit.

2              Isn't it true that in order to do a

3    proper forensic audit, you have to speak to the

4    victim or proposed victim?

5    A    What I have to do is examine all bank

6    records, statements, checks.   And I actually

7    reconciled checks that she made payable to Con Ed,

8    telephone company, real state taxes.   I even verified

9    that these were indeed the real estate taxes that

10   were due and owing on Charles Brown's property, that

11   outlays was his Con Ed bill.   Everything she did was

12   proper.

13   Q    That wasn't my question.   The question I

14   asked you, sir, was if you did a forensic audit,

15   isn't it proper procedure, when you engage in a

16   forensic audit, to speak to the victim about what

17   happened?   That's the question I asked you.

18   A    No, I follow the money trail.   That's what I

19   did.

20   Q    So it would be your testimony then it would

21   not be necessary to speak to the purported victim; is

22   that correct?

23   A    Not in this case.

24   Q    Not in this case?

25   A    No.

Cross-Emma/Mitchell                                        297

1    Q    Well, had you done audits prior to this for

2    guard ad litem cases where you did not speak to the

3    victim?

4    A    I would, if I found it necessary.

5    Q    No, that's not the question.

6         Go ahead.  I apologize.

7         MR. MITCHELL:  I apologize, Judge.

8    Q    Go ahead.  Answer.

9    A    I would, if I deem it necessary.

10   Q    The question I asked you was had you ever

11   conducted forensic audits in other guardian ad litem

12   cases where you did not speak to the victim?

13   A    It depends on who the victim is.  The victim

14   is normally an incapacitated person.  In this case it

15   would be Charles Brown.  Obviously, he was deceased

16   at the time.  He is the victim.

17   Q    Have you ever investigated guardian ad litem

18   circumstances forensically in which you did not speak

19   to the guardian?

20   A    I could think of one other incident.

21   Q    One other case?

22   A    Yes.

23   Q    What's the name of the case?

24   A    I can't say that.

25   Q    You can't remember the name of the case?

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page280 of 374

1    A    No.

2    Q    You've done 40?

3    A    Yes.

4    Q    That's not that big a number.  You can't

5    remember one?

6              MR. CAPPOCK:  Objection, your Honor.

7              THE COURT:  The question is

8        argumentative.

9              MR. MITCHELL:  I apologize, sir.

10   Q    Let me ask you this:  Do you think that it

11   would have been appropriate to talk to Minnie Simmons

12   with regard to the sale of the house, with regard to

13   302 St. James?  Would it have been appropriate for

14   you to talk to Minnie Simmons, who was supposed to be

15   paid at closing, and who wasn't supposed to be paid

16   after closing?

17   A    I ascertained that information on my own

18   without speak to Minnie Simmons.

19             THE COURT:  Your answer, under those

20       circumstance, you didn't think it was appropriate?

21             THE WITNESS:  That's correct.

22   Q    So, how would you know who her creditors were

23   if you didn't speak to her?  How would you know?

24   A    When you failed to cooperate without

25   providing me with the documents, I reached out to the

Cross-Emma/Mitchell                                    299

1   attorney that represented the buyer, I reached out to

2   the title company, I gathered the documents and I

3   figured out what happened at the closing.

4       Q   You listed a group of people that you

5   suspected were creditors -- I mean, paid after

6   closing; is that correct?

7       A   I saw who was paid by the bank checks that

8   were distributed at closing.  I saw those checks.

9       Q   Did you ever go to Minnie Simmons and say,

10  Mitchell paid those people.  Were these people

11  supposed to be paid?

12      A   No.

13      Q   So how do you know they weren't supposed to

14  be paid?

15              THE COURT:  Sustained.  Argumentative.

16      Q   Did you know anything about the conditions

17  that existed at 302 St. James Place prior to -- I

18  know.  Let me rephrase that.

19              Did you know anything about the

20  conditions of 302 St. James Place during the time of

21  the guardianship, which would be approximately 1998

22  to about June of 2003, when Mr. Brown past away?

23      A   I ascertained later on that there were issues

24  with a foreclosure, non-payment of real state taxes.

25  There were a number of issues.

Cross-Emma/Mitchell                                          304

 1              THE COURT:  Calls for a hearsay answer.
 2      And I sustained the objection.
 3              MR. MITCHELL:  I see.  Okay.
 4              THE COURT:  Did you review a report
 5      filed by the attorney, Colin Bull, in regard to
 6      that issue?
 7              THE WITNESS:  No, I didn't see anything
 8      like that.
 9      Q    I'm asking did you review a report filed by
10      Mr. Davis in the guardianship file?
11      A    No, I didn't see anything like that.
12      Q    Did you ever talk to Mr. Davis about the
13      difficulties with regard to the tenants paying rent?
14      A    I talked to him but that was not an issue
15      because you are talking about the year 2001.  When I
16      was talking to Mr. Davis it was the year 2008, seven
17      years later, where it was no longer an issue.
18      Q    I see.
19              Now, it's your testimony that you met
20      and spoke with a person by the name of Marshall
21      Kaplan?
22      A    Yes, I did.
23      Q    Who is Mr. Marshall Kaplan?
24      A    He is an attorney.
25      Q    And did -- one point he represented Minnie

                            MS

                          AP-609

Case 23-705, Document 32, 07/24/2023, 3547454, Page283 of 374

Cross-Emma/Mitchell                    305

1  Simmons; correct?

2      A   Yes, he did.

3      Q   You know how many years he represented Minnie

4  Simmons?

5      A   No.

6      Q   Do you know if he was representing Minnie

7  Simmons at the time Mr. Brown past away in 2003?

8      A   I believe he was.

9      Q   Yes.  In fact, he is the one that officially

10  filed the probate petition.  And he filed that

11  probate petition sometime in the third or fourth

12  quarter of 2003?

13     A   2003?

14     Q   Correct.

15     A   Yes.

16     Q   Did you ever ask Mr. Kaplan why he didn't do

17  a final accounting?

18     A   No.

19     Q   In your professional judgment, wasn't he

20  supposed to?

21     A   Should have.

22     Q   Did you go over with Mr. Kaplan whether or

23  not rents were paid at 302 St. James?

24     A   No.

25     Q   In order to do a final accounting, isn't it

MS

Case 23-705, Document 32, 07/24/2023, 3547454, Page284 of 374

1    important, for a guardianship, isn't it important to

2    know whether or not rents are paid?

3        A    It would be, yes.

4        Q    Why didn't you ask Mr. Kaplan if rents were

5    paid?

6        A    The issue you're talking about happened in

7    2001.  I entered the case in 2008, seven years later.

8        Q    Well, you prepared a final accounting;

9    correct?

10       A    I prepared a final accounting based upon an

11   account stated as per the Court direction.

12       Q    And a component of a final accounting is

13   rents collected; isn't that correct?

14       A    It could be, yes.

15       Q    In this case, because it involved real

16   property that was being rented, isn't it true that

17   you had an obligation to examine whether or not rents

18   were collected before you filed the final accounting?

19       A    Not an account stated because we had no

20   information at all.

21       Q    So it's your testimony then you had no

22   information on the rents at all?

23       A    None.

24       Q    Mr. Kaplan represented the estate since at

25   least 2003 and likely before.  Did you ask him about

Cross-Emma/Mitchell                                    312

1       filed.  That was a big problem in court.

2       Q    Isn't it true there was an annual accounting

3   filed in this case in 2000?

4       A    2000.  But it was never approved.  Never

5   reviewed or approved.

6       Q    Right.  But did you review it?

7       A    I saw it but didn't make much sense.

8       Q    Well, did you, when you reviewed the

9   accounting that was put together in 2000, did you see

10  any reference to property in South Carolina?

11      A    I can't recall if I saw any reference to

12  property in South Carolina.  I do recall Mr. Bull

13  mentioning it though.

14      Q    You do recall Mr. Bull mentioning it.

15           Now, sir, when you were told that Minnie

16  Simmons was suffering from dementia by one of the

17  daughters, did you make an effort to confirm that

18  representation yourself?

19      A    No.

20      Q    Can you tell the jury why not?

21      A    Because she was represented by an attorney,

22  which was you.

23      Q    I see.  We've been there.  Okay.

24           THE COURT:  What was that?  Please,

25      don't make any -- next question, please.

Case 23-705, Document 32, 07/24/2023, 3547454, Page286 of 374

```
 1      A    Yes.

 2      Q    Do you remember a lawyer by the name of

 3  Richard Balsam?

 4      A    Yes.

 5      Q    Okay.  Who was Mr. Richard Balsam?

 6      A    He's an attorney for the Department of Social

 7  Services Legal Department that filed the compulsory

 8  accounting to assert the Medicaid lien of $292,000.

 9      Q    Excuse me?

10           THE COURT:  He just answered.

11      Q    Can you repeat it?  I just lost it.

12           THE COURT:  Mr. Balsam is the attorney

13      for the Department of Social Services who moved

14      for compulsory accounting in regard to the

15      $292,000 lien, Medicaid lien.

16      Q    Did you speak to Mr. Balsam?

17      A    Yes.

18      Q    Did you speak to Mr. Balsam sometime during

19  the early part of your investigation?

20      A    Yes.  I would say within two months after I

21  was appointed I spoke with him.

22      Q    So approximately what month did you speak to

23  Mr. Balsam and year?

24      A    In 2008.  I probably would have spoke to him

25  by 2000 -- about August.
```

Cross-Emma/Mitchell                                    315

1       Q    About August of 2008?

2       A    Yes.

3       Q    And during the time that you spoke with Mr.

4   Balsam, did he refer to any conversations that he had

5   with me?

6       A    No, I don't recall him mentioning you at all.

7       Q    Well, sir, isn't it true that HRA Balsam

8   advised you that -- no, withdrawn.  Withdrawn.

9            Okay.  Isn't it true that HRA Balsam --

10           MR. CAPPOCK:  Objection, hearsay.

11           THE COURT:  Let me hear the whole

12      question, please.

13      Q    Did you speak to HRA attorney Balsam

14  regarding a distribution of the proceeds of the sale

15  of the house?

16      A    Yeah, of course.

17      Q    And did you place a reference regarding

18  those, the distribution of the proceeds of the sale

19  of the house, in your affirmed report that you gave

20  to Judge Pesce?

21      A    I make reference to the Medicaid lien of

22  $292,000.  And I stated in my findings that it was

23  still valid.

24      Q    Well, but that's not the question I asked

25  you, sir.  What I am asking -- do you have a copy of

MS

Cross-Emma/Mitchell                                    316

1   your guardian report?

2        A    Yes.  I am looking at it right now.

3        Q    Can you look at the paragraph, I think it's

4   on page three, could you look at that paragraph and

5   tell the jury whether or not you made a reference in

6   your report to the distribution of assets of the sale

7   of the house?

8              THE COURT:  And, if you can, you can

9         answer that question yes or no.

10       A    You mean to HRA?

11       Q    No.  Distribution of the proceeds of the

12  house regarding the sale?

13             THE COURT:  Are you asking whether he

14        itemized where the checks were cut?

15             MR. MITCHELL:  No.  You know what, hold

16        on.

17       Q    I'm going to ask you if you remember if these

18  were the words that you used in your report and if

19  you remember this.

20             MR. CAPPOCK:  Objection, your Honor.  I

21        will object to him reading from a document that's

22        not in evidence.

23             THE COURT:  Overruled.  Go ahead.  Ask

24        the question.

25       Q    In addition to the report, in addition to the

Case 23-705, Document 32, 07/24/2023, 3547454, Page289 of 374

Cross-Emma/Mitchell                                    317

1   probate and Surrogate's Court, I also discovered a

2   separate estate file in the accounting department of

3   the Surrogate's Court.  Apparently, HRA started a

4   compulsory accounting proceeding for a $292,000

5   unpaid Medicaid lien.  This proceeding was withdrawn

6   in October 2007.  I contacted HRA and the attorney

7   advised me --

8              MR. CAPPOCK:  Objection, your Honor.

9       Reading from the same document.  That is a hearsay

10      assertion.

11              THE COURT:  That's hearsay.  Is there --

12      all right.

13              Did you contact HRA about the compulsory

14      accounting proceeding?

15              THE WITNESS:  Yes.

16   Q   And did you investigate what happened to the

17   compulsory proceeding that was initiated by HRA?

18   A   Yes, I did.

19   Q   And was there a significant event that took

20   place with regard to that compulsory accounting

21   proceeding in October of 2007?

22   A   They withdraw without prejudice.

23   Q   All right.  Now, let me ask you this, sir:

24              THE COURT:  Was there a reason that you

25      learned for the reason of the withdrawal?

MS

Cross—Emma/Mitchell                                        318

1          THE WITNESS:  Yes.  I contacted him.  I

2     said, Why would you withdraw that without

3     prejudice?  They said we found out the house was

4     sold and they assumed the proceeds were

5     distributed and there would be no ability, with

6     most everybody out of state, collecting the money

7     so they withdraw it without prejudice.

8          THE COURT:  Was that 192,000 was a lien?

9          THE WITNESS:  292 was a lien.

10         THE COURT:  On the property?

11         THE WITNESS:  .Well, actually, there is a

12    distinction between -- we call it a Medicaid lien

13    but it's actually called a Medicaid claim.  Claim

14    is not a recorded thing like a mortgage would be.

15    Q    I see.  But what words did you use in your

16    report, lien or claim?

17    A    Lien is the operative word.  I used lien.

18    Q    You didn't use claim?

19    A    No.

20    Q    Were you trying to be accurate in the sworn

21    to document when you used the word lien instead of

22    claim?

23         MR. CAPPOCK:  Objection.

24    Q    Were you trying to be accurate when you swore

25    to the accuracy of this document by you using the

MS

AP-617

EMMA/MITCHELL/CROSS

1      because we have to make sure the record is right.  He

2      is going to read from D and he is going to read the

3      bottom paragraph from D.

4          THE COURT:  On the first page?

5          MR. MITCHELL:  On the first page, right.

6      A    "Ordered that Steven T. Mitchell, Esq. is

7  discharged as guardian of Charles Brown and Charles L.

8  Emma, 808 20th Avenue, Brooklyn, New York, telephone

9  number, (718) 232-3001 is hereby appointed guardian ad

10  litem in his stead to investigate, subpoena records,

11  marshal assets."

12      Q   Was I ever the guardian of the estate of Charles

13  Brown?

14      A    No, you weren't.

15      Q    So, that Order was issued in mistake; correct?

16      A    Yes.  In fact, I do recall when I received this

17  Order --

18      Q    I just asked you if it was issued in mistake.

19  That's all I asked.

20      A    Yes, a mistake.  I noticed it right away.

21      Q    When was it fixed?  When was the mistake fixed?

22      A    I don't know.  I did call chambers and said,

23  listen, that's an error.

24      Q    You called them and said it was error?

25      A    Yes.

340

PROCEEDINGS

1    (Exhibits handed)

2        THE COURT:  Anything further before we go on,

3    Mr. Cappock?  I will give you an opportunity to be

4    heard.

5        MR. CAPPOCK:  Your Honor, first of all, I don't

6    know how a purported mistake made on an error --

7    sorry, on an Order signed and drafted by Judge

8    Pesce's chambers has anything to do with this witness

9    or not.  He indicated that he notified Judge Pesce's

10   office.  I don't know see how introducing this other

11   exhibit does anything one way or the other on that.

12       And number two, it seems to me like we're

13   getting very, very close if not right into the area

14   that the Court had instructed the defendant not to go

15   into, whether Judge Pesce had proper jurisdiction

16   over him in his role in the guardianship proceeding.

17       THE COURT:  This is my ruling.  Of course,

18   seeing these are already in evidence, the error is

19   obvious from what was filed with the County Clerk as

20   opposed to what was actually signed by the judge --

21       MR. MITCHELL:  I don't understand.  What was

22   signed by the judge is what the County Clerk has.

23       THE COURT:  The clerk has the unamended version

24   that was filed and obviously it was a mistake written

25   later.  At this point, I'm not going to allow E in,

PROCEEDINGS

1    but Mr. Mitchell can ask the witness, if you wish,

2    whether in fact the Order filed with the clerk on

3    July 3, 2008, was in error in that Judge Pesce had

4    inserted language in regard to the first operative

5    paragraph.  And I do believe we're getting back into

6    the authority of Mr. Emma to conduct his

7    investigation, so that's my ruling.  You have an

8    exception.

9         MR. MITCHELL:  Thank you.  I have an objection.

10        THE COURT:  I'm going to return E to you.

11        MR. MITCHELL:  Right.  Thank you.

12        THE COURT:  And I will give the court officer C

13   and D, which is still in evidence.  And let's just

14   take five minutes.

15        MR. MITCHELL:  Five minutes?  Can we have ten?

16        THE COURT:  Okay, ten, but I want to finish this

17   witness today.

18        MR. MITCHELL:  Okay.  I think I'll be all right.

19        THE COURT:  We'll reconvene at five minutes to

20   four.

21        (Whereupon, an off-the-record discussion was

22   held, followed by a recess.)

23        THE COURT:  Please call the case.

24        THE COURT CLERK:  Recalling case on trial,

25   People against Stephen Mitchell.

342

PROCEEDINGS

1          THE COURT:  Hopefully, the last time, Mr. Emma,

2     I remind that you are still under oath.

3          THE COURT OFFICER:  Ready for the jury?

4          THE COURT:  Yes, we are.

5          THE COURT OFFICER:  Jury entering.

6          (Whereupon, the jury enters the courtroom.)

7          THE COURT CLERK:  All jurors are present.  Do

8     both sides waive the reading of the roll call?

9          MR. CAPPOCK:  Yes, your Honor.

10          MR. MITCHELL:  Yes, your Honor.

11          THE COURT CLERK:  Mr. Emma, I remind you that

12     you are still under oath.

13          MR. MITCHELL:  Your Honor, I'm missing one

14     thing.  Just a second please, I apologize.  I brought

15     so many files.

16          (Whereupon, there was a pause in the

17     proceedings.)

18          MR. MITCHELL:  One second, sir.  I'm really

19     sorry.

20          THE COURT:  Okay, take your time.

21     BY MR. MITCHELL:

22     Q     Okay, Mr. Emma, did you during the course of

23     your work speak to Judge Pesce ex parte about this case?

24     A     Uhmm, I did on February 23, 2009.

25     Q     Can you explain to the jury what ex parte means?

EMMA/CAPPOCK/REDIRECT

1    Q    In your experience, in the experience of your

2    practice, does an executor or guardian always know who all

3    their creditors are and what the credit amounts are?

4    A    In an estate, usually, but not necessarily so.

5    Q    Is there a reason in your practice that you

6    encountered why people hire title companies when they're

7    doing a --

8    A    You always hire title companies when you buy a

9    house because you never know -- buyer beware, you never

10   know what kind of liens, judgments, mortgages there may be

11   out there.  You never know.  Violations.  There could be a

12   whole slew of reasons.  It would be insane to buy property

13   today without title, title insurance.

14   Q    In your experience, have you encountered times

15   where title companies will fine debts, liens and the like

16   that people didn't know about?

17   A    Yes.  That happens quite often.

18   Q    When was Marshall Kaplan responsible for

19   providing a final accounting for this guardianship?

20   A    Again, it appears from what I saw in the court

21   file, I believe he appeared in this case in 2001, 2002,

22   but there was no final accounting required until the death

23   of the incapacitated person which took place in June of

24   2003.  So, there was no responsibility to do a final

25   accounting until sometime after June of 2003.

Case 23-705, Document 32, 07/24/2023, 3547454, Page296 of 374

EMMA/CAPPOCK/REDIRECT

1    Q    Was Marshall Kaplan still on the case at that

2  point?

3    A    Apparently, he filed a probate petition towards

4  the end of 2003 and --

5    Q    Did there come a time that Marshall Kaplan

6  ceased being responsible for providing a final accounting?

7    A    Yes.  He was relieved by Mr. Mitchell, I

8  believe, about November of 2003.

9    Q    And at that time, who was responsible for

10  providing the final accounting?

11    A    Well, Mr. Mitchell would.  As the attorney.

12    Q    Through your analysis of the court file, why was

13  the HRA proceeding withdrawn?

14        MR. MITCHELL:  Objection.  Objection.

15        THE COURT:  Do you know why the HRA lien was

16        withdrawn or the claim was withdrawn?

17        THE WITNESS:  The compulsory accounting was

18        withdrawn because they believed that the assets were

19        all distributed by the estate; they didn't know about

20        the guardianship.  Because they saw that the property

21        was owned by the incapacitated person.

22        MR. MITCHELL:  Objection.  I move to strike

23        "because they saw."

24        THE COURT:  Overruled.

25        THE WITNESS:  (Continuing) Because when they saw

Gillon - Cross/Mitchell                461

1    BY MR. MITCHELL:

2         Q    Good day, sir.

3              How are you sir?

4         A    Sir,

5         Q    That's great.

6              You prepared some very impressive charts.

7              Did you during the course of your preparation for the

8    charts or after you completed them ever speak to Minnie Simmons

9    at all about the contents of those charts?

10        A    No, sir.

11        Q    Have you ever met Minnie Simmons?

12        A    No,

13        Q    Have you ever spoken to a person named Mr. Balsam of

14   HRA?

15        A    No, sir.

16        Q    Have you interviewed anyone with respect to the

17   preparation of the charts that you presented to the jury today?

18        A    No, sir.

19        Q    Did you prepare any notes regarding any component of

20   your preparation of the charts that you showed the jury today?

21        A    Handwritten notes?

22        Q    Yes.

23        A    No.

24        Q    What about typewritten or email notes?

25        A    No emails, typewritten, no.

hh

Verlezza - Direct/Cappock                    513

1      A    That's another daughter of Minnie Simmons.

2      Q    Did you have occasion to interview her?

3      A    Yes.

4      Q    Do you know who Charles Emma is?

5      A    Yes.

6      Q    And actually I believe you mentioned him earlier.  If

7   you could just refresh the jury's recollection as to who he is.

8      A    My understanding he was appointed by the Court to do

9   an accounting of the guardianship for Charles Brown.

10      Q    Did you have an opportunity to speak with him in the

11   about course of your investigation?

12      A    Yes, I did.

13      Q    Under what circumstances?

14      A    Once the case was initiated by the district attorney's

15   office he was asked in because he had knowledge about the case

16   He actually brought this $401,000 check with some bank

17   statements that he had.

18      Q    Did you have an opportunity to meet and interview him?

19      A    Yes.

20      Q    Do you know who Richard Balsam is?

21      A    Richard Balsam --

22           Just look at my notes.

23           I believe Richard Balsam is an individual that works

24   for HRA.  Human Resources Administration.

25      Q    For what purpose did you speak to him?

kh

556

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1   like an income tax return, much simplified.

2          And there's a reason why it's due every year on

3   May 31st of any year.  The accounting for the previous year

4   is due.  One of the reasons it's due on May 31st is that it

5   comes about six weeks after income taxes are due.  So, in many

6   instances, where a guardianship also has to file income taxes,

7   filing with a court within six weeks is a very simple matter.

8          Q.    The guardianship cases you have overseen,

9   approximately, how many would you say involve guardianship

10   accounting as part of the oversight?

11          A.    Every one of them.

12          Q.    Are you familiar with Supreme Court case Index

13   No. 107103/99 regarding an individual named Charles Brown?

14          A.    Yes, I am.

15          Q.    How are you familiar with this case?

16          A.    Well, I was just looking at the file this morning but

17   I'm familiar because it was a unique case in certain ways.

18          Q.    What involvement, if any, did you have in this case?

19          A.    I -- the case began in 1999 with a petition from a

20   Ms. Simmons on behalf -- I think it was Ms. Simmons -- on

21   behalf of Charles Brown.  And, finally, the order appointing a

22   guardian was assigned by a judge who preceded me in handling

23   guardianship matters.  So when I took over the inventory, it

24   was about 2003 when I first began -- when it first came on my

25   radar screen.

- VM -

558

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    back when I thought that there was a serious problem, and I had

2    to take some unusual action.  I also looked at some of the

3    orders that I signed and I looked at a -- in guardianship

4    matters, when I took over, I decided that I would keep what I

5    call a chamber's file.  Every case that comes through the court

6    system has a file, court file, and that court file is kept in

7    the clerk's office.  Unfortunately, many times, it's difficult

8    to keep track of what exactly is in the clerk's office file

9    because when you have thousands of cases, you want to try and

10   have easy access to the status of the case at any given time

11   rather than having to go down and get the file out of the

12   clerk's office.

13         So I began keeping what we call a chamber file that

14   maintained copies of orders and documents that would refresh my

15   recollection by just looking at it.  It also contains my

16   personal notes.  In other words, when I conducted a hearing or

17   a conference or a telephone conversation or a discussion with

18   my law clerk about a case, I would, most times, make an entry

19   in the court file so that it would remind me of what the follow

20   up on the case would be or what the last action was.  So I

21   looked at that file as well, which, of course, is in my

22   chambers.

23         Q.   Is this chamber's file a file to which anyone has

24   access?

25         A.   My staff.

- VM -

559

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1      Q.   And is anybody outside of your staff allowed access

2    to this?

3      A.   Nope.

4      Q.   Do you know an individual by the name of Stephen

5    Mitchell?

6      A.   Yes, I do.

7      Q.   Who is that?

8      A.   He was the -- he's the person who came in, I think,

9    in 2003 or 2004 as attorney for the guardian of the property

10   and the person of Charles Brown.

11     Q.   Have you had any opportunities in the past to meet

12   this individual?

13     A.   I -- perhaps once before but that was, I think, the

14   first time that I really had any active communication with him.

15     Q.   Following his involvement with the case, did you have

16   an opportunity to meet and observe this individual?

17     A.   Prior to the case?

18     Q.   No, after Mr. Mitchell became involved in the case.

19     A.   Yeah, he appeared many times.

20     Q.   I would ask you if you could look around the

21   courtroom and see if you see Mr. Mitchell.

22     A.   He is sitting over there.

23          THE COURT:   Indicating the defendant, for the

24   record.

25     Q.   Do you know of any role -- I'm sorry.  If you could

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1  just give a little bit more detail on the role that the

2  defendant had in the matters pertaining to the guardianship

3  and/or Estate of Charles Brown?

4      A.   I think, if I recall, Mr. Mitchell came in replacing

5  a prior attorney by the name of Mitchell Kaplan.   And

6  Mr. Kaplan had received an order of the court to sell the

7  property.   He was the -- Mr. Marshall -- Mr. Kaplan was a

8  co-guardian, along with Minnie Simmons.   He was unknown to

9  Ms. Simmons, I don't think, or to Mr. Brown, but that is a

10  common occurrence because what guardians must do when they are

11  appointed is obtain a bond.   If that person -- if the guardian

12  is going to handle assets, money, then, depending on how much

13  money there is in the estate and how much the income is every

14  year, the guardian of the property is required to obtain a

15  bond.

16      Often times a lay guardian is unable to obtain a bond

17  because they don't have the assets, unless they are Rockefeller

18  so they can easily get a bond.   So what the court does in those

19  instances is they assign an attorney, usually, who can get

20  bonded and then the attorney handles the money.   In the event

21  that something goes wrong, then the bond covers.   It's like an

22  insurance policy so that the attorney doesn't go away with

23  money.   So, in this case, Mr. Kaplan was appointed to serve

24  that role.   He was bonded.

25      In 2003, a decision was made, I think by the prior

- VM -

561

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1   judge, to sell the home in which Charles Brown lived.  Kaplan

2   began the process of selling the home, which is somewhat

3   involved because it's a guardianship matter and we -- at least

4   what I did was I would have the sale advertised in the papers

5   and then anyone who was interested and called the phone number

6   of the attorney, the attorney would have to tell them that they

7   have to appear in my courtroom and bid and have an auction,

8   basically, in my courtroom.

9          That did not take place in this case because Kaplan

10  was replaced by Mr. Mitchell I think just about as Mr. Brown --

11  just before Mr. Brown passed away, if I recall correctly.  And

12  then Mr. Mitchell proceeded with the sale of the property

13  without the process that I had put in place.

14     Q.   Was the subject of this sale ever brought up during

15  any of the defendant's appearances in your courtroom?

16     A.   Every day, every time.

17     Q.   For what purpose was it brought up?

18     A.   Well, part of the role of a guardian or an attorney

19  who sells property in a guardianship proceeding is that soon

20  after the sale, you have to account to the court, present a

21  copy of the real estate.  If you sell real estate there's

22  always a closing statement.  So the closing statement is

23  presented to the court by petition and asking the court to

24  approve everything that went on at the sale at the closing.

25          MR. CAPPOCK:  I would ask that the witness be

- VM -

562

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1       shown what's previously been marked into evidence as

2       People's 6.

3                THE COURT:  People's 6, please.

4       Q.    Judge Pesce, do you recognize this document?  And if

5       so, what do you recognize it to be?

6       A.    These are minutes of a conference held on March 10,

7       2008 at which Sherry Weindorf, Collin Bull and Stephen Mitchell

8       appeared.

9       Q.    Were you the judge overseeing that conference call?

10      A.    Yes, I was.

11      Q.    Had you had an opportunity to previously review these

12      minutes?

13      A.    Yes.

14      Q.    Do these minutes accurately reflect what was stated

15      on the record in --

16      A.    Yes.

17      Q.    Now, before we get to those specific minutes, did you

18      have an opportunity, before testifying today, to review any

19      minutes of proceedings that happened prior to March 10, 2010?

20      A.    Yes, I did.

21      Q.    What were they?

22      A.    To refresh my recollection, I guess.  I mean, there

23      were a lot of appearances in this case.  Lots.

24      Q.    Without stating any -- without doing any specific

25      reading from those minutes, could you summarize what the status

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1  of the court case had been in those prior appearances leading

2  up to March 10, 2008?

3      A.   Prior to this it was just a series of appearances

4  where I was trying to get Mr. Mitchell to provide the

5  accounting that is done after the closing.  So you do the

6  closing, which is for someone else, and if that someone else is

7  an incapacitated person, you have to provide the court with an

8  accounting because the court is, basically, in charge of the

9  guardianship matters.  It's a standard procedure.

10          That's what I was looking for Mr. Mitchell to do in

11  addition to doing an accounting for the guardianship because

12  Charles Brown passed away and, therefore, when an incapacitated

13  person passes away, the guardian has to do a final accounting,

14  meaning that once he passes away, the case, basically, the

15  guardianship, goes into a suspended state because the IP, the

16  subject of the guardianship, is deceased.  It kind of -- the

17  guardianship kind of winds down and then the rest is taken over

18  by the Surrogate's Court.

19          So, in this case, Ms. Simmons, the guardian, had to

20  provide a final accounting to the court.  She, I think, by

21  then, shortly after the sale, wound up in a nursing facility

22  herself.  So I looked to Mr. Mitchell as the attorney for

23  Ms. Minnie Simmons to provide the final accounting as well as

24  the accounting for the closing.

25      Q.   Had the court issued an official order to the

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1  defendant prior to the March 10, 2008 calendar call?

2      A.   I issued an official order.  I issued dozens of

3  requests by phone call, by mail, by email, by begging, by

4  pleading, by threatening and nothing worked.

5      Q.   I would ask you to refer to the bottom of Page 3,

6  starting at Line 22.

7              THE COURT:  This is People's 6?

8              MR. CAPPOCK:  This is People's 6.

9              THE COURT:  March 10th, okay.

10     A.   Page 3?

11     Q.   Correct.

12     A.   Yes.

13     Q.   Does this section, or any other section of the

14  minutes, indicate when the defendant was first ordered to

15  provide this accounting to the court?

16     A.   Yes, it indicates that I signed an order on

17  November 5, 2004 for the guardian to file a final accounting,

18  that it had to have been done even prior to that.

19     Q.   Is there any indication in the records of a specific

20  time when the defendant was confronted with this order?

21              THE COURT:  Again, you are referring to

22      People's 6?

23              MR. CAPPOCK:  Yes.

24     Q.   Actually, if I could refer you to People's 6, Page 3,

25  Line 22 through Line 25, if you could actually read that.

- VM -

565

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1      A.   Yes, on August 31, 2005, I held a conference because

2  a final accounting had not been done.  You appeared and I

3  advised you and ordered you to file the financial accounting

4  within 90 days.

5      Q.   Did the defendant file this within 90 days?

6      A.   No, he did not.

7      Q.   Was he reminded of this at the March 10, 2008

8  appearance?

9      A.   Yes, he was.

10      Q.   I would ask you to refer to Page 2, Line 19 through

11  Page 3, Line 15.  I would ask you, did the defendant give you

12  any indication for any reasons for his noncompletion of the

13  final accounting?

14      A.   Yes, he did.  According to the record that I recall,

15  actually, that he had engaged somebody to help him, Mr. Alan

16  Kahn, who, supposedly, was familiar with those matters.  And at

17  that point he promised that he can get it done in short order.

18  And I'm quoting him in the minutes, "probably within the next

19  month or so."  This is March 10, 2008.

20      Q.   Was the defendant, at that time, requesting any kind

21  of an extension?

22      A.   Yes.

23      Q.   Was there a specific time period that he was asking

24  for for an extension?

25      A.   I think I'll have to go --

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1          THE COURT:  Do you have a reference in the

2     minutes, Mr. Cappock?

3     A.    Well, on Page 6 from those minutes I said -- that's

4     me, again.  I'm quoting myself.  "It's four years that you were

5     under orders by the court to submit a final.  It's three years

6     that I gave you 90 days, three months, not three years to file

7     it."  And then he asked for -- because of extenuating

8     circumstances, he asked for additional time.

9          Is there a specific point?  I don't recall how much

10    time I gave him.  I kept giving him, giving him extensions.

11    Q.    If I could refer you to Page 11, Line 5.  At that

12    point did the defendant ask for a specific time period?

13    A.    Yes.  "Because I really have worked hard to try and

14    finish this.  If you give me 60 days."

15    Q.    Was this the first time that the defendant had asked

16    for an extension or had he previously done so?

17    A.    Oh, he has been asking for extensions for four years,

18    five years.

19    Q.    Now, typically, how long after the property sale does

20    an individual in the defendant's position have to produce a

21    final accounting?

22    A.    Anywhere from 30 to 90 days.

23    Q.    Did you grant the defendant an extension on March 10,

24    2008?

25    A.    Well, he asked for 60 days.  I said not 60 days, not

- VM -

567

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    after five years.  But I did give him 30 days.

2        Q.   And what was suppose -- did you give any instructions

3    to the defendant as to what had to be done by the completion of

4    that 30-day period?

5        A.   The final accounting.  That would include the

6    accounting on the sale of the premises.

7        Q.   I am --

8        A.   This is the final accounting that is usually due

9    within 90 days after the death of an incapacitated person.  The

10   death was in 2003.

11            MR. CAPPOCK:  I would ask that the witness now

12       be shown what has been previously marked in evidence as

13       People's 7.

14            THE COURT:  People's 7, please.

15       Q.   Do you recognize this document?  And if so, what do

16   you recognize it to be?

17       A.   Yes, I do.  It is the minutes of an appearance before

18   me on April 10, 2008 by Stephen Mitchell and Collin Bull.

19       Q.   Were you the presiding judge over that calendar call?

20       A.   Yes.

21       Q.   Have you had an opportunity to previously review

22   this?

23       A.   Yes.

24       Q.   Do these minutes accurately reflect the events that

25   occurred in that courtroom at the time you were there?

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1      A.   Yes.

2      Q.   Did the defendant submit his final accounting on this

3   date?

4      A.   No, he did not.

5      Q.   I'll refer you to Page 2, Line 8 through Page 3,

6   Line 14.  Within the section, or anywhere else in the minutes,

7   did the defendant provide any excuse or --

8            MR. CAPPOCK:  I will rephrase.

9      Q.   Did the defendant provide any reason for his failure

10   to produce this accounting?

11      A.   Well, he said that he was on trial before Judge

12   Costell in federal court in the Southern District in another

13   case.

14      Q.   Did he mention any assistance that he had sought in

15   preparation for the final accounting?

16      A.   Yes, he named a Mister -- I think it may be wrong in

17   the minutes.  The name that Mr. Mitchell gives in these minutes

18   is Mr. Chan, C-H-A-N, but it's really Mr. Kahn, K-A-H-N.  For

19   some reason, the reporter typed it Mr. Chan.

20      Q.   It's your recollection, though, that on April 10,

21   2008, Mr. Mitchell was referring to Mr. Kahn?

22      A.   Yes, because at one point I say "I know Mr. Chan."

23      Q.   That's in the minutes that you're referring to?

24      A.   Yes.  And I really don't know any Mr. Chan but I do

25   know Mr. Kahn, the person who Mr. Mitchell said was going to

- VM -

569

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    help him.

2        Q.    This would be the same Mr. Kahn who was referenced in

3    the March 10, 2008 minutes?

4        A.    Yes, it is.

5        Q.    Did the defendant make any requests after providing

6    these reasons?

7        A.    Yes, I think this was -- if I may digress a bit.

8    Judges hear all kinds of reasons why individuals cannot do what

9    the court wants them to do.

10               MR. MITCHELL:  Objection, move to strike as

11       nonresponsive.

12               THE COURT:  Sustained.

13               MR. MITCHELL:  Thank you, Your Honor.

14       A.    Well, the reason given --

15               THE COURT:  Go ahead.

16       A.    The reason given was that I have a family commitment,

17   and I'm reading Mr. Mitchell's statement.

18       Q.    Certainly, in fact, if you could just read it into

19   the record.

20       A.    "My daughter is turning 16.  That is why I was

21   asking."

22       Q.    Was he asking for another extension?

23       A.    Yes, he was.

24       Q.    How much of an extension was he asking for this time?

25       A.    I think he asked until the 20th.  I think on

- VM -

570

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    April 10th he asked for the 20th or the 20th of May.

2         Q.   Actually, if I could refer you to --

3         A.   Yes.

4              THE COURT:  All right.  Do you have a reference,

5    Mr. Cappock?

6              MR. CAPPOCK:  Yes, one moment, Your Honor.

7         Q.   If I could refer you to Page 3, Lines 12 through 14.

8    Actually, if you could read that portion into the record.

9         A.   This is Mr. Mitchell:  "In the next 30 days, Mr. Chan

10   and I will be going.  We should be able to finish the

11   accounting."

12        Q.   Did you grant him an extension to finish this

13   accounting?

14        A.   I'm not sure if this is when I said I don't care

15   anymore and I'm going to refer the matter to -- yes, actually,

16   June 2nd.  I gave him until June 2nd.  Wow.  Yup.

17        Q.   If I could refer you specifically to Page 9, Line 10

18   to Page 10, Line 17.  Actually, I would ask if you gave any

19   warnings to the defendant before adjourning the case, and if

20   so, if you would read this portion into the record?

21             MR. MITCHELL:  This is March 10th?

22             THE COURT:  This is April 10th.

23             MR. MITCHELL:  I'm sorry.

24        A.   That's Page 9 from?

25        Q.   Page 9, Line 10 to Page 10, Line 17.

-- VM --

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    A.    This is -- again, I am speaking:  "Mr. Mitchell, so

2   you're aware, I am making all attorneys aware in these

3   guardianship cases, the flagrant failure by someone who has a

4   fiduciary duty in guardianship cases, even if that individual

5   is an attorney, is subject to be reported to the Grievance

6   Committee.  And with some people, there is a line of thought

7   that the responsibility lies with the court.  And there have

8   been cases where judges have referred fiduciaries to the

9   Grievance Committee for their flagrant failure to perform their

10   fiduciary duties.  You are on the cusp of that.

11        "I am going to call two individuals who have, in the

12   past, received appointments from this court as special

13   referees.  I will discuss this matter with them.  I will

14   determine who is best for this matter, assuming they wish to

15   consider being appointed, and I will have he or she ready to,

16   somewhat, jump in and take over this matter.

17        "The only thing that is left undecided is the date.

18   So you tell me what date you will have a report submitted to

19   the court, not something that the court will sink its teeth in,

20   if I'm quoting you correctly.  You tell me which date you're

21   going to have it done and final.  If it's not final, if it's

22   not filed with the court by that date, then I will not even

23   have a conference on this matter.  This is your last chance to

24   go in and make a record because next time, if it's not filed, I

25   don't care what the excuse is, I will appoint a special

- VM -

572.

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1   referee.  I will send a letter to the Grievance Committee and I

2   will prepare also notice that you be surcharged for your

3   failure to perform your duties.  So you give me the date.  You

4   might as well order these minutes."  And Mr. Mitchell gave me a

5   date of June 2nd or June 5th.

6       Q.   Was the June 2nd or June 5th to be for a calendar

7   appearance --

8       A.   No.

9       Q.   -- or for another purpose?

10          Which date was the case, ultimately, set for,

11   June 2nd or June 5th?

12      A.   June 2nd.

13      Q.   What was to be done by June 2nd?

14      A.   He was to file the accounting.

15      Q.   Did the defendant indicate that he would have the

16   accounting?

17      A.   Yes.

18      Q.   I'm sorry, on April 10th, did the defendant

19   indicate that he would have the accounting completed by

20   June 2nd?

21      A.   Yes.

22      Q.   Do you recall if any final accounting was submitted

23   on or before June 2nd?

24      A.   No.

25      Q.   I'm sorry?

- VM -

AP-641

573
HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1    A.   I do recall.  It was not filed.

2              MR. CAPPOCK:   I would ask that the witness now

3    be shown what has been previously marked into evidence as

4    People's 8.

5              THE COURT:   People's 8, please.

6    A.   Yes.

7    Q.   Have you had an opportunity to review these minutes,

8    previously?

9    A.   Yes, I have.

10   Q.   I'm sorry, this document previously?

11   A.   Yes.

12   Q.   What is it?

13   A.   It's the minutes of the conference before me on

14   June 26, 2008, and present were co-guardian Eugene Davis and an

15   attorney by the name of Collin Bull.

16   Q.   Was the defendant present on this date?

17   A.   No.

18   Q.   Was this the first calendar appearance following the

19   June 2nd deadline?

20   A.   Yes.

21   Q.   What was the purpose of this court appearance?

22   A.   It was to determine the process for a surcharge,

23   basically.  Mr. Bull, I believe, was representing the bond

24   company.

25   Q.   You mentioned a surcharge before.  So if you could,

- VM -

574
HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1   please describe what surcharge is referring to?

2       A.   When there's indication that a guardian has either

3   misspent money or spent money not for the benefit of the

4   incapacitated person or did something, some spending without

5   the court permission, you can actually force the bond company

6   to pay those expenses.

7           What you need to do is start an ancillary proceeding,

8   meaning another proceeding, whereby, the person who spent that

9   money who's bonded, gets what they call surcharged.  It means

10  that he gets to pay for it, basically, but it's the insurance

11  company that pays for it.  You have to conduct a hearing.  You

12  have to conduct an investigation.  You have to have all your

13  evidence prepared so that you can establish.  And, usually, the

14  court will assign someone to prepare the surcharge proceeding.

15      Q.   Now, what is a guardian ad litem?

16      A.   Someone appointed by the court to handle any

17  litigation that is needed in the guardianship proceeding.

18      Q.   Was the subject of a guardian ad litem addressed

19  either on June 26, 2008 or on any prior occasions?

20      A.   Well, it certainly was addressed any time that --

21  well, at least it's implied any time that you discuss

22  surcharge.  The implication is that there will be a guardian

23  ad litem appointed to handle the surcharge.  I don't recall, I

24  would have to read this.  If there's a place that you know --

25      Q.   If I could refer you to Page 4, Line 14 through

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1   Page 5, Line 2, in that section was the subject of a guardian

2   ad litem addressed?

3       A.    If I read it, I guess it was.  "Okay.  I'm going

4   to -- well, I will have to determine whether proceedings should

5   be initiated for Mr. Mitchell's failure to comply with the

6   Court's order.  And perhaps I will combined that with a

7   surcharge proceeding because a failure of Mr. Mitchell to abide

8   by the Court's order will result in additional expenses to the

9   estate to pay for the guardian ad litem.  And whatever those

10  expenses are will be the basis for surcharge action against

11  Mr. Mitchell.  This court will initiate sua sponte when we have

12  some idea what the costs will be."

13      Q.    Did there come a time in this case that a guardian

14  ad litem was assigned?

15      A.    Yes.

16      Q.    Was it you or somebody else who made this assignment?

17      A.    I think I did.

18      Q.    Who was the guardian ad litem who was assigned?

19      A.    An attorney by the name of Charles Emma.

20      Q.    For what purpose was Charles Emma assigned?

21      A.    To, basically, investigate all of the financial

22  dealings by Mr. Mitchell as they related to Charles Brown's

23  estate and provide the judge with information sufficient for

24  the judge to then decide whether a surcharge proceeding should

25  be held.

- VM -

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1      A.   Usually, whenever I appoint a guardian ad litem and

2   he reports to me that there's some serious problems, I call him

3   into chambers to try and get to the bottom of the reason for

4   his report.  Because, technically, as my appointee, I appointed

5   him but his interest is really the guardianship.  It's not what

6   I want, what I don't want, what result I'm looking for, it's

7   what is the best interest of the guardianship.

8           I wanted to ask questions about -- he had previously

9   communicated to my chambers that he was having difficulty

10  obtaining records from banks, and that's always the case.

11  Banks are notorious for delaying production of documents.  I

12  wanted to talk to him specifically about why he was having

13  difficulty.

14     Q.   Without get into the content of any specific

15  conversations or any specific assertions made by Mr. Emma, did

16  you take any action after talking with Mr. Emma?

17     A.   Yes, I recall because it was somewhat unusual.  I was

18  angry when he told me of his efforts to obtain records from --

19  I don't think it was Carver.  I think it was a big bank, Chase.

20  You would expect bureaucracy just to delay things.  And I

21  actually got on the phone and spoke to -- I forget who -- about

22  their failure to provide documentation.

23     Q.   Did that phone call have any effect on Chase Bank?

24     A.   Oh, yes.

25     Q.   What effect?

- VM -

590

HON. MICHAEL L. PESCE - PEOPLE - DIRECT/MR. CAPPOCK

1      A.    I think, before I took the bench, they were already

2 in the courtroom.

3      Q.    So this happened the same day, February 23, 2009?

4      A.    Yes, it was very unusual.  I remember the case

5 specifically because guardianship judges in Brooklyn meet every

6 month and I told the story of the bank, just about the bank not

7 being cooperative, because all the judges have that problem.

8      Q.    Did Mr. Emma then appear in court on February 23,

9 2009?

10      A.    Yes.

11      Q.    This was also with the defendant there?

12      A.    Yes.

13      Q.    Had the defendant submitted his final accounting by

14 this date, February 23, 2009?

15      A.    No, he had not.

16      Q.    Did Mr. Emma provide the results of his investigation

17 to the court on this date?

18      A.    Yes, he did.

19      Q.    Was the subject of a check for $401,082.50 brought up

20 in the proceedings on this date?

21      A.    I think so.

22      Q.    In what context was that check brought up?

23      A.    Because we, basically, needed to know where the money

24 went.

25      Q.    If you could, it's a couple of pages, if you could

- VM -

606

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    Q.   Now, the thing, though, is, in this case, by 2005,

2  Mr. Brown is dead; right?

3    A.   That's right.

4    Q.   So there's no ward?

5    A.   That's right.

6    Q.   So as a matter of fact, in June of 2003, after

7  Mr. Brown died, it became an estate; isn't that correct?

8    A.   Yes.

9    Q.   And well, so --

10        THE COURT:  Well, finish your answer.

11   A.   Well, it's an estate.  As soon as anybody dies, you

12  can open an estate.  Just open a case in Surrogate's Court.

13  Even if there is no money involved, you just open an estate.

14        In a case where there's a guardianship proceeding in

15  Supreme Court and an estate in Surrogate's Court, the

16  Surrogate's Court basically waits until the guardianship matter

17  is over and then when it's over, upon a final accounting, that

18  money that's left over is transferred to the Surrogate's Court.

19   Q.   What statute says that?  Do you have a statute that

20  says that?

21   A.   That is the procedure that was put in place at least

22  in Brooklyn.  And often times what I do, given that it takes a

23  long time for final accountings to be done while the surrogate

24  proceeding is waiting, what I do is, and I would have done that

25  in this case as well, is to keep some money in the guardianship

- VM -

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    account, transfer the funds to the proper individual who

2    received letters, letters of authority given by the Surrogate's

3    Court for someone to act on behalf of the estate, send the

4    money to that person while I am finishing up the guardianship

5    matter by getting the final account filed, reviewed, changed.

6    if it needed to be changed.  And, finally, when I approve it. I

7    then close the matter and send whatever balance of the money is

8    left to the Surrogate's Court.

9         So that is the practice in Kings County.  Other

10   counties have the same practice.  It's a case where, often

11   times in our legal system, there are two courts that have

12   concurrent jurisdiction over the same matter for at least --

13   for a period of transition, so to speak.

14        Q.   Sir, this procedure that you just outlined, is it

15   written down somewhere?

16        A.   Well, there's an internal, like, practices that we

17   use.

18        Q.   Internal practices?

19        A.   Yes.

20        Q.   Is this internal practice written down so a lawyer

21   like me and my guardian slash executrix, Minnie Simmons, could

22   read it and say, oh, this is what we're supposed to do

23   anywhere?

24        A.   No, but I was actually looking for it.  We never got

25   around to instruct you to switch some money over to the

- VM -

608

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1   Surrogate's Court.

2       Q.   Do you know who Minnie Simmons is?

3       A.   Yes.

4       Q.   Minnie Simmons was a guardian in the guardianship

5   case and she was the guardian of Mr. Brown up until the day he

6   died.  Then she became the executor of his estate; correct?

7       A.   Yes.

8       Q.   So she is one in the same in terms of the procedure

9   that you talked about, at one point she is guardian then later

10  she becomes executrix; right?

11      A.   Um-hum.

12      Q.   So you're telling this jury that the procedure that

13  you just described in detail was not written down anywhere for

14  her to read it or follow it; is that correct?

15      A.   No.  Well, yeah, but the procedure that have been

16  used in the past was that --

17      Q.   No, move to strike.  The only question I asked was

18  whether or not --

19      A.   It's not written down.

20      Q.   Excuse me?

21      A.   It's not written down anywhere.

22      Q.   So I couldn't read it either?

23           THE COURT:  Well --

24      A.   No.

25      Q.   Have you heard of the law -- tell the jury the laws

- VM -

609

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    that govern guardianship; isn't that Article 81?

2        A.   Yes.

3        Q.   That's a statute, meaning that the State of New York

4    legislature made up Article 81 in their procedures to follow;

5    correct?

6        A.   Yes.

7        Q.   Can the jury if they wanted to go to a law library.

8    They could get a copy; right?

9        A.   Yes.

10       Q.   They could probably get a coppy from their

11   assemblyman or something; correct?

12       A.   Yes.

13       Q.   The SCPA is the Surrogate's Court Procedure Act;

14   correct?

15       A.   Yes.

16       Q.   That governs estates where people die; correct?

17       A.   Yes.

18       Q.   Is that written down?

19       A.   Yes.

20       Q.   Then they have rules of court which govern the

21   procedures that Article 81 proceedings have and that the

22   Surrogate's Court Procedure Act has; correct?

23       A.   Yes.

24       Q.   And those are written down?

25       A.   Yes.

- VM -

610
HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1     Q.   All of those things are necessary for a lawyer and

2   for an individual to be able to kind of figure out what the

3   rules are regarding guardianships and estates; is that correct?

4     A.   Yes.

5     Q.   And they're all in public record; correct?

6     A.   Yes.

7     Q.   So somebody wanted to go get it in writing they

8   could; correct?

9     A.   Yes.

10    Q.   But your rules they can't get in writing?

11    A.   Yes.

12           MR. CAPPOCK:  Objection, Your Honor.

13           THE COURT:  Overruled.

14    Q.   Who was the fiduciary in the Brown guardianship case,

15   me or Minnie Simmons?

16    A.   You mean the guardian?

17    Q.   Yes.

18    A.   Minnie Simmons.

19    Q.   Not me?

20    A.   Not you.

21    Q.   So if you had any questions about where the money

22   went, one of the -- the person who should have known, best

23   known, is Minnie Simmons; correct?

24           MR. CAPPOCK:  Objection, Your Honor.

25           THE COURT:  Sustained.

- VM -

611

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1        Q.    Who, ultimately, is responsible for any money spent
2    in a guardianship, the fiduciary or the lawyer?
3        A.    The person who has the money.
4        Q.    The person who has the money?  I see.  Okay.
5              Does the fiduciary have any responsibility to tell
6    the court what's going on?
7        A.    Yes.
8        Q.    What responsibility is that?
9        A.    Well, if she suspects or if there is an event that's
10   not in the best interest of the ward, meaning Mr. Brown, that
11   he or she, the guardian, has to bring it to the attention of
12   the court.
13       Q.    Mr. Brown was dead by 2005; correct?
14       A.    Yes.
15       Q.    So any money that was spent after he died was not
16   pertinent to Mr. Brown, wouldn't that be so?
17       A.    Well, it's pertinent to his estate.
18       Q.    Pertinent to his estate, and who was in charge of
19   Mr. Brown's estate?
20       A.    I am at the time.
21       Q.    You were in charge of Mr. Brown's estate?
22       A.    Absolutely.
23       Q.    How is that?
24       A.    Surrogate's Court will not take any action until I
25   transfer the money over.

- VM -

AP-652

617
HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1              THE COURT:  Overruled.

2       A.    I don't think so.  I don't know.  I don't remember.

3       Q.    You don't remember?

4       A.    That's not the purpose why I appointed Mr. Emma, so I

5   wasn't really looking for that.

6       Q.    Would it have been important for Mr. Emma to talk to

7   Minnie Simmons in order to complete his report?

8              MR. CAPPOCK:  Objection.

9              THE COURT:  Sustained.

10      Q.    What were your expectations with regard to

11  Mr. Emma's --

12             MR. MITCHELL:  Withdrawn.  Let me ask this a

13         better way.

14      Q.    Have you ever appointed Mr. Emma to conduct

15  investigations of the nature of this case before?

16      A.    Yes, I have.

17      Q.    How many times?

18      A.    I would say at least a half a dozen times.  It's his

19  expertise.  He is very good at it.

20      Q.    He is very good at it?

21      A.    He is very good at it.

22      Q.    Do you know as part of his investigation he makes it

23  a point to speak to the principals involved in the case?

24      A.    Absolutely.

25             MR. CAPPOCK:  Objection, Your Honor.

                        - VM -

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1            THE COURT:  Overruled.

2      Q.   Excuse me?

3      A.   Absolutely.

4      Q.   Would have you expected in case that he would have --

5            MR. MITCHELL:  Withdrawn.

6      Q.   Who were the principals in the Charles Brown case?

7      A.   Minnie Simmons.  I guess Ms. Brown may have had

8  relatives, more immediate relatives, but it was, basically,

9  Ms. Simmons and you.

10     Q.   Did you receive a report from Mr. Emma in which he

11 outlined who it was that he spoke to in order -- as a part of

12 his investigation?

13     A.   Yes.

14     Q.   Do you have a copy of it with you, sir?

15     A.   Yeah, somewhere.

16     Q.   I could give you a copy, if you prefer?

17     A.   Sure.

18           THE COURT:  What's the question first?

19     Q.   The question is:  Do you remember who it was that

20 Mr. Emma spoke to?

21     A.   Spoke to, I think he listed that on the first page.

22 You have two, three, four, five people.

23     Q.   So --

24     A.   You can refresh my recollection.

25     Q.   I am going to.

- VM -

619
HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1       A.    I must have read it.  So was it Minnie Simmons he

2    spoke to?

3              MR. MITCHELL:  With all due respect, Your Honor,

4    I am going to do just that.  This will be deemed Defense

5    5?

6              MR. CAPPOCK:  No.

7              THE COURT:  Judge, do you recall whether

8    Mr. Emma spoke with Minnie Simmons as part of his

9    investigation?

10             THE WITNESS:  I don't recall.  I think I said I

11   don't think he did.

12             THE COURT:  Now, please, you can use anything to

13   refresh the judge's recollection.

14             Gentlemen, keep the conversation to a minimum.

15             MR. MITCHELL:  I'm sorry, Judge.

16             THE COURT:  I would appreciate it.

17             MR. MITCHELL:  I'm sorry, Judge.

18             THE COURT:  All right.  This document has been

19   shown to the judge for the purpose of refreshing his

20   recollection.

21             MR. MITCHELL:  Yes, H.

22             THE COURT:  Give him the opportunity to look at

23   it.

24             COURT OFFICER:  Your Honor, mark it for

25   identification?

- VM -

620

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1           THE COURT:  No.

2       Q.   Judge, are you familiar with that document?

3       A.   Yes.

4           THE COURT:  You don't have to direct.  Let the

5       judge look at it.

6       A.   Yes, I am familiar.

7           THE COURT:  Judge, does that refresh your

8       recollection, Judge?

9           THE WITNESS:  Yes, it does.

10          THE COURT:  State the question again.

11      Q.   Did Mr. Emma make a list of the people that he spoke

12      to?

13      A.   Yes.

14      Q.   In order to prepare his report?

15      A.   You're right.  I don't think that he had spoken to

16      Minnie Simmons.

17      Q.   So he didn't speak to --

18      A.   No, he spoke to Linda Simmons and Joanne Simmons, the

19      daughters of Minnie Simmons.

20      Q.   And you testified earlier that Minnie Simmons was a

21      principal in this matter; correct?

22      A.   Yes, she was a guardian.

23      Q.   Now, one of the things that you did before you became

24      a judge was you were an assemblyman?

25      A.   Yes, I was.

- VM -

621

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    Q.  How long were you an assemblyman?

2           MR. CAPPOCK:  Objection, relevance.

3           THE COURT:  Sustained.

4           MR. MITCHELL:  Your Honor, I could establish his

5    background to the jury.

6           THE COURT:  All right.  Judge, how long were you

7    a member of the New York State Assembly?

8           THE WITNESS:  Eight years.

9           THE COURT:  Let's move on, please.

10    Q.  You testified earlier that the property in question

11  was not sold through the guardianship proceeding; is that

12  correct?

13          MR. CAPPOCK:  Objection.

14    A.  Yes, it was.

15    Q.  Excuse me?

16    A.  Yes, it was.

17    Q.  It was sold through the guardianship proceeding?

18    A.  Yes.

19    Q.  Isn't it true that it was sold through an order of

20  Surrogate's Court?

21    A.  Well, Ms. Simmons received letters to conduct the

22  sale, but Ms. Simmons, if I recall, I wasn't -- I didn't have

23  the case back then.  Maybe you're correct.  Maybe it was the

24  Surrogate's Court.  Maybe it was the guardianship court.

25          THE COURT:  But no matter what, Ms. Simmons

- VM -

622

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    would have the authority to convey the property?

2              MR. MITCHELL:  Excuse me?

3              THE COURT:  I am asking the judge whether either

4    one would have the power to convey the property.

5              THE WITNESS:  Yes.

6              THE COURT:  Go ahead, Mr. Mitchell.

7              MR. MITCHELL:  That wasn't my question, sir.

8              THE COURT:  That was my question.

9              MR. MITCHELL:  I understand.

10   Q.   Sir, do you remember issuing an order that stated

11   that the -- that Minnie Simmons received an order of the

12   Surrogate's Court that allowed her to sell the property?

13   A.   I don't recall seeing that.

14   Q.   One moment.

15   A.   Either way, I would have no objection.  I would have

16   ordered the sale myself.

17             MR. MITCHELL:  Objection, move to strike.  There

18   was no question pending.

19             THE COURT:  Overruled.

20             MR. MITCHELL:  There was no question pending,

21   sir.

22   A.   Well, that's the procedure.

23             THE COURT:  All right.  Next question, please.

24             MR. MITCHELL:  All right.  One moment.  I am

25   getting something out.

- VM -

623

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1          THE COURT:  I think that -- Judge, is it your

2     testimony that you're not certain whether the property was

3     conveyed by Minnie Simmons as guardian of Charles Brown or

4     as the executor of the Estate of Charles Brown?

5          THE WITNESS:  Probably, if I were to take --

6     yes, it was through the letters of administration from the

7     Surrogate's Court.

8     Q.   So now you remember that the -- that the --

9     A.   I may have already -- I may have done it prior to the

10    letters of administration -- letters of Surrogate's Court.

11    Q.   Do you remember, sir?  If you don't, I could help

12    you.

13    A.   I am not sure if it was me or my predecessor.  I

14    remember that there was -- I read the minutes of a conference

15    with two attorneys regarding -- there were two proceedings to

16    foreclose on the premises, and there was a sale already

17    scheduled because there was a proceeding to foreclose because

18    of nontax payment and a proceeding to close because of, I

19    think, mortgage payments hadn't been made.  They were in

20    Supreme Court.  They were actually consolidated and brought

21    into my part.  And when they came into my part, the process of

22    the sale of the premises was already in place and it was only a

23    question of how it was going to be sold, and then you came in

24    or you were already into the matter and you proceeded -- no,

25    Mitchell Kaplan -- Marshall Kaplan was in on the case to

- VM -

624

HON. MICHAEL L. PESCE ~ PEOPLE - CROSS/MR. MITCHELL

1    conduct the sale as a co-guardian of Charles Brown.

2                    MR. MITCHELL:  Was there a question pending,

3        Judge?

4                    THE COURT:  Yes, the testimony is relevant.

5        Step up, please, both of you.

6                    (Whereupon, there was a discussion held off the

7        record sidebar.)

8                    THE COURT:  Next question, please.

9                    MR. MITCHELL:  Yes, Your Honor, one moment.  I

10       have to reorganize my questions.

11                   (Whereupon, there was a pause in the

12       proceedings.)

13       Q.   How much -- do you know how much in fees you've

14   awarded Charles Emma over the years?

15                   MR. CAPPOCK:  Objection, Your Honor.

16                   THE COURT:  Overruled.  If you recall.

17       A.   I don't recall.

18                   THE COURT:  Next question.

19       A.   I have appointed him a number of times.

20       Q.   Do you know if it was more than $100,000?

21       A.   Oh, no.  No.

22       Q.   Not --

23       A.   Over the years?

24       Q.   Yes.

25       A.   Well, I have been appointing him for eight years,

- VM -

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1      A.   Because the City doesn't let go.  When the City is

2  owed money, they don't let go.  I've dealt with this Medicaid

3  liens from the City on many guardianships.  And for the City to

4  have withdrawn the lien when there was $400,000 that they knew

5  was the net receipts from a sale rather than just wait and see

6  how much of that money gets to the Surrogate's Court, they

7  withdraw the lien?

8      Q.   Well, let me ask you this --

9      A.   I --

10              THE COURT:   Let the judge finish.

11      A.   I asked that they investigate the matter within HRA.

12      Q.   I see.

13      A.   The City doesn't let that kind of thing go.  Why

14  should they?

15      Q.   Okay.  So you asked somebody in HRA to look into

16  this?

17      A.   I recall having a conversation with many people in

18  HRA trying to find out what happened.

19      Q.   Who did this?

20      A.   I did.

21      Q.   No, who you did speak to?

22      A.   It's probably in my notes somewhere.

23      Q.   You have notes?

24      A.   It's -- yeah, I do have notes.

25      Q.   Did you --

- VM -

633

HON. MICHAEL L. PESCE — PEOPLE — CROSS/MR. MITCHELL

1    A.   I take notes on cases.

2    Q.   I know, you gave a copy to Mr. Kaplan to review.

3    A.   No, nobody gets those.  They're personal.  They're

4    judge's product.

5    Q.   Secret?

6              MR. CAPPOCK:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    A.   Not secret.

9              THE COURT:  Sustained.

10   Q.   Let me ask you this again:  You said that you've

11   dealt with many compulsory accounting situations; correct?

12   A.   Okay.

13   Q.   Yes?

14   A.   Yeah.

15   Q.   Do people negotiate settlements with the City?

16   A.   Absolutely.

17   Q.   Do people report that the money has been expended and

18   then the City drops the claim because the money has been

19   expended?

20   A.   Absolutely.  But the City had no proof of that

21   whatsoever and they dropped ——

22             MR. MITCHELL:  Withdrawn —— objection.  No

23   question pending and hearsay, all of it.  Please sustain

24   the objection.

25             THE COURT:  Overruled.  Let's continue.

— VM —

637

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    Q.    Excuse me?

2    A.    Yes.

3    Q.    Those lawyers did not do those accountings?

4              MR. CAPPOCK:  Objection, Your Honor, relevance.

5              THE COURT:  Sustained.

6    Q.    Sir, isn't it a fact that one of the reasons why I

7    had problems doing the accounting was because Marshall Kaplan,

8    who was the attorney prior to me, and Dagmar Plaza, who was the

9    attorney prior to me, refused to cooperate in preparing the

10   accounting?

11             MR. CAPPOCK:  Objection, Your Honor.

12             THE COURT:  Overruled.

13   A.    No.

14             THE COURT:  Did Mr. Mitchell ever tell you he

15   was having problems getting the record because of lack of

16   cooperation of prior attorneys?

17             THE WITNESS:  I think at one point he blamed

18   Mr. Kaplan.  I don't recall Mr. Mitchell making any

19   statements about Dagmar Plaza, but the -- what prompted

20   this whole matter is the fact that the $400,000 for --

21             MR. MITCHELL:  Objection.  This is not -- this

22   answer is not --

23             THE COURT:  Okay.  Sustained.

24             MR. MITCHELL:  -- answering the question.

25   A.    I have never -- but if I may explain, I have never

- VM -

640

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    attorney/client privilege before you?

2              THE WITNESS:  Not that I recall.

3    Q.   I refuse --

4              THE WITNESS:  That would have been a source of

5    another hearing in my part.

6    Q.   I refuse to answer; is that what you're saying?

7              MR. CAPPOCK:  Objection.

8    Q.   I refused to answer?  The crux of what Mr. Cappock

9    and what you are suggesting is that I refused to answer

10   questions about what we did; is that correct?

11             MR. CAPPOCK:  Objection, Your Honor.

12             THE COURT:  Sustained.

13   Q.   Let me ask you this, Judge:  Did you have the

14   capacity to go over my head and speak to Minnie Simmons and ask

15   her what happened?

16   A.   When the daughter was -- came into the courtroom and

17   advised me that she was -- that Ms. Simmons was frail, old, I

18   did not want to place her in that position where she would come

19   to court and be questioned.  That issue came up a number of

20   times.  I chose not to force Ms. Simmons to come to court

21   because I knew it would be a great burden upon her since the

22   focus was not Ms. Simmons but what happened to the money.

23   Q.   Sir, I don't think -- can you show this jury anywhere

24   in the minutes where there was a conversation between you and

25   one of the daughters of Minnie Simmons in which the daughter

- VM -

641

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1   told -- informed you that her mother was old and frail and

2   unable to answer in court?

3        A.   Yes, I have the minutes.

4        Q.   Where?  Which one?

5        A.   No, not that she was unable to come to court and

6   answer questions by the Court.  I held a conference, basically,

7   to see whether Ms. Simmons could come in and, basically, we

8   made a call.  Actually, when we learned about her condition,

9   the daughter came.  We set a date when she could come in.  I

10  did not ask her daughter about what Ms. Simmons knew or did not

11  know about your activities.

12       Q.   Okay.  I --

13       A.   I do not want to discuss -- I needed a substitute, a

14  successor guardian to finish the case, and that would have been

15  the daughter.

16       Q.   Isn't it true that Mr. Bull at one time asked for a

17  hearing regarding Minnie Simmons' competency and you said that

18  could not take place?

19            MR. CAPPOCK:  Objection, Your Honor.

20            THE COURT:  Overruled.  Do you recall that,

21  Judge?

22       A.   It would take place if there was a guardianship

23  proceeding.

24       Q.   No, I asked a specific --

25            THE COURT:  Do you remember in particular?

- VM -

646

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1      Q.    Judge, do you remember me asking you not to mock me

2    because I told you that I had a flood?

3      A.    Yes.

4      Q.    Sir, do you remember if I moved to quash a subpoena

5    that you issued to Chase Bank?

6      A.    Yes.  Oh, yes.  Oh, yes, I do.

7      Q.    Was that a lawful action to move to quash?

8      A.    You?

9      Q.    Yes.

10     A.    Your action?

11     Q.    Yes.

12     A.    Absolutely unlawful.

13     Q.    It was unlawful for me to move to quash?

14     A.    Absolutely.  I issued a subpoena.  You want to quash,

15   you make a motion.  You don't write to the bank to say don't

16   obey the subpoena because I'm going to quash it.

17     Q.    Well, didn't I make a motion that you denied?

18     A.    That's right but you already advised the bank before

19   that.

20     Q.    All right.  I advised the bank that I was going to

21   make a motion.

22     A.    That's right.

23     Q.    I made the motion and then you denied the motion.

24     A.    That's right.

25     Q.    So what you're saying it was unlawful for me to tell

- VM -

647

HON. MICHAEL L. PESCE - PEOPLE - CROSS/MR. MITCHELL

1    the bank that I was going to make a motion to quash?

2         A.    I thought so.

3         Q.    Oh, you thought so?

4         A.    It was my directive.

5         Q.    I see.

6         A.    The subpoena was my directive.

7         Q.    Was the bank a party to the -- your subpoena?

8         A.    Yes.

9         Q.    So if I had been successful in moving to quash, would

10   it have --

11              MR. MITCHELL:  Withdrawn.

12        Q.    Would it have been appropriate for me to give notice

13   to a party of the subpoena as to what my actions were --

14              MR. CAPPOCK:  Objection.

15        Q.    -- before I filed a motion?

16              THE COURT:  Sustained.

17              Judge, these were the records of the bank; is

18        that correct?

19              THE WITNESS:  These are bank records relating to

20        his account, Mr. Mitchell's.

21        Q.    Did I tell you I had trouble getting my records from

22   Chase Bank?

23        A.    Yes, you did.

24        Q.    I told you that throughout the entire time?

25        A.    And other banks, I think, also.

- VM -

658

HON. MICHAEL L. PESCE - PEOPLE - REDIRECT/MR. CAPPOCK

1    responsibility to the Estate of Charles Brown?

2         A.   No, it did not.

3         Q.   Did this mistake negate the defendant's

4    responsibility with regards to not properly providing the sale

5    proceeds from the sale of 302 St. James to the estate?

6         A.   No.

7         Q.   Did the court -- and by the court I mean you -- ever

8    give the defendant approval or permission to keep the money

9    from the sale of 302 St. James Place?

10        A.   Absolutely not.

11             MR. MITCHELL:  Objection.  Withdrawn.

12             THE COURT:  Overruled.

13        Q.   You reference a court order that makes someone a

14   guardian.  Does that order write out the responsibilities of

15   the guardian?

16        A.   Yes, it does.

17        Q.   Do Supreme Court judges investigate cases where there

18   are criminal allegations?

19        A.   We do a preliminary look.  We take a preliminary look

20   usually by appointing someone to get some information for us.

21        Q.   After that preliminary look -- and would it be fair

22   to say that that preliminary look was done in this case by

23   Charles Emma?

24        A.   Yes.

25        Q.   After that preliminary look is done, does the Court

- VM -

L. Simmons - Direct/Cappock                    687

1          THE COURT:  Please have a seat.  If you would get

2     as close to the microphone as you can.  You can move it

3     up, down, left, right, whatever is comfortable for you.

4     Please speak into it and please keep your voice up during

5     the testimony, okay?

6          THE WITNESS:  Okay.

7          THE COURT:  Mr. Cappock, go ahead.

8    DIRECT EXAMINATION

9    BY MR. CAPPOCK:

10     Q    Ma'am, could you please say your name for the record

11    again.

12     A    Linda Simmons.

13     Q    Where do you live.  What neighborhood?

14     A    In Bedford-Stuyvesant.

15     Q    How long have you lived there?

16     A    About 40 years.

17     Q    Are you employed?

18     A    Yes.

19     Q    How are you employed?

20     A    New York City Police Department.

21     Q    For how long have you been employed with the New York

22    City police department?

23     A    Over 30 years.

24     Q    What position do you currently hold there?

25     A    Detective.

L. Simmons - Direct/Cappock                          688

1     Q      What command do you work for?

2     A      Two-eight detective squad up in Harlem.

3     Q      Do you know an individual by the name of Minnie

4  Simmons?

5     A      Yes, I do.

6     Q      How do you know her?

7     A      That's my mother.

8     Q      Could you describe your relationship with your mother

9  and any other members of Minnie Simmons' family?

10    A      We're close.  That's my mother.  She has three

11  daughters.  I have two other sisters.  She's not able to care

12  for herself totally right now, so we go back and forth to the

13  nursing home visiting.

14    Q      Where is that nursing home located that she lives in?

15    A      It's on Herkimer between Buffalo and Rochester.

16    Q      How old is your mother?

17    A      Eighty-two.

18    Q      Did your mother raise you and your sisters?

19    A      Yes.

20    Q      Could you describe what family life was like growing

21  up.

22    A      My father was in the air force.  We traveled the

23  world, we were born in different countries.  So it was just us.

24  We didn't have family in the different countries that we

25  traveled.  So we depended upon each other.

hh

L. Simmons - Direct/Cappock                    692

1    Q    Is she able to leave -- today, is she able to leave

2    the nursing home?

3    A    No.

4    Q    Why not?

5    A    Because she can't walk.

6    Q    Do you know an individual by the name of Charles

7    Brown?

8    A    Yes.

9    Q    Who is that?

10   A    That was my uncle.

11   Q    How is he related to you and your mother?

12   A    That's my mother's sister's husband.

13   Q    Is Charles Brown currently alive?

14   A    No.

15   Q    Do you recall when he passed away?

16   A    Sometime in June 2003.

17   Q    Now, after Charles Brown passed away are you aware if

18   there came a time that there were any estate proceedings?

19   A    Yes.

20   Q    Was a will probated?

21   A    Yes.

22   Q    Are you aware who the executor of that estate was?

23   A    My mother.

24   Q    Is your mother still the executor of that estate?

25   A    I don't think so.  Not right now.

L. Simmons - Cross/Mitchell                707

1    Q    Do you have any awareness of anybody else having been

2   given permission and authority to sign your mother's name to any

3   type of financial documents or other documents?

4    A    No.

5              MR. CAPPOCK:  No further questions at this time,

6        Your Honor.  I'll remove the exhibit from the overhead.

7              MR. MITCHELL:  That's it?

8              THE COURT:  Yes, Mr. Mitchell.  You may proceed.

9              MR. MITCHELL:  One moment, Judge, please.

10             THE COURT:  Yes, sir.

11  CROSS EXAMINATION

12  BY MR. MITCHELL:

13   Q    Good afternoon.  No, good morning.

14   A    Good morning.

15   Q    When we first met about this particular business, I

16  presented papers to sign with regard to retaining me; is that

17  correct?

18   A    Yes.

19   Q    And I discussed with your family what my fee would be,

20  correct?

21   A    On the paper it said -- I remember it saying a certain

22  percentage.  But I don't remember what it was.

23   Q    I understand.  When I came to your home and discussed

24  my fee arrangement with your mom and you, I didn't require that

25  your family give me any money up front, correct?

hh

L. Simmons - Cross/Mitchell                    708

1      A    I believe so.

2      Q    That's correct?

3      A    Yes.

4      Q    And, in fact, during the entire time that I

5  represented your family I never asked your mother to write me a

6  check, correct?

7                 MR. CAPPOCK:  Objection, Your Honor.

8                 THE COURT:  Are you aware of whether Mr. Mitchell

9            was paid by you, your mother, or any member of your family

10           while he represented them.

11                THE WITNESS:  He wasn't paid by me, but I don't

12           know about anybody else because I wasn't around on the

13           other visits.

14     Q    Do you know if your mother ever paid me?

15     A    No, I don't know.

16     Q    You don't know.  Okay.  The retainer agreement that I

17  had with you -- with you and your mom, rather, this was your

18  mom -- was a percentage; it wasn't an hourly rate, correct?

19     A    I believe so, yes.

20     Q    Now, it's your testimony that I was retained by your

21  mother sometime in early 2005, correct?

22     A    That's around that date.  I'm not quite sure.

23     Q    Within a year of the sale of the house; would that be

24  fair to say.

25     A    Yes.

hh

L. Simmons - Cross/Mitchell                    709

1     Q     And more closer to a year than eight months; would

2   that be fair to say?

3     A     I don't recall the time.

4     Q     Fair enough.

5           Do you remember any of the circumstances of what 302

6   St. James Place was like at the time that your family retained

7   me?

8     A     No, I don't.

9     Q     Had you visits 302 St. James at any point in

10  2004-2005?

11    A     No.

12    Q     You remember there were tenants, correct?

13    A     Right.   I know there were tenants.

14    Q     Were the tenants paying rent?

15    A     I know that there was a guy that was living there that

16  would bring stuff, the money to the house to my mother.   That's

17  all I know.   There was an individual that was collecting the

18  rent.

19    Q     Do you know if, do you know if 302 St. James Place had

20  become an SRO place?

21    A     No.   I don't know.

22    Q     Do you know anything about the physical condition of

23  302 St. James, whether or not it was in disrepair between 2004

24  and the time we sold it in 2005?

25    A     No, I don't know.

hh

Balsam - Cross/Mitchell

1   already distributed because of the sale of the house, because of

2   the sale of the house in December.  You see that?

3      A   Yes.

4      Q   Is that a true statement?

5      A   No.  At the time I did not withdraw the proceeding

6   because I believed the assets were distributed.

7      Q   So, now --

8           THE COURT:  Okay.  Wait.  At that time was your

9     petition still in place?

10         THE WITNESS:  At the time that this conversation

11    took place the -- no, the petitioned had already been

12    withdrawn.  October 27, 2007 was when the petition was

13    withdrawn.  I believe this conversation --

14         THE COURT:  When was it withdrawn?

15         THE WITNESS:  October 2007.

16      Q   The petition was withdrawn in October 2007?  So you

17   had withdrawn the petition already?

18      A   Yes.

19      Q   By the time this report was prepared you had withdrawn

20   the petition?

21      A   Yes.

22      Q   All right.

23         THE COURT:  But the petition was in place in

24     2005; is that correct?

25         THE WITNESS:  The petition was commenced in 2007.

Balsam - Cross/Mitchell                    770

1          THE COURT:  Okay.  There was no petition filed

2      prior to 2007?

3          THE WITNESS:  No.

4          THE COURT:  Okay.  Go ahead.

5      Q    Wait a minute.  Isn't it true that you guys filed

6   compulsory accounting petitions as early as 2004?

7      A    No.

8      Q    You filed notices of claim as early as 2004?

9      A    We filed a claim against the estate.

10     Q    In 2004?

11     A    I believe that was the first time, right.

12     Q    And that would be before December of 2005, correct?

13     A    Before September 2005?

14     Q    Before December of 2005 HRA filed claims against the

15  estate?

16     A    Yes.

17     Q    And the claims were for $292,000?

18     A    I believe so, yes.

19     Q    So if there was a closing in 2005 you already had a

20  claim in 2004, correct?

21     A    I'm sorry.  I don't understand the question.

22         MR. MITCHELL:  Withdrawn.  I'll withdraw it.

23     Q    Anyway, let's get back to this report of guardian ad

24  litem, Page 3.  So it's your testimony then that -- withdrawn.

25         Let me ask you this:  You see where Mr. Emma says that

hh

Balsam - Cross/Mitchell                                771

1   he's an affiant on the front page?

2       A    I'm sorry.  I misplaced the page.

3       Q    First page.

4       A    In the exhibits.  What was the exhibit.

5       Q    No, the guardian, the report of the guardian ad litem

6   that we were just looking at.

7       A    Right.  I just misplaced the page.  The document

8   closed.

9                THE COURT:  I think I can find it.

10               MR. MITCHELL:  Thank you, Judge.

11      Q    Take a look at the first page of that document.  You

12  see where it says "report of guardian ad litem" and then index

13  number, there's a caption.  You see all that?

14      A    Yes.  Um-hum.

15      Q    You see in the second, maybe the second sentence of

16  the first paragraph, it says "the Court authorized your

17  affiant."  Do you see that?

18      A    "The Court..."

19      Q    Authorized your affiant?

20      A    Yes.

21      Q    You're a lawyer, right?

22      A    Yes.

23      Q    Could you tell the jury what an affiant is?

24      A    Affiant is the person who is making the affidavit.

25      Q    And that means that this is a sworn-to document?

Balsam - Cross/Mitchell                    772

1        A      Correct.

2        Q      So what Mr. Emma said on page three about this

3    proceeding was withdrawn in October 2007:  "I contacted HRA and

4    the attorney advised me they withdrew the proceeding only

5    because they believed the estate assets were already distributed

6    because of the sale of the house in December 2005," he said

7    something and swore to something that you're saying is not true?

8               MR. CAPPOCK:  Objection, Your Honor.

9               THE COURT:  Sir, are those facts true as you know

10       them?

11              MR. MITCHELL:  I asked him that, sir.

12       A      The attorney is incorrect.  If he's saying I said

13   that, that's not the reason why I withdrew the petition.  He's

14   incorrect.

15       Q      All right.  Now, when was the first time you read this

16   report by Mr. Emma that we're talking about?

17       A      I don't recall the date the first time I read it.  But

18   I guess upon receipt.

19       Q      Upon receipt?  So you think that you reviewed it

20   sometime in 2009?

21       A      Possibly yes.

22       Q      Possibly?  Okay.  This attorney swore to something

23   that was not true.

24              MR. CAPPOCK:  Objection, Your Honor.

25              THE COURT:  Sustained.

Balsam - Cross/Mitchell                         773

1   Q    No, it's a question.

2        According to your testimony this attorney swore to

3   something that was not true.

4        MR. CAPPOCK:  Objection, Your Honor.

5   Q    And I'm asking you, you immediately went to the court

6   and told them that this report was incorrect, right?

7        THE COURT:  That's a number of questions.

8   Sustained.

9   Q    Okay.  Let me ask you this.

10       THE COURT:  Sir, did you tell Mr. Emma what is in

11  his report that he submitted to the Court as guardian ad

12  litem in regard to the status of the HRA claim?

13       THE WITNESS:  Did I have a conversation with

14  Mr. Emma regarding his report?

15       THE COURT:  Yes.

16       THE WITNESS:  I don't recall I did.  No.

17       THE COURT:  Did you speak to Mr. Emma?

18       THE WITNESS:  I have spoken to Mr. Emma over the

19  course of this proceeding, yes.

20       THE COURT:  Did he speak to you about the status

21  of the HRA claim against the estate?

22       THE WITNESS:  Yes, he did.

23       THE COURT:  Do you know when that was?

24       THE WITNESS:  We've had numerous telephone

25  conversations over the years.  So the exact time as to

Balsam - Cross/Mitchell                    774

1      when -- we specifically spoke about the claim many times.

2      But as far as exact dates I don't recall.

3                  MR. MITCHELL:  May I inquire, Judge?

4                  THE COURT:  Go ahead, sir.

5      Q    This report of the guardian ad litem, do you know who

6      it was written for the benefit of?

7      A    I believe it was requested by the court.

8      Q    Judge Pesce?

9      A    I believe so.

10     Q    So after you received the report in March of 2009 did

11     you write Judge Pesce and tell him that Mr. Emma made a material

12     mistake in his report?

13     A    I did not write any such letter, no.

14     Q    What is a motion?  Tell the jury because they don't

15     know.  Or they might not know.

16     A    A motion is brought by a party, a party in the action

17     for some relief.

18     Q    We shouldn't-- lawyer speak.  A motion is when you ask

19     the judge to do something, right?

20     A    Yes.

21     Q    So if I want to play baseball here and I say, "Judge,

22     I want to play baseball," I say I make a motion to play

23     baseball, correct?

24     A    Um-hum.

25     Q    Did you make a motion to correct what it was that

hh

Balsam - Cross/Mitchell                    775

1   Mr. Emma wrote in this report at any time in your life?

2        A    No, I did not.

3              THE COURT:  When was the petition -- what was the

4   date of the withdrawal of the petition?

5              THE WITNESS:  October 2007.

6              THE COURT:  But the claim was still on the

7   estate; is that correct?

8              THE WITNESS:  Yes.

9              MR. MITCHELL:  All right.  Let me ask you this,

10  sir.  Please show -- this is Defense F for identification.

11             COURT OFFICER:  Mark it, Your Honor?

12             THE COURT:  It's been marked previously for

13  identification.  So it does not have to be marked again.

14             The witness has the document.

15       Q    Have you ever seen that letter before, sir?

16       A    No, I don't recall seeing this letter.

17       Q    Look on the second page.  You see your name copied

18  there?

19             THE COURT:  Let me see.

20             MR. MITCHELL:  Sure?

21                  (Witness handing to Court)

22             THE COURT:  All right.  Step up.

23             (Discussion at the bench off the record)

24             THE COURT:  Just hang on to this and listen to

25  the next question from Mr. Mitchell.

Balsam - Cross/Mitchell                  776

1    Q    So you remember seeing this letter?

2    A    No, I don't.

3    Q    Or receiving it?

4    A    I don't recall receiving the letter.

5    Q    Let me ask you this.  Do you recall-- withdrawn.

6         THE COURT:  Sir, do you recall telling Judge

7    Pesce or Mr. Emma that the Medicaid lien had been

8    withdrawn by the New York City HRA in October of 2007 as a

9    result of being informed by Mr. Mitchell that the funds

10   from the estate were already distributed?

11        Do you recall telling that to either Judge Pesce,

12   Mr. Emma, or anyone else related to this case?

13        THE WITNESS:  No, I don't recall saying that.

14        THE COURT:  Please look at this document.  Does

15   that refresh your recollection as to whether you told

16   anyone that?

17        MR. MITCHELL:  Thank you, Judge.

18        THE WITNESS:  I don't recall.

19        THE COURT:  Does that document refresh your

20   recollection in regard to the subject matter of the

21   question?

22        THE WITNESS:  No.

23        THE COURT:  Let's move on then.

24        MR. MITCHELL:  Thank you, Judge.

25   BY MR. MITCHELL (Cont'g):

hh

JOANNE SIMMONS -- PEOPLE -- DIRECT/MR. CAPPOCK

1     Q.   Do you know an individual by the name of Charles

2  Brown?

3     A.   Yes, that was my uncle.

4     Q.   How is he related to your mother?

5     A.   That was her sister's -- her older sister's husband.

6  Her brother-in-law.

7     Q.   Is Charles Brown still alive?

8     A.   No.

9     Q.   Do you recall when he passed away?

10    A.   June of 2003.

11    Q.   Are you aware if there were any estate proceedings

12  after he passed away?

13    A.   Yes, there -- they were working on -- yes, my mother

14  was made the executrix of the will.

15    Q.   Was this will probated?

16    A.   Yes, from my understanding it was.

17    Q.   Are you aware of who was named the executor of the

18  estate?

19    A.   My mother.

20    Q.   Do you know an individual by the name of Eugene

21  Davis?

22    A.   Yes.

23    Q.   Who is that?

24    A.   He is my uncle's nephew.  But he's not related to me.

25  He's on the other side, my uncle's side.

-- VM --

JOANNE SIMMONS - PEOPLE - DIRECT/MR. CAPPOCK

1    Q.    When you say your uncle's nephew, you mean Charles

2    Brown?

3    A.    Charles Brown's nephew.

4    Q.    Do you know of any connection he has to the Estate of

5    Charles Brown?

6    A.    I believe that now he would be the executor because

7    my mother's no longer physically able to go any place.

8    Q.    Did she stop becoming the executor for that reason?

9    A.    Um-hum.

10   Q.    Are you aware of any real property that Charles Brown

11   owned?

12   A.    Yes, he owned a home at 302 St. James Place,

13   Brooklyn, New York.

14   Q.    Have you ever been to that house?

15   A.    Yes, we used to go there a lot growing up.

16   Q.    When would you say you last been to that house?

17   A.    Oh, last time was probably, approximately, 20 years

18   since I left the state.

19   Q.    Do you know what, ultimately, happened to that house

20   following the death of Charles Brown?

21   A.    The house was sold.

22   Q.    How were you aware that the house was sold?

23   A.    The house was sold by Mr. Mitchell.  I asked him to

24   sell the house to pay the vendors.

25   Q.    What is Mr. Mitchell's first name?

- VM -

848

JOANNE SIMMONS - PEOPLE - DIRECT/MR. CAPPOCK

1    A.    Mr. Stephen Mitchell.

2    Q.    Have you met Mr. Stephen Mitchell in person before?

3    A.    Yes, I have.

4    Q.    I would ask if you would look around the courtroom,

5    if you recognize anybody you know to be Stephen Mitchell, can

6    you point him out and indicate an item of clothing he was

7    wearing?

8    A.    Right over there with it the -- it looks like a tan

9    or a gray jacket.

10            THE COURT:   Indicating the defendant.  Thank

11    you.

12    Q.    Who did the defendant represent in this sale?

13    A.    Minnie Simmons.

14    Q.    Who hired the defendant?

15    A.    Minnie Simmons did, my mother.  She hired him, but I

16    spoke to him about what was going on and my mother signed for

17    him to sell the house.

18    Q.    When you say you spoke to him about what was going

19    on, what specifically are you referring to?

20    A.    Well, I spoke to him about exactly what we wanted

21    done for the house to be sold.  There were outstanding bills on

22    the house, et cetera, so he was supposed to, basically, take

23    care of and finish any outstanding business that my mother, at

24    that time, had the responsibility of fulfilling, like selling

25    the house and paying the other nursing home, et cetera.  So

- VM -

899

PROCEEDINGS

1    believe February 24, 2010.  In that order Judge Pesce

2    explicitly states that the house was sold pursuant to an

3    order of the Surrogate's Court and, therefore, he did not

4    have any jurisdiction with regard to the matter.

5               He says that after motions that were filed to

6    eliminate jurisdiction by the Travelers Insurance Company,

7    who did not want to pay Mr. Emma and Ms. Weindorf on their

8    application for the bond to be paid, Judge Pesce agreed

9    that he did not have jurisdiction but paid Mr. Emma and

10   Ms. Weindorf for doing an accounting.  He did not exercise

11   jurisdiction and acknowledge that the Surrogate's Court

12   had jurisdiction.  It's very clear.  There is no dispute

13   about that.

14              So, based on that, I don't see any way that

15   Judge Pesce could substitute for Minnie Simmons in this

16   case as the permission or authority witness, given that he

17   did not have authority over her.  The order didn't come

18   from him.

19              THE COURT:  All right, Mr. Cappock.

20              MR. CAPPOCK:  Yes, Your Honor, a few points in

21   opposition to that.

22              THE COURT:  I just want to note that

23   Mr. Mitchell has referred to this order earlier in motion

24   papers.  I'm sure it's contained in the file in his motion

25   to dismiss for lack of jurisdiction.  All right, go ahead,

- VM -

900

PROCEEDINGS

1    Mr. Cappock.

2         MR. CAPPOCK:  Yes, Your Honor.  I am aware of

3    the motion Mr. Mitchell is referring.

4         THE COURT:  You mean the order to which he is

5    referring?

6         MR. CAPPOCK:  The order to which Mr. Mitchell

7    just referred.

8         THE COURT:  Right.

9         MR. CAPPOCK:  And the defendant misinterprets

10   the impact of that order.  He is not saying that he had no

11   jurisdiction involved --

12        THE COURT:  Just get to the issue how you prima

13   facie established lack of permission and authority.

14        MR. CAPPOCK:  Yes, Your Honor.  In several ways,

15   No. 1, that despite the issue of the order, Judge Pesce

16   clearly testified that the court oversees the money, that

17   the executor, the guardian, any attorney acting on that

18   person's behalf, has to seek permission from the Court in

19   order to deviate at all from the stated purpose of the

20   monies of the guardianship and then the estate.  This was

21   never done.  Judge Pesce clearly testified that permission

22   and authority was not given.

23        Now, we heard testimony from Collin Bull, who is

24   currently overseeing the estate, that there was no

25   permission or authority given.  There's also

                          -- VM --

913

PROCEEDINGS

1    evidence presented in this case by the district attorney

2    to support their claim that I stole money.  And what they

3    tried to do is they used the check registry.  And what

4    they're going to argue is that, circumstantially, they

5    have a case.

6          What happened, Mr. Nelson will be able to

7    testify to, is that all they have is a check registry and

8    that the numbers that are in that check registry really

9    don't mean anything in terms of establishing fraud from

10   any sort of legitimate audit standard because they are not

11   backed up with communications with the person authorized

12   or may have authorized the transactions, Minnie Simmons.

13   That is a standard practice with regard to forensic

14   accounting and auditing procedure.

15         So my argument for using Mr. Nelson is that the

16   People's evidence is substandard.  It does not reach.  And

17   because it's substandard, it really isn't admissible, but

18   it's already been admitted.  So my argument to the jury is

19   that because the evidence is substandard, and the People

20   provided substandard evidence, you cannot believe it and

21   there is reasonable doubt for that reason.

22         The other thing that Mr. Nelson will testify is

23   that he has a considerable amount of experience in dealing

24   with attorneys and attorney trust accounts.  He has

25   audited them.  He has advised attorneys in maintaining the

- VM -

914

PROCEEDINGS

1    accounts.  He would testify that, typically, attorneys

2    only pay creditors at closing or directly associated with

3    the property, and it is not unusual for attorneys to put

4    money in their escrow accounts to pay creditors who are

5    independent of and not directly associated with the

6    closing.  That would be an impeachment of the People's

7    suggestion that certain creditors that were paid were not

8    part of the closing.

9              THE COURT:  Well, what is the foundation for

10   his -- beyond his speculating that that may be --

11             MR. MITCHELL:  Speculating --

12             THE COURT:  -- the practice of some attorneys,

13   what, in this case, gives concrete substance to that?

14             MR. MITCHELL:  What he just said?  What he is

15   proposed to say?

16             THE COURT:  Right.  I'm supposed to allow him to

17   say in some cases attorneys pay some of the outstanding

18   balances outside the four corners of the closing.

19             MR. MITCHELL:  No, he is not saying that.  He's

20   saying that that's typically, and he's an expert in the

21   field.

22             THE COURT:  But does he point to something

23   specifically rather than putting this in the heads of the

24   jurors just to have them speculate that maybe --

25             MR. MITCHELL:  What do you mean?

                     - VM -

PROCEEDINGS

1    Evidence.

2              THE COURT:  Well, that doesn't do me any good.

3              MR. MITCHELL:  This is such a basic -- I mean,

4    could I research it?  Yes.  But this is such a basic form

5    of admissible evidence that I didn't bother look at the

6    1912 case that would allow this in.

7              THE COURT:  So that I could do some research,

8    when is Gray-Felder going -- she's number two here?

9              MR. MITCHELL:  No, she's the first person I

10   wanted to call.

11             THE COURT:  Okay.  You could introduce that

12   later.

13             MR. MITCHELL:  Yes, I could introduce it later.

14             THE COURT:  Let's put this to the side and start

15   moving on.  Let me give you my decision on Mr. Nelson.

16             Now, I have reviewed his qualifications and, I

17   guess, maybe I heard you misspeak, you referred to him as

18   an attorney?  He is a certified public accountant.  Is

19   that correct, Mr. Mitchell?

20             MR. MITCHELL:  Yes, he's not an attorney.

21   Licensed in New Jersey and New York.

22             THE COURT:  All right.  I'm going to use this CV

23   as the basis of my decision.  Clearly, he is a certified

24   public accountant.  And I will put on the record the CV

25   that has been presented to me.

                          ~ VM ~

925

PROCEEDINGS

1          Putting that aside, I've also considered the

2     offer of proof in regard to what he would testify to.  The

3     Court must decide should the subject matter be allowed as

4     part of expert testimony, this is in the sound discretion

5     of the Court.  I'll be quoting now from Richardson on

6     Evidence.  Section 7-301:  "The guiding principle is that

7     expert opinion is proper when it would help to clarify an

8     issue calling for professional or technical knowledge

9     supposed by the expert and beyond the kin of a typical

10    juror.  It is for the trial court, in the first instance,

11    to determine when jurors are able to draw conclusions from

12    the evidence based on their own day-to-day experience,

13    day-to-day experience, their common observation and their

14    knowledge and when they will be benefited by the

15    specialized knowledge of an expert witness."

16         In that same section the author notes:  "The

17    decision to allow expert testimony, thus, involves an

18    assessment of whether the testimony will be helpful as

19    opposed to unduly confusing.  Thus, expert testimony is

20    offered to help clarify an issue, not to confuse the jury,

21    including not to have the jury speculate."

22         The Court concludes and notes that a typical

23    juror is familiar with bank accounts, with deposits and

24    withdrawals.  The proposed testimony of Mr. Nelson is not

25    substandard, that is he cannot point to any error in the

- VM -

926

PROCEEDINGS

1    presentation made by the district attorney in regard to

2    the bank accounts or the summary prepared in regard to the

3    bank accounts.  No error has been identified.

4           In addition, the fact that Mr. Verlezza did not

5    talk to Minnie Simmons, although not argued this morning,

6    is before the jury for argument on the issue of permission

7    and authority, and such a failure does not preclude the

8    argument that the defendant took the money without

9    permission and authority, circumstantially.

10           In the Court's opinion, the jury does not need

11   expert testimony to clarify the testimony regarding bank

12   records.  The People are not required to prove larceny by

13   an IRS or an audit performed pursuant to any standards.

14   What was admitted into evidence here was simply a summary,

15   a summary of the bank records of four accounts.  The

16   financial evidence is simple to understand and within the

17   can of the average juror.

18           Next, allowing Mr. Nelson to testify as to the

19   practices of attorneys in closings is, certainly, beyond

20   the area of his purported expertise.  Moreover, the fact

21   that some attorneys may pay expenses after the closing of

22   title is simply -- that testimony was simply introduced as

23   speculation into this case and, thus, does not clarify any

24   issue for the jury, but on the other hand, confuse the

25   jury by having the jury engage in speculation.

                        - VM -

927

PROCEEDINGS

1            Thus, it's the Court's decision that Mr. Nelson,

2    based upon the offer of proof, will be precluded from

3    testifying.  The defense has an exception.

4            MR. MITCHELL:  Your Honor, I just want to note,

5    for the record, in clarity that the People were able to

6    produce and pose financial people.  I wouldn't say they

7    were experts but financial witnesses on their case, and

8    the defense is being precluded from challenging the

9    evidence that they put forth with someone on a greater

10   footing with regard to financial evidence.

11           THE COURT:  You have an exception to my ruling.

12           MR. MITCHELL:  I will tell Mr. Nelson he could

13   be excused.

14           THE COURT:  Yes.

15           MR. MITCHELL:  Thank you.

16           THE COURT:  Mr. Mitchell, also, ask your first

17   witness to be ready to come into the courtroom.  So we'll

18   now bring the jury in.

19           (Whereupon, there was a pause in the

20   proceedings.)

21           THE COURT:  Mr. Cappock, the stipulation could

22   be read into the record.

23           MR. CAPPOCK:  Thank you, Your Honor.  Should I

24   have it marked now or we'll mark it on the record?

25           THE COURT:  Mark it now.  You will rest your

- VM -

1007

PROCEEDINGS

1   act on behalf of another?  That was in the previous

2   definition read by the Court but it seems that that wasn't

3   in this part.

4          THE COURT:  Hang on just a second.  For the

5   purposes of this case, a fiduciary is a guardian appointed

6   to act on behalf of an incapacitated person, and also, a

7   fiduciary is an executor acting on behalf of the estate of

8   a deceased.  Each fiduciary, the guardian and an executor,

9   assumes a duty to act in good faith with care, candor,

10  loyalty in fulfilling his or her obligations.  Is that

11  good?

12         MR. CAPPOCK:  That's good.  Are we going to put

13  in the part at the end that was there before, fulfilling

14  the obligations to the court or to the estate?

15         MR. MITCHELL:  No, the problem I have is the

16  word candor, I got to tell you, because that is a debate

17  in this case as to what extent candor is required.

18         THE COURT:  Well, there again -- well, if we

19  are -- I'm not going to allow you to argue to the jury

20  that Judge Pesce didn't have jurisdiction over you.

21         MR. MITCHELL:  You're not going to allow me to

22  argue to the jury that --

23         THE COURT:  No, that's a legal argument, not a

24  factual argument, and that's not for the jury.

25         MR. MITCHELL:  I noted my objection to that

- VM -

AP-694

1008

PROCEEDINGS

1    because there is testimony by Judge Pesce that there were

2    secret rules that he made up.

3              THE COURT:  No, you can say that in regard to

4    whether this is beyond a reasonable doubt that there was

5    sloppiness, whatever, but that's an issue of law.

6              MR. MITCHELL:  Well, did the Court decide --

7              THE COURT:  Well, I will decide that you had no

8    constitutional or statutory -- I'm not going to charge it

9    to the jury, but that you had no constitutional or

10   statutory duty not to respond to Justice Pesce.

11             MR. MITCHELL:  Okay, I will take exception to

12   that and object to it.  I would ask the Court for the

13   legal basis that you could give for that.  Stephen

14   Mitchell didn't have to respond to Judge Pesce at all.

15   The person that had to respond to Judge Pesce is Minnie

16   Simmons.

17             THE COURT:  The jury will decide who had what

18   duty and how they feel the circumstances played out.

19             MR. MITCHELL:  Okay, but I, certainly, can argue

20   to the jury that Stephen Mitchell was not the fiduciary

21   and didn't have a responsibility to answer, it was Minnie

22   Simmons, and Minnie Simmons was capable of answering.

23             Let me put this on the record --

24             THE COURT:  No.  And he's going to respond, you

25   know, look at Minnie Simmons.

- VM -

AP-695

1009

PROCEEDINGS

1      MR. MITCHELL:  Yeah, let him.  I hope he does.

2  Let me ask you this -- let me just place this on the

3  record.

4      THE COURT:  Let's do one thing at a time.  Let's

5  finish this.  Let's not get off on a --

6      MR. MITCHELL:  But it's important to this.

7      THE COURT:  I know it's important because you

8  want to argue jurisdiction to this jury.  You want this

9  jury to nullify the facts in this case because --

10     MR. MITCHELL:  That's correct, I do.  I

11  absolutely would like them to do that.

12     THE COURT:  And that is something that we know

13  that it happens but the Court is in a position to avoid

14  that at all costs.

15     MR. MITCHELL:  I understand.

16     THE COURT:  They're not a legislature.  They're

17  finders of fact in a criminal case.

18     MR. MITCHELL:  There is one thing I would like

19  to point out, and it was something that I was precluded

20  from arguing.

21     THE COURT:  You see here, we are not doing this.

22  Let's get back to what we were doing.

23     MR. MITCHELL:  Sir, it does relate to what we

24  were doing.

25     THE COURT:  No, let's go.  You had an objection

- VM -

1010

PROCEEDINGS

1   to candor.

2          MR. MITCHELL:  Yes, I did.

3          THE COURT:  Okay.  Are you denying that a

4   fiduciary does not have the duty of candor?

5          MR. MITCHELL:  I think it depends.  I think that

6   a fiduciary has an absolute right to refuse to answer

7   questions that a judge may demand of them and that the

8   appropriate measure of that is for the judge to hold the

9   fiduciary in contempt, have a hearing and make an

10  assessment as to whether or not that fiduciary had --

11         THE COURT:  That's the one thing in this case I

12  can't believe didn't happen.

13         MR. MITCHELL:  What?

14         THE COURT:  That Judge Pesce ordered you on a

15  certain day and then proceeded to hold you in contempt.

16         MR. MITCHELL:  And you know why he didn't?

17  Because he didn't have jurisdiction, and that's why I

18  object to you not letting me argue jurisdiction.  Pesce

19  knew that he didn't have jurisdiction and that if he did

20  hold me in contempt, I could have taken a writ to the

21  Appellate Division and he would have lost, and he didn't

22  want to suffer that embarrassment.  Since I do, like, a

23  billion appeals, I would have made sure he lost.

24         That's why he didn't hold me in contempt,

25  because he couldn't.  He didn't have jurisdiction.  That

- VM -

AP-697

1011

PROCEEDINGS

1    is a writable offense that I would have been able to avoid

2    an appellate process and go right across the street to the

3    Appellate Division and get him smack down for doing so,

4    especially, especially, since I was the lawyer.  He could

5    have --

6         THE COURT:  I'm not doing this again,

7    Mr. Mitchell.

8         MR. MITCHELL:  I'm just pointing it out and

9    objecting to --

10         THE COURT:  And if you do it to the jury, I'm

11   going to stop you and I'm going to tell the jury that it's

12   not a defense in this case.  So I warn you right now,

13   you're not going to get into the jurisdiction.

14         MR. MITCHELL:  I'm not going to argue

15   jurisdiction.

16         THE COURT:  You're not.

17         MR. MITCHELL:  I'm not.  What I'm going to do --

18         THE COURT:  Well, that appears to be the case.

19         MR. MITCHELL:  No, I'm not.

20         THE COURT:  Okay, let's get back to what we were

21   doing.  You objected to candor.

22         MR. MITCHELL:  Yes.

23         THE COURT:  Do you have any other objections?

24         MR. MITCHELL:  No.

25         THE COURT:  Okay, I have everyone's argument on

-- VM --

1148

PROCEEDINGS

1    that -- I think we put on the record quite a bit the

2    jurisdictional questions that I have objections to.  I

3    think that the jury should have been charged with regard

4    to that with respect to the ownership.

5              THE COURT:  First, the indictment has the owner

6    as the Estate of Charles Brown.  So that's why that was

7    charged.

8              In regard to the jurisdictional, as I've

9    indicated in my previous rulings in this case, that is a

10   matter of law, not a jury issue.

11             MR. MITCHELL:  I think in this case, because of

12   the testimony of Judge Pesce with regard to his

13   jurisdiction and my inability to cross-examine him on that

14   issue, I think that that -- I take exception to that.

15             THE COURT:  You have an exception.

16             Are there any requests for additions,

17   Mr. Cappock?  You made that additional.

18             MR. CAPPOCK:  Other than the special

19   investigatory techniques.

20             THE COURT:  Usually that comes in -- that's

21   fingerprint DNA.  That may be more confusing than it's

22   worth.  It says any scientific or investigative technique.

23   I don't think it's appropriate.

24             Do you have any request for additional charges?

25             MR. CAPPOCK:  No, I have no other additional

- VM -

SUMMATIONS - PEOPLE

1    Likewise, the statements that were not based on

2    any firsthand knowledge by Judge Pesce and by Charles

3    Emma, which Judge Pesce admitted he made an error, are,

4    again, irrelevant, because the claim was never withdrawn.

5    The claim still exists.  Regardless of what mistakes Judge

6    Pesce might have made in his second-hand information on

7    what the existence was of the claim, which he later

8    corrected, that doesn't magically make $291,000 appear in

9    HRA's bank account from the Estate of Charles Brown.  In

10   fact, as you saw from Judge -- as you heard testimony from

11   Judge Pesce's letter, some of his basis for his

12   misapprehension was based on the defendant's own

13   self-serving statement.  So, again, that is irrelevant to

14   whether this claim still exists.

15   We know that the assets weren't distributed to

16   anybody other than the defendant himself.  And that was

17   not the reason why the petition was withdrawn, and that is

18   why the claim still exists.  You heard testimony that

19   those proceeds, the $411,000, were absolutely subject to

20   being attached by the HRA claim, but they never were

21   because they were never put into the estate in the first

22   place as the family wanted.

23   Now, you heard from Judge Pesce who oversaw the

24   guardianship proceeding and, as you heard his testimony,

25   he has an oversight function in terms of this case.

- VM -

1116

SUMMATIONS - PEOPLE

1    Nothing can happen without his approval, without the

2    Court's approval.  And beyond the sale taking place, he

3    did not approve any of this.  The removal of tenants, that

4    shouldn't have been taken place, according to the terms of

5    the contract in the first place, was nothing that was

6    authorized to come out of the estate in Judge Pesce

7    either.  There were no expenditures that were permitted by

8    Judge Pesce.  The defendant did not have the permission or

9    the authority of the Court overseeing this estate to take

10   the actions that he did either.

11        The defendant, however, did have a

12   responsibility that he did not live up to.  He was

13   repeatedly, repeatedly told to provide a final accounting.

14   Now, the final accounting was finally done but never by

15   the defendant, and it was done by Charles Emma as the

16   guardian ad litem.  That was not a decision, as you heard

17   from Judge Pesce, that was taken lightly.  That was

18   something that was after many adjournments, many second

19   chances for an accounting that was due in 2005 that he was

20   still asking for in 2008, and that the defendant was told

21   that if he didn't come up with an accounting, if he didn't

22   account for the money, that he would be reported to the

23   DA's Office and the Grievance Committee.  Despite those

24   threats, the defendant still never came in with any of the

25   required accounting other than floods and excuses about

- VM -